1  Nicole Lavallee (SBN 165755)
   Email: nlavallee@bermantabacco.com
2  Daniel E. Barenbaum (SBN 209261)
   Email: dbarenbaum@bermantabacco.com
3  Jeffrey Rocha (SBN 304852)
   Email: jrocha@bermantabacco.com
4  Pierce Stanley (SBN 352152)
   Email: pstanley@bermantabacco.com
5  **BERMAN TABACCO**
   425 California Street, Suite 2300
6  San Francisco, CA  94104
   Telephone: (415) 433-3200
7  Facsimile:  (415) 433-6382

8  Catherine Pratsinakis (*pro hac vice forthcoming*)
   Email: cpratsinakis@dilworthlaw.com
9  **DILWORTH PAXSON LLP**
   1500 Market Street, Suite 3500E
10 Philadelphia, PA 19102
   Telephone: (215) 575-7013

11
   *Attorneys for Plaintiff Roberto Verthelyi*
12 *and the Putative Class*

13                **UNITED STATES DISTRICT COURT**

14                **CENTRAL DISTRICT OF CALIFORNIA**

15

16 ROBERTO VERTHELYI, on behalf      )  No.
   of himself and all others similarly )
17 situated,                          )  <u>CLASS ACTION</u>
                                      )
18            Plaintiff,              )  **CLASS ACTION**
                                      )  **COMPLAINT FOR**
19            v.                      )  **RESTITUTION AND**
                                      )  **INJUNCTIVE RELIEF FOR**
20 PennyMac Mortgage Investment Trust )  **VIOLATIONS OF CAL. BUS.**
   and PNMAC Capital Management,      )  **& PROF. CODE § 17200 *ET***
21 LLC,                               )  ***SEQ.***
                                      )
22            Defendants.             )  <u>**JURY TRIAL DEMANDED**</u>
                                      )
23                                    )
                                      )
24 _____    )

25

26

27

28

CLASS ACTION COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF FOR
VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*

Plaintiff Roberto Verthelyi ("Plaintiff"), by and through his undersigned attorneys, brings this class action on behalf of himself individually and all others similarly situated, against Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC (together, "PennyMac," the "Company," or "Defendants").

Plaintiff brings claims for violations of California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.* ("UCL"). The allegations below are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, (i) a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by PennyMac, (ii) a review and analysis of press releases and other public statements, and (iii) a review and analysis of reports, including media reports, about the Company.

## I.    SUMMARY OF THE ACTION

1. This is a class action for restitution and injunctive relief brought against PennyMac on behalf of a class consisting of all persons and entities who own or owned shares of PennyMac's fixed-to-floating rate Series A Preferred Shares (NYSE: PMT-PA) and/or Series B (NYSE: PMT-PB) Preferred Shares (together, "Preferred Shares" or "Series A and B," respectively) at any time between August 25, 2023 and the conclusion of this action (the "Class").

2. Defendant PennyMac Mortgage Investment Trust is a mortgage real estate investment trust ("REIT") that invests primarily in residential mortgage loans and mortgage-related assets. It is externally managed by PNMAC Capital Management, LLC, a wholly-owned subsidiary of PennyMac Financial Services, Inc. (NYSE: PFSI).

3. As offered in 2017, PennyMac's Series A and B Articles Supplementary called for these instruments to transition in 2024 from a fixed-rate

to floating-rate dividend pegged to the three-month London Interbank Offered Rate ("LIBOR").

4.    LIBOR was a key benchmark interest rate between major global banks, published daily by the Intercontinental Exchange.[1]  For decades, LIBOR was used as a benchmark[2] for setting interest rates on debt instruments such as mortgages, corporate loans, and credit cards, as well as for financial products such as derivatives and preferred stock.  As of the end of 2020, the value of financial products referencing USD LIBOR was $223 **trillion**.[3]

5.    It was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in U.S. Dollars ("USD").  However, by 2012, banks were accused by various regulatory agencies of manipulating LIBOR rates.

6.    In 2014, as a response to concerns about the reliability and robustness of LIBOR and other term wholesale unsecured bank borrowing rates, the United

---

[1] *See* Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was it Used*, Investopedia (June 10, 2024), https://www.investopedia.com/terms/l/libor.asp.

