UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Jonas P. Mann (SBN 263314)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
jonas@umklaw.com

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)
sfarina@wc.com
mcollins@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>PENNYMAC MORTGAGE INVESTMENT TRUST; PNMAC CAPITAL MANAGEMENT, LLC,<br><br>        Defendants. | Case No. 2:24-cv-05028-MWF<br><br>**PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Hearing Date:  Nov. 18, 2024<br>Time:  10:00 a.m.<br>Place:  Courtroom 5A<br>Judge:  Michael W. Fitzgerald |

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 18, 2024, at 10:00 a.m., or such other date ordered by the Court, in Courtroom 5A of this Court, located at First Street Courthouse, 350 W. First Street, Los Angeles, California, Defendant PennyMac Mortgage Investment Trust ("PennyMac") will and hereby does move the Court for an order dismissing Plaintiff's Complaint and each claim therein without leave to amend.

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(6) on the grounds that the Complaint fails to state a claim. PennyMac's Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, any reply memorandum, the pleadings and filings in this action, and such other matters as may be presented at or before the hearing. PennyMac respectfully requests oral argument on this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 13, 2024.

Dated: August 20, 2024            Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac*
*Mortgage Investment Trust and PNMAC*
*Capital Management, LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac*
*Mortgage Investment Trust*

# **TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ................................................................................. 1

II.  BACKGROUND ................................................................................ 3

    A.  The Parties and the Preferred Shares ........................................... 3

    B.  The Discontinuation of LIBOR and the LIBOR Act .................... 4

    C.  The Impact of LIBOR's Cessation and the LIBOR Act on the Preferred Shares ......................................................................... 7

III.  LEGAL STANDARD ....................................................................... 7

IV.  ARGUMENT ..................................................................................... 8

    A.  Plaintiff Cannot State a Claim Under California's Unfair Competition Law Because Maryland Law Governs. ..................... 8

    B.  Plaintiff Fails to State a Claim Under the UCL. ....................... 10

        1.  PennyMac's Actions Complied with the LIBOR Act and Were Not "Unlawful" Under the UCL. ........ 11

        2.  PennyMac's Interpretation is Protected by the UCL's Safe Harbor. .................................................. 17

        3.  Plaintiff Fails To State a Claim that PennyMac's Lawful Interpretation of its Articles Pursuant to the LIBOR Act Is "Unfair" Under the UCL. .................. 18

V.  CONCLUSION ................................................................................ 21

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                    **PAGE(S)**

*Aliya Medcare Fin., LLC v. Nickell*, 2015 WL 4163088 (C.D. Cal. July 9, 2015).......10

*Alvarez v. Chevron Corp.*, 656 F.3d 925 (9th Cir. 2011) .............................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................................7

*Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954 (C.D. Cal. 2015) .............................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................................................7

*Bresler v. Wilmington Tr. Co.*, 348 F. Supp.3d 473 (D. Md. 2018)...............................9

*Century 21 Real Estate LLC v. All Prof. Realty, Inc.*,

   600 F. App'x 502 (9th Cir. 2015) .............................................................................10

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ........................................................19

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006) .10

*Crosby v. California Physicians' Serv.*, 279 F. Supp. 3d 1074 (C.D. Cal. 2018).........19

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) .................................19

*Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149  (2018) .............................................12

*Fleming v. Charles Schwab Corp.*, 878 F.3d 1146 (9th Cir. 2017)..............................18

*Flores v. Wells Fargo Bank, N.A.*, 2012 WL2427227 (N.D. Cal. June 26, 2012)........20

*Hadley v. Kellogg Sales Co.*, 243 F. Supp.3d 1074 (N.D. Cal. 2017) .........................18

*Holland v. Gen. Motors LLC*, 2024 WL 1680062  (C.D. Cal. Jan. 25, 2024) ........19, 20

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ..........................................10

*Kim v. Cedar Realty Tr., Inc.*, 2023 WL 4896635 (D. Md. Aug. 1, 2023) ..................20

*Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522 (2d Cir. 2023) ....................................9

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014)........................................................11

*Lozano v. AT&T Wireless Servs.*, Inc., 504 F.3d 718 (9th Cir. 2007)..........................19

*Melt Franchising, LLC v. PMI Enters., Inc.*,

   2009 WL 32587 (C.D. Cal. Jan. 2, 2009) ................................................................10

*Millam v. Energizer Brands, LLC*, 2022 WL 19001330 (C.D. Cal. Dec. 9, 2022).......18

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .......................................19

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

*Pac. Recovery Sols. v. United Behav. Health*, 508 F. Supp. 3d 606 (N.D. Cal. 2020) . 19

*Pro Water Sols., Inc. v. Angie's List, Inc.*,
  2021 WL 124496 (C.D. Cal. Jan. 13, 2021) .................................................. 9

*Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270 (C.D. Cal. Jan. 7, 2013) ................... 20

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ..................................... 7

*Stender v. Archstone-Smith Operating Tr.*,
  2014 WL 5152002 (D. Colo. Oct. 14, 2014) ................................................. 8

*United States v. 1.377 Acres of Land*, 352 F.3d 1259 (9th Cir. 2003) .......................... 16

*Vitek v. Bank of America, N.A.*, 2014 WL 1042397 (C.D. Cal. Jan. 23, 2014) ............. 10

*Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078 (9th Cir. 2007) ..... 11, 16, 17

**STATE CASES**                                                              **PAGE(S)**

*Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134 (2003) ......................... 17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ... 17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010) ............... 19, 20

*Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89 (Md. 2021) ................................... 8

*Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (1992) .......................................... 9

*People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884 (2016) .............. 19

*Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906 (2001) .............................. 9

*Wildewood Operating Co., LLC v. WRV Holdings, LLC*,
  303 A.3d 1273 (Md. App. Ct. 2023) ........................................................... 16

**STATUTES**                                                                **PAGE(S)**

12 U.S.C. § 5801 ................................................................................. 5, 13, 17, 18

12 U.S.C. § 5802 ................................................................................................. *passim*

12 U.S.C. § 5803 ................................................................................................. *passim*

12 U.S.C. § 5804 ................................................................................................... 13

12 U.S.C. § 5806 ................................................................................................ 6, 19

12 U.S.C. § 5807 ..................................................................................................... 5

15 U.S.C. § 78bb .................................................................................................. 18

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Cal. Bus. & Prof. Code § 17200 ......................................................................... 1, 10

Md. Code Ann., Corps. & Ass'ns § 2-105 ............................................................. 8

Md. Code Ann., Corps. & Ass'ns § 2-208 ............................................................. 8

Md. Code Ann., Corps. & Ass'ns § 8-101 .......................................................... 3, 8

Md. Code Ann., Corps. & Ass'ns § 8-102 ............................................................. 9

Md. Code Ann., Corps. & Ass'ns § 8-201 ...................................................... 3, 8, 9

Md. Code Ann., Corps. & Ass'ns § 8-203 .......................................................... 3, 9

**REGULATIONS**                                                                **PAGE(S)**

Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg.

    5204 (Jan. 26, 2023) (codified at 12 C.F.R. part 253) ...................................... 5, 7, 13

**OTHER AUTHORITIES**                                                          **PAGE(S)**

Alt. Ref. Rates Comm., *Proposed Legislative Solution to Minimize Legal Uncertainty*

    *and Adverse Economic Impact Associated with LIBOR Transition* (2020),

    https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC-

    Proposed-Legislative-Solution.pdf ........................................................................ 16

Black's Law Dictionary (11th ed. 2019) ............................................................... 14

*SOFR Averages and Index Data*, Fed. Rsrv. Bank of New York (last accessed Aug. 14,

    2024), https://www.newyorkfed.org/markets/reference-rates/sofr-averages-and-

    index ...................................................................................................................... 21

Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was It*

    *Used?*, Investopedia (June 21, 2024),

    https://www.investopedia.com/terms/l/libor.asp#citation-1 ....................................... 5

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Roberto Verthelyi brings this putative class action pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, erroneously contending that a 2021 statute enacted by Congress, the Adjustable Interest Rate (LIBOR) Act, overrides the contractual terms he and others agreed to when they purchased preferred shares of PennyMac Mortgage Investment Trust ("PennyMac").  It does not.

PennyMac set out the terms for issuing dividends on its preferred shares in the governing documents authorizing those shares, the Articles Supplementary (the "Articles").  Although the Articles envision that the dividends will transition from a fixed rate to a floating rate based on the London Inter-Bank Offered Rate ("LIBOR"), they also contain provisions the parties agreed would apply if the LIBOR rate were unavailable.

When LIBOR was discontinued in 2023, PennyMac applied the fallback provisions in the Articles.  After disregarding any LIBOR- and polling-based provisions as directed by the LIBOR Act and its implementing regulations, the Articles provide that dividends be issued at the dividend rate in effect during the prior period.  Following these clear terms, PennyMac has continued to issue dividends for the preferred shares at their respective initial fixed rates.  Plaintiff, however, contends that the LIBOR Act required PennyMac to transition to a floating dividend rate based on the Secured Overnight Financing Rate ("SOFR").

Plaintiff's claim fails.  The LIBOR Act fills gaps in financial instruments that had no practicable fallback provisions and would effectively cease to function without LIBOR, by directing such instruments to use a SOFR-based rate instead.  The Act, however, does not override contractual language that provides a functional fallback, expressly stating that the statute does not "alter or impair" terms calling for the use of replacement rates not based on LIBOR.  12 U.S.C. § 5803(f)(2).

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Plaintiff nonetheless contends that PennyMac's contractual fallback should be disregarded, arguing that the preferred shares' fallback provisions are directed at temporary LIBOR unavailability, while only provisions "accounting for the permanent cessation of LIBOR" survive the LIBOR Act. Class Action Complaint, ECF No. 1 (June 14, 2024) ("Compl.") ¶ 14; *see id.* ¶¶ 45, 56. But this supposed distinction between temporary and permanent replacements—the basis for Plaintiff's entire Complaint—is pulled from thin air, with no grounding in either the Articles or the LIBOR Act. The Articles' fallback provisions are not limited to "temporary delay[s] in the reporting of LIBOR rates," *id.* ¶ 56 (emphasis omitted), but even if they were, the LIBOR Act makes clear that specific, non-LIBOR based fallback rates—whether temporary or permanent—remain in effect.

Fundamentally, none of this forms the basis for a claim under the UCL. As an initial matter, disputes over shareholders' rights under the Articles are governed by Maryland law, not California law, so the UCL does not apply and Plaintiff's claim must be dismissed. But even if the UCL did apply, Plaintiff has not stated a claim. PennyMac's adherence to the Articles complies with the LIBOR Act, which expressly permits contracts like PennyMac's to continue using their contractual replacement rates. PennyMac's conduct is therefore not "unlawful" under the UCL, and it is protected by the UCL's safe harbor.

Any effort to extend the UCL's "unfair" prong to impose liability on actions that are in accordance with the LIBOR Act fares no better. The LIBOR Act preempts state laws relating to the selection of replacement rates, precluding a court from finding that a state law like the UCL imposes requirements on rates beyond those in the LIBOR Act. And, importantly, there is nothing unfair here. The Articles and the LIBOR Act govern, and PennyMac is simply applying their terms.

Indeed, if anything is unfair, it would be Plaintiff's reading. Plaintiff seeks to impose a requirement that does not exist in the statute and disregard agreed-upon contractual language, in a way that Plaintiff believes would be to his and other preferred

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

shareholders' advantage.  *See* Compl. ¶ 78.   But Plaintiff's approach ignores PennyMac's duties to its common shareholders, whose equity would be improperly diminished by distributing company assets to the preferred shareholders where not required.  Fairness requires that PennyMac honor the terms of its agreements, and issue dividends pursuant to its contractual terms and the LIBOR Act.  That is exactly what PennyMac has done here.  Accordingly, Plaintiff's claim should be dismissed with prejudice.

## II.    BACKGROUND

### A.    The Parties and the Preferred Shares

PennyMac is a Real Estate Investment Trust ("REIT") organized under Maryland law.  Compl. ¶ 28.  Its operations are managed by PNMAC Capital Management, LLC ("PCM"), a Delaware limited liability company.  *Id.* ¶¶ 28–29.  PennyMac has two classes of stock:  common and preferred.  *See id.* ¶ 33.

At issue here are the terms of two series of PennyMac's preferred stock:  the Series A and Series B Fixed-to-Floating Preferred Shares ("Preferred Shares"), which were issued in March 2017 and July 2017, respectively (attached as Exhibit A and Exhibit B).[1]  Compl. ¶¶ 31, 35.  Each series was issued pursuant to its Articles, *id.* ¶ 3, which are Maryland corporate documents that authorize a REIT to issue additional shares and are incorporated into the REIT's charter document, the declaration of trust, *see* Md. Code Ann., Corps. & Ass'ns §§ 8-101(b), 8-201, 8-203(b).

The Articles provide that purchasers of the Preferred Shares ("Preferred Shareholders") receive quarterly dividends at a fixed rate for the first several years after the shares were issued.  Compl. ¶¶ 31, 35; Ex. A ¶ 4(a); Ex. B ¶ 4(a).  After a certain date—March 15, 2024 for the Series A and June 15, 2024 for the Series B—the dividend

---

[1] Both of PennyMac's Articles Supplementary and its Declaration of Trust referenced herein are attached as exhibits A–C, respectively, to the accompanying Declaration of Matthew Donald Umhofer in Support of Defendants' Request for Judicial Notice, and the Court may take judicial notice of their contents for purposes of deciding this Motion to Dismiss.  *See* Request for Judicial Notice ("RJN").

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

rate is then set according to further contractual terms, which direct PennyMac through a waterfall of steps to determine the applicable dividend rate.  Compl. ¶¶ 32, 36; Ex. A ¶¶ 4(a), (g); Ex. B ¶¶ 4(a), (g).

Specifically, the Articles provide that Preferred Shareholders are to be paid dividends at a rate based off of the contractually-defined term "Three-Month LIBOR." *See* Ex. A ¶ 4(a); Ex. B ¶ 4(a).  "Three-Month LIBOR," in turn, provides contingencies for how the dividend should be calculated in a variety of circumstances.  *See* Ex. A ¶ 4(g); Ex. B ¶ 4(g).  Per the Articles' terms, Three-Month LIBOR is set first at a LIBOR rate appearing on a Reuters page (the "Screen Rate").  *Id.*  If the Screen Rate is unavailable, a series of "fallbacks" kick in:  first, Three-Month LIBOR will equal the average interest rate quoted to PennyMac from individual banks on the London or New York City markets (the "Polling Rate").  *Id.*  If the Polling Rate is unavailable, then "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period."  *Id.*  Finally, "if there was no such Dividend Period"—that is, there was no immediately preceding Dividend Period utilizing a Three-Month LIBOR Rate—then the Articles set the dividend rate outright: "***the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.***"  *Id.*[2]

The Articles do not limit the use of these fallback provisions to any particular circumstances; by their terms, they are applicable whenever the Screen Rate is unavailable.

**B.    The Discontinuation of LIBOR and the LIBOR Act**

In June 2023—after PennyMac issued the Preferred Shares, but before the dates on which the dividend rates were set to float—the applicable LIBOR rate was discontinued.  Compl. ¶ 7.  The change was announced in late 2017, but did not become effective for USD LIBOR until 2023.  *Id.*

---

[2] All emphases are added unless otherwise noted.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

LIBOR had long been a cornerstone of global financial markets. It represented the average interest rate at which major banks could borrow funds from one another in the London interbank market and served as a key benchmark for interest rates across various financial products.[3] Although new contracts could account for the transition away from LIBOR by benchmarking to a different rate, many outstanding financial instruments already relied on USD LIBOR and, by their own terms, would not function after LIBOR was discontinued—so-called "tough legacy" instruments. *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. Part 253).[4] These instruments were held by countless counterparties around the world, precluding as a practical matter any renegotiation of terms prior to LIBOR's cessation.

To address these otherwise non-functioning contracts, Congress passed the Adjustable Interest Rate (LIBOR) Act of 2021 ("LIBOR Act" or "Act"). *See* 12 U.S.C. §§ 5801–5807. Congress sought to create a "clear and uniform" "nationwide" process to replace LIBOR in contracts that did not otherwise provide for a replacement rate with a reference rate based on SOFR, *id.* §§ 5801(b)(1), 5802(6), 5803. At the same time, Congress expressly intended "to ***allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, to operate according to their terms.***" *Id.* § 5801(b)(3). In other words, the LIBOR Act does not override contracts in which the parties had already agreed to a workable replacement as

---

[3]Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was It Used?*, Investopedia (June 21, 2024), https://www.investopedia.com/terms/l/libor.asp#citation-1, *cited in* Compl. ¶ 4 n.1.

[4] Congress delegated regulatory responsibilities to the Federal Reserve Board, 12 U.S.C. § 5807, which published its final rule in 2023, *see* 12 C.F.R. Part 253. Although the implementing regulations provide more detail on the Board-selected replacement rate when one is required, they largely mirror the Act in terms of determining whether a switch to a SOFR-based rate is mandatory. *Compare*, *e.g.*, 12 U.S.C. § 5803(a)–(b) *with* 12 C.F.R. § 253.3(a).

a fallback.  In line with these goals, the LIBOR Act also expressly preempts state law
"relating to the selection and use of a benchmark replacement" rate.  *Id.* § 5806(1).

The Act serves as a gap-filler for tough legacy contracts—contracts that would
not, by their own terms, function after the cessation of LIBOR—by requiring those
instruments to transition to a SOFR-based benchmark replacement rate.  *Id.* § 5803(a)–
(b).  It requires parties to evaluate instruments benchmarked to LIBOR and their
"fallback provisions" to determine whether a switch to SOFR is mandatory.  *Id.*
"Fallback provisions" are "terms in a LIBOR contract for determining a benchmark
replacement…." *Id.* § 5802(11).  A "benchmark replacement," in turn, is "a benchmark"
(*i.e.*, an index or reference rate), "or an interest rate or dividend rate … to replace LIBOR
or any interest rate or dividend rate based on LIBOR, whether on a temporary,
permanent, or indefinite basis…."  *Id.* § 5802(3).

Specifically, on the first business day after June 30, 2023, parties were to
"disregard[]" "reference[s]" in contracts' "fallback provisions" to (1) "benchmark
replacements" based on LIBOR, such as those which require use of the last-published
LIBOR value, and to (2) requirements that parties "poll" banks, *i.e.*, ask banks to quote
their estimate of LIBOR to the parties directly.  *Id.* §§ 5802(17), 5803(b).  If, after
disregarding those two references, an instrument does not include another "specific
benchmark replacement" or a "determining person,"[5] the LIBOR Act directs the
instrument to switch to the Federal Reserve Board-selected, SOFR-based benchmark
replacement rate.  *Id.* § 5803(a).

Contracts that provide for non-LIBOR-based fallbacks, and therefore are
workable by their own terms after LIBOR's cessation, remain in effect and are not
directed to switch to the SOFR-based rate:

---

[5] A "determining person" is a person who has the authority to determine an
appropriate benchmark replacement.  12 U.S.C. § 5802(10).  PennyMac's Articles do
not reference a "determining person," so this provision is not at issue.  *See* Ex. A ¶ 4(g);
Ex. B ¶ 4(g).

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

1
2
3
4

> Nothing in this chapter may be construed to alter or impair … (2) except as provided in subsection (b) [described above], any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value….

5   *Id.* § 5803(f)(2); *see also* 12 C.F.R. § 253.3(b)(2).

6       **C.     The Impact of LIBOR's Cessation and the LIBOR Act on the**
7              **Preferred Shares**

8       Applying the plain language of the LIBOR Act to the Articles, the fallback
9   provisions in each of the Articles contain a "specific benchmark replacement" not based
10  on LIBOR: the dividend rate from the prior period, which is the initial fixed rate for each
11  offering.    *See* Section IV.B.1.b, *infra*.    Accordingly, PennyMac informed its
12  shareholders in August 2023 that it would continue issuing the dividends for its Preferred
13  Shares at the initial fixed rates, and it has done so.  Compl. ¶¶ 19, 53.  This lawsuit
14  followed.

15  **III.   LEGAL STANDARD**

16      When evaluating a Rule 12(b)(6) motion to dismiss, the court takes well-pleaded
17  factual allegations as true, but need not credit legal conclusions.  *See Ashcroft v. Iqbal*,
18  556 U.S. 662, 678 (2009).  To survive the motion, a plaintiff must allege "enough facts
19  to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550
20  U.S. 544, 570 (2007).  A claim is facially plausible only when the plaintiff pleads facts
21  that "allow[] the court to draw the reasonable inference that the defendant is liable for
22  the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  A court may dismiss a complaint
23  without leave to amend and with prejudice where "any amendment would be an exercise
24  in futility."  *Steckman v. Hart Brewing, Inc.*,143 F.3d 1293, 1298 (9th Cir. 1998).

25
26
27
28

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

1    **IV.**    <u>**ARGUMENT**</u>

2       **A.**     **Plaintiff Cannot State a Claim Under California's Unfair**

3            **Competition Law Because Maryland Law Governs.**

4      Plaintiff relies on California's Unfair Competition Law to bring a putative

5 nationwide class action, Compl. ¶¶ 1, 21–22, but this dispute is not subject to the UCL

6 because PennyMac's operative charter document (the "Declaration of Trust") compels

7 the application of Maryland law. Ex. C § 13.1; *see also* Md. Code Ann., Corps. & Ass'ns

8 § 8-201. The Declaration of Trust expressly provides that the parties' rights and the

9 effects of its provisions are "subject to and construed according to" Maryland law:

10      The Declaration of Trust is executed by the undersigned Trustees and

11      delivered in the State of Maryland with reference to the laws thereof, and

12      *the rights of all parties and the validity, construction and effect of every*

13      *provision hereof shall be subject to and construed according to the laws*

14      *of the State of Maryland without regard to conflicts of laws provisions*

15      *thereof*.

16 Ex. C. § 13.1.

17      This choice-of-law provision governs the dispute here. PennyMac issued the

18 Preferred Shares pursuant to Articles Supplementary. Compl. ¶ 3. The Articles

19 Supplementary are, by operation of law, part of PennyMac's Declaration of Trust, and

20 therefore are subject to the Declaration of Trust's choice of law provision. *See* Md. Code

21 Ann., Corps. & Ass'ns § 8-101(b) (a "declaration of trust" is "either as originally

22 accepted for record or as amended, corrected, or supplemented by … articles

23 supplementary").[6] Given that PennyMac is a Maryland legal entity and the Articles are

24

25      [6] Maryland's highest court has recognized that articles supplementary "are simply

26 an amendment of the corporate charter" under the analogous provisions of Maryland law
governing corporations. *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md.

27 2021) (citing Md. Code Ann., Corps. & Ass'ns §§ 2-105(a)(13), 2-208); *see also Stender
v. Archstone-Smith Operating Tr.*, 2014 WL 5152002, at *4 (D. Colo. Oct. 14, 2014)

28 (noting "Maryland courts consistently apply Maryland corporate law to issues involving
REITs" and citing cases).

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

a creature of Maryland law, *id.* §§ 8-102, 8-201, 8-203, Maryland "has a substantial relationship to the parties or their transaction" and there is a "reasonable basis for the parties' choice of law," *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 (2001).

The choice-of-law provision applies to the allegations here, which boil down to a disagreement over shareholder rights. *See* Compl. ¶¶ 18–19, 51–52, 57; *see also Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522, 525 (2d Cir. 2023) (articles supplementary are "a contract between [a Maryland legal entity] and its preferred stockholders under Maryland law that defines the rights of these stockholders in connection with their securities"). There can be no question that this dispute centers on the "validity, construction and effect" of the Articles Supplementary, which are part of PennyMac's Declaration of Trust, and the "rights of all parties" thereunder. *See Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992) ("[A] valid choice-of-law clause" in the parties' agreement "encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized[.]"); *see also Bresler v. Wilmington Tr. Co.*, 348 F. Supp.3d 473, 488 n.10 (D. Md. 2018) (applying a contractual choice-of-law provision to non-contractual claims where the underlying language is "sufficiently broad to encompass" other claims (citation omitted) (internal quotation marks omitted)).

This is fatal to Plaintiff's claims. California courts routinely recognize that UCL claims are not cognizable when a dispute is governed by another state's law, and dismiss claims just like these. For example, in *Pro Water Solutions, Inc. v. Angie's List, Inc.*, the court dismissed UCL claims where a user agreement stated that the agreement and the parties' relationship would be governed by Indiana law. 2021 WL 124496, at *4–7 (C.D. Cal. Jan. 13, 2021). The *Pro Water* court held that this clause was broad enough to encompass the UCL claims, and that "[a] valid choice of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Id.* at *7 (citation omitted) (internal quotation marks omitted). *See also Aliya Medcare Fin., LLC*

9

*v. Nickell*, 2015 WL 4163088, at *18–20 (C.D. Cal. July 9, 2015) (dismissing UCL claim on choice-of-law grounds); *Vitek v. Bank of America, N.A.*, 2014 WL 1042397, at *6–8 (C.D. Cal. Jan. 23, 2014) (same); *Melt Franchising, LLC v. PMI Enters., Inc.*, 2009 WL 32587, at *2–3 (C.D. Cal. Jan. 2, 2009) (same); *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1063–65, 1070 (E.D. Cal. 2006) (same).

This court should follow suit, and dismiss with prejudice Plaintiff's California state law claims, because Maryland law governs.[7]

### B. Plaintiff Fails to State a Claim Under the UCL.

The UCL defines "unfair competition" as including "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL is a separate theory of liability, *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009), and Plaintiff purports to bring claims under the "unlawful" and "unfair" prongs, *see* Compl. ¶¶ 72–82. Both fail.

The Complaint should be dismissed with prejudice because PennyMac has paid dividends on the Preferred Shares in accordance with their terms, pursuant to the plain language of the LIBOR Act, which explicitly allows contracts like PennyMac's to continue relying on their original, workable fallback provisions. Its actions are therefore not "unlawful" under the UCL, and also fall within the UCL's safe harbor for actions expressly permitted by law. Nor are they otherwise "unfair." To the extent that Plaintiff argues the UCL compels PennyMac to issue dividends benchmarked to SOFR even though the plain text of the Articles and the LIBOR Act do not direct such issuance, the LIBOR Act itself preempts such an argument. And PennyMac's decision to give effect to the plain meaning of its agreements with shareholders is not "unfair" under the UCL.

---

[7] Nor is there any reason to discard the choice of law provision as contrary to California policy. "[T]he mere fact" that Maryland law may "provide[] greater or lesser protection than California law would, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Century 21 Real Estate LLC v. All Prof. Realty, Inc.*, 600 F. App'x 502, 504 (9th Cir. 2015) (citation omitted) (internal quotation marks omitted).

10

### 1. PennyMac's Actions Complied with the LIBOR Act and Were Not "Unlawful" Under the UCL.

As relevant here, the "unlawful" prong of the UCL essentially provides a cause of action under California law for violations of other laws. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014). Here, Plaintiff brings a UCL claim grounded in alleged violations of the LIBOR Act and its implementing regulations, arguing that the LIBOR Act requires that PennyMac pay the Preferred Shareholders dividends calculated using a SOFR-based rate. Compl. ¶¶ 74–75. This allegation fails because the LIBOR Act imposes no such requirement. Indeed, applying the plain statutory text to the four corners of the contract makes clear that PennyMac has complied with the LIBOR Act in interpreting and applying the fallback provisions set out in the Articles Supplementary and continuing to issue dividends at the initial fixed rates. Accordingly, Plaintiff fails to state a claim that PennyMac's conduct is "unlawful" under the UCL. *See Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) (noting that defendant's conduct "must violate a law … in order for [p]laintiffs to state a claim for relief under Section 17200's 'unlawful' prong").

### a. The LIBOR Act and Its Regulations Direct Parties How To Interpret and Apply LIBOR Contracts.

The statutory provisions governing which contracts must transition to the Board-selected, SOFR-based rate are set out at 12 U.S.C. § 5803(a)–(b).

Subsection (a) provides:

On the LIBOR replacement date, the Board-selected benchmark replacement shall be the benchmark replacement for any LIBOR contract that, after giving effect to subsection (b)—

(1) contains no fallback provisions; or

(2) contains fallback provisions that identify neither—

(A) a specific benchmark replacement; nor

(B) a determining person.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

12 U.S.C. § 5803(a).  Subsection (b) further provides that:

> On the LIBOR replacement date, any reference in the fallback provisions of a LIBOR contract to—
>
>> (1) a benchmark replacement that is based in any way on any LIBOR value…; or
>>
>> (2) a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates;
>
> shall be disregarded as if not included in the fallback provisions of such LIBOR contract and shall be deemed null and void and without any force or effect.

*Id.* § 5803(b).[8]

Reading these two provisions together directs parties as follows:  First, evaluate the contract's "fallback provisions," that is, the "terms in a LIBOR contract for determining a benchmark replacement []" to be used if LIBOR is unavailable.  *Id.* § 5802(11).  If any language within the fallback provisions relies on LIBOR, or requires polling, disregard it, as the LIBOR Act deems such language "null and void and without any force or effect."  *Id.* § 5803(b).  Second, once any such LIBOR- or polling-based references have been disregarded, evaluate any remaining fallback provisions.  If (1) there are no such fallback provisions, or (2) the remaining fallback provisions do not identify either a "specific benchmark replacement" or a "determining person," then the LIBOR Act directs that the contract apply the Board-selected, SOFR-based rate as a replacement for the LIBOR-based rate.  *Id.* § 5803(a).

---

[8] "LIBOR replacement date," "Board-selected benchmark replacement," "benchmark replacement," "determining person," "LIBOR contract," and "fallback provisions" are all statutorily-defined terms which govern this Court's interpretation of the Act.  *See Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018).  The definitions are codified at 12 U.S.C. § 5802 and will be discussed herein as relevant.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Other contracts—*i.e.*, contracts that, after striking any LIBOR- or polling-based references, still provide for either a "specific benchmark replacement" or a "determining person" fallback—are not required to transition to the SOFR-based rate, and instead continue to operate according to their terms (save for the stricken LIBOR- or polling-based provisions).  *See id.*  This is confirmed by the statute's savings clause: "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value…."  *Id.* § 5803(f)(2).

This commitment to leaving untouched the non-LIBOR, non-polling provisions of contracts with workable LIBOR replacements is reflected across the statute, from the statutory purposes to its safe harbor section.  Through the LIBOR Act, Congress sought to provide an avenue for unworkable contracts to navigate LIBOR cessation and preclude inevitable litigation that would arise when contracts could not operate according to their terms.  *See id.* § 5801(b).  But another key purpose was "to allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, ***to operate according to their terms***."  *Id.* § 5801(b)(3).

Further, the statute explicitly states that "nothing in this chapter may be construed to create any negative inference or negative presumption regarding the validity or enforceability of—any benchmark replacement … that is not a Board-selected benchmark replacement."  12 U.S.C. § 5804(e)(1).  The Federal Reserve Board's implementing regulations are more of the same, recognizing that they do not apply to "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value … after disregarding any LIBOR- or poll-based fallback provisions."  88 Fed. Reg. at 5209.

The statute is plain: tough legacy contracts must switch to SOFR, but those contracts that provide a workable fallback are given effect.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

**b.    After Applying the LIBOR Act, the Articles Provide for**

**Dividends at the Initial Fixed Rates.**

PennyMac applied these governing statutory provisions to its Articles to determine the dividend rates owed on the Preferred Shares after LIBOR's cessation. When the initial fixed terms expired, the fallback provisions kicked in, subject to the LIBOR Act's guidance on which provisions to disregard.  After disregarding from the "Three-Month LIBOR" definition the provisions relying on LIBOR-as-published (the Screen Rate) and bank polling (the Polling Rate) pursuant to the Act, the final sentence remains.  It instructs: "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *See* Ex. A ¶ 4(g); Ex. B ¶ 4(g).

The first half of the sentence directs that the Three-Month LIBOR rate from the immediately preceding Dividend Period be employed.  But if the immediately preceding Dividend Period did not use a Three-Month LIBOR rate—*i.e.*, "there was no such Dividend Period"—then the final clause applies: "the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *Id.*

Here, the relevant "immediately preceding Dividend Period[s]" were the periods before each Series was set to float: (1) the period from December 15, 2024 to, but excluding, March 15, 2024 for the Series A shares; and (2) the period from March 15, 2024 to, but excluding, June 15, 2024 for the Series B shares. Ex. A ¶¶ 4(a), (i); Ex. B ¶¶ 4(a), (i).  There were no Three-Month LIBOR rates in effect during those periods; LIBOR was no longer being published, and the shares were still paying their fixed rates. *See* Compl. ¶ 7; Ex. A ¶ 4(a); Ex. B ¶ 4(a).  Because there was "no such Dividend Period" employing a Three-Month LIBOR rate, the Articles direct that "the dividend rate in effect for the immediately preceding Dividend Period" applies: the fixed rates.

As particular, defined dividend rates, the fixed rates each are a "specific benchmark replacement." *See* 12 U.S.C. § 5802(3) (defining "benchmark replacement"

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

to include a "dividend rate"); *Specific*, Black's Law Dictionary (11th ed. 2019) ("specific" defined as "[o]f, relating to, or designating a particular or defined thing"). And the fixed rates do not rely on LIBOR in any way. Therefore, they are exactly the types of fallback rates that the LIBOR Act confirms should be given effect: "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value…." 12 U.S.C. § 5803(f)(2).

By continuing to issue dividends to the Preferred Shareholders at the fixed rates, PennyMac is doing precisely what the LIBOR Act instructs it to do: apply the contractual terms the parties had agreed to when they provide for a specific fallback dividend rate.

### c.    Plaintiff's Argument that a Fallback Must Have Envisioned the Permanent Cessation of LIBOR Fails.

In an effort to get around this straightforward application of the LIBOR Act to the Articles, the Complaint invents from whole cloth an additional statutory "requirement" that is found nowhere in the Act itself. The Complaint contends that, to be given effect, fallback provisions must contemplate LIBOR's permanent cessation, alleging that the LIBOR Act requires SOFR substitution in contracts that do not provide fallback provisions specifically "***for [the] discontinuation of LIBOR***."    Compl. ¶ 48; *see also id.* ¶¶ 14, 45. Because PennyMac's fallbacks were allegedly "created to be used in the event of a temporary delay in the reporting of LIBOR rates," rather than the permanent discontinuation of LIBOR, Plaintiff would read them out of the Articles and give them no effect. *Id.* ¶ 56 (emphasis omitted).

The Complaint tellingly cites to no support in the statute for this supposed additional requirement, and a plain reading of the Act proves it incorrect. The statute does not impose any temporal or duration-based prerequisites on whether a specific rate in a fallback provision may survive. Indeed, it says just the opposite, expressly defining a "benchmark replacement" as encompassing rates "to replace LIBOR or any interest

15

rate or dividend rate based on LIBOR, whether on a ***temporary***, permanent, or indefinite basis." 12 U.S.C. § 5802(3).[9]  And any fallback provision, after striking LIBOR- and polling-based language, with a "specific benchmark replacement" not based on LIBOR is given effect.  *Id.* § 5803(f)(2).

So long as the benchmark replacement meets the other statutory requirements, whether the fallback provision was envisioned to be temporary or permanent is of no import in the statutory scheme.  This makes sense, because the reason for, and the duration of, LIBOR's unavailability makes no difference to whether the contract can continue to work without LIBOR.  And the statute makes clear—from its purpose to its definitions to its operative provisions to its savings clauses—that its goal was to fix broken contracts that could no longer feasibly operate, not override the terms parties had agreed to if those terms could still function.

Plaintiff attempts to force a transition to SOFR by reading out the last sentence of the Preferred Shares' fallback provisions, with no justification in either the contract or the statutory text.  *See Wildewood Operating Co., LLC v. WRV Holdings, LLC*, 303 A.3d 1273, 1284–85 (Md. App. Ct. 2023) (all contractual clauses should be given effect); *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (same).  Since PennyMac's interpretation of its Preferred Shares complied with the LIBOR Act, its actions are not "unlawful" under the UCL.  *See Webb*, 499 F.3d at 1082.

---

[9] This is consistent with other provisions in the statute as well.  *See, e.g.*, 12 U.S.C. § 5802(10) (a "determining person" may have authority to determine a benchmark replacement "***on a temporary basis***").  And the inclusion of "temporary" fallback rates as sufficient benchmark replacements differed from earlier proposed guidance, indicating that it was a conscious decision by Congress.  *See* Alt. Ref. Rates Comm., *Proposed Legislative Solution to Minimize Legal Uncertainty and Adverse Economic Impact Associated with LIBOR Transition* 19 (2020), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC-Proposed-Legislative-Solution.pdf.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

## 2.    PennyMac's Interpretation is Protected by the UCL's Safe Harbor.

For essentially the same reasons that PennyMac's conduct is not "unlawful," Plaintiff's claim is barred in its entirety by the UCL's safe harbor, which immunizes from UCL liability practices that are approved by the government.    Where the government "has permitted certain conduct or considered a situation and concluded no action should lie," courts may not override that determination. *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 958 (C.D. Cal. 2015) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999)); *see also Webb*, 499 F.3d at 1082 (UCL safe harbor for practices legislature and implementing agency "intended to permit").    Therefore, "[a] business practice that might otherwise be considered unfair or deceptive cannot be the basis of a [UCL] cause of action if the conduct has been deemed lawful" by another source of law. *Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147 (2003); *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (affirming dismissal of a UCL claim for "unlawful" business practices under the safe harbor rule).

As discussed, one of Congress's primary purposes was to allow workable contracts "to operate according to their terms."  12 U.S.C. § 5801(b)(3).  The statutory definitions and operative provisions bear out that purpose, directing that only certain, specific contractual language (based on LIBOR or polling) be disregarded, *id.* § 5803(b); substituting SOFR for LIBOR only when contracts have no surviving fallbacks including a specific benchmark replacement or a determining person, *id.* § 5803(a); and expressly not "alter[ing] or impair[ing]" surviving contractual provisions relying on non-LIBOR-based fallback rates, *id.* § 5803(f)(2).

As described above, *see* Section IV.B.1.b, PennyMac's Preferred Shares fall within the LIBOR contracts that Congress expressly "permitted" to operate according to their own terms.  Congress's decision to "unequivocally permit[]" the conduct challenged here "afford[s a] safe harbor from UCL liability." *Alvarez*, 656 F.3d at 933.

17

### 3. Plaintiff Fails To State a Claim that PennyMac's Lawful Interpretation of its Articles Pursuant to the LIBOR Act Is "Unfair" Under the UCL.

The Complaint's conclusory allegations that PennyMac's actions were "unfair" under the UCL in addition to being "unlawful" fail on their own terms as well.  *See* Compl. ¶¶ 80–82.  The Complaint relies entirely on PennyMac's alleged violation of the LIBOR Act, and makes no effort to explain what about PennyMac's compliance with the Act would possibly be unfair.  *See, e.g., id.* ¶¶ 21, 72, 80–82.  The Court's inquiry can and should end there: "where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs … do not survive."  *Millam v. Energizer Brands, LLC*, 2022 WL 19001330, at *7 (C.D. Cal. Dec. 9, 2022) (quoting *Hadley v. Kellogg Sales Co.*, 243 F. Supp.3d 1074, 1104–05 (N.D. Cal. 2017)).  Since Plaintiff's unlawful claim fails, so too must his unfair claim.[10]

To the extent Plaintiff now attempts to argue that, even if PennyMac's actions comply with the LIBOR Act, they nonetheless avoid the safe harbor and are "unfair," such a claim would be entirely unsupported by the Complaint, and also fail under both the LIBOR Act and the UCL.

### a. The LIBOR Act Preempts Any Claim Seeking To Impose a SOFR-Based Rate Where the LIBOR Act Does Not Require One.

The LIBOR Act reflects Congress's intention that LIBOR contracts be treated uniformly nationwide after LIBOR's discontinuation.  12 U.S.C. § 5801(b)(1).  To this

---

[10] The Complaint does not purport to allege any fraudulent conduct or deceptive practices by PennyMac in connection with its Preferred Shares.  In any event, such claims would be subject to the jurisdictional bar of the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1).  *See Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1152–56 (9th Cir. 2017).

18

end, the LIBOR Act expressly preempts "any provision of any State … law … relating to the selection or use of a benchmark replacement[.]"  *Id.* § 5806(1); *see Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010) (express preemption occurs when Congress "indicate[s] its intent to displace state law through express language").  It is the LIBOR Act and its implementing regulations that determine what rate applies, not any individual state's law.  Plaintiff accordingly cannot turn to California law to impose a benchmark replacement rate different than what is dictated by the LIBOR Act.[11]

### b.    PennyMac's Actions Are Not Otherwise Unfair.

Even if the Court were to look past the Complaint's wholesale reliance on an alleged LIBOR Act violation and the Act's express preemption provision to consider Plaintiff's unfair claim further, the claim fails on its own terms.

"[T]he proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts."  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *Lozano v. AT&T Wireless Servs.*, Inc., 504 F.3d 718, 735 (9th Cir. 2007)).  "In the absence of further clarification by the California Supreme Court," federal courts may apply either a "tethering" or a "balancing" test.  *Lozano*, 504 F.3d at 736.  The Complaint fails to state a claim under either test.

Under the "tethering" test, a plaintiff must plead facts sufficient to show that the public policy allegedly rendering the defendant's actions unfair is "tethered to specific constitutional, statutory, or regulatory provisions."  *Holland v. Gen. Motors LLC*, 2024 WL 1680062, at *2 (C.D. Cal. Jan. 25, 2024) (Fitzgerald, J.) (quoting *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)).  But the only statutory

---

[11] California courts and courts within the Ninth Circuit have repeatedly found UCL claims preempted under statutes with similarly broad preemption provisions.  *E.g.*, *Crosby v. California Physicians' Serv.*, 279 F. Supp. 3d 1074, 1082–83 (C.D. Cal. 2018) (UCL claim expressly preempted by ERISA); *Pac. Recovery Sols. v. United Behav. Health*, 508 F. Supp. 3d 606, 619–21 (N.D. Cal. 2020) (dismissing a UCL claim with prejudice due to express ERISA preemption); *People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884, 901–02 (2016) (UCL claim expressly preempted by the Airline Deregulation Act); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992) (finding that Congress's use of the phrase "relating to" denotes broad preemptive effect).  There is no reason to reach a different result here.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

and regulatory regimes mentioned in the Complaint are the LIBOR Act and its implementing regulations, and as described above, PennyMac's conduct fully complies with them. Accordingly, the Complaint does not allege any "unfairness" tethered to any "specific constitutional, statutory, or regulatory provisions." *Holland*, 2024 WL 1680062, at *2; *see Flores v. Wells Fargo Bank, N.A.*, 2012 WL 2427227, at *8 (N.D. Cal. June 26, 2012) (dismissing UCL "unfair" claim where no legislative policy allegedly violated).

Under the traditional "balancing" test, a plaintiff must plead facts showing that "the challenged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Holland*, 2024 WL 1680062, at *2 (quoting *Drum*, 182 Cal. App. 4th at 257). Plaintiff rotely recites this standard, Compl. ¶ 82, but that is insufficient, *see Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270, at *9 (C.D. Cal. Jan. 7, 2013) (dismissing claim alleging in conclusory fashion that harm of allegedly unfair business practices "greatly outweighs any benefits" (internal quotation marks omitted)).

More fundamentally, applying the terms of the Articles pursuant to statutory guidance is not unfair. PennyMac's trustees owe fiduciary duties to its Preferred Shareholders, like Plaintiff, "where the right claimed by the [P]referred is not to a preference as against the common stock but rather a right shared equally with the common." *Kim v. Cedar Realty Tr., Inc.*, 2023 WL 4896635, at *5 (D. Md. Aug. 1, 2023) (citation omitted). Though Preferred Shareholders are entitled to the contractual protections explicitly set out in their agreements, "additional preferences and limitations will not be presumed or implied." *Id.* (citation omitted) (internal quotation marks omitted). If PennyMac were to transition to a floating dividend based on SOFR despite the fact that neither the LIBOR Act nor the text of the Articles compel it to do so, PennyMac would have unjustly favored one class of shareholders over another. *See id.* (noting that "when the interests of the preferred and common stockholders are at odds,

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

the board must typically honor its obligations to the common stockholders"). The "fair" action, therefore, is the one PennyMac took: enforcing the plain terms of the Preferred Shares as written, pursuant to the LIBOR Act, and not selecting a different benchmark rate to the detriment of its common shareholders.

Nor are the fixed rates inherently unfavorable to the Preferred Shareholders. The Articles' fallback provision was put into effect without knowing what the market conditions would be if and when the fallback was invoked, or what the supposed alternatives may be at that point. And as applied here, whether dividends at the fixed rates are lower or higher than dividends based on the SOFR benchmark depends entirely on what SOFR is, which varies over time as interest rates rise and fall. Throughout the life of these securities, the fixed rate can surpass a floating rate based on SOFR—indeed, the fixed rate would have exceeded a floating rate based on SOFR for several of the years after the Preferred Shares were issued, and may well do so again in the future.[12]

PennyMac treats all of its shareholders—including the Preferred Shareholders—fairly by honoring the contractual language to which all parties agreed, as interpreted pursuant to the LIBOR Act, as it has done here.

## V.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's claim with prejudice.


Dated: August 20, 2024              Respectfully submitted,

                                    */s/ Matthew Donald Umhofer*
                                    UMHOFER, MITCHELL & KING, LLP
                                    Matthew Donald Umhofer
                                    Jonas P. Mann

                                    *Attorneys for Defendants PennyMac*
                                    *Mortgage Investment Trust and PNMAC*
                                    *Capital Management, LLC*

---

[12] *See SOFR Averages and Index Data*, Fed. Rsrv. Bank of New York (last visited Aug. 14, 2024), https://www.newyorkfed.org/markets/reference-rates/sofr-averages-and-index.

21

1

2

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

3

*Attorneys for Defendant PennyMac
Mortgage Investment Trust*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for PennyMac Mortgage Investment Trust, certifies the brief contains 6,958 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 20, 2024            Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

*PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT*