Nicole Lavallee (SBN 165755)
Email: nlavallee@bermantabacco.com
Daniel E. Barenbaum (SBN 209261)
Email: dbarenbaum@bermantabacco.com
Jeffrey Rocha (SBN 304852)
Email: jrocha@bermantabacco.com
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Catherine Pratsinakis (Admitted *pro hac vice*)
Email: cpratsinakis@dilworthlaw.com
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013

*Attorneys for Plaintiff Roberto Verthelyi
and the Putative Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO VERTHELYI, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC, <br><br> Defendants. | No. 2:24-cv-05028-MWF-JC <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT PENNYMAC MORTGAGE INVESTMENT TRUST'S MOTION TO DISMISS** <br><br> Date: November 18, 2024 <br> Time: 10:00 a.m. <br> Ctrm: 5A <br> Judge: Michael W. Fitzgerald |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................. 6

    A.    LIBOR Overview .................................................................................... 6

    B.    The LIBOR Act and Rule ....................................................................... 7

    C.    PennyMac's Articles Require Payment of a Floating Rate ................. 7

III.  ARGUMENT ...................................................................................................... 9

    A.    PennyMac Violated the "Unlawful" and "Unfair" Prongs of the UCL When It (1) Violated the LIBOR Act and Rule and (2) Disregarded Legislative Intent and Public Policy Underlying the LIBOR Act ........................................................................................... 9

        1.    The Articles are Tough Legacy Contracts that Do Not Contemplate the Permanent End to LIBOR ......................... 10

        2.    A Fixed Interest Rate Is Neither a Benchmark Nor Benchmark Replacement ....................................................... 11

        3.    The LIBOR Act Was Enacted to Prevent Adjustable-Rate Securities from Unfairly Converting into Permanent Fixed-Rate Instruments ............................................................. 14

    B.    PennyMac's Misconduct Violated the UCL's Unfairness Prong ...... 15

    C.    PennyMac is Not Shielded by Federal Preemption or the UCL's Safe Harbor ........................................................................................... 17

    D.    California Law Applies to this Dispute ............................................... 18

        1.    The Articles Contain No Choice-of-Law Provision ............... 18

        2.    This Dispute Falls Outside the Scope of the Declaration's Choice-of-Law Provision ......................................................... 19

        3.    Enforcing the Declaration's Maryland Choice-of-Law Provision Violates a Fundamental California Policy ............. 20

IV.   CONCLUSION .................................................................................................. 22

1

# **TABLE OF AUTHORITIES**

2

3

**Cases**

4    *Abeyta v. DMCG, Inc.*,
         No. 22-CV-07089-SI, 2023 WL 3047054 (N.D. Cal. Apr. 20, 2023) ...............17

5    *Ashcroft v. Iqbal*,
         556 U.S. 662 (2009) .........................................................................................9

6

7    *BBBB Bonding Corp. v. Caldwell*,
         73 Cal. App. 5th 349 (2021) ..........................................................................17

8    *Bermudez v. PrimeLending*,
         No. LA-CV12-00987-JAK-Ex, 2012 WL 12893080 (C.D. Cal. Aug. 14,
9         2012).................................................................................................................22

10   *Century 21 Real Est. LLC v. All Prof. Realty, Inc.*,
         889 F. Supp. 2d 1198 (E.D. Cal. 2012), *aff'd*, 600 F. App'x 502 (9th Cir.
11        2015).................................................................................................................22

12   *Century 21 Real Estate LLC v. All Prof. Realty, Inc.*,
         600 F. App'x 502 (9th Cir. 2015) ...................................................................22
13

14   *Collins v. Unum Life Ins. Co. of Am.*,
         185 F. Supp. 3d 860 (E.D. Va. 2016), *aff'd*, 700 F. App'x 205 (4th Cir.
15        2017).................................................................................................................13

16   *E.H. v. Meta Platforms, Inc.*,
         No. 23-CV-04784-WHO, 2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ...........16

17   *Eminence Capital, LLC v. Aspeon, Inc.*,
         316 F.3d 1048 (9th Cir. 2003)........................................................................22
18

19   *Florida v. Tenet Healthcare Corp.*,
         420 F. Supp. 2d 1288 (S.D. Fla. 2005) ..........................................................19

20   *Graham Oil Co. v. ARCO Prods. Co.*,
         43 F.3d 1244 (9th Cir. 1994), as amended (Mar. 13, 1995) ..............................11
21

22   *Impac Mortg. Holdings, Inc. v. Timm*,
         255 A.3d 89 (Md. 2021).................................................................................19

23   *In re Anthem, Inc. Data Breach Litig.*,
         162 F. Supp. 3d 953 (N.D. Cal. 2016) ...........................................................16
24

25   *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*,
         No. CV20-7150-PSG-PJWx, 2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) .....21

26   *Lee v. CarMax Auto Superstores Cal., LLC*,
         No. CV-13-7648-MWF-VBKx, 2013 WL 12473808 (C.D. Cal. Dec. 2,
27        2013)................................................................................................................14

28

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th. Cir. 2012)..................................................................18

*McKell v. Wash. Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ...........................................................9, 18

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992) ..............................................................................20

*Ochoa v. Zeroo Gravity Games LLC*,
  No. CV22-5896-GW-ASx, 2023 WL 4291650 (C.D. Cal. May 24, 2023)........20

*Ribbens Int'l., S.A. de C.V. v. Transport Int'l. Pool, Inc.*,
  47 F. Supp. 2d 1117 (C.D. Cal. 1999) ....................................................22

*Rodriguez v. Sony Computer Entm't Am., LLC*,
  801 F.3d 1045 (9th Cir. 2015)..................................................................13

*Rose v. Bank of Am., N.A.*,
  57 Cal.4th 390 (2013) ................................................................................9

*Turner v. Porsche Cars N. Am., Inc.*,
  No. CV23-6465-MWF-BFMx, 2024 WL 3533834 (C.D. Cal. June 19,
  2024).........................................................................................................16

*Urica, Inc. v. Pharmaplast, S.A.E.*,
  No. CV11-02467-MMM-RZx, 2013 WL 12123305 (C.D. Cal. Jan. 10,
  2013).........................................................................................................20

*Vrugtman v. It's Just Lunch Int'l LLC*,
  No. 20-2352-JGB-SPx, 2021 WL 4979443 (C.D. Cal. Sept. 24, 2021).......18, 21

*Walter v. Hughes Commc'ns, Inc.*,
  682 F. Supp. 2d 1031 (N.D. Cal. 2010) ..............................................21, 22

*Zuniga v. Bank of Am. N.A.*,
  No. CV14-06471, 2014 WL 7156403 (C.D. Cal. Dec. 9, 2014) .................16

**Statutes**

12 C.F.R. §253.4(b) .....................................................................................7

12 C.F.R. pt. 253.......................................................................................2, 3

12 U.S.C. §5801...........................................................................................3

12 U.S.C. §5801(a)(2) ...............................................................................4, 7

12 U.S.C. §5801(b)(1) ................................................................................10

12 U.S.C. §5802...........................................................................................3

12 U.S.C. §5802(1).............................................................................5, 7, 12

12 U.S.C. §5802(11)..................................................................................5, 7

12 U.S.C. §5802(3) ................................................................ 12, 13

12 U.S.C. §5803(a) ...................................................................... 3, 7

12 U.S.C. §5803(a)-(b) ..................................................................... 5

12 U.S.C. §5803(b) .......................................................................... 7

12 U.S.C. §5803(f)(2) ............................................................... 5, 12

Cal. Bus. & Prof. Code §17200 .................................................... 5, 9

Md. Code Ann., Com. Law § 13-406 .............................................. 21

Md. Code Ann., Com. Law § 13-408 .............................................. 21

Md. Code Ann., Corps. & Ass'ns §8-101(b)..................................... 19

**Rules**

Fed. R. Civ. P. 15(a)(2) .................................................................. 22

**Legislative History**

Congressional Record (House), *Adjustable Interest Rate (LIBOR) Act of 2021*, 167 Cong. Rec. H7479-01 (Dec. 8, 2021) .......................................... 14

Regulations Implement the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01 (Jan. 26, 2023).......................................... 2, 10

*The End of LIBOR: Transitioning to an Alt. Interest Rate Cacl. for Mortgs., Student Loans, Bus. Borrowing, and Other Fin. Prods.: Hrg. Before H. Comm. on Fin. Servs.*, 117th Cong. 17 (Apr. 15, 2021) ................................................... passim

*The LIBOR Transition: Protecting Consumers and Investors*, 117th Cong. 357 (Nov. 2, 2021) .................................................. 2, 12

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .............................................. 12

The Chicago Manual of Style §6.23 (16th ed. 2010) ............................ 13

Plaintiff submits this memorandum of law in opposition[1] to the motion to dismiss filed by PennyMac Mortgage Investment Trust (the "Trust") (ECF 34) and adopted in its entirety by PNMAC Capital Management, LLC ("PCM") (ECF 35) (collectively, "PennyMac" or "Defendants").[2]

## I.    <u>INTRODUCTION</u>

Plaintiff brought this class action for restitution of dividends owed and injunctive relief against PennyMac on behalf of himself and all persons and entities who own or owned shares of PennyMac's fixed-to-floating rate Series A and/or Series B Preferred Shares on or after August 25, 2023.

The dividend terms are in the governing documents—the 2017 Articles Supplementary ("Articles")—at Section 4(a)-(l). Section 4(a) of the Articles require PennyMac to transition from a fixed-rate to floating-rate dividend pegged to the London Interbank Offering Rate ("LIBOR"), a benchmark then widely used by investors around the globe to calculate adjustable or floating interest rates.[3] As of March 15, 2024, the Articles promised Series A preferred stockholders a floating rate equal to Three-Month LIBOR plus 5.831%. ¶32; Ex. A §4(a). As of June 15, 2024, the Articles promised to pay Series B preferred stockholders a floating rate equal to Three-Month LIBOR plus 5.99%. ¶36; Ex. B §4(a).

On March 5, 2021, the U.K. Financial Conduct Authority announced that LIBOR would permanently cease publication on June 30, 2023. ¶46. Concerned

---

[1] Plaintiff herein refers to: the Complaint (ECF 1) as "¶__"; the Declaration of Catherine Pratsinakis, filed concurrently herewith, as "Pratsinakis Decl."; the Trust's motion to dismiss (ECF 34) as "Mem."; and Exhibits attached to the Declaration of Matthew Donald Umhofer (ECF 36-1) as "Ex. __." Unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks and citations are omitted.

[2] Plaintiff responds to PCM's motion to dismiss (ECF 35) in a separate, concurrently filed opposition.

[3] ¶4 & nn.1-2 (referring to articles that provide further explanation).

[No. 2:24-cv-05028-MWF-JC] PLAINTIFF'S OPPOSITION TO PENNYMAC'S MOTION TO DISMISS (ECF 34)                                    1

about ensuing turmoil, Congress and the Federal Reserve sought to pass legislation to address the U.S. market's heavy reliance on the LIBOR benchmark. ¶¶46-49.

The Federal Reserve explained: "Of particular concern are so-called 'tough legacy contracts,' which are contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a **clearly defined or practicable replacement benchmark** following the cessation of USD LIBOR." *See* Regulations Implement the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. pt. 253). Congress, therefore, set out to address contracts (like the Articles here) that did not "contemplate the permanent cessation of LIBOR."[4] According to the Federal Reserve, "many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR."[5] As Senator Patrick Toomey stated during hearings, "any legislation that addresses tough legacy contracts must be narrowly tailored, not change the equities of these contracts…."[6]

---

[4] Pratsinakis Decl. Ex. 1 (*The End of LIBOR: Transitioning to an Alt. Interest Rate Cacl. for Mortgs., Student Loans, Bus. Borrowing, and Other Fin. Prods.: Hrg. Before H. Comm. on Fin. Servs.*, 117th Cong. 17, at 14 (Apr. 15, 2021) ("House Hrg.") (statement of Daniel E. Coates, Senior Associate Director, Office of Risk Analysis and Modeling, Federal Housing Finance Agency)).

[5] *Id*. Ex. 1 (House Hrg.) 62 (statement of Mark Van Der Weide, General Counsel, Bd. of Govs. Fed. Reserve); *see also id*. Ex. 2 (*The LIBOR Transition: Protecting Consumers and Investors*, 117th Cong. 357, at 114 (Nov. 2, 2021) ("Senate Hrg.") (statement of Thomas Wipf, Chair of the Alternative Reference Rates Committee and Managing Director, Morgan Stanley) ("For many existing legacy contracts that reference LIBOR, however, things are much less simple. . . effectively converting what were **floating-rate instruments into fixed-rate instruments**."); *id.* at 137 (same); *id.* at 138 (same); *id.* at 145-146 (statement of J. Christopher Giancarlo, Senior Counsel, Willkie Farr & Gallagher LLP, and Former Chair, U.S. Commodity Futures Trading Commission) ("The legislation makes clear that all LIBOR contracts **must be converted to an alternative benchmark** before June 30, 2023.").

[6] Pratsinakis Decl. Ex. 2 (Senate Hrg.) 135; *see also id*. Ex. 1 (House Hrg.) 62.

To avoid chaos and litigation stemming from such concerns, Congress sought to pass legislation that "establish[ed] a clear and uniform framework, on a nationwide basis, for replacing LIBOR in legacy contracts ... [, which] should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, *or that effectively convert to fixed-rate instruments*."[7] Congress did not seek to interfere with "legacy contracts with fallbacks to another *floating rate*."[8]

To this end, on March 15, 2022, Congress enacted the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. §5801 *et seq.* (the "LIBOR Act"). On February 27, 2023, the Federal Reserve enacted the final rule implementing the LIBOR Act. *See* 12 C.F.R. pt. 253 (the "LIBOR Rule"). The LIBOR Act and Rule mandated that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [Secured Overnight Financing Rate, or SOFR] *shall be the benchmark replacement for any LIBOR contract* that, after giving any effect to subsection (b)–(1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person." 12 U.S.C. §§5803(a) & 5802.

Given that the Articles have no adequate fallback provision nor reference a benchmark to replace LIBOR, on August 25, 2023, PennyMac shocked investors and the market by announcing that it would rely on certain legacy language to pay a fixed rate in perpetuity instead of adopting SOFR. ¶¶15, 53. PennyMac misconstrues the LIBOR Act and its Articles, disadvantaging its preferred stockholders and undermining the LIBOR Act's core objective—to protect all parties to LIBOR contracts from being unfairly disadvantaged by LIBOR's permanent cessation.

---

[7] *Id*. Ex. 1 (House Hrg.) 63 (Mark Van Der Weide).

[8] *Id*. at 19, 39 (same).

PennyMac moves to dismiss this action by asserting that: (1) it did not violate the LIBOR Act by converting its floating-rate notes into permanent fixed-rate notes, and, thus, did not violate the UCL; and (2) the Maryland choice-of-law provision in the Declaration of Trust[9] ("Declaration") precludes Plaintiff's UCL claim. PennyMac is wrong on both fronts.

The fundamental disagreement here is whether the Articles contain a permissible and workable fallback provision or benchmark to replace LIBOR or whether instead PennyMac was required to transition to SOFR.

*First*, the Articles are "tough legacy contracts" that did not contemplate the permanent cessation of LIBOR, reflecting the type of contract that requires adoption of the SOFR index under the LIBOR Act and Rule. Section 4(g) of the Articles is not a clearly defined, practicable, or "workable" fallback provision,[10] but a temporary fix for when LIBOR is unavailable on a particular date by a specified time (11:00 a.m.). PennyMac claims that a final clause in a waterfall at Section 4(g) calls for a fixed rate when LIBOR is unavailable, rendering it an adequate fallback. On the contrary, PennyMac's obligation to pay a floating rate and the lack of an alternative benchmark in the Articles demonstrate that the parties (and the Articles) did not anticipate the permanent cessation of LIBOR. Indeed, the floating-rate provision in Section 4(a) in the Articles requires PennyMac to pay a premium over LIBOR—a clear and separate indication that neither party contemplated using a fixed rate as a replacement for LIBOR in perpetuity.

*Second*, Section 4(g) does not reference any **benchmark** other than LIBOR and a fixed interest rate is not a benchmark or benchmark replacement for LIBOR.

---

[9] *See* Ex. C (Trust's Articles of Amendment and Restatement of its Declaration of Trust, dated July 24, 2009).

[10] The LIBOR Act requires a "clearly defined or practicable replacement benchmark rate [*i.e.,* index] when LIBOR is discontinued." 12 U.S.C. §5801(a)(2). PennyMac, however, uses the term "workable." Mem. 5, 6, 10, 13, 17.

The statutory phrase "benchmark replacement" builds on the statutory definition of "benchmark"— "an index of interest rates or dividend rates." 12 U.S.C. §5802(1). Fixed rates are disassociated from an index, and differ from rates that rely on a benchmark, such as the "prime rate or the effective Federal funds rate." *Id.* §5803(f)(2) (statute provides examples of *benchmark replacements*; concept of *fixed rates* is not referenced). Because the Articles do not identify a benchmark to replace LIBOR, PennyMac was required to adopt the SOFR index.

While the statutory language is clear, the legislative record also supports a finding that PennyMac had to adopt SOFR, and that Congress sought to prohibit legacy contracts from "***convert[ing] to fixed-rate instruments.***" Pratsinakis Decl. Ex. 1 (House Hrg.) 63. Nothing in the legislative record supports finding that a fixed rate is an adequate benchmark replacement for LIBOR. Plaintiff will demonstrate: (a) PennyMac was required to adopt SOFR; (b) the Articles do not anticipate the permanent end to LIBOR; (c) the Articles contain no clearly defined or practicable fallback or benchmark; (d) PennyMac knew it was not complying with the LIBOR Act when it adopted a fixed-rate in place of LIBOR; and (e) PennyMac's competitors with similar legacy contracts adopted SOFR in compliance with the LIBOR Act and Rule.

PennyMac's Articles are the ***exact*** tough legacy contracts Congress sought to reform. Since Section 4(g) does not provide an adequate fallback and the Articles do not reference an alternative benchmark to LIBOR, PennyMac had to adopt SOFR in place of LIBOR. 12 U.S.C. §§5802(11), 5803(a)-(b). By violating the LIBOR Act, Defendants (both California-based) violated California's Unfair Competition Law, California Business and Professions Code §17200 *et seq*. ("UCL"), broadly prohibiting "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

Finally, the Maryland choice-of-law provision does not apply because the Articles were not adopted into PennyMac's Declaration of Trust. Even assuming it applied, the choice-of-law provision does not cover extra-contractual violations of the LIBOR Act, and its enforcement would interfere with California's strong policy favoring public injunctions.

## II.    FACTUAL BACKGROUND

### A.    LIBOR Overview

LIBOR was a key benchmark used by major banks worldwide for decades as the benchmark for setting interest rates in fixed-to-floating notes, mortgages, credit cards, and other financial products. ¶¶4, 39. By the end of 2020, the value of financial products referencing LIBOR was $223 trillion. ¶4.

In 2014, after allegations of LIBOR manipulation arose, the U.S. Treasury's Financial Stability Oversight Council advocated for alternative benchmarks, leading to the creation of the SOFR. ¶¶6, 40. The Federal Reserve and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee* ("ARRC") to help ensure a successful transition from LIBOR to a more robust reference rate—its recommended alternative was SOFR. *Id*.

By late 2017, the LIBOR panel banks announced that they would cease publishing LIBOR by the end of 2021—later extended through June 2023 for USD LIBOR. ¶¶7, 46. In 2018, ARRC was reconstituted to develop guiding principles for transitioning floating-rate notes from LIBOR to SOFR. ¶¶8, 41. By 2019, ARRC published guidance on fallback provisions to reduce market disruption in the event of LIBOR's cessation. ¶41. By 2021, ARRC's guidance encouraged replacing LIBOR with SOFR (or a SOFR-like index) to reduce litigation and regulatory risk. *Id*. ARRC recommended that fallback language be feasible, practicable, and fair (i.e., not advantage one market participant to the disadvantage of another). *Id*.

### B.    The LIBOR Act and Rule

In enacting the LIBOR Act on March 15, 2022, Congress found that "a significant number of existing contracts that reference LIBOR" do not provide a "clearly defined or practicable replacement benchmark rate when LIBOR is discontinued." 12 U.S.C. §5801(a)(2). A "fallback provision" means terms in a LIBOR contract for determining a benchmark replacement. *Id.* §5802(11). A "benchmark" is "an index of interest rates or dividend rates that is used … as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." *Id.* §5802(1).

Section 5803(a) of the LIBOR Act provides that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [SOFR] ***shall be*** the benchmark replacement for any LIBOR contract that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement nor (B) a determining person." 12 U.S.C. §5803(a). Subsection (b) further states that any reference in the fallback provision to either (1) a benchmark replacement that references LIBOR or (2) a requirement that a poll be conducted to obtain quotes "concerning interbank lending or deposit rates … shall be disregarded as if not included in the fallback provisions…." 12 U.S.C. §5803(b). In December 2022, the Federal Reserve issued the LIBOR Rule, 12 C.F.R. §253.4(b), adopting SOFR as the LIBOR benchmark replacement. ¶¶12, 47.

### C.    PennyMac's Articles Require Payment of a Floating Rate

Defendant PennyMac Mortgage Investment Trust is a Maryland real estate investment trust that invests primarily in residential mortgage loans and mortgage-related assets. ¶¶2, 28. Defendant PCM is a Delaware entity that externally manages

the Trust, overseeing all aspects. *Id.* Defendants are based in and operate out of California. ¶¶28-29.

PennyMac issued two preferred share series, Series A and Series B Fixed-to-Floating Preferred Shares, in March and July 2017, respectively. ¶¶30-31, 34-35. These Floating-Rate-Shares are governed by the Articles. ¶3; Mem. 3. PennyMac raised ***over $310 million*** selling them by promising investors floating-rate dividends. ¶30. In Section 4(a) of the Series A Articles, PennyMac promised dividends equal to an initial fixed rate of 8.125% from the date of issuance in 2017 through March 14, 2024 (a "Fixed Rate Period") followed by "a floating rate equal to Three-Month LIBOR … ***plus a spread of 5.831%***" from "March 15, 2024 and thereafter." ¶¶31-32, 35-36; Ex. A §4(a); Ex. B §4(a). In Section 4(a) of the Series B Articles, PennyMac promised dividends equal to an initial fixed rate of 8.00% from issuance in 2017 through June 14, 2024, followed by "a floating rate equal to Three-Month LIBOR… ***plus a spread of 5.99%***" from "June 15, 2024 and thereafter." *Id.*

On August 25, 2023, well after LIBOR's cessation, rather than complying with the LIBOR Act and Rule as many of its competitors had done (¶¶18, 50), and despite the Preferred Shares' designation as "Fixed-to-Floating" securities, PennyMac claimed that it had a workable fallback and benchmark replacement that permitted the Preferred Shares to remain fixed-rate instruments in perpetuity, beyond the Fixed Rate Periods defined in Section 4(a) of the Articles. ¶¶15, 53. PennyMac claims that the LIBOR Act permitted it to use its outdated legacy definition of "Three-Month LIBOR" based on Section 4(g) of the Articles, which addresses only temporary LIBOR unavailability and includes the final sentence: "or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." Mem. 14. Thus, despite the language in Section 4(a), according to PennyMac, the Articles direct it to pay "the dividend rate in effect for the immediately preceding Dividend

Period…: the fixed rates." *Id*. As a result, Series A Preferred Shareholders are being paid a flat 8.125% dividend when they should be receiving 11.19%, and Series B Preferred Shareholders are receiving 8.00% instead of 11.35%. ¶19.

## III.    <u>ARGUMENT</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a complaint's allegations, courts must "assume the[] veracity" of all well-pleaded factual allegations, draw all reasonable inferences from them, and "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

### A.    PennyMac Violated the "Unlawful" and "Unfair" Prongs of the UCL When It (1) Violated the LIBOR Act and Rule and (2) Disregarded Legislative Intent and Public Policy Underlying the LIBOR Act

Plaintiff alleges that Defendants' conduct, in violation of the LIBOR Act and Rule and their underlying policies, amounts to unlawful and unfair conduct under California's UCL. ¶¶69-87. California's UCL broadly prohibits any unlawful, unfair, or fraudulent business act or practice, with each category establishing distinct grounds for liability. *See* Cal. Bus. & Prof. Code §17200; *Rose v. Bank of Am., N.A.*, 57 Cal.4th 390, 394 (2013); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006).

By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices [that the unfair competition law makes] *independently* actionable." *Rose*, 57 Cal.4th at 396; *McKell*, 142 Cal. App. 4th at 1474. "Violations of federal statutes, including those governing the financial industry, may serve as the predicate for a UCL cause of action." *Rose*, 57 Cal.4th at 396. Thus, under the UCL's borrowing principle,

Defendants' violations of the LIBOR Act and Rule also constitute violations of the UCL's unlawful prong. "[T]he UCL does not serve as a mere enforcement mechanism. It provides its own distinct and limited equitable remedies for unlawful business practices, using other laws only to define what is 'unlawful.'" *Id.* at 397. PennyMac concedes that if the Court finds that Plaintiff has adequately pled a violation of the LIBOR Act and Rule, Plaintiff's UCL *unlawful* prong claim must be sustained.

### 1.    The Articles are Tough Legacy Contracts that Do Not Contemplate the Permanent End to LIBOR

The Articles are "tough legacy contracts" that did not contemplate the permanent cessation of LIBOR. The Federal Reserve defines "tough legacy contracts" as "contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a clearly defined or practicable replacement benchmark following the cessation of USD LIBOR." 88 Fed. Reg. at 5205; 12 U.S.C. §5801(b)(1).

The Articles do not contemplate the end of LIBOR and predate news of LIBOR ending by ***four years*** and its cessation by over ***ten years***. Rather, Section 4(g) is a waterfall centered on LIBOR, reflecting a series of steps (in preferential order) for when LIBOR is unavailable on a particular date by a specified time (11:00 a.m.).[11] These steps are systematic, going from polling banks, to using the LIBOR quote from the "immediately preceding Dividend Period" or "if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." This final clause does not state that PennyMac can revert to its initial fixed rate in perpetuity. But even if this final

---

[11] Section 4(g) of the Articles states that Three-Month LIBOR must be calculated "for each Dividend Period during the Floating Rate Period," providing a series of steps for how to calculate "Three-Month LIBOR" when a LIBOR quote is unavailable at "11:00 am (London time) on the relevant Dividend Determination Date." *See* Ex. A §4(g); Ex. B §4(g).

clause means what PennyMac claims it means, it is part of a highly integrated clause that cannot be severed. *Graham Oil Co. v. ARCO Prods. Co*., 43 F.3d 1244, 1248-49 (9th Cir. 1994), as amended (Mar. 13, 1995) (striking entire arbitration clause though only portions violated federal law because it was not severable).[12] Nor is Section 4(g) workable given the language in Section 4(a) requires a spread of 5.831% or 5.99% *over LIBOR* (i.e., a floating rate) during the floating-rate period. That obligation is a clear, separate indication that neither party contemplated using a fixed rate in perpetuity. Section 4(a) does not simply vanish.

As such, Section 4(g) does not provide a clearly defined or practicable fallback provision. And to the extent there is ambiguity as to the adequacy of Section 4(g), the legislative history makes clear that this is the exact type of contract the LIBOR Act sought to reform by mandating the adoption of SOFR.[13]

## 2.    A Fixed Interest Rate Is Neither a Benchmark Nor Benchmark Replacement

Additionally, the Articles do not reference an alternative benchmark to replace LIBOR. PennyMac erroneously asserts that the definition of "benchmark

---

[12] The Articles similarly do not have a severability or survival clause.

[13] The legislative record is filled with references to this problem of waterfalls in floating rate instruments referring only to LIBOR and not contemplating LIBOR's demise. For example, as Mr. Coates explained, many contracts simply "did not contemplate the permanent cessation of LIBOR[,]" for an orderly transition away from LIBOR. Pratsinakis Decl. Ex. 1 (House Hrg.) at 14. Similarly, Mark Van Der Weide, General Counsel for the Federal Reserve, affirmed that the LIBOR Act was designed to address such permanent cessation scenarios not contemplated by contracts. *Id.* at 62-63. The Securities Industry and Financial Markets Assoc. (SIFMA) testified that tough legacy contracts "executed prior to LIBOR cessation and in many cases prior to the development/adoption of robust fallback language (e.g., 2019-2020) … were not designed at the time of issuance with a permanent cessation, of LIBOR in mind." *Id.* at 95, 97; *see also* ARRC, *Second Report—The Alternative Reference Rate Committee*, at 25, 27 (Mar. 2018), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report (most contracts referencing LIBOR "do not envision the possibility that LIBOR might permanently cease and have fallbacks that would not be economically appropriate if such an event occurred"). *See, infra,* Section A.3.

replacement" in the LIBOR Act encompasses ***fixed interest rates***. But investors were promised ***floating rates*** and never warned of even the possibility of a permanent fixed rate.

PennyMac cannot escape the LIBOR Act's definition of "***benchmark***"—an "index of interest rates or dividend rates that is used … as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." 12 U.S.C. §5802(1). A fixed rate is disassociated from an index.[14] A "fixed interest rate" is "[a]n interest rate that is specified and is not subject to change," and a *"floating rate"* is "a varying interest rate that is tied to a financial index such as the prime rate." Black's Law Dictionary (12th ed. 2024). The LIBOR Act identifies prime rate and Federal funds rate as example benchmark replacements. *Id.* §5803(f)(2).

The term "benchmark replacement" incorporates the meaning of "benchmark" and builds on it:

> The term "benchmark replacement" means a benchmark, **or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR)**, to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

*Id.* §5802(3).

---

[14] Pratsinakis Decl. Ex. 1 (House Hrg.) 62 ("[A] contract converts to a fixed rate when LIBOR ends, a party [is] disadvantaged by that conversion [and] might request that a court reform the contract by substituting an alternative floating rate for LIBOR."); Pratsinakis Decl. Ex. 2 (Senate Hrg.) 120 (statement of Andrew Pizor, Staff Attorney, National Consumer Law Center) ("People have had expectations about what LIBOR would do, what their rates would be like in the future. And so it is appropriate that *whatever index* replaces that should be as close as possible to the LIBOR to match those expectations, and that will be the SOFR.").

PennyMac contends that the **red clause** creates items in a series, but this misconstrues the language, construction, and purpose of the Act, going well beyond the legislative and ordinary meaning of "benchmark." *Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015) (holding "phrases must be construed in light of the overall purpose and structure of the whole statutory scheme").

The **red clause *does not*** convey items in a series. This is made plain by the lack of an Oxford comma and use of "**, or**" immediately after "benchmark" instead of the "next to-last item only." *See* House Legislative Counsel's Manual on Drafting Style (Dec. 2020), https://legcounsel.house.gov/sites/evo-subsites/legcounsel-evo.house.gov/files/documents/ManualDraftStyle_2022.pdf, at 44 ("(iii) each item (other than the last item) ends with a comma ... (iv) the conjunction 'and' or 'or' appears at the end of the next to-last item only"). Moreover, Section 5802(3) uses an Oxford comma for a series within the same definition ("on a temporary, permanent**,** or indefinite basis"), which further supports that the **red clause** is not a series. 12 U.S.C. §5802(3).

The only logical reading is that the **red** clause is an appositive clause intended to explain (not contradict) the term "benchmark." *See Collins v. Unum Life Ins. Co. of Am.*, 185 F. Supp. 3d 860, 874 (E.D. Va. 2016) (holding that "appositive clauses contained within commas are said to be 'nonrestrictive'... A nonrestrictive clause 'can be omitted without obscuring the identity of the noun to which it refers'" (citing The Chicago Manual of Style §6.23 (16th ed. 2010))), *aff'd*, 700 F. App'x 205 (4th Cir. 2017). Upon removing the appositive clause, the statutory language reads: "The term 'benchmark replacement' means a benchmark … to replace LIBOR or any interest rate or dividend rate based on LIBOR.…" *Id.*

Contrary to its contention, the Articles do not reference an alternative benchmark to LIBOR. The final clause at the end of the waterfall in Section 4(g)

points to a fixed rate which is not a benchmark rate. Nor does inclusion of the word "temporary" in the definition of "benchmark replacement" render Section 4(g) workable. Mem. 15-16. PennyMac was required to adopt SOFR, as many of its competitors had done. By failing to do so, PennyMac violated the LIBOR Act and the UCL.

### 3. The LIBOR Act Was Enacted to Prevent Adjustable-Rate Securities from Unfairly Converting into Permanent Fixed-Rate Instruments

While the LIBOR Act (and PennyMac's violation if it) is clear, the Court may refer to legislative history if the statutory language is unclear or ambiguous. *See, e.g., Lee v. CarMax Auto Superstores Cal., LLC*, No. CV-13-7648-MWF-VBKx, 2013 WL 12473808, at *6-7 (C.D. Cal. Dec. 2, 2013).

Nowhere in the hundreds of pages of historical legislative records does *anyone* suggest that a fixed rate qualifies as a benchmark replacement or adequate fallback provision. The legislative record demonstrates the *opposite*—stating that a goal is to prevent floating-rate instruments from unfairly converting into fixed-rate instruments.

Congressman Brad Sherman urged Congress to pass the LIBOR Act, stating: "trillions of outstanding loans [] have adjustable interest rates … tied to… [LIBOR,] the most important interest rate in the world. We are dealing here with ***adjustable rate*** mortgages, business loans and securities, … [and] [f]or many years LIBOR was the index." Pratsinakis Decl. Ex. 3 (Congressional Record (House), *Adjustable Interest Rate (LIBOR) Act of 2021*, 167 Cong. Rec. H7479-01 (Dec. 8, 2021)). In his congressional testimony, Mark Van Der Weide, the General Counsel of the Federal Reserve, explained the dilemma:

> A key question is whether existing LIBOR-based contracts (legacy contracts) can seamlessly transition to alternative reference rates when

LIBOR ends. … [M]ost business loans have workable fallback language—by their terms, business loans generally fall back to an alternative floating rate, such as the prime rate .... ***Conversely, many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR****.... [I]f a legacy contract converts to a fixed rate when LIBOR ends, a party disadvantaged by that conversion might request that a court reform the contract by substituting an alternative floating rate for LIBOR.

Pratsinakis Decl. Ex. 1 (House Hrg.) 62. Van Der Weide further testified:

Federal legislation should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks***, or that convert to fixed-rate instruments***.

*Id.* at 63.

Thus, the legislative record supports the finding that PennyMac's decision to convert its floating-rate notes into fixed-rate notes is what Congress sought to prevent with the LIBOR Act. PennyMac's alleged misconduct, therefore, violates the unlawful prong of the UCL. ¶¶21-23, 69-87. The Class was, and will continue to be, denied the dividends promised and owed, unless this action proceeds.

### B. PennyMac's Misconduct Violated the UCL's Unfairness Prong

"Under the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision ... [the "tethering test"]; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers [the "balancing test"]; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer [the "FTC test"]."

*Turner v. Porsche Cars N. Am., Inc.*, No. CV23-6465-MWF-BFMx, 2024 WL 3533834, at *4 (C.D. Cal. June 19, 2024) (Fitzgerald, J.). The Court only needs to find Plaintiff's allegations meet one of these tests for PennyMac's motion to be denied. *E.H. v. Meta Platforms, Inc.*, No. 23-CV-04784-WHO, 2024 WL 557728, at *6 (N.D. Cal. Feb. 12, 2024).

PennyMac allegedly took advantage of ordinary retail investors who have and will continue to lose dividend income from their retirement portfolios and otherwise. (¶20). Series A investors should have received 11.19% interest instead of 8.13%, and Series B investors should have received 11.35% instead of 8.00%. ¶¶9-10, 12-21, 41-45, 49-60, 73-82.

Even if the Court were to find that this practice is not explicitly prohibited by the LIBOR Act, its legislative history and policy goals make clear that it was unethical and significantly harmful to consumers, thus satisfying the balancing test. *Zuniga v. Bank of Am. N.A.*, No. CV14-06471, 2014 WL 7156403, at *9 (C.D. Cal. Dec. 9, 2014) (Fitzgerald, J.) (legislative history may contribute to a finding of unfairness). For the same reasons, this conduct also satisfies the FTC test, as PennyMac has no policy justification that outweighs the significant harm here. Additionally, the LIBOR Act provides a clear public policy mandate to transition to SOFR under these circumstances, which supports Plaintiff's claim under the tethering test. *See In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989-90 (N.D. Cal. 2016).

PennyMac's claim that transitioning to SOFR would unfairly favor preferred shareholders over common stockholders (Mem. 20-21) overlooks the mandate of the LIBOR Act and the obligations under the Articles. PennyMac does not owe common stockholders a duty to violate the law and its contractual obligations when it is economically advantageous for them.

PennyMac's assertion that fixed rates may hypothetically surpass floating rates is unavailing. Mem. 20-21. PennyMac's decision to violate the LIBOR Act to avoid higher payouts in today's high-interest-rate environment is a tangible harm. ¶¶18, 78. PennyMac's alleged misconduct, therefore, violates the unlawful prong of the UCL.

## C.    PennyMac is Not Shielded by Federal Preemption or the UCL's Safe Harbor

PennyMac's attempts to invoke federal preemption and UCL safe harbor defenses are unavailing.

PennyMac raises these defenses primarily in the context of Plaintiff's unfairness prong UCL claim; it assumes that its actions were lawful under the LIBOR Act and Rule and then argues (a) that, as a result, the UCL Safe Harbor precludes bringing a UCL claim against its lawful compliance, and (b) Plaintiff is pre-empted by the federal LIBOR Act and Rule from asserting state law claims. Neither are correct.

**UCL Safe Harbor.** To qualify for protection under the UCL's safe harbor, a statute must either explicitly prohibit liability or expressly preclude an action based on the alleged conduct. *See BBBB Bonding Corp. v. Caldwell*, 73 Cal. App. 5th 349, 377 (2021); *Abeyta v. DMCG, Inc.*, No. 22-CV-07089-SI, 2023 WL 3047054, at *2 (N.D. Cal. Apr. 20, 2023). As the UCL claim here is not one based on a lawful act, the statute's safe harbor provision does bar Plaintiff's UCL claims. And even if PennyMac's actions were found to not be expressly barred by the LIBOR Act and Rule, that does not preclude Plaintiff's unfairness prong claim as to whether the fixed rate selected by PennyMac was fair to investors.

**Federal Preemption.** Contrary to PennyMac's contention (Mem. 10, 18-19), Plaintiff is not arguing that state law should override federal law to impose an alternative reference rate. Simply put, Plaintiff asserts that Defendants violated

federal law, and that this violation in turn constitutes a violation of the UCL, which borrows violations of other laws and makes them independently actionable under the UCL's unlawful prong. *See, e.g.*, *McKell* 142 Cal. App. 4th at 1485 (plaintiffs were not using the UCL to impose state law on a federal savings association, but rather to demonstrate that the defendant violated federal law). As the *McKell* court found, using the UCL as described does not "interfere in any way with the operation of the federal law," as the UCL "only provides a means of enforcing federal requirements." *Id*. at 1485-86. Federal preemption does not apply.

### D.    California Law Applies to this Dispute

#### 1.    The Articles Contain No Choice-of-Law Provision

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Vrugtman v. It's Just Lunch Int'l LLC*, No. 20-2352-JGB-SPx, 2021 WL 4979443, at *3 (C.D. Cal. Sept. 24, 2021). Moreover, the law of the state in which a court sits determines the enforceability of a choice-of-law clause. *Id*. "This applies to actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." *Id.*

At the center of this dispute is the LIBOR Act and its interplay with the Articles, which have no choice-of-law provision. California-based entities violated federal law to the detriment of retail investors located in California and nationwide. While the PennyMac Trust was formed under Maryland law, and its external manager PCM under Delaware law, both Defendants are based in and operate out of California. ¶¶28-29. The misconduct occurred in California (¶26), and one can readily infer that responsible employees, officers, and directors reside in California, and that PennyMac's statements and public filings emanated from California (¶¶21, 25-26, 28-29). Under similar circumstances, California courts apply California law. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th. Cir. 2012) (applying California law to out-of-state parties when the misconduct occurred in California);

*see also Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1312 (S.D. Fla. 2005) (same).

Despite California's strong connection to this action and overarching interest in deterring corporate misconduct that takes place within its borders, PennyMac asserts that Maryland law applies because of a choice-of-law clause in another completely irrelevant document—the Declaration of Trust. As PennyMac acknowledges, the "governing documents" at issue here are the Articles (Mem. 1), and those have no choice-of-law provision (*see* Exs. A & B).

PennyMac asserts *multiple times* that the Articles are incorporated into the Declaration by operation of law. Mem. 3, 8, 9. PennyMac is overreaching. The Articles state that they **"may"** become part of Article VI of the Declaration upon a restatement, expressing a possibility and not a certainty. *See* Ex. A at 1; Ex. B at 1 ("upon any restatement of the Declaration of Trust, [the Articles Supplementary] may become part of Article IV of the Declaration of Trust...."). That a declaration of trust can be amended through articles supplementary under Maryland law does not negate the language here. Md. Code Ann., Corps. & Ass'ns §8-101(b). PennyMac could have filed a restatement, but never did. *See* Pratsinakis Decl. Ex. 5 (official list of PennyMac filings from Maryland Dept. of Assessments and Taxation). Defendants' reliance on *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md. 2021) (Mem. 8 n.6), is misplaced because there, unlike here, the issue of whether the articles amended the declaration was not raised and Impac's articles provide greater certainty. Pratsinakis Decl. Ex. 6, at 187 (Impac's Articles) ("upon any restatement of the Charter, [the Articles] ***shall*** become part of... the Charter").

### 2.    This Dispute Falls Outside the Scope of the Declaration's Choice-of-Law Provision

Even if the choice-of-law provision applied, this dispute falls outside its narrow scope:

---

> [T]he rights of all parties and the validity, construction and effect of
> every provision hereof shall be subject to and construed according to
> the laws of the State of Maryland without regard to conflicts of laws
> provisions thereof.

Ex. C, §13.1, at 20. The narrow clause applies to provisions of the Declaration, which are extraneous to this Action. Courts refuse to apply narrow choice-of-law provisions to extra-contractual claims where, as here, the contract containing the clause is not at issue. *Ochoa v. Zeroo Gravity Games LLC*, No. CV22-5896-GW-ASx, 2023 WL 4291650, at *11 (C.D. Cal. May 24, 2023) (false advertising, fraud, and consumer protection statutory claims did not sound in contract); *Urica, Inc. v. Pharmaplast, S.A.E.*, No. CV11-02467-MMM-RZx, 2013 WL 12123305, at *11 (C.D. Cal. Jan. 10, 2013) (contract language of "construed and enforced in accordance with the laws of Illinois" narrowly applied to contract claims, not related tort claims). This is not a dispute arising from the Declaration. It is a dispute over whether PennyMac violated the LIBOR Act, enacted ***thirteen years*** after the Declaration was filed.

### 3.    Enforcing the Declaration's Maryland Choice-of-Law Provision Violates a Fundamental California Policy

Even if the Maryland choice-of-law provision in the Declaration applied to the instant dispute, the Court *still* should not enforce it.

Courts apply a multi-factor test in deciding whether it should enforce a choice-of-law clause. *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 466 (1992). The court first considers "whether the chosen state has a substantial relationship to the parties or their transaction" and/or "whether there is any other reasonable basis for the parties' choice of law." *Id*. If either test is met, "the court must next determine whether the chosen state's law is contrary to a fundamental policy of California." *Id*. If "there is a fundamental conflict with California law," the court must then

determine whether California has a materially greater interest than the chosen state in the determination of the particular issue." *Id*. Finally, "[i]f California has a materially greater interest than the chosen state, the choice of law shall not be enforced" as "contrary to this state's fundamental policy." *Id*.

While Maryland has an interest because one of two Defendants is incorporated there,[15] the Maryland Consumer Protection Act ("CPA"), which is California's UCL equivalent, conflicts with the fundamental California policy of allowing private parties to act on behalf of the Attorney General to hold California-based companies accountable and to seek equitable relief for the public. *See, e.g.*, *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1042 (N.D. Cal. 2010). The *Walter* court compared California's UCL to Maryland's CPA and found that enforcing the Maryland choice-of-clause would deprive the plaintiff of the right to seek injunctive relief on behalf of the public. *Id.* at 1041-42.[16] That conflict still exists today. Md. Code Ann., Com. Law § 13-406 & § 13-408 (authorizing only its Attorney General to seek injunctive relief and consumers the right to seek damages only). As in *Walter*, enforcing a Maryland choice-of-law provision here would be "contrary to a fundamental policy of California" because it will deprive Plaintiff the ability to secure injunctive relief for the public. 682 F. Supp. 2d at 1041 ("[w]here a difference in available remedies implicates a fundamental policy set out in California law, the reviewing court must at least take pause before it allows the parties to contract around those policies by choosing to apply foreign law.").

PennyMac's reliance on *Century 21 Real Estate LLC v. All Prof. Realty, Inc.*,

---

[15] *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV20-7150-PSG-PJWx, 2020 WL 8461696, at *4 (C.D. Cal. Oct. 21, 2020) (Texas has a substantial relationship because the defendant is incorporated there).

[16] *See Vrugtman*, 2021 WL 4979443, at *8-9 (refusing to enforce Nevada choice-of-law clause that conflicted with California policy); *Jialu Wu*, 2020 WL 8461696, at *6 (refusing to enforce Texas choice-of-law clause where the defendant could not demonstrate that the plaintiff would be able to seek a public injunction under Texas' Deceptive Trade Practices Act).

600 F. App'x 502, 504 (9th Cir. 2015), is entirely misplaced. In *Century*, enforcement of the choice-of-law provision did not actually interfere with a fundamental California policy because the agreement contained the same rights and protections as the California statute. *See Century 21 Real Est. LLC v. All Prof. Realty, Inc*., 889 F. Supp. 2d 1198, 1217 (E.D. Cal. 2012), *aff'd*, 600 F. App'x 502 (9th Cir. 2015). The *Century* court noted there was no actual interference with a fundamental California policy. *Id.* at 1217 nn.14-15 ("The mere fact that the chosen law provides greater or lesser protection than California law would" is insufficient). Here, the Articles do not cure the conflict by affording Plaintiff the right to seek injunctive relief on behalf of the public. Thus, enforcing the Maryland choice-of-law clause ***actually*** interferes with this fundamental California policy.

Finally*,* California has a materially greater interest than Maryland in applying its laws to this dispute. *Walter*, 682 F. Supp. 2d at 1042. Both Defendants are based in California, the principal bad actors are based in California, and the misconduct occurred there, while only one Defendant is incorporated in Maryland. *See Ribbens Int'l., S.A. de C.V. v. Transport Int'l. Pool, Inc.*, 47 F. Supp. 2d 1117, 1123 (C.D. Cal. 1999) (finding California had a materially greater interest over Pennsylvania where transaction took place in California and business dealings were concentrated there); *see also Bermudez v. PrimeLending*, No. LA-CV12-00987-JAK-Ex, 2012 WL 12893080, at *6 (C.D. Cal. Aug. 14, 2012) (same). The Court should not enforce the Maryland choice-of-law clause.

## IV.    <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny PennyMac's motion to dismiss or, in the alterative, grant Plaintiff leave to amend his Complaint under Rule 15(a)(2), which is "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2); *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) ("This policy [in Rule 15(a)(2)] is to be applied with extreme liberality.").

1   Dated: October 11, 2024          **BERMAN TABACCO**

2

3                                    By:   */s/ Daniel E. Barenbaum*
                                          Daniel E. Barenbaum
4

5                                    Nicole Lavallee
                                     Jeffrey Rocha
6                                    425 California Street, Suite 2300
                                     San Francisco, CA 94104
7                                    Telephone: (415) 433-3200
                                     Facsimile: (415) 433-6382
8                                    Email:  nlavallee@bermantabacco.com
                                             dbarenbaum@bermantabacco.com
9                                            jrocha@bermantabacco.com
10

11                                   Catherine Pratsinakis (*pro hac vice*)
                                     **DILWORTH PAXSON LLP**
12                                   1500 Market Street, Suite 3500E
                                     Philadelphia, PA 19102
13                                   Telephone: (215) 575-7013
                                     Email:  cpratsinakis@dilworthlaw.com
14

15

16                                   *Attorneys for Plaintiff Roberto Verthelyi*
                                     *and the Putative Class*
17

18                         <u>**CERTIFICATE OF COMPLIANCE**</u>

19          The undersigned, counsel of record for Plaintiff Roberto Verthelyi, certifies

20   that this brief contains 6,892 words, which complies with the word limit of L.R. 11-

21   6.1.

22                                   */s/ Daniel E. Barenbaum*
                                     Daniel E. Barenbaum
23

24                                   *Attorney for Plaintiff Roberto Verthelyi and*
                                     *the Putative Class*
25

26

27

28