[2] "Benchmark" rates set global interest levels for various transactions and have traditionally been used in finance to calculate floating interest rates for numerous financial instruments worldwide and are typically "calculated by an independent body, most often to reflect the cost of borrowing money in different markets." *See* Bloomberg, *Finance, Overview – Benchmark Rates*, *https://www.bloomberglaw.com/external/document/X2M5PMDO000000/finance-overview-benchmark-rates* (last visited June 12, 2024); European Central Bank, *What are benchmark rates, why are they important and why are they being reformed?* (July 11, 2019), https://www.ecb.europa.eu/ecb-and-you/explainers/tell-me-more/html/benchmark_rates_qa.en.html#:~:text=Interest%20rate%20benchmarks%20%E2%80%93%20also%20known,other%20more%20complex%20financial%20transactions.

[3] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3 (Dec. 2, 2022), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20221216a2.pdf.

---

CLASS ACTION COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF FOR VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*                    2

States Department of the Treasury Financial Stability Oversight Council called for the development of alternative interest rate benchmarks.  Later that year, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee* ("ARRC") to help ensure a successful transition from USD LIBOR to a more robust reference rate—its recommended alternative, the Secured Overnight Financing Rate ("SOFR").

7.     By late 2017, as a result of price manipulation, the LIBOR panel banks announced that they would stop publishing LIBOR at the end of 2021 (later extended to June 2023 for USD LIBOR only) to enable time for the market to move away from LIBOR.

8.     In 2018, the ARRC was reconstituted with expanded membership to, among other things, coordinate with the cash and derivatives markets on the risk that LIBOR might not exist beyond 2021.  Additionally, it aimed to develop guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR.

9.     By 2019, the ARRC published guidance on suggested fallback provisions to reduce market disruption in the event of LIBOR's cessation.  This included recommendations for fallback provisions on floating rate notes, bilateral business loans, syndicated loans, securitizations, and residential adjustable-rate mortgages.  The ARRC considered international standards from the International Swaps and Derivatives Association ("ISDA").

10.     Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions to replace LIBOR with SOFR or a SOFR-like equivalent, minimize ambiguity, and reduce litigation and regulatory risk. The ARRC sought to ensure that LIBOR fallback language resembled language used in other classes and liabilities where feasible; to ensure that LIBOR fallback language was feasible, practicable, and fair; and to encourage the use of fallback

provisions that did not advantage any market participant to the disadvantage of another.  Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants.

11.    In 2022, because a significant number of financial contracts in the United States referenced LIBOR and contained no procedure for replacing LIBOR in the event of its cessation, Congress adopted the Adjustable Interest Rate (LIBOR) Act (the "LIBOR Act"), 12 U.S.C. § 5801 *et seq*.

12.    The LIBOR Act mandates that for certain securities contracts that reference or use a LIBOR-based rate after June 30, 2023, including those governing the Preferred Shares at issue here, financial institutions must replace LIBOR with the Federal Reserve Bank's benchmark created in 2017 as an alternative to LIBOR: SOFR.  In December 2022, pursuant to authority granted to it under the LIBOR Act, the Board of Governors of the Federal Reserve System issued a final rule (the "LIBOR Rule") adopting SOFR as a replacement for LIBOR.  *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act (Regulation ZZ), 12 C.F.R. § 253.4(b) (2023).

13.    Section 5803 of the LIBOR Act states that once LIBOR ceases to exist on June 30, 2023, the "Board-selected benchmark replacement *shall* be the benchmark replacement for any LIBOR contract that . . . contains no fallback provisions; or contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person" (emphasis added).  *See* 12 C.F.R. § 253.3(a).

14.    The Articles Supplementary for PennyMac's Series A and B Preferred Shares contains no fallback provisions accounting for the permanent cessation of LIBOR.  There is no specific benchmark replacement, nor a designated "determining person."  As such, the LIBOR Act and LIBOR Rule

***required*** and require PennyMac to use SOFR to calculate the floating rates for the Preferred Shares.

15.     On August 25, 2023, instead of complying with the law and adopting a floating rate pegged to the three-month SOFR (LIBOR's replacement), PennyMac shocked investors by announcing that it would continue paying the lower ***existing fixed rate*** in perpetuity on each of the Preferred Shares.[4] PennyMac claimed that it was contractually allowed to convert this floating rate instrument into a lower yielding fixed rate instrument by adopting in perpetuity the "dividend rate[s] in effect for the immediately preceding dividend period[s]."[5]

16.     PennyMac's interpretation has no legal basis and contorts the most basic underlying nature of this security—that its variable rate be pegged to a "clearly defined" and "practicable" market rate.[6]

17.     The market agreed.  Upon PennyMac making its announcement, the value of the Preferred Shares trading on the market dropped from the liquidation preference price of $25.00 per share, both trading at steep discounts from the par value and liquidation preference.  At close on August 28, 2023, the Series A Preferred Shares had dropped to $22.77 and have since plunged as low as $20.11.

---

[4] *See* Matt Levine, *Some Floating Rates Won't Float*, Bloomberg (Sept. 11, 2023), https://www.bloomberg.com/opinion/articles/2023-09-11/some-floating-rates-won-t-float; PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares* (Aug. 25, 2023), https://pmt.pennymac.com/news-events/press-releases/news-details/2023/PennyMac-Mortgage-Investment-Trust-Announces-LIBOR-Replacement-Rate-for-its-Series-A-and-Series-B-Preferred-Shares/default.aspx.

[5] PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares*, *supra* note 4.

[6] *See* 12 U.S.C. § 5801(b)(1); 12 C.F.R. § 253.1(c); *see also* ARRC, *Second Report—The Alternative Reference Rate Committee*, at 25, 27 (Mar. 2018), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report (also noting that most contracts referencing LIBOR do not appear to have envisioned a permanent or indefinite cessation of LIBOR and have fallbacks that would not be economically appropriate if this event occurred).

---

At close on August 28, 2023, the Series B Preferred Shares had dropped to $22.40 and have since plunged as low as $19.80.

18.    Had PennyMac complied with the LIBOR Act and LIBOR Rule and adopted the three-month SOFR, as many of its competitors had done, the Series A and B Preferred Shareholders would be paid a floating rate appreciably higher than the illegally, improperly, and unfairly adopted fixed rates.

19.    For example, the Series A Preferred Shareholders would have received 11.18884% on March 15, 2024—not the 8.125% fixed rate that PennyMac announced.  And the Series B Preferred Shareholders would be receiving 11.34784% as of June 15, 2024—not the 8.000% that PennyMac announced.

20.    PennyMac's Preferred Shares are, on information and belief, held in significant part by retail investors who have and will continue to suffer losses in amounts that will be proven at trial.  Further, the substantial drop in the market price of the Preferred Shares following the August 25, 2023 PennyMac announcement created a loss of $40 million in market capitalization.  Given that retail investors have significant exposure to the Preferred Shares, at least one market professional is reported to have described PennyMac's behavior as "particularly nasty, even exploitative, to investors. … [¶]  I don't think they would have had the sheer *chutzpah* to treat institutional investors that badly."[7]

21.    As a California-based entity, PennyMac is subject to California's UCL, Business and Professions Code Section 17200 *et seq.*  The UCL prohibits unlawful, unfair, or fraudulent business acts or practices.  Thus, when PennyMac explicitly violated the LIBOR Act and LIBOR Rule, it engaged in an unlawful

---

[7] Randall W. Forsyth, *Investors in This REIT Got a 'Nasty' Surprise. Why It Pays to Read the Fine Print*, BARRON'S (Sept. 8, 2023), https://www.barrons.com/articles/reit-preferred-share-investors-nasty-surprise-2bd5153b (emphasis added).

(and unfair) business practice under California law, giving rise to the present action.

22.    As alleged herein, Plaintiff seeks to enjoin and seek restitution in relation to PennyMac's conduct under California's UCL, which embodies California's fundamental policy of providing private parties with injunctive relief and restitution as forms of redress from unlawful and/or unfair business practices committed within the State of California.  As further provided under the UCL, Plaintiff seeks payment of restitution of all amounts which PennyMac was obligated to provide to Plaintiff and which, through the unfair and unlawful practices alleged herein, PennyMac did not pay to Plaintiff.

23.    The State of California has a material interest in applying its consumer protection laws to enjoin PennyMac's conduct, require it to pay restitution, and deter and prevent continuing and future harm to Plaintiff and those similarly situated.[8]

## II.    JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) of the Class Action Fairness Act ("CAFA") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the proposed Class includes more than one hundred (100) Class members, with at least one member of the proposed Class being a citizen of a different state than at least one Defendant.

25.    This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly because

---

[8] In an effort to resolve this matter and seek redress, on May 10, 2024, a notice and demand letter was sent on behalf of Plaintiff to PennyMac outlining the injuries and claims alleged herein and requesting corrective measures to resolve the dispute.  In response, PennyMac stated bases for its erroneous position and took no corrective measures.

they conduct business in and are "at home" in this district, as their principal places of business are in Westlake Village, California.

26.    Venue is appropriate in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Defendants' principal places of business are within the County of Los Angeles, State of California, which is within this judicial district; (ii) Defendants are subject to personal jurisdiction in this judicial district; (iii) the injury to Plaintiff occurred within this judicial district; and (iv) many of the acts and transactions giving rise to this action occurred in this judicial district.

## III.   **PARTIES**

27.    Plaintiff Roberto Verthelyi ("Plaintiff" or "Verthelyi") is a natural person and a resident of the State of New Jersey.  He holds 20 shares of PennyMac's Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares, which he has held since June 27, 2023.  Verthelyi also holds 60 shares of PennyMac's Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares, which he has held since at least prior to June 30, 2023.  As a result of Defendants' conduct alleged herein, Verthelyi has incurred injuries and will continue to incur additional injuries.

28.    Defendant PennyMac Mortgage Investment Trust is a REIT that invests primarily in residential mortgage loans and mortgage-related assets.  It is externally managed by PNMAC Capital Management, LLC and organized and existing under the laws of Maryland, with a principal place of business at 3043 Townsgate Road, Westlake Village, California.

29.    Defendant PNMAC Capital Management, LLC is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 3043 Townsgate Road, Westlake Village, California.

# IV. FACTUAL ALLEGATIONS

## A. PennyMac Issues Fixed-to-Floating Rate Preferred Shares

30.    In 2017, PennyMac issued two series of Preferred Shares, raising over $310 million: (i) the Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares; and (ii) the Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares.

### 1. Series A Preferred Shares

31.    PennyMac has 4,600,000 Series A Preferred Shares that were issued and are still outstanding.  From, and including, the date of original issuance of the Series A Preferred Shares in March 2017 to, but not including, March 15, 2024 only, holders of the Series A Preferred Shares were entitled to receive cumulative dividends on the Series A Preferred Shares at a fixed rate of 8.125% per annum based on the $25.00 per share liquidation preference.

32.    Then, from, and including, March 15, 2024 and thereafter, holders of the Series A Preferred Shares were and will continue to be entitled to receive cumulative dividends on the Series A Preferred Shares at a floating rate equal to three-month LIBOR as calculated on each applicable dividend determination date plus a spread of 5.831% per annum based on the $25.00 per share liquidation preference.  Dividends are payable quarterly in arrears on the 15th day of each March, June, September and December.

33.    Series A Preferred Shares rank senior to the common shares and on parity with the Series B Preferred Shares with respect to payments of dividends or amounts upon the liquidation, dissolution, or winding up.  Moreover, Series A Preferred Shares were not redeemable before March 15, 2024, except in connection with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

34.    Series A Preferred Shares have no stated maturity date and are not subject to any sinking fund or mandatory redemption.  On or after March 15,

2024, or within 120 days of the occurrence of a change in control, PennyMac may redeem any or all of the Series A Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

### 2.    Series B Preferred Shares

35.    PennyMac has 7,800,000 Series B Preferred Shares that were issued and are still outstanding.  From, and including, the date of original issuance of the Series B Preferred Shares in July 2017 to, but not including, June 15, 2024 only, holders of the Series B Preferred Shares were and are entitled to receive cumulative dividends on the Series B Preferred Shares at a fixed rate of 8.00% per annum based on the $25.00 per share liquidation preference.

36.    Then, from, and including, June 15, 2024, and thereafter, holders of the Series B Preferred Shares will be entitled to receive cumulative dividends on the Series B Preferred Shares at a floating rate equal to three-month LIBOR as calculated on each applicable dividend determination date plus a spread of 5.99% per annum based on the $25.00 per share liquidation preference.  Dividends are payable quarterly in arrears on the 15th day of each March, June, September, and December.

37.    The Series B Preferred Shares are not redeemable before June 15, 2024, except in connection with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

38.    As with Series A, the Series B Preferred Shares have no stated maturity and are not subject to any sinking fund or mandatory redemption.  On or after June 15, 2024, or within 120 days of the occurrence of a change of control, PennyMac may redeem any or all the Series B Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including the redemption date.

**B.    SOFR is Created as an Alternative to LIBOR**

39.    For decades it was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in USD.  LIBOR was a basic rate of interest used in lending between banks on the London interbank market and served as a reference for setting the interest rate on loans and instruments such as preferred stock.  However, by 2012, banks were accused by various governmental agencies of manipulating LIBOR rates.

40.    In 2014, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the ARRC, which developed SOFR as an alternative to LIBOR.  SOFR has been published on an overnight basis since 2018 and is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities in the overnight Treasury repurchase agreement market.

41.    In 2018, the ARRC developed a set of guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR.  By 2019, the ARRC published guidance on suggested fallback provisions for use in the event of LIBOR's cessation to reduce market disruption. Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions that replaced LIBOR with SOFR or a SOFR equivalent; minimize ambiguity; reduce litigation and regulatory risk; ensure LIBOR fallback language resembled language used in other classes and liabilities where feasible; ensure that fallback language was feasible, practicable, and fair; and encourage the use of fallback provisions that did not advantage any market participant to the disadvantage of another.  All of the ARRC's suggested benchmark replacements for LIBOR contemplated using either SOFR with certain spread adjustments, or replacements chosen by a relevant governmental body or the ISDA.  For its part,

the ISDA has also published guidance encouraging the replacement of LIBOR in floating rate contracts with SOFR.[9]

42.    While one of the ARRC's guiding principles on benchmark replacements allowed for issuers to choose their own replacement rate, this guidance stipulated that the chosen replacement rate must include a "spread adjustment," which could be positive, negative, or zero, to accommodate variances from the then current benchmark rate.  None of ARRC's suggested guiding principles on benchmark replacements endorse the use of an existing fixed rate as a replacement to LIBOR.

43.    Similar to LIBOR, SOFR publishes one-, three-, six- and twelve-month forward-looking rates and is considered by experts to be the more accurate and secure interest rate pricing benchmark.

44.    Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants.  Indeed, the ARRC's findings are specifically cited by the Board of Governors of the Federal Reserve in the Board's final memorandum implementing the LIBOR Act, as well as part of the Supplementary Information published as part of the LIBOR Rule.[10]

45.    PennyMac's Series A and Series B Preferred Shares contracts *do not contain* a fallback provision for calculating dividend rates during the floating rate period *in the event that LIBOR ceases to exist*, nor any procedures for designating a calculation agent.  The Articles Supplementary for Series A and B Preferred Shares do provide a mechanism for determining the dividend on the "Dividend

---

[9] *See* 12 C.F.R. § 253, App. A.

[10] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3, *supra* note 3; Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 n.15 (Jan. 26, 2023).

Determination Date" in the event that the then-current LIBOR rate is temporarily unavailable—where "no such [LIBOR] rate appears on 'Reuters Page LIBOR01' or if the 'Reuters Page LIBOR01' is not available at approximately 11:00 a.m. (London time)."[11]  PennyMac has publicly pointed to this provision as its fallback provision for assessment in accordance with the LIBOR Rule.  However, this provision does not comply with the LIBOR Rule's requirements, as it neither addresses the permanent cessation of LIBOR, nor specifies a replacement benchmark or rate if LIBOR is permanently discontinued.

## C. Congress Adopts the LIBOR Act and the Federal Reserve Issues the LIBOR Rule

46.    In March 2021, the United Kingdom Financial Conduct Authority announced that LIBOR would cease publication and set forth a plan for transition. Banks and financial institutions stopped using USD LIBOR for new loans in the United States by January 1, 2022, and all remaining USD LIBOR rate publications were discontinued by June 30, 2023.

47.    Recognizing the need for a uniform, nationwide solution for replacing references to USD LIBOR in legacy contracts, on March 15, 2022, Congress enacted the LIBOR Act.  Moreover, pursuant to authority granted to it under the LIBOR Act, the Federal Reserve issued the LIBOR Rule in December 2022 adopting SOFR as the default replacement for LIBOR.  *See* 12 C.F.R. § 253.4(b).

48.    The LIBOR Act broadly defines "LIBOR contract" to include any obligation or asset that, by its terms, uses the overnight, one-month, three-month, six-month, or twelve-month tenors of USD LIBOR as a benchmark.  Broadly, for LIBOR-based contracts (a) without fallback provisions for its discontinuation of

---

[11] *See* Art. Supp. Series A, ¶4(g); Art. Supp. Series B, ¶4(g).

LIBOR or (b) with LIBOR-based fallback provisions, it requires that SOFR be substituted for LIBOR.

49.    The LIBOR Act and LIBOR Rule were adopted to address the exact deficiencies present in PennyMac's outdated, legacy Articles Supplementary, which have no clearly defined, practicable replacement benchmark rate or fallback procedures for replacing LIBOR in the event of its discontinuation.

**D.    PennyMac Acts in Contravention of the LIBOR Act and the LIBOR Rule**

50.    By 2023, banks, REITS, and financial institutions that had previously issued loans or preferred stock pegged to LIBOR began transitioning to SOFR. For example, Bank of America—which had issued similar LIBOR-based variable rate investments governed by legacy fallback provisions similar to those used by PennyMac, *i.e.*, contemplating a fixed rate replacement only if LIBOR was temporarily available and only after obtaining quotes from banks—announced a replacement of the three-month LIBOR rate with the three-month SOFR rate as adjusted pursuant to the LIBOR Act and the Federal Reserve's LIBOR Rule on comparable floating-rate Preferred Shares.

51.    Holders of PennyMac's Series A and B Preferred Shares were entitled to the same treatment, as evidenced by market reaction to the announcement.  Specifically, commencing on March 15, 2024, PennyMac should have paid Series A Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

52.    Similarly, commencing on June 15, 2024, PennyMac should have paid Series B Preferred Shareholders a floating rate dividend equal to three-month SOFR as adjusted plus a spread of 5.99% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference.

53.    On August 25, 2023, PennyMac's Preferred Shareholders learned that instead of adopting the three-month SOFR rate, PennyMac unilaterally decided to replace its floating Three-Month LIBOR interest rate obligation for Series A and Series B Preferred Shares with the existing fixed rate, stating:

> In accordance with the Articles Supplementary for each of the Series . . . and disregarding the Polling Provisions contained therein, the applicable dividend rate for dividend periods from and after March 15, 2024, in the case of the Series A Preferred Shares, or June 15, 2024, in the case of the Series B Preferred Shares, shall be calculated at the dividend rate in effect for the immediately preceding dividend period.[12]

54.    Contrary to PennyMac's contention, the Articles Supplementary, which contain no fallback provision for when LIBOR is discontinued, do not permit PennyMac to convert a floating-rate dividend stock into a fixed-rate dividend preferred stock.

55.    PennyMac sought to justify its decision by claiming that:

> The LIBOR Rule provides with respect to any reference in the terms of a security requiring a poll or inquiries for quotes or information related to USD LIBOR ("Polling Provisions") contained in so called "fallback provisions" applicable in the event USD LIBOR is not published, such Polling Provisions shall be disregarded and deemed null and void and without any force or effect.[13]

56.    In doing so, PennyMac relied upon a legacy LIBOR-based fallback provision used in similar form throughout the industry that was clearly created to be used in the event of *a temporary delay in the reporting of LIBOR rates*. Pursuant to that provision, were a temporary delay in the reporting of LIBOR to occur, PennyMac first would try to obtain quotes from London banks and, if no

---

[12] PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares*, *supra* note 4.

[13] *Id.*

suitable quotes could be obtained, PennyMac would then be required to obtain quotes from three New York banks.  If no suitable quotes could be obtained from New York banks, then PennyMac would revert to the dividend rate paid in the previous period.  PennyMac claimed that, absent LIBOR, the already-existing fixed rate should continue to be used because that was the last dividend rate paid on the first date that PennyMac would seek to calculate a LIBOR-based floating rate.

57.    In so acting, PennyMac violated the LIBOR Act and LIBOR Rule when attempted to rely on that inapplicable language in the Articles Supplementary.

**E.    Preferred Shareholders' Present and Future Harm**

58.    Following PennyMac's announcement, the prices of both the Series A and Series B Preferred Shares fell precipitously, shedding $40 million in collective market capitalization.  Specifically, prior to PennyMac's announcement, Series A Preferred Shares (NYSE: PMT-PA) were trading at or near $24 per share, or a 4% discount to par value ($25).  After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $22 per share, a 15% discount to par.

59.    Prior to PennyMac's announcement, Series B Preferred Shares (NYSE: PMT-PB) traded at or near $24.00 per share, or 4% discount to par.  After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $20 per share, or an 18% discount to par.

60.    In addition to the loss in market value, Preferred Shareholders have and will continue to earn less than the interest promised on their investment, in an amount to be proven at trial.

**V.    CLASS ACTION ALLEGATIONS**

61.    Plaintiff brings this action as a class action individually and on behalf of all others similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who own or owned shares of PennyMac's Series A Preferred Shares and/or Series B Preferred Shares at any time between August 25, 2023 and the conclusion of this action.  Excluded from the Class are (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director, or controlling person of Defendants; (e) any entity in which any person or entity excluded from the Class has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

62.     The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable. While the exact number and location of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class located nationwide.  Indeed, as of February 22, 2024, PennyMac had 4,600,000 outstanding shares of Series A Preferred Shares and 7,800,000 outstanding shares of Series B Preferred Shares.

63.     Members of the Class may be identified from records maintained by PennyMac, its transfer agent, or other brokers and nominees and, as necessary, may be notified of the pendency of this action by mail, using a form of notice customarily used in class action lawsuits.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a)     whether Defendants were required to comply with the LIBOR Act as set forth in 12 U.S.C. § 5801 *et seq.*;

(b)     whether Defendants' conduct as alleged herein violated the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.*;

(c)     whether Defendants were required to comply with the LIBOR Rule as set forth in 12 C.F.R. § 253 *et seq.*;

(d)     whether Defendants' conduct as alleged herein violated the LIBOR Rule, 12 C.F.R. § 253 *et seq.*;

(e)     whether Defendants' conduct as alleged herein amounts to unfair or unlawful acts or practices within the meaning of the UCL, California Business and Professions Code § 17200 *et seq.*; and

(f)     whether Plaintiff and the putative Class members are entitled to relief, including restitution and injunctive relief, as sought herein.

65.     Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class suffered economic injury and will continue to suffer economic injury as a result of Defendants' wrongful conduct in violation of state law as alleged in this Complaint.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

67.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the money and/or property lost by the individual Class members as well as the future harm to them may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress those wrongs.  There will be no difficulty in the management of this action as a class action.

68.     Further, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

(a)    The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for PennyMac;

(b)    The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or that would substantially impair their ability to protect their interests; and

(c)    PennyMac has acted or refused to act on grounds generally applicable to the proposed Class, thereby making final injunctive and other equitable relief appropriate with respect to the members of the proposed Class as a whole.

## VI.    CLAIM FOR RELIEF

### COUNT ONE
### Violation of California's Unfair Competition Law (UCL)
### Cal. Bus. & Prof. Code § 17200 *et seq.*

69.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.    Plaintiff and Defendants are each a "person" as defined by California Business and Professions Code § 17201.  California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

71.    "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including: (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; (c) a "fraudulent" business act or practice; and (d) "unfair, deceptive, untrue or misleading advertising."  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

72.     By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful and/or unfair business practices as prohibited by California's UCL.

**A.      "Unlawful" Prong**

73.     California Business and Professions Code § 17200 *et seq.*, treats violations of other laws, when committed pursuant to a business activity, as independently actionable unlawful practices.

74.     Defendants have violated the LIBOR Act, 12 U.S.C. 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*, and thus, pursuant to California Business and Professions Code § 17200 *et seq.*, have engaged in a pattern of "unlawful" business practices within the meaning of California's UCL.

75.     As alleged herein, pursuant to the LIBOR Act and LIBOR Rule and their provisions amending existing LIBOR-based contracts, including those governing Defendants' conduct here, commencing on March 15, 2024, holders of PennyMac Series A Preferred Shares were required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on a twenty-five dollars ($25.00) per share liquidation preference.  Similarly, pursuant to the LIBOR Rule, commencing on June 15, 2024, holders of PennyMac Series B Preferred Shares are required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.99% per annum based on a twenty-five dollars ($25.00) per share liquidation preference.

76.     Beginning on or about August 25, 2023, Defendants committed and have been committing unlawful and unfair acts, including those described herein, by engaging in a pattern of "unlawful" business practices within the meaning of California Business and Professions Code § 17200 *et seq.*, by replacing its floating three-month LIBOR dividend rate for Series A and Series B Preferred Shares with

a fixed rate, in violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*

77.    When Defendants announced their intention to replace the floating rate dividend in Series A and Series B Preferred Shares in violation of the LIBOR Act and the provisions set forth under the LIBOR Rule, the price of Series A and Series B Preferred Shares dropped precipitously in the secondary market, translating to a loss of value of $40 million in collective market capitalization and causing Plaintiff's and the putative Class's investments to lose substantial value.

78.    Further, as a result of Defendants' decision to replace the floating rate dividend on Series A and Series B Preferred Shares with an already-existing fixed rate dividend in violation of the LIBOR Act and the LIBOR Rule, Preferred Shareholders are expected to receive dividends at an interest rate materially lower than the SOFR three-month rate and will thus lose many millions of dollars in dividend payments on their investments.

79.    Therefore, as a direct and proximate result of Defendants' prohibited unfair and unlawful business practices that took place in California, as alleged herein, Plaintiff and the putative Class have suffered injury in fact and have lost and will continue to lose substantial value and sums of money in an amount to be proven at trial.

**B.    "Unfair" Prong**

80.    Beginning as of approximately August 25, 2023, as alleged herein, Defendants also committed unfair acts as prohibited by California Business and Professions Code § 17200 *et seq.*

81.    A business act or practice is "unfair" under the UCL if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, where that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

82.     As alleged herein, Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  The gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct.  Furthermore, neither Plaintiff nor the putative Class could reasonably have avoided being injured by Defendants' conduct as alleged herein, and there were reasonably available alternatives to further Defendants' legitimate business interests other than the unfair and unlawful interference with Plaintiff's ownership interests in their Preferred Shares as described herein.

**C.     Remedies Provided For Under the UCL**

83.     The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.  Plaintiff and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

84.     Through its unfair and unlawful acts and practices, PennyMac has improperly obtained and will continue to obtain money from Plaintiff and the Class.  As such, Plaintiff requests that this Court cause PennyMac to restore this money to Plaintiff and all Class members, and to enjoin PennyMac from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future.  Plaintiff and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

85.     In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees, a reward which is available to a prevailing Plaintiff in a class action such as this, whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

86.     Absent an award for injunctive relief and restitution as alleged and requested herein, Plaintiff and the putative Class would not otherwise have an adequate remedy at law given that Defendants' unfair and unlawful conduct in

1  violating the LIBOR Act and the LIBOR Rule is continuing and will not cease

2  until Defendants are forced to come into compliance with the law.

3       87.    Plaintiff reserves the right to allege further conduct that constitutes

4  other unlawful and/or unfair business acts or practices.

5  **VII.**  **PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiff prays for relief and judgment as follows:

7  A.  Determining that this action is a proper class action, certifying

8      Plaintiff as Class representative under Rule 23 of the Federal Rules of

9      Civil Procedure, and appointing Plaintiff's counsel as Class Counsel;

10  B.  Declaring that Defendants must implement the applicable Board-

11      selected benchmark replacement, SOFR, as a replacement to the

12      three-month LIBOR rate set forth in the Articles Supplementary for

13      PennyMac Series A and Series B Preferred Shares pursuant to

14      12 C.F.R. § 253.5 *et seq.*;

15  C.  Granting injunctive relief as permitted by law and in equity;

16  D.  Ordering that Defendants pay all amounts owed to the Plaintiff and

17      the Class arising out of the actions complained of herein, including

18      restitution, interest, disgorgement of any ill-gotten gains, and any

19      other relief as allowed in law or equity;

20  E.  Awarding Plaintiff and the Class their reasonable fees and expenses

21      incurred in this action, including counsel fees and expert fees; and

22  F.  Awarding such other and further relief as the Court may deem just

23      and proper.

24  **VIII.**  **DEMAND FOR TRIAL BY JURY**

25       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands

26  a trial by jury.

27  ///

28  ///

CLASS ACTION COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF FOR
VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*                    23

DATED:  June 14, 2024

**BERMAN TABACCO**

By:  ___*/s/ Daniel E. Barenbaum*___
         Daniel E. Barenbaum

Nicole Lavallee
Jeffrey Rocha
Pierce Stanley
425 California Street, Suite 2300
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email:    nlavallee@bermantabacco.com
             dbarenbaum@bermantabacco.com
             jrocha@bermantabacco.com
             pstanley@bermantabacco.com

Catherine Pratsinakis (*pro hac vice forthcoming*)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013
Email: cpratsinakis@dilworthlaw.com

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*