# Exhibit 1


# THE END OF LIBOR: TRANSITIONING TO AN ALTERNATIVE INTEREST RATE CALCULATION FOR MORTGAGES, STUDENT LOANS, BUSINESS BORROWING, AND OTHER FINANCIAL PRODUCTS

## VIRTUAL HEARING

BEFORE THE

### SUBCOMMITTEE ON INVESTOR PROTECTION, ENTREPRENEURSHIP, AND CAPITAL MARKETS

OF THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

APRIL 15, 2021

Printed for the use of the Committee on Financial Services

**Serial No. 117–17**



U.S. GOVERNMENT PUBLISHING OFFICE

44–665 PDF          WASHINGTON : 2021

Exhibit 1
Page 3

## HOUSE COMMITTEE ON FINANCIAL SERVICES

MAXINE WATERS, California, *Chairwoman*

CAROLYN B. MALONEY, New York
NYDIA M. VELÁZQUEZ, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
ED PERLMUTTER, Colorado
JIM A. HIMES, Connecticut
BILL FOSTER, Illinois
JOYCE BEATTY, Ohio
JUAN VARGAS, California
JOSH GOTTHEIMER, New Jersey
VICENTE GONZALEZ, Texas
AL LAWSON, Florida
MICHAEL SAN NICOLAS, Guam
CINDY AXNE, Iowa
SEAN CASTEN, Illinois
AYANNA PRESSLEY, Massachusetts
RITCHIE TORRES, New York
STEPHEN F. LYNCH, Massachusetts
ALMA ADAMS, North Carolina
RASHIDA TLAIB, Michigan
MADELEINE DEAN, Pennsylvania
ALEXANDRIA OCASIO-CORTEZ, New York
JESUS "CHUY" GARCIA, Illinois
SYLVIA GARCIA, Texas
NIKEMA WILLIAMS, Georgia
JAKE AUCHINCLOSS, Massachusetts

PATRICK McHENRY, North Carolina,
    *Ranking Member*
FRANK D. LUCAS, Oklahoma
BILL POSEY, Florida
BLAINE LUETKEMEYER, Missouri
BILL HUIZENGA, Michigan
STEVE STIVERS, Ohio
ANN WAGNER, Missouri
ANDY BARR, Kentucky
ROGER WILLIAMS, Texas
FRENCH HILL, Arkansas
TOM EMMER, Minnesota
LEE M. ZELDIN, New York
BARRY LOUDERMILK, Georgia
ALEXANDER X. MOONEY, West Virginia
WARREN DAVIDSON, Ohio
TED BUDD, North Carolina
DAVID KUSTOFF, Tennessee
TREY HOLLINGSWORTH, Indiana
ANTHONY GONZALEZ, Ohio
JOHN ROSE, Tennessee
BRYAN STEIL, Wisconsin
LANCE GOODEN, Texas
WILLIAM TIMMONS, South Carolina
VAN TAYLOR, Texas

CHARLA OUERTATANI, *Staff Director*

(II)

Exhibit 1
Page 4

SUBCOMMITTEE ON INVESTOR PROTECTION, ENTREPRENEURSHIP, AND CAPITAL MARKETS

BRAD SHERMAN, California, *Chairman*

CAROLYN B. MALONEY, New York
DAVID SCOTT, Georgia
JIM A. HIMES, Connecticut
BILL FOSTER, Illinois
GREGORY W. MEEKS, New York
JUAN VARGAS, California
JOSH GOTTHEIMER. New Jersey
VICENTE GONZALEZ, Texas
MICHAEL SAN NICOLAS, Guam
CINDY AXNE, Iowa
SEAN CASTEN, Illinois
EMANUEL CLEAVER, Missouri

BILL HUIZENGA, Michigan, *Ranking Member*
STEVE STIVERS, Ohio
ANN WAGNER, Missouri
FRENCH HILL, Arkansas
TOM EMMER, Minnesota
ALEXANDER X. MOONEY, West Virginia
WARREN DAVIDSON, Ohio
TREY HOLLINGSWORTH, Indiana, *Vice Ranking Member*
ANTHONY GONZALEZ, Ohio
BRYAN STEIL, Wisconsin

(III)

Exhibit 1
Page 5

Exhibit 1
Page 6

# CONTENTS

| | Page |
|---|---|
| Hearing held on: | |
| April 15, 2021 | 1 |
| Appendix: | |
| April 15, 2021 | 35 |

## WITNESSES

### THURSDAY, APRIL 15, 2021

Coates, Daniel E., Senior Associate Director, Office of Risk Analysis and Modeling, Federal Housing Finance Agency (FHFA) ..................................... 5

Coates, John, Acting Director, Division of Corporation Finance, U.S. Securities and Exchange Commission (SEC) .................................................................. 7

Smith, Brian, Deputy Assistant Secretary for Federal Finance, U.S. Department of the Treasury ............................................................................................. 8

Van Der Weide, Mark, General Counsel, Board of Governors of the Federal Reserve System .............................................................................................. 9

Walsh, Kevin P., Deputy Comptroller, Market Risk Policy, Office of the Comptroller of the Currency (OCC) .......................................................................... 11

## APPENDIX

Prepared statements:
| | |
|---|---|
| Coates, Daniel E. | 36 |
| Coates, John | 43 |
| Smith, Brian | 47 |
| Van Der Weide, Mark | 49 |
| Walsh, Kevin P. | 56 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

Sherman, Hon. Brad:
| | |
|---|---|
| Written statement of the Alternative Reference Rates Committee (ARRC) | 68 |
| Written statement of the Association for Financial Professionals et al. | 70 |
| Written statement of the Structured Finance Association | 76 |
| Written statement of the Securities Industry and Financial Markets Association (SIFMA) | 83 |
| Letter from various undersigned organizations | 95 |

Exhibit 1
Page 7

Exhibit 1
Page 8

# THE END OF LIBOR: TRANSITIONING TO AN ALTERNATIVE INTEREST RATE CALCULATION FOR MORTGAGES, STUDENT LOANS, BUSINESS BORROWING, AND OTHER FINANCIAL PRODUCTS

————

**Thursday, April 15, 2021**

U.S. HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON INVESTOR PROTECTION,
ENTREPRENEURSHIP, AND CAPITAL MARKETS,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, DC*

The subcommittee met, pursuant to notice, at 2 p.m., via Webex, Hon. Brad Sherman [chairman of the subcommittee] presiding.

Members present: Representatives Sherman, Scott, Himes, Foster, Meeks, Vargas, Gottheimer, Gonzalez of Texas, San Nicolas, Axne, Casten, Cleaver; Huizenga, Stivers, Wagner, Hill, Emmer, Mooney, Davidson, Hollingsworth, Gonzalez of Ohio, and Steil.

Ex officio present: Representative Waters.

Chairman SHERMAN. The Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets will come to order.

And live, from Washington, D.C., the Financial Services Committee's Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets hearing entitled, "The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Products."

Without objection, the Chair is authorized to declare a recess of the subcommittee at any time. Also, without objection, members of the full Financial Services Committee who are not members of this subcommittee are authorized to participate in today's hearing.

As a reminder, I ask all Members to keep themselves muted when they are not being recognized by the Chair. The staff has been instructed not to mute Members except when the Member is not being recognized by the Chair and there is inadvertent background noise.

Members are reminded that they may only participate in one remote proceeding at a time. If you are participating today, please keep your camera on. If you choose to attend another remote proceeding, please turn your camera off.

I will now recognize myself for a 4-minute opening statement, after which we will hear from Ranking Member Huizenga.

In a way, this is a test to see whether Congress can pass necessary legislation that is not Democratic, and is not Republican.

(1)

Exhibit 1
Page 9

2

There are $200 trillion of business loans, of home mortgages, and of other instruments that have adjustable interest rates that are keyed to the London Interbank Offered Rate (LIBOR). As of January of next year, two of the minor London Interbank Rates will no longer be published. And as of June of next year, none of the London Interbank Rates will be published.

You start with $200 trillion of instruments. Ninety-nine percent of the problem we do not have to deal with because many of these instruments are short term and they will expire before next year. And a lot of these instruments were drafted with the foresight to recognize that there is a possibility that the London Interbank Rate would not be published, and the parties have agreed what to do under those circumstances.

So, we are dealing with a mere 1 percent. But that mere 1 percent is $2 trillion of instruments. These instruments were drafted and the parties agreed without anticipating that LIBOR would no longer be published during the term.

Now, I do not want to minimize this. This is still $2 trillion. Chair Powell of the Federal Reserve has told us that this is a systemic risk to our entire economy. And in the last 2 months, both the Chair of the Fed and the Secretary of the Treasury have testified before our committee, saying that Federal legislation is necessary.

What Federal legislation? There is a bill in Albany, New York. I have circulated draft number 1, and just this week, I circulated to members of the committee discussion draft number 2. These bills are substantively identical, and we are still fine-tuning the drafting, and I look forward—I am glad that Mr. Huizenga has agreed to work with me on that final drafting, and I look forward to working with him to get this bill adopted.

Some 30 organizations have written to our committee saying that we need legislation along the lines of these discussion drafts. Now, these are groups that do not always agree. Supporting this approach are the Americans for Financial Reform, the National Consumer Law Center, the U.S. Chamber of Commerce, the Structured Finance Association, and SIFMA.

Finally, you might ask, well, why not just have the States do it? There are five reasons: first, some States will not do it.

Second, you get into choice-of-law litigation where you may have the borrower in one State, the lender in a second State, and the security for the loan is in a third State. If they have different rules, different amounts to be paid, we can litigate instrument by instrument, which is not an efficient approach.

Third, we would leave our lenders with 51 different systems to deal with, which is expensive and unnecessary.

Fourth, no State has jurisdiction where the Trust Indenture Act of 1939 is applicable. So, even if we got all 51 States to act, and even if they were consistent, we would still be leaving hundreds of billions of dollars outside the solution.

And finally, some instruments are, in effect, in two levels. You may have a mortgage-backed security subject to New York law, which is an investment in a pool of mortgages which are subject to 50 different State laws depending upon where the home is located.

Exhibit 1
Page 10

3

We need Federal legislation, and I look forward to working with the members of this committee to achieve it. And we need to act soon because the legislation drafts have regulators having to adopt regulations, and that will take some time as well, and we have to get it all done this year.

With that, I recognize the ranking member of the subcommittee, Mr. Huizenga, for 5 minutes.

Mr. HUIZENGA. Thank you, Mr. Chairman. I do appreciate you having this hearing. As you have pointed out, as of late, we have heard from some of those regulators who have acknowledged the need for a Federal approach. They had not been so enthusiastic about that until more recently. And as you indicated, this is not necessarily a Democrat or a Republican issue, but I will note that it does need to be open to input. So, there is no party attached to this, but there is a need for input on it.

I am going to skip over some of my remarks because I know that time is going to be short here. But as you pointed out, when we have over $223 trillion, with a "T"—which, by the way, is even more than what we have been spending lately—that is a huge amount of money. And when we have that, these exposures that are in derivatives, corporate bonds, business loans, secured products, commercial and residential mortgage loans, credit cards, student loans, auto loans—a lot of things are tied to LIBOR, and obviously, to date, we saw with the London Whale that there has now been $9 billion in fines that have been levied here and in the U.K., in the European Union.

There is a lot of agreement that this was a benchmark that could not continue. And there have been comprehensive reforms which include designating a new lead regulator for LIBOR, in addition to new governance and oversight technology for the benchmark. However, despite these reform efforts in both the U.S. and the U.K., "LIBOR has increasingly relied on market and transaction database expert judgment."

So in response to the recommendations and objectives set forth by the Financial Stability Board (FSB) and the Financial Stability Oversight Council (FSOC), and to address continued risks related to the U.S. Dollar LIBOR, the Federal Reserve Board and the Federal Reserve Bank in New York jointly convened the Alternative Reference Rates Committee (ARRC) in 2014. ARRC was tasked to identify, "risk-free alternative reference rates for U.S. Dollar LIBOR, identify best practices for contract robustness, and to create an implementation plan with metrics of success and a timeline to support an orderly adoption."

That is, I think, all good. In 2017, ARRC announced the Secured Overnight Financing Rate, or SOFR, its recommended alternative to the LIBOR. SOFR is an overnight interest rate based on Treasury repurchase transactions or overnight corporate loans secured by U.S. Treasury securities. Unlike LIBOR, SOFR is calculated based on interest rates charged in real transactions in the U.S. Treasury repo market.

One of the biggest challenges that we have with transitioning away from LIBOR is the thousands of existing legacy contracts that extend beyond 2023 that reference LIBOR but do not contain contractual, "fallback language," that allows for the contract to be

Exhibit 1
Page 11

4

amended, and continue to function should LIBOR be discontinued.
That is as of the fourth quarter of 2020.

There are $223 trillion of outstanding exposures to U.S. Dollar
LIBOR—$74 trillion in contractual notional value will remain out-
standing after LIBOR's discontinuation in June of 2023, and this
includes approximately $69 trillion in derivatives and approxi-
mately $5 trillion in cash products.

Some of these parties have begun incorporating fallback provi-
sions, but it looks like, as we transition away, slowly transition
away, both Treasury and Federal Reserve officials have called now
for Federal legislation to assist in the smooth transition.

I am looking forward to hearing from the witnesses today. Mr.
Chairman, we do need to work on this together, with the input not
only of industry and those who are affected, but those of us who
have been elected to act as that speed bump at times to make sure
that we are heading in the right direction, and I for one want to
make sure that the Federal Reserve, not just the New York Fed
but the Federal Reserve, it seems to me, may need to have a piece
of this rather than just being the New York Federal Reserve, and
we need to make sure that any Federal legislation provides market
stability and preserves market liquidity.

I think my time is expiring, but I do look forward to working
with you in a cooperative manner, and I yield back.

Chairman SHERMAN. I could not agree with you more—a trillion
dollars here, and a trillion dollars there, can add up to real money.

I now recognize the Chair of the full Financial Services Com-
mittee, the gentlewoman from California, Chairwoman Waters, for
1 minute.

Chairwoman WATERS. Thank you so very much, Chair Sherman.
You have been talking about LIBOR to anybody who would listen
to you for over a year or so now, maybe longer than that, and I
am so pleased that you are holding this hearing.

Trillions of dollars of consumer contracts, ranging from mort-
gages and student loans to securities contracts, are currently tied
to the LIBOR, which will cease as a reference rate in 2023. As a
result, these contracts will have to use another rate.

LIBOR proved to be easily manipulated when banking authori-
ties around the globe found extensive collusion by megabanks like
JPMorgan, Citigroup, Barclays, Deutsche Bank, UBS, and the
Royal Bank of Scotland, to fix the LIBOR to their own advantage.
These institutions paid billions of dollars in fines to settle their
fraud, but now we need to protect consumers, investors, and the
U.S. financial system as the markets transition away from the
LIBOR.

Thank you, and I yield back the remainder of my time.

Chairman SHERMAN. Thank you, Madam Chairwoman.

Today, we welcome the testimony of our distinguished witnesses.

First, we have Dan Coates, who is the Senior Associate Director
for the Office of Risk Analysis and Modeling at the Federal Hous-
ing Finance Agency (FHFA).

Our second witness will prove that our subcommittee can attract
more Coates than any other subcommittee this week. We have
John Coates, no relation, who is the Acting Director of the Division

Exhibit 1
Page 12

5

of Corporation Finance at the U.S. Securities and Exchange Commission (SEC).

Our third witness will be Brian Smith, who is the Deputy Assistant Secretary for Federal Finance at the U.S. Department of the Treasury.

Our fourth witness will be Mark Van Der Weide, who is the General Counsel at the Board of Governors of the Federal Reserve System. And I want to thank Mr. Van Der Weide for his help in drafting what is now discussion draft 2, which I have circulated this week.

And finally, we will have Kevin Walsh, who is the Deputy Comptroller for Market Risk Policy at the Office of the Comptroller of the Currency.

The witnesses are reminded that your oral testimony will be limited to 5 minutes. You will be able to see a timer on your screen that will indicate how much time you have left, and a chime will go off at the end of your time. I would ask that you be mindful of the timer and quickly wrap up your testimony if you hear the chime so that we can be respectful of both the witnesses' and the committee members' time. And without objection, your full written statements will be made a part of the record.

I now recognize Mr. Dan Coates for 5 minutes.

**STATEMENT OF DANIEL E. COATES, SENIOR ASSOCIATE DIRECTOR, OFFICE OF RISK ANALYSIS AND MODELING, FEDERAL HOUSING FINANCE AGENCY (FHFA)**

Mr. DAN COATES. Good afternoon, Chairwoman Waters, Chairman Sherman, Ranking Member Huizenga, and members of the subcommittee. I appreciate the opportunity to testify before you today.

I serve as the Senior Associate Director of Risk Analysis and Modeling in the Federal Housing Finance Agency's Division of Federal Home Loan Bank Regulation.

FHFA regulates and oversees Fannie Mae, Freddie Mac, and the Federal Home Loan Bank System. Since 2008, FHFA has also served as conservator of Fannie Mae and Freddie Mac—together, the Enterprises.

Since completing my Ph.D. in economics, I have served in the Federal Government for over 30 years. Today marks the first time I am testifying before Congress.

At FHFA, I lead an office of economists and financial analysts supporting our examination, supervision, and regulation of the Federal Home Loan Banks. Since the 2017 announcement of LIBOR's future discontinuation, I have lead FHFA's LIBOR transition efforts as it oversees the transition of its regulated entities.

LIBOR has been the world's most widely used interest rate benchmark. Preparing for this transition has been and will continue to be an enormous undertaking, with a variety of implications for all participants in the global financial system.

FHFA and its regulated entities have been leaders in this effort, and I am proud of what we have accomplished to date. As Director Calabria has made clear, FHFA's efforts to transition away from LIBOR are guided by the same core principles that direct all of the agency's work: ensuring the safety and soundness of our regulated

Exhibit 1
Page 13

6

entities; supporting liquidity and resilience in our nation's housing finance markets; and protecting homeowners and renters.

While important work remains, I am confident that we will meet our goal of fully transitioning the Enterprises and the Federal Home Loan Banks away from LIBOR before the end of 2021. When this effort began, LIBOR was the reference rate for the vast majority of financial products central to the operations of FHFA's regulated entities. Such products included Enterprise and Federal Home Loan Bank System debt, Federal Home Loan Bank advances, derivatives transactions, mortgage-backed securities, collateralized mortgage obligations, credit risk transfer transactions, and adjustable rate mortgages, known as ARMs.

Our challenge was to ensure our regulated entities transitioned to robust reference rates for all of these products, and for the related internal systems of the regulated entities. FHFA supports, and its regulated entities have adopted, the ARRC's recommended replacement rate as being the best suited for this transition away from LIBOR.

There are a number of contracts that did not contemplate the permanent cessation of LIBOR. Disputes over the interpretation of these contracts will likely be lessened with the passage of Federal legislation to provide clarity about the transition.

While FHFA is open to any robust reference rate that meets the principles of the International Organization of Securities Commissions and its fit for purpose, the time remaining to prepare for this transition is getting short, and FHFA does not support a wait-and-see approach to this transition.

While the date of the LIBOR cessation has recently been extended for most U.S. Dollar LIBOR maturities until June 30th, 2023, FHFA has continued to ensure that our regulated entities are ready for the LIBOR cessation by the end of this year. The actions FHFA has taken since 2018 to prepare for this transition are consistent with the guidance issued on November 30, 2020, by the Federal Reserve, the OCC, and the FDIC, who stated their concerns that continued LIBOR use after the end of 2021 would create safety and soundness risks.

Thanks to FHFA's leadership, the Federal Home Loan Banks and the Enterprises are moving prudently away from LIBOR. As of July 2020, the Federal Home Loan Banks have ceased entering into LIBOR transactions with maturities beyond 2021. As of December 31, 2020, the Enterprises are no longer purchasing LIBOR-indexed ARMs or issuing any LIBOR-based mortgage products. They are now purchasing SOFR-based ARMs and issuing SOFR-indexed mortgage-backed securities and other market products.

FHFA's regulated entities have led the LIBOR transition as the first and most significant issuers of SOFR-indexed debt and as developers of SOFR-based alternatives to their existing LIBOR products. At FHFA, we continue to look for ways we can enhance awareness of the importance of this transition.

I will be glad to answer your questions.

[The prepared statement of Senior Associate Director Daniel Coates can be found on page 36 of the appendix.]

Chairman SHERMAN. Thank you, Mr. Coates.

We now recognize Mr. John Coates for 5 minutes.

Exhibit 1
Page 14

7

**STATEMENT OF JOHN COATES, ACTING DIRECTOR, DIVISION OF CORPORATION FINANCE, U.S. SECURITIES AND EXCHANGE COMMISSION (SEC)**

Mr. JOHN COATES. Thank you, Chairwoman Waters, Chairman Sherman, Ranking Member Huizenga, and members of the subcommittee. I appreciate the opportunity to testify today about the transition away from LIBOR and the efforts of the staff of the Securities and Exchange Commission to monitor that transition in furtherance of the Commission's missions, which are to protect investors, maintain fair and orderly markets, and facilitate capital formation.

The announced discontinuation of LIBOR and the transition to one or more alternatives will have significant impacts on the financial markets and on market participants, and it may present material risks for both public companies and their investors, as well as SEC-supervised entities. Those risks will be greater if an orderly transition is not completed in a timely manner, including important work to be done this year and beyond.

A cross-agency team of staff at the Commission has been collaborating regularly on transition matters, and the staff is actively monitoring the extent to which market participants are identifying and addressing risks in preparing for the transition.

In the division that I currently help lead, the Division of Corporation Finance, we have been encouraging public companies to plan for the transition and consider their disclosure obligations and the risks that the transition may present to their businesses. We specifically encourage companies to inform investors about risk identification and mitigation, as well as any anticipated material impacts of the transition which may particularly affect companies who face financing constraints.

Companies may also need to reflect the transition in their information technology systems, their internal controls, and their policies and procedures. The back office, which sometimes gets neglected, is going to be very important in this transition.

A second division at the SEC, our Trading and Markets Division, has been monitoring the impacts of the transition on brokers, counterparties, and exchanges. These impacts may arise due to being a party to transactions referencing LIBOR, making a market in those instruments, underwriting, placing, or advising on them. And the impact can have several different channels for how they affect these firms, on their businesses and systems. Valuation models are going to have to be changed, business processes used, and risk management frameworks. Ultimately, these firms serve clients who also are going to be affected.

A third division at the SEC, our Examinations Division, has been assessing the impact on entities that we oversee. Last year, we performed roughly 75 exams on a wide range of registrants, with a focus on identifying challenges from the transition. They have also provided guidance for how to plan for and carry out a successful transition. And as with our other efforts, that exam work is ongoing.

Preparation in risk management by investment advisors and funds is performed by our Division of Investment Management. That division has been encouraging advisors to consider the effect

Exhibit 1
Page 15

8

of the transition on LIBOR-based instruments which are held by mutual funds, which are in turn held by millions of retail investors. Investment Management has been providing guidance to encourage funds to provide tailored disclosures about the transition and how it interacts with their investment objectives, holdings, strategies, and structure.

Finally, two of our offices have been also involved in LIBOR-related work, our Office of the Chief Accountant and our Office of Municipal Securities. Let me just say it is nice to be testifying before a Chair who has an accounting background, which is a central focus of my division. Our Chief Accountant continues to monitor the activities of preparers and auditors, standard setters and other regulators to address the financial reporting issues related to the transition. The staff of the Chief Accountant has been having ongoing discussions with various stakeholders and has supported efforts to raise awareness of the accounting side of the transition, and we note that the Financial Accounting Standards Board (FASB) and the International Accounting Standards Board (IASB) have continued to update their standards to reflect ongoing changes throughout the transition.

Last but not least, our Office of Municipal Securities has been encouraging municipal issuers and advisors to focus on those issues directly relevant to the municipal market, which is also important to retail.

Thank you for the opportunity to testify here today.

[The prepared statement of Acting Director John Coates can be found on page 43 of the appendix.]

Chairman SHERMAN. I thank our witnesses for limiting their comments to 5 minutes.

We now recognize Mr. Smith for 5 minutes.

## STATEMENT OF BRIAN SMITH, DEPUTY ASSISTANT SECRETARY FOR FEDERAL FINANCE, U.S. DEPARTMENT OF THE TREASURY

Mr. SMITH. Thank you to Chairwoman Waters, Chairman Sherman, and Ranking Member Huizenga. I appreciate the opportunity to testify at this hearing on this important issue.

As Treasury's Deputy Assistant Secretary for Federal Finance, I oversee the Department's work on the LIBOR transition.

Though LIBOR is used in more than $200 trillion of outstanding financial contracts today, 2 tenors of USD LIBOR will cease being published at the end of 2021, and the remainder will cease by June 2023. LIBOR's widespread use in the financial system, but short remaining lifespan, underscores the urgency of a timely and effective transition.

In recent years, Treasury has played an active role in highlighting the risks associated with the continued use of LIBOR and encouraging a market participant-led transition. Since 2013, annual reports of the Financial Stability Oversight Council (FSOC), which the Treasury Secretary chairs, have called attention to LIBOR-related financial stability risks, encouraged market participants to formulate and execute their transition plans, and recommended that member agencies use their authorities to facilitate transition.

Exhibit 1
Page 16

9

Treasury has served as an ex-officio member of the Alternative Reference Rates Committee, or ARRC, since that group was convened in 2014 by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York. The ARRC is composed of a diverse set of private market participants working towards successful transition away from LIBOR. As an alternative to LIBOR, the ARRC has recommended the Secured Overnight Financing Rate, or SOFR, which is a robust rate based on nearly $1 trillion in daily transactions. The ARRC has also recommended robust contract fallback language for various financial products and has worked closely with regulators to identify and tackle potential roadblocks to transition.

Treasury applauds the passage of LIBOR transition legislation in New York State, which will provide meaningful relief for the transition of legacy contracts written under New York law. In addition, Treasury has also taken initial steps to address the potential tax consequences of modifying contracts that reference LIBOR, although some of the relevant tax statutes lack a grant of regulatory authority, which limits the tax relief that Treasury can provide.

Despite this important progress, challenges for the transition remain, and Federal legislation is needed. As Secretary Yellen described in recent testimony before the House Financial Services Committee, legislation is necessary for so-called, "tough legacy" contracts that do not specify a workable fallback rate and are not feasible for private-sector actors to modify on their own. Federal legislation could also ensure that Treasury has sufficient authority to address the tax consequences of the LIBOR transition and amend the Higher Education Act of 1965's reference to LIBOR for special allowance payments under the legacy guaranteed Federal student loan program.

With LIBOR's cessation dates approaching quickly, market participants must make progress on transitioning contracts, where feasible, and new contracts should begin referencing alternative rates like SOFR. In addition, in the case of consumer loans, it is imperative that lenders engage with consumers about how this transition will affect them and provide them with timely notice of any changes. Lenders need to act responsibly so that consumers are not caught by surprise.

With that, I will conclude my remarks. Chairman Sherman and Ranking Member Huizenga, thank you again for your interest and your engagement on this important issue, and I look forward to your questions.

[The prepared statement of Deputy Assistant Secretary Smith can be found on page 47 of the appendix.]

Chairman SHERMAN. Thank you for your brevity.

I now recognize Mr. Van Der Weide, and I want to thank Mr. Van Der Weide for his help in drafting the session draft number 2. You are recognized for 5 minutes.

## STATEMENT OF MARK VAN DER WEIDE, GENERAL COUNSEL, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Mr. VAN DER WEIDE. Chairman Sherman, Ranking Member Huizenga, and members of the subcommittee, thank you for the opportunity to appear today. My testimony will discuss the impor-

Exhibit 1
Page 17

10

tance of ensuring a smooth, transparent, and fair transition away from LIBOR to more durable replacement rates, as well as some of the challenges posed by this transition. Before I delve into these issues, however, it may be helpful to review how LIBOR is used and why it will be discontinued.

LIBOR measures the average interest rate at which large banks can borrow in unsecured wholesale funding markets. Over the past few decades, LIBOR became a benchmark used to set interest rates for commercial loans, mortgages, derivatives, and many other financial products. In total, U.S. Dollar LIBOR is used in more than $200 trillion of financial contracts worldwide.

By now, the flaws of LIBOR are well documented. A fundamental deficiency is that LIBOR has been based on thinly traded markets, which has made the rate vulnerable to collusion and manipulation. Following the exposure of these weaknesses and the imposition of material large legal penalties on a number of firms and individuals that engaged in LIBOR misconduct, most of the LIBOR banks determined that they would not continue making LIBOR submissions.

Last month, LIBOR's U.K. regulator announced that the one-week and two-month U.S. Dollar LIBOR rates will cease to be published at the end of 2021, while the remaining LIBOR rates will cease to be published on a representative basis in mid-2023. This definitive announcement about the end of LIBOR underscores the importance of moving away from this moribund benchmark rate.

Market participants, regulatory agencies, consumer groups, and other stakeholders have put in a great deal of work to prepare for life after LIBOR. To promote a smooth transition away from the rate, the Central Reserve convened the Alternative Reference Rate Committee, or ARRC, in 2014. Recognizing that the private sector must drive the transition, the ARRC's voting members are private-sector firms.

In 2017, the ARRC identified Secured Overnight Financing Rate, or SOFR, as its recommended alternative to U.S. Dollar LIBOR. SOFR is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities. Unlike LIBOR, SOFR is based on a market of high-volume underlying transactions, regularly around $1 trillion daily.

Market participants are not required to replace LIBOR with SOFR for financial contracts. Importantly, the Federal Reserve and the other regulatory agencies issued a statement last year to emphasize that a bank may use any reference rate for its loans that the bank determines to be appropriate for its funding model and customer needs. They also noted, however, that a bench loan contract should include robust callback language.

The Fed's supervision of LIBOR is strengthening. In November of 2020 the Federal Reserve, the OCC, and the FDIC sent a letter to banking firms noting that the continued use of U.S. Dollar LIBOR in new transactions after 2021 will create safety and soundness risks. Accordingly, we have encouraged our supervised entities to stop using LIBOR in new contracts as soon as practicable, or in any event, by the end of this year.

Exhibit 1
Page 18

11

Vice Chair Quarles emphasized in a recent speech that banking firms should be aware of the intense supervisory focus the Fed is placing on the LIBOR transition.

A key question for policymakers is whether legacy LIBOR contracts can seamlessly switch over to alternative reference rates when LIBOR ends. The ARRC recently estimated that roughly one-third of legacy contracts will not mature before mid-2023. Some of these legacy contracts have workable fallback language to address the end of LIBOR, but others do not, which may result in significant litigation.

Chair Powell and Vice Chair Quarles have publicly stated their support for Federal legislation to mitigate risks related to legacy contracts. Federal legislation would establish a clear and uniform framework on a nationwide basis for replacing LIBOR in legacy contracts that do not provide for an appropriate fallback rate.

Federal legislation should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, or that effectively convert to fixed-rate instruments.

Federal legislation should not affect legacy contracts with fallbacks to another floating rate, nor should Federal legislation dictate that market participants must use any particular benchmark rate in future contracts.

Finally, to avoid conflict-of-laws problems, Federal legislation should preempt any outstanding State laws on legacy LIBOR contracts.

Thank you. I look forward to your questions on this important matter.

[The prepared statement of Mr. Van Der Weide can be found on page 49 of the appendix.]

Chairman SHERMAN. Thank you.

Mr. Walsh is now recognized for 5 minutes.

## STATEMENT OF KEVIN P. WALSH, DEPUTY COMPTROLLER, MARKET RISK POLICY, OFFICE OF THE COMPTROLLER OF THE CURRENCY (OCC)

Mr. WALSH. Chairwoman Waters, Chairman Sherman, Ranking Member Huizenga, and members of the subcommittee, thank you for the opportunity to discuss the OCC's work to ensure the large, mid-sized, and community banks we supervise are prepared for the cessation and replacement of the London Interbank Offered Rate, or LIBOR.

I am Kevin Walsh, Deputy Comptroller for Market Risk Policy. I am the OCC's ex-officio member of the Alternative Reference Rate Committee, I oversee the agency's representation on other committees associated with LIBOR cessation, and I oversee the development and interpretation of policy and guidance related to market risk facing the Federal banking system.

The OCC has worked closely with the institutions we supervise to ensure their preparedness since 2018. To avoid the risk of market disruptions, prolonged litigation, and adverse financial impacts, the OCC has stressed to banks we supervise the importance of adequate transition planning and successfully executing those plans before LIBOR ceases to be reported.

Exhibit 1
Page 19

12

The OCC's mission is to ensure that the institutions we charter and supervise operate in a safe and sound manner and treat all customers fairly. Rather than endorse any specific replacement rate, including the Secured Overnight Financing Rate (SOFR), we want to ensure that banks have the flexibility to determine LIBOR's successor rate or rates as may be most appropriate for the continued operation of their business model and risk appetite and the function that rate supports in a safe and sound manner.

Starting in 2018, as part of our ongoing outreach sessions with bank CEOs, CFOs, chief risk officers, and bank directors, we included discussions of LIBOR cessation and encouraged them to consider their exposures, risk tolerances, and mitigation plans. We first mentioned the need for LIBOR transition plans in our semi-annual risk perspective that year. Since then we have published several bulletins and guidance documents that set forth our expectations for bank transition activities.

In November 2020, the OCC published a joint letter with the Federal Reserve and the FDIC which reiterated that a bank may use any reference rate it determines to be appropriate for its business model and customer needs. That month, the OCC and other banking regulators clarified expectations that banks must stop creating new LIBOR exposures by the end of 2021, with few exceptions. Recently, the OCC published a self-assessment tool that includes a series of questions related to bank exposure assessment and planning, consideration of replacement rates, fallback language, and the bank's overall LIBOR cessation preparedness. The tool helped bank management evaluate, identify, and alleviate transition risks. To date, more than 95 percent of the institutions we supervise have gone through the process to quantify their exposures.

For smaller community banks that engage in LIBOR-based lending, such as commercial or residential real estate lending or small business loans, the transition process may present operational challenges that banks will need to address based on their resources, the scope of their exposure, and the relative financial sophistication of their borrowers. The OCC is working closely with these banks to assist them in mitigating these challenges.

OCC examiners are also supporting the regional and largest banks to address their LIBOR-based exposures and are actively monitoring the adequacy of their planning and implementation of their mitigation strategies. My testimony describes how new International Swaps and Derivatives Association (ISDA) protocols in a recently enacted New York State law have significantly reduced the risk of market disruption in the derivatives market.

Mitigating risks within consumer loan products and securities portfolios will be more complex, given the nature of those instruments. Loans are typically negotiated between parties, and the applicability of a variety of State laws can make negotiations more complicated. Securities, notably securitized exposures, are complicated by the diverse investor bases that need to provide agreement to make changes to the rates. Banks continue to work on preparing these portfolios for the transition, and the OCC is closely monitoring their efforts.

Exhibit 1
Page 20

13

To further assist with the transition, the OCC appreciates Congress' efforts to clarify contracts that do not have a fallback provision or new rate as is designated in the draft Adjustable Interest Rate LIBOR Act of 2021. Legislation could be helpful in addressing systemic risks associated with the LIBOR cessation by incentivizing financial counterparties to agree to an appropriate reference rate or otherwise designating SOFR as the replacement rate. The OCC has provided comments to staff and looks forward to working with the subcommittee to perfect the legislation.

Thank you again for inviting me to appear today. I will be happy to answer your questions.

[The prepared statement of Deputy Comptroller Walsh can be found on page 56 of the appendix.]

Chairman SHERMAN. Thank you.

We will be conducting this hearing while there is voting going on, on the Floor. I have been told that Mr. Casten will be back within 10 minutes, which will give me a chance to rush to the Floor to vote.

Mr. HUIZENGA. Mr. Chairman, this is Bill Huizenga. Just a point of clarification, you do not intend to halt the hearing, correct? You are just expecting this to go on, on an ongoing rolling basis, correct?

Chairman SHERMAN. Exactly. Out of respect for our witnesses' time, I am hoping that members can vote and come back and that they will be available when they are called on, and if they are not, we will go on to the next member from the respective party.

Mr. HUIZENGA. And is there any indication—I know that recently votes were changed to a 30-minute window, and I know we have 14 votes today. Are we anticipating that those will continue to be 30-minute votes for each one of those, or are you aware of leadership taking up that time, which may make this a little more challenging to do this on an ongoing rolling basis?

Chairman SHERMAN. The rules are 30 minutes. In the past, they have been 40 minutes. My guess is that 30 today will mean 30, but there is no change in the official policy.

Mr. HUIZENGA. Okay. Thank you.

Chairman SHERMAN. And I will remind members that the tape of this hearing will be available. So if you miss part of it, you can go back and watch it late tonight, or you can watch it while we are waiting for the 13th and 14th vote later in the evening.

I will now yield myself 5 minutes.

I want to thank Mr. Van Der Weide for pointing out that the discussion drafts honor the sanctity of contracts with the 90 percent-plus contracts that were written in anticipation of the possibility that LIBOR would no longer be published, and that these discussion drafts involve inserting government only where the parties did not make an agreement that can be carried out.

I want to thank Mr. Walsh for pointing out the operational challenges that will face, particularly small and medium-sized institutions. If we end up with 51 different rules, small banks that may not do business in the District of Columbia and all 50 States, but may have loans on their books for one reason or another in 5 or 10 different places, could easily find themselves facing real operational difficulties.

Exhibit 1
Page 21

14

I now have a question for each one of our witnesses that I am hoping to get a simple yes or no answer to, and I will go down the list. The question is, is it important that we promptly adopt Federal legislation to provide a statutory fix for LIBOR-based contracts that lack sufficient background language?

Mr. Dan Coates, is it important?

Mr. DAN COATES. Yes. Yes, we believe it is important.

Chairman SHERMAN. Mr. John Coates?

Mr. JOHN COATES. The Commission has not taken a position formally on legislation, but we are supportive of efforts to increase the stability of the market, so we stand ready to support your efforts in this legislation.

Chairman SHERMAN. That is as close to a yes as you can get until the new Chair takes over.

Mr. Smith?

Mr. SMITH. Yes. Secretary Yellen has indicated support for the Federal legislation.

Chairman SHERMAN. Mr. Van Der Weide?

Mr. VAN DER WEIDE. Yes, thumbs up.

Chairman SHERMAN. And Mr. Walsh?

Mr. WALSH. We think it is constructive.

Chairman SHERMAN. Thank you.

Mr. John Coates, in the absence of a clear solution for LIBOR-based contracts as we get closer to June 2023, I imagine we are going to see increased price volatility or a discounting of those instruments that lack clear fallback language. Is that something that we would expect, where two contracts that look identical will be trading differently because one has significant fallback language in it but the other one does not?

Mr. JOHN COATES. I think that is a fair prediction. I think any risks, including litigation risk, can affect pricing and could create discrepancies in pricing. I think that is correct.

Chairman SHERMAN. Now, Mr. Van Der Weide, I have a question for you about timing. Each proposal, whether it is the one from Albany or the two that I have circulated, all involve the idea of an agency writing a regulation. So first you need the legislation, and then, you get the regulatory process. So how much time do we have to adopt legislation and have it signed into law, so that the Fed can adopt regulations that will solve this problem?

Mr. VAN DER WEIDE. I think it is important that we have a regulatory agency with the ability to write regulations to implement the legislation. There are going to be a lot of complicated operational issues, and it will be useful to have an agency that can do the interstitial work to plug those holes. That does mean I think it is important for Congress to act expeditiously to get the legislation passed. I do not have a deadline to give you, but as you know, the important LIBOR tenors are going to be going away in mid-2023. We will want to give an agency some time to write the rules, so, decently well in advance of June 2023, we want Congress to have that legislation passed.

Chairman SHERMAN. My staff calculated that you need 240 days to adopt regulations. Is that right, or can you do it more quickly? Or optimally, would you have 240 days, or how much less could you live with?

Exhibit 1
Page 22

15

Mr. VAN DER WEIDE. Optimally, yes, I think that having 8 months would be great, but we can do it a little faster than that. I am sure we can do it a little faster than that.

Chairman SHERMAN. Okay. Well, my hope is that we have this signed into law, hopefully before Halloween. Otherwise, it starts to get scary for financial markets.

My time has expired. I will now recognize Mr. Huizenga for questions.

Mr. HUIZENGA. Thank you, Mr. Chairman.

I want to start with my fellow Dutchman. Being Chair of the Dutch Caucus, this is an important clarification, whether it is "Van Der Weide," as we would say in West Michigan, or "Van Der Weide." Feel free to clarify.

But I do have a question for you. Does the New York State legislation only fix New York problems, or does it impact some of those other contracts across the country? And what happens in the absence of any Federal intervention?

You are on mute. Sorry, we need you to come off mute. We still cannot hear you, sir.

Mr. Chairman, I am hoping we will be able to add a little time back onto the clock.

Chairman SHERMAN. We will add 20 seconds back.

Mr. HUIZENGA. It was about 40 seconds.

Chairman SHERMAN. We will add 45 seconds back.

Mr. HUIZENGA. Whatever.

Chairman SHERMAN. Which means you now have more than 5 minutes. Go on.

Mr. HUIZENGA. Okay. If he is speaking, I am sorry, but I cannot hear him.

Chairman SHERMAN. Neither can I.

Mr. HUIZENGA. Let me move on, and hopefully we will be able to get back to you, Mr. Van Der Weide, for that clarification on your name pronunciation.

But to everybody, I guess, the question that the chairman asked, I think is a good one. In your support of this, is it this specific language that we have before us, or is it the concept of Federal legislation needing a response?

Why don't we start off with the two Mr. Coates?

Mr. DAN COATES. Congressman, we support any Federal legislation to smooth the transition. We stand ready to help you and your colleagues.

Mr. HUIZENGA. So it is more the concept that we need to address it.

Mr. DAN COATES. Yes, sir.

Mr. HUIZENGA. Correct. Okay.

Mr. John Coates?

Mr. JOHN COATES. Yes, thank you. The same answer as before, which is we are supportive of efforts to increase the stability of the markets, and that applies regardless of the particular language.

Mr. HUIZENGA. Okay. And, Mr. Walsh, I detected a hint of a little more reticence on your part. I do not know whether that was intentional or me reading into it, but the question I have for you is, is the concept for the need for Federal legislation or this specific language? And then, do you perceive any conflict in using SOFR?

Exhibit 1
Page 23

16

Mr. WALSH. To answer the first part of your question, Congressman, we think that the Federal legislation is very constructive and we have offered comments to staff and would be very happy to review those comments with staff and work to perfect the legislation, moving forward.

No, we do not see that there is any issue or problem with SOFR, but the scope and spectrum of banks that the OCC supervises is extraordinarily diverse, from the largest globally active, most complex financial institutions down to small community banks that operate in a very local way, and their needs are different. We want to respect that and give them the opportunity to use any replacement rate that they think fits their business model, their risk appetite, and is appropriately approved through their internal processes for risk management.

Mr. HUIZENGA. So let me ask you, what happens in the absence of Federal intervention?

Mr. WALSH. I think that in the absence of Federal legislation, the contracts that do not have fallback language can be very problematic, and there are also a large number of contracts that require 100 percent of investor-based agreement that we do not think is operationally executable.

Mr. HUIZENGA. Is the shorthand to that answer, litigation?

Mr. WALSH. Yes.

Mr. HUIZENGA. Okay. On preemption, we all know that State law governs private contracts made in that State. Federal legislation providing fallback language for these tough legacy contracts is essentially amending these contracts governed by State law, retroactively inserting fallback provisions. So what it sounds like is we are needing to preempt State law to a degree, correct?

Either Mr. Coates, or if Mr. Van Der Weide is back on?

Mr. WALSH. Here at the OCC, we think it is very important that there be consistency across all of the markets, and that Federal legislation can help propel that consistency.

Mr. HUIZENGA. Yes. One of the concerns, in my closing seconds here, is in an effort to avoid litigation, I am afraid that we may be susceptible to litigation challenging the constitutionality of interfering with these private contracts under the Takings Clause of the 5th Amendment. So does anybody else have any concerns about that? Either of the Mr. Coates or yourself, Mr. Walsh?

Mr. DAN COATES. I would defer to those trained in the law to answer that question.

Mr. HUIZENGA. Mr. Coates or Mr. Walsh, in the closing seconds?

Mr. JOHN COATES. What I would say is I think we can work at a technical level to try to minimize that risk, and I think you are right that there is risk of litigation no matter what, and the question is how best to minimize it to the greatest extent we can.

Mr. HUIZENGA. Thank you, and I appreciate the extra time, Mr. Chairman. While I think both you and I are leaving to go vote, I am assuming that we have coverage from some capable colleagues of ours, correct?

Chairman SHERMAN. Mr. Casten has proven that he can get back just in time. I am turning over the gavel to him.

And as to the constitutional matter, I will point out that the contracts clause of the U.S. Constitution limits the power of State Gov-

Exhibit 1
Page 24

17

ernments, not the power of the Federal Government. Although the sanctity of contracts is an important principle, it is not as constitutional a principle when Federal Government takes action.

With that, I yield to Mr. Casten both for his questions and for his service as Acting Chair.

Mr. CASTEN. [presiding]. Thank you very much, Mr. Sherman. I am not sure how I got bumped up in the queue, but I guess with great power comes great responsibility, or something like that.

Chairman SHERMAN. I believe it is because others are not there. If there is a more senior member of the subcommittee—

Mr. CASTEN. Perfect, perfect. I will take it, and I will watch for staff letting me know who is next in the queue.

Thank you to all our witnesses, and I want to echo what Chairman Sherman said at the start. This is one of these issues that is, thankfully, so bloody complicated that it is nonpartisan. So I hope you will forgive my lack of education on this issue, but I would just like to understand.

I think I understand what we are doing, or at least what the fulcrum of issues are on the day after LIBOR ends. What I am curious for your view on is to what degree do we need to be concerned about the days before it ends? Specifically, there is a robust swaps and futures market and all of those folks who are hedging out their LIBOR risk. We know that LIBOR has been gameable. Presumably, the liquidity in those swaps and futures markets is going to start shrinking as we get close to D-Day.

Is there sufficient vigilance from a regulatory perspective for that period? Is there anything we should be watching for? And if the answer is, "That is a dumb question, Casten," that is an acceptable answer as well. I am asking out of curiosity. And I am happy for any of you who have thoughts on that, to direct it to any particular witness.

Mr. WALSH. Here at the OCC, we have had a very well-thought-out and aggressive program in our supervision activities with respect to LIBOR cessation and transition since 2018. It was a phased approach in the first period. We focused on awareness, communicating that LIBOR was ending and that banks that we supervise needed to do an inventory and understand their risk exposures. In the next phase, we added preparedness, where we worked closely with the banks. I mentioned in my opening statement the LIBOR self-assessment tool that we first published as guidance to the banks we supervise, and more recently have made public for the entire financial institution community to use. It is a checklist, a series of over 30 questions to identify risks that they might have. And finally now, we are moving into a phase where we will be very actively examining banks to determine the level of preparedness that they have.

So we think that we are very well along in terms of the before-the-end-date tasks that have to be undertaken.

Mr. CASTEN. Okay. But you are satisfied that those forwards, futures, and swaps, those markets will stay robust as long as we need them to stay robust and sufficiently liquid?

Mr. WALSH. Yes, I am.

Mr. CASTEN. Okay. So the second question is, I was in the utility industry before I got here, and you have a lot of contracts, like a

Exhibit 1
Page 25

18

lot of industries, where you have cost pass-throughs for your customers, and in the context of a borrower and a lender, I think I understand where the fulcrum of the issues is here. But presumably, there is some quantum of borrowers who have downstream contracts where they can pass this risk along as it moves.

I am just curious whether there is any lingering—if we do not mandate that everybody switches to a fixed product, to the extent that some borrowers have the ability to pass whatever the resulting risk is on to their customers, do we need to be vigilant about that? Is there even any way to quantify how big that risk is? Because you would have to start looking into a lot of downstream contracts beyond the pure banking contracts. But I presume there is a decent number of those pass-through contracts out there.

Has anybody looked into that or understood it, or am I barking up a short tree? Anybody can answer that question.

Mr. JOHN COATES. In the absence of someone else answering, let me just offer that actually litigation is hard to pass through. There are ways you can do it, but if you are the direct party, even if you have a perfectly matching ability to recover on the economics, if you end up in litigation because the terms of that security are uncertain, you are going to be in litigation. So there is actually a kind of—regardless of the economics of the position of that contract in the overall market, you do have an incentive to look for clarity in what has to be paid.

Mr. CASTEN. And I guess I am not thinking that you would ever have a right to pass through litigation, but if I am not mandated to go to another basis, and I do not have any particular economic incentive to pick one basis versus the other, is there any risk there that you might just default to? I don't know. I am just curious if it is something we should be thinking about.

Mr. JOHN COATES. In effect, the terms of renegotiation might not be well considered if the party doing the negotiations—yes, I think that is a fair point for anybody supervising.

Mr. CASTEN. Apologies for my ignorance, but I do appreciate your time and your willingness to tolerate me.

The Chair will now recognize Representative Wagner from Missouri.

Mrs. WAGNER. Thank you, Mr. Chairman.

Mr. Smith, will you describe the steps that the Treasury Department has taken and is taking to facilitate the transition from LIBOR?

Mr. SMITH. Yes. Thank you for that question and your interest in this important issue. The Treasury Department has taken several steps regarding the transition away from LIBOR, all with the goal of trying to ensure a smooth transition that avoids disruptions of financial markets, as well as for businesses, consumers, and families who have financial products related to these rates.

The Financial Stability Oversight Council (FSOC) that the Treasury Secretary chairs has highlighted the risks surrounding LIBOR and the transition for several years now, and encouraged market participants to evaluate their exposures, and regulators to collaborate on encouraging transition.

Treasury is an ex-officio member of the Alternative Reference Rate Committee and has supported its work to establish robust

Exhibit 1
Page 26

19

fallback language in contracts, to consider alternative reference rates like SOFR, and to engage with market participants about their use, encourage them to stop using LIBOR where feasible, and begin using alternative rates, if possible.

And lastly, the Treasury Department has published tax rules, a proposal, with reliance to help manage the tax consequences of the transition away from LIBOR so that potential tax consequences don't become an impediment to participants who want to transition away.

Mrs. WAGNER. Thank you very much.

Mr. John Coates, will you describe the SEC's role in this process and the steps the Commission and its staff are taking to facilitate the transition, please?

Mr. JOHN COATES. Thank you very much for the interest in what we have been doing. Also, my written statement outlines this a little bit more than I will do right now. But at a high level, what we have been doing is to actively monitor the extent to which public companies and other supervised entities of ours are identifying, disclosing, and managing the risks associated with the transition, particularly risks associated with new contracts or tough legacy contracts that extend beyond 2021.

We put out some written guidance on how to approach these topics, as well as risk alerts to investors to draw attention to the issues that regulated entities and public companies should all be considering as they engage in the transition.

Mrs. WAGNER. Thank you very much.

Mr. Van Der Weide, will you describe the differences between LIBOR and SOFR?

I don't think we can hear you.

Anybody else want to take a stab? I'm sorry, Mark. I don't think we can—is it just me?

Mr. SMITH. I can't hear him either, and I will be happy to take that, if you would like.

Mrs. WAGNER. Please.

Mr. SMITH. LIBOR is a survey-based rate. It is constructed by polling a panel of banks and asking them where they can borrow. SOFR is based on transactions in the Treasury repo markets, the overnight markets, and it is based on actual transactions, not a survey of where people think they can borrow. And it is based on collateralized borrowing, that is, people pledging Treasury securities as the collateral.

So key differences are the transaction basis. SOFR has almost a trillion dollars of the transactions that occur every day, and they are actual, observable transactions that you can see. They are actually done. LIBOR is a survey where banks determine their submission sometimes based on transactions, but often based on judgment, because they have no transactions to reference.

I am sorry, ma'am, I can't hear you.

Mrs. WAGNER. I'm sorry. I am trying to cut down on the background noise.

Given the issues that we had with LIBOR in the past, could you discuss a little bit, Mr. Smith, how SOFR addresses that risk of manipulation, please? In my limited time.

Exhibit 1
Page 27

20

Mr. SMITH. Yes. The main way is because it is based on that robust set of transactions that are so large and deep and done by such a diverse set of market participants. That makes it very hard to manipulate. The profit was also very transparent for taking those transactions, how they are aggregated and calculated in a final number, done by the Federal Reserve Bank of New York, and done in compliance with International Organization of Securities Commissions (IOSCO) principles.

Mrs. WAGNER. Thank you all very much. I appreciate the panel. I appreciate the discussion. And I will yield back.

Mr. CASTEN. And if I am following the grid properly, I believe that in terms of participation, Mr. Foster from Illinois is now up next.

Mr. Foster, you are recognized for 5 minutes.

Mr. FOSTER. First, I wanted to thank everyone who has been working on this for a decade. I remember during the financial crisis, you would wake up every day and check out the LIBOR spread to find out if the world was ending or not, and then to find out more than a year later that the whole thing was just sort of made up made me a little bit queasy. So, it is nice to see that we are finally fixing this.

I would like to ask some questions about whether people expect systematic differences in the average rate of the alternative rates. Will LIBOR be higher or lower on average? Who are the winners and losers if it turns out that there are a couple of basis points difference in these?

Mr. VAN DER WEIDE. Can you hear me now? Can you hear me now?

Mr. FOSTER. Yes, we can.

Mr. VAN DER WEIDE. Okay. Sorry for all of the technical difficulties.

There may be some differences in the rate. There are different alternative rates that folks use as LIBOR is going away. SOFR, the alternative rate that has been recommended by the ARRC, is different in nature, as Brian Smith indicated, than LIBOR. So, for example, daily averages of SOFR will show more volatility than LIBOR, and SOFR will behave a little bit differently in times of economic stress and financial crises than LIBOR will.

But in general, the way that SOFR is implemented into contracts is it is done through an average, and the average of SOFR and LIBOR correlate quite closely together if you look over the last 30 years of data. They correlate quite closely together. So we think in the long haul, there shouldn't be significant categories of winners and losers as people move over to SOFR for derivatives and some other transaction types.

Mr. FOSTER. Are they based on averages or mediums or—

Mr. VAN DER WEIDE. The version of SOFR that is used in financial contracts is based on an average over multiple days, and that averaging mechanism softens some of the volatility and gets us to, I think, a more tractable result.

Mr. FOSTER. Okay. And are there already players in the market betting that we are going to fix this one way or another and trying to play the decision that is made in the legislation here in the shift in the value of some of the positions that are held on this? Is that

Exhibit 1
Page 28

21

something that is happening yet? Or are people just counting on it being continuous and smooth, with no disruption?

Mr. VAN DER WEIDE. There are certainly investors out there who are taking positions on the speed and nature of the way we transition away from LIBOR. We are trying to ignore that noise and move forward with the LIBOR transition in the way that we think is most publicly useful. But there are certainly various parties out there entering into different kinds of contracts based on the nature and the speed of the LIBOR transition process.

Mr. FOSTER. And what is the structure of such a bet that one might be able to place?

Mr. VAN DER WEIDE. I don't think I have enough expertise to answer that one.

Mr. FOSTER. Is there someone else who might have a guess at that?

Mr. SMITH. I guess I would offer that the ARRC, in its approach to thinking about fallback, tried to develop a process that was transparent and fair for all participants, to avoid that kind of winners and losers type of situation by developing in advance a clearly laid-out approach for what the spread adjustment would be when contracts fell back, having external parties calculate a clear formula for it, and having that trigger at the moment that the administrator of LIBOR announced that it would be. So, those fallback amounts have already been fixed earlier this year when the announcement was made.

Mr. FOSTER. And are there specific institutions that might introduce systemic risk that have a special role in creating any of these rates?

Mr. VAN DER WEIDE. The nice thing about SOFR, one of the main nice things about SOFR is that it does, as Brian indicated earlier—there are a ton of underlying transactions, and they come from a pretty diverse and large set of financial institutions. So at least the primary alternative to LIBOR, SOFR, is going to be one that is based on a large volume and a diverse set of market participants.

Mr. FOSTER. Okay. And who is it that accumulates the data for it? I just looked up something on the Web here at the Federal Reserve Bank of New York, and it indicates that Mellon had a special role in calculating the rate. I was just wondering if we are very dependent on specific institutions here, and if there may be systemic risk there?

Mr. VAN DER WEIDE. I don't think in a problematic way, no.

Mr. FOSTER. Okay. Thank you.

I yield back.

Mr. CASTEN. The gentleman from Ohio, Mr. Stivers, is now recognized for 5 minutes.

Mr. STIVERS. Thank you, Mr. Chairman.

My first question is for Mr. John Coates. The SEC has an important role to play in ensuring that Federal and State LIBOR transition legislation is effective. As you know, the Trust Indenture Act may require unanimous consent of note holders to effect a change in the benchmark interest rate on those transactions. Unanimous consent in practice is impossible to achieve, especially on the scale of tens of thousands of note holders, and the requirement in this

Exhibit 1
Page 29

22

unique scenario could harm investors that the Trust Indenture Act (TIA) is meant to protect. Therefore, narrow, targeted guidance and relief related to the application of TIA might be necessary to reach the end goal of amending contracts in an expedient manner, while at the same time staving off uncertainty and potential litigation.

Mr. Coates, do you think that the SEC will be able and willing to issue some narrow and targeted guidance related to the Trust Indenture Act and the LIBOR transition?

Mr. JOHN COATES. Thank you for that question. I think it is a very good question, and it highlights an important difference in the way that State and Federal law can respond or anticipate the transition here. It is exactly correct, as you summarized, that the Trust Indenture Act can create problems. The SEC does have an ability to provide exemptive relief under that Act. I would note that it would require a Notice and Comment Rulemaking, as we understand the role that we would be likely to play, which, as you know, can take some time. And I will also note that the bill that I think is being discussed here would directly address the question, as well.

So I think we are ready to both help in the technical sense with language in this bill, as well as consider the potential need for exemptive relief if that becomes necessary.

Mr. STIVERS. Great. Thank you. That is really the only key question I had, and I appreciate everybody's hard work. I appreciate all of the witnesses. This is a very important transition for our financial markets. It is important that we get it right.

This is not, as the ranking member said in his opening statement, a partisan issue at all. Republicans and Democrats both want to get this transition right, and we stand ready to work with the Administration and the SEC and the FHFA and the Federal Reserve in any way we can. I look forward to starting to move this legislation forward. I know that the Chair of the subcommittee has been working on this a while and cares a lot about it.

With that, I yield back.

Mr. CASTEN. It is nice to see the generosity of spirit across the aisle, and with the clock, which is freeing up so much extra time here.

The gentleman from California, Mr. Vargas, is now recognized for 5 minutes.

Mr. VARGAS. Mr. Chairman, thank you very much. I appreciate the opportunity to speak.

And I also want to thank each and every one of our witnesses today.

I don't know if anyone remembers Y2K, but I was on the San Diego City Council, on the Public Safety Committee, and I remember that New Year's Eve. I had never been so nervous, because we didn't know what was going to happen. I remember sitting there in the police department, thinking all of the lights were going to go off, because we were told all these crazy things were going to happen. The street lights were going to go down, all of our signaling for the traffic was going to go down potentially, police weren't going to be able to communicate with each other. So I remember sitting there with the chief of police, the chief of the fire

Exhibit 1
Page 30

23

department, the mayor, and all of us were, like, we don't know, let's see what happens.

Nothing happened, thank God, and we kept going. And the reason for that was we were prepared. We had worked hard on this and people were prepared.

That is the way I see this, to be frank. It sounds like you all have been working hard; 99 percent of potential problems seem to have been anticipated and corrected. This 1 percent is $2 trillion, and that is nothing to sneeze at. But it sounds like most of the issues have been solved.

So my question here is, on this last little bit, how really could consumers be hurt? What would be the big difference to a consumer if we didn't fix this legislatively? I hope that we will, and it sounds like we will. But if we didn't, what would be the damage? Can somebody explain that to me?

Mr. DAN COATES. Congressman, our concern with the need for a Federal legislative effort is that, as you know, a lot of these mortgages and mortgage contracts are written differently in different States. The advantage of a Federal effort is that all consumers would be assured of a predictable, fair, and equitable solution regardless of in what State they live. So our efforts have been designed to try to minimize disruption, and that is why we think there is great value in the Federal legislative effort.

Mr. VARGAS. I think there is, too, obviously, but what happens if we don't have, for some reason—I don't know if you guys know why we are walking across the street so crazily today is because someone decided that we should vote on everything. This is not our normal procedure. Normally, we would sit here and talk to each other and we wouldn't be disrupted. I am sitting here looking at the clock, knowing I have to run off. This is not normal, and sometimes things happen here that are abnormal. It is abnormal what is happening today, and I apologize for that, for your time. It is inappropriate, and I apologize.

But what would happen if somehow this thing were to fall apart?

Mr. DAN COATES. Our concern is that there are some who may not move, or who may be worried about expressing their discretionary ability because they don't know how it will be interpreted in various States. The advantage of the Federal legislation is that not only do consumers understand a fair and equitable solution will come across the board but also the administrative ability to move these contracts will be able to move them with some degree of—

Mr. VARGAS. I understand the benefits of it, but I am asking the opposite; what are the risks? Can anyone else answer that? What are the risks? What if the thing falls apart? What if we do have suspension built in and some crazy person decides that we have to vote on each and every one of them, as opposed to just taking them en bloc, as we normally do? What happens if someone gets a wild idea here and we are not able to fix this? What happens? Can someone talk about that? What is the downside?

Is anyone going to take a shot? If not, I will pick on somebody here.

Go ahead, Mr. Smith. I will pick on you.

Mr. SMITH. Sure, I am happy to take that. As you say, it is really important that consumers don't have their normal life, their nor-

Exhibit 1
Page 31

24

mal economic activity disrupted by something that is far away and
something that no one is really paying attention to. So, we wanted
to pay very close attention to that issue.

If this LIBOR transition does not go well, people may not know
what their mortgage payment is if it is linked to LIBOR. They may
have their credit card payment disrupted. Financial markets may
be disrupted. Lending to businesses may be disrupted. Litigation
will take over, and I think it will be disruptive to markets and dis-
ruptive to consumers.

Mr. VARGAS. Thank you for your work. I really do appreciate
what you guys are doing, I really do. Thank you.

Chairman SHERMAN. I believe that every member in attendance
has asked their questions. Am I correct on that?

Mr. HUIZENGA. Mr. Chairman, Bill Huizenga here. I talked to a
number of our members on the Floor that I know were in the
queue. I know some of them were trying to vote at the end of the
last bill and the beginning of this one, so I am not sure who the
last Republican was. I just walked in. Do you mind informing me
who that was?

Chairman SHERMAN. Who was the last Republican to speak?

Mr. Stivers has asked questions.

Mr. HUIZENGA. Okay. I do know that Mr. Steil, Mr. Gonzalez,
Mr. Hill, and I think Mr. Davidson, were all in our queue. I don't
know whether or not they have returned.

Chairman SHERMAN. I see we do have a member to recognize.
Mr. Hill is recognized for 5 minutes.

Mr. HILL. Thanks, Mr. Chairman. I appreciate this good hearing
on a super-important topic. Thanks for your high-quality opening
of the hearing, and thanks for helping us navigate these votes this
afternoon.

Mr. Van Der Weide, I want to start out with just sort of the big
picture. The staff information I have seen is there is about $16 tril-
lion of notional value that will be outstanding in legacy contracts
after June 2023. Is that the right number for us to be thinking
about of the legacy transactions?

Mr. VAN DER WEIDE. I would say that our expectation for total
legacy contracts by mid-2023 is more in the range of $70 trillion,
but only about $10 trillion of those would be what we would con-
sider tough legacy contracts that have inappropriate fallback provi-
sions that are very difficult for the contracting parties to renego-
tiate. So $10 trillion, I think, is the number that we are focused
on.

Mr. HILL. Good. That is very helpful. Thanks for that clarifica-
tion, because that was one of the items that I wanted to clear up.

Mr. Coates, I have long advocated for this change. The whole 6
years I have served in Congress, we have been talking about it,
and we are superb here in D.C. in talking about problems, and you
are aware of that. In fact, last January, when FHFA testified, I
asked then, what is the status of Fannie Mae and Freddie Mac
being ready to go in their conversion. Can you give us an update,
please?

Mr. DAN COATES. Sure. And thank you for the attention to
FHFA's work. I appreciate that.

Exhibit 1
Page 32

25

Our regulated entities have really done a lot of work to be ready for this transition. They started by writing new contract language within the confines of the ARRC to ensure that those LIBOR contracts that were written had clearer fallback language.

We then got consumer groups and all interested parties together with the ARRC to set up new LIBOR ARMs, and they started building those. And after we got those built, we have prohibited the Enterprises from issuing LIBOR-based products anymore, or purchasing LIBOR-based products.

They are largely transitioned away from LIBOR, to SOFR, in all of their mortgage-based products, so we feel pretty comfortable. The one remaining area is some derivatives activity, and we expect the LIBOR-related derivative activities to drop off as SOFR derivative liquidity increases.

Mr. HILL. Good. Thanks for that answer.

So, Mr. Walsh, I was curious, in the Majority staff's memo to the committee, they talked about some ambiguity for small and medium-sized banks and their discomfort with SOFR. Having been a former CEO of a medium-sized community bank, I really couldn't tell from their memo what is driving that. We didn't use LIBOR in our portfolio lending. We used Wall Street Journal prime, plus or minus, competing, obviously, with LIBOR quotes. Tell me what is going on with the community banks where they have discomfort with this?

Mr. WALSH. Thank you for that question. It is a very important one.

As my colleague, Brian Smith, mentioned earlier, SOFR is an overnight risk-free rate, and it has great benefit in that it is transparent. The two issues that community banks, as well as some corporate-type borrowers, have expressed with respect to SOFR is that it doesn't include a credit component. It is an overnight risk-free rate. And there is much work being done at present to address that, to try to create a credit spread that would be appropriate to apply to SOFR to make it more credit-sensitive.

It is also, as I think Mr. Van Der Weide was describing, an average rate. LIBOR is a rate that is set in advance and paid in arrears, and there has been some concern expressed by various parties that they will find it difficult to manage their cash flow positions if they do not know at the start of a reset period what the final amount of interest due might be. There is work being done to address that in trying to find a so-called forward-looking term rate for SOFR.

Mr. HILL. I hope you and your bank supervisors will collectively help push that education and collaborate on a solution there.

Mr. Van Der Weide, another question I was curious about. We talked about State legislation. The State of New York is curing part of this. How do you reference it? Has the General Assembly of New York passed any legislation on this, and what percentage of the market might that assist?

Mr. VAN DER WEIDE. We think the New York legislation will probably cover a majority of the financial contracts out there under LIBOR, but for a variety of reasons we do think that Federal legislation is really needed to provide that kind of nationwide uniform

Exhibit 1
Page 33

26

solution and to cover some of the central Trust Indenture Act and tax issues.

Mr. HILL. Good. Thank you.

Mr. Chairman, I appreciate the time, and I yield back.

Chairman SHERMAN. Thank you.

Without objection, I will enter into the record letters from SIFMA, the Structured Finance Association, the American Bankers Association, and the American Council of Life Insurers, and others, in support of Federal legislation in this area, and a letter from the Structured Finance Association making basically the same point, and a statement from the Structured Finance Association.

Withput objection, it is so ordered.

And I now recognize Mr. Davidson.

Mr. DAVIDSON. Thank you. I was expecting the rotation to go to a Democrat, but it is nice to be in the queue. Thank you, Mr. Sherman. Thank you, Mr. Hill. And thanks to our witnesses.

This is an important topic for our financial markets, and it is always good when Congress spends time on things that are actually substantive.

A lot has already been said. I like that it has already been highlighted that this is an average. So it is designed to smooth out some of the day-to-day volatility, and it is designed to mitigate some of the volatility because of that.

But I am particularly interested in going back to September of 2019 and the repo market. We saw that spike. Should we be worried about this happening again, Mr. Van Der Weide? If so, what would be the implications we would have under a new SOFR-based system?

Mr. VAN DER WEIDE. We have seen some dysfunction in the Treasury markets over the last couple of years. We saw it in September 2019, and we saw it again in March of 2020. We and our colleagues at Treasury and some of the other agencies are taking a hard look at what we can do to improve the resiliency of Treasury markets.

I will say that the SOFR spike, the Treasury repo spike in September of 2019 was very short-lived, in part because of some of the actions the Federal Reserve took in response to it. But because of the way SOFR is integrated into financial contracts, through a longer-term average, spikes in SOFR that only last for a day or two, like what occurred in September of 2019, are not going to have a bad volatility effect on the usage of that rate in the contracts. I think through the averaging mechanism, we have a good mechanism to deal with some of the short volatility spikes that might occur in Treasury repo rates.

Mr. DAVIDSON. Okay. So do you anticipate enough stability in repo that the Fed will not actively intervene in repo, or how do you see that playing out? And what role does SOFR play in that?

Mr. VAN DER WEIDE. We think the averaging mechanism is going to be enough to deal with the volatility, the national volatility in Treasury repo rates. But I should also mention that SOFR is not a mandated rate. We are not mandating that banks or financial firms use SOFR in their contracts. So if they are concerned about the volatility of SOFR for certain transaction types, they are certainly able to migrate to a different alternate rate.

Exhibit 1
Page 34

27

Mr. DAVIDSON. In the crisis, of course, everyone hopes to, first and foremost, create some stability. But there was concern when this high amount of interest was being paid out in the repo market, and it was being paid above what some of the offers were from other banks. There were some banks who were maybe as high as 10 percent.

Now, that didn't last in an enduring way, as you have already highlighted, but I heard from banks who said that they were offering to finance substantially lower, and the market could have cleared, provided stability at a lower rate. Did you deal with any of those claims?

Mr. VAN DER WEIDE. I think fundamentally the disruptions in the Treasury repo market back in September were quite short term, so they are not going to impact the nature of the SOFR rate that is going to be used in financial contracts. Those kinds of very temporary disruptions are not, I think, a black mark against the potential use of SOFR.

Mr. DAVIDSON. Okay.

Mr. Coates, what has FHFA done to ensure that its regulated entities are prepared to transition away from LIBOR, and what kind of exposure is there left for LIBOR?

Mr. DAN COATES. Thank you for the question and for your interest in FHFA's regulated entities.

As I outlined earlier, the Enterprises—Fannie and Freddie—and the Federal Home Loan Banks have been moving prudently away from LIBOR and to SOFR since we started this effort in 2018. They have worked, in Fannie and Freddie's case, with the Consumer Products Working Group to develop new fallback language to ensure that those last few LIBOR contracts had clear roadmaps for how they would transition.

Then, they worked with all of the industry groups and consumer groups to develop an acceptable adjustable rate mortgage based on SOFR, and then they went and built that system. They have offered now SOFR-based adjustable rate mortgages and other mortgage products, and they are out of LIBOR mortgage-based products.

Mr. DAVIDSON. Won't there be about two-thirds still outstanding after 2023?

Mr. VAN DER WEIDE. As you may know, the exposure information is not public, but I would be glad to follow up with you and discuss the exposure information, if you are interested.

Mr. DAVIDSON. Okay. Thank you so much.

My time has expired, and I yield back.

Chairman SHERMAN. Thank you.

Without objection, we will add to the record a letter from the United States Chamber of Commerce and related organizations supporting Federal legislation along the lines of the discussion draft that has been circulated; a letter from the Alternative Reference Rate Committee supporting the specific draft that has been circulated; and a letter from Americans for Financial Reform, the National Consumer Law Center, and the Student Borrower Protection Center supporting the New York legislation, which is substantively identical to the discussion draft that has been circulated.

With that, I recognize Mr. Emmer for 5 minutes.

Exhibit 1
Page 35

28

Mr. Emmer, are you there?

Mr. EMMER. I am. If I could yield my time to Mr. Gonzalez, please?

Chairman SHERMAN. Mr. Gonzalez, you are now recognized.

Mr. GONZALEZ OF OHIO. Sure. You caught me off guard there, Tom. But in any event, thank you for yielding.

Thank you, Chairman Sherman and Ranking Member Huizenga, for holding this hearing today. It is certainly an important topic.

I want to also commend the ARRC for the work they have done over the years. I feel like if the ARRC didn't exist, we would be probably talking about how to create it and make sure it exists today. So, I certainly appreciate all of the work and all of the thought that has gone into the various proposals.

I want to start with Mr. Smith. I was pleased to see that the State of New York just enacted legislation that does provide for a legal safe harbor to address financial contracts that have inadequate fallback language, which we know sort of comprises that tail risk. However, it doesn't fully address the Federal issues.

From this past year's experience, we know that securitization trustees, for example, were taking steps toward initiation of litigation, which is more than a year prior to the original LIBOR end date of December 2021. So with that as the backdrop, how concerned are you that we would see additional litigation soon, and maybe paint a timeline for us. The longer it takes us to enact something at the Federal level, when do you see the litigation coming, and in what kind of volume?

Mr. SMITH. Thank you for the question. As you highlighted, New York has taken an important step for managing risk for contracts based in New York law, but there remains a necessity for Federal legislation both to make sure we have a comprehensive and uniform approach that covers all of the United States, as well as because of the unique Federal issues.

You identified the trust and bank issue. That is one of several issues. We also want to make sure at the Treasury Department that we can manage the tax consequences of LIBOR transition and make sure that doesn't become an impediment. There are certain legacy student loans based on the legacy program that have a reference to LIBOR in statute. Those are just some of the Federal issues that we want to make sure to manage. And as you highlight, litigation is certainly a risk if they are not managed appropriately.

Mr. GONZALEZ OF OHIO. Thanks. Do you suspect that Treasury will provide legislative guidance or suggestions with respect to handling the tax consequences and the issue in the student loan market?

Mr. SMITH. Yes. Treasury has provided technical assistance on the draft legislation related to managing the tax consequences, with an aim of ensuring that tax realization events are not triggered by the move from LIBOR to SOFR, including by this legislation, as well as by making sure that Treasury has appropriate authority to do rulemaking to cover the broad range of technical issues that might come up.

Mr. GONZALEZ OF OHIO. Great.

And for Mr. Dan Coates, without an appropriate authorized alternative solution, many of the parties responsible for directing

Exhibit 1
Page 36

29

LIBOR-based calculations have already notified the contractual parties that they will seek court direction. Can you explain the implication of massive litigation on financial markets? And then, who ultimately would bear the cost of this litigation?

Mr. DAN COATES. I appreciate your question. There are a lot of entities that will bear the cost if folks don't move. As you know, Fannie Mae securities are governed by D.C. law, and Freddie Mac's by New York State law, and the Federal Home Loan Banks all around the country. So the challenge if folks don't move, and if the lawsuits happen all over the place—we already saw this before the New York State law was started—trustees were starting to go to the courts to seek resolution. So, the real challenge is that this transition would be stalled in 51 jurisdictions, and that could end up getting different outcomes in the different jurisdictions, which could affect consumers differently. So, we are very concerned about that.

Mr. GONZALEZ OF OHIO. Thank you.

And then with my last few seconds, according to market participants, whom I hope we hear from publicly at some point, implementing the transition will require significant operational and systems changes. So based on the current timeline, are you concerned about interruptions to the marketplace?

That one is for either Mr. Dan Coates or Mr. Smith.

Mr. DAN COATES. I will just take a shot at it. We have seen good progress. The ARRC has had an Infrastructure Working Group to bring vendors in to get them ready, and we have every expectation that things will make more progress.

Mr. GONZALEZ OF OHIO. Thank you, and I will yield back to Mr. Emmer, or just yield back altogether. I don't know if he is on.

Chairman SHERMAN. I don't see him. I do want to comment that the discussion draft that I have circulated does contain, as Section 6, a provision that shifting from one index to the other index does not constitute a sale exchange or disposition of property for tax purposes. The other technical assistance that Treasury has sent in was just received yesterday, and I know it will be very interesting to myself, Mr. Huizenga, and others working to perfect this draft.

With that, I will recognize Mr. Steil for 5 minutes.

Mr. STEIL. Thank you very much, Mr. Chairman. It has been a good hearing today and a good discussion of LIBOR. I want to shift gears slightly just for one minute, if I could, while we have you, Mr. Coates. I would like to ask you about some recent statements from your office regarding SPACs.

Last week, you put out a statement kind of opining whether Special Purpose Acquisition Companies (SPACs) were ideal. A popular commentator called the remarks, "a weird speech," his words, that was really, "advice for plaintiffs' lawyers," also his words, rather than anything related to SEC enforcement priorities. And then this week, alongside the SEC's acting Chief Accountant, you issued another statement that I think had some market implications regarding how warrants are issued and SPAC offerings and how they should be treated for accounting purposes. One of the major law firms actually noted that it has essentially frozen the SPAC marketplace as a result of some of those comments. And the firm pointed out, in the public comment that I read, that they were not

Exhibit 1
Page 37

30

aware of a statement put out without notice or comment that had such a chilling effect on capital market activities.

I read your statement and I noticed there was a pretty solid, well-written disclaimer in the footnote of your statement. But admittedly, despite that, I think many people out there are worrying that these comments may have greater teeth. Did you determine the significant market-moving statements are appropriate?

Mr. JOHN COATES. Thank you for those questions about SPACs. I am happy to give you a quick answer now. I don't want to distract from the LIBOR focus of the hearing, and I am happy to go at much greater length, if you would like, after this with my staff and your staff.

Very briefly, yes, we believe that the statements were appropriate for protection of investors and issuers and capital formation. I will note that the accounting statement that came out this week is not reflecting anything new. The guidance comes from FASB. That guidance has been there for years. And the reason that we put it out is because a particular registrant came to us with the questions and asked for our advice, and we gave it. Once we gave it, we recognized it might have implications for other issuers and did not feel comfortable not telling the market about the conclusion that we had reached about that question.

But again, as I said, I will be happy to follow up later, if you would like, with more information.

Mr. STEIL. Thank you for the background as to the orientation of the formation of those comments. Should we expect a more formal rulemaking on this issue in the near future?

Mr. JOHN COATES. I guess I would have to say I look forward to working with our new Chair, who will come on board very shortly, and talk about that issue with him and the rest of the staff at the SEC.

Mr. STEIL. Very good. I appreciate you letting me shift gears there for a second.

Let's pivot back to LIBOR, which I have actually been pretty interested in since I first arrived on this committee. I spoke about this topic in 2019, and while it seldom makes the front page of some of the newspapers, I think the LIBOR transition is actually one of the more important stories affecting our economy. So if I could ask a question for you, Mr. Van Der Weide.

In a speech delivered to the Alternative Reference Rate Committee last month, Vice Chairman Quarles sought to address rumors that the transition from LIBOR will be delayed further. Do you think the message has been fully received that LIBOR is really ending? This is one of my concerns.

And then, in particular, how do New York's recent moves impact the pace of this transition?

Mr. VAN DER WEIDE. I think the statements that we heard last month from the U.K.'s Financial Conduct Authority and the administrator of LIBOR were pretty definitive that major U.S. LIBOR tenors are ending in June 2023. I think that message is getting across. We are certainly getting that message across during our supervisory process. We have issued, along with our sister banking agencies, the OCC and the FDIC, several pieces of supervisory guidance over the last few months, and that is reinforcing the sig-

Exhibit 1
Page 38

31

nificance of the imminent demise of LIBOR and the cessation of writing new contracts under LIBOR. So, I consider the end of LIBOR to be set at this point in the middle of 2023.

Mr. STEIL. I appreciate that.

In observance of the time remaining, I appreciate everyone's time today discussing this important topic, and with that, I will yield back.

Chairman SHERMAN. Thank you. I assure you, Mr. Steil, that we will focus on SPACs at the subcommittee level expeditiously.

And without objection, I will put in the record a letter from the National Association of Federally-Insured Credit Unions supporting the idea of Congress taking legislation promptly on the LIBOR contracts consistent with the discussion draft that has been circulated.

Without objection, it is so ordered.

And I believe the next person in line is Mr. Hollingsworth, so I will recognize him for 5 minutes.

Mr. HOLLINGSWORTH. I appreciate that, Mr. Chairman. And I certainly appreciate all of the witnesses that we have here today.

As my good friend, Mr. Steil, said, this is an important issue. The numbers that we are dealing with—and certainly the chairman introduced this concept—are enormous, and making sure that we have an elegant solution to this transition is really important to both the real economy and the financial economy. Nothing I am going to ask about should minimize my sympathy for the problem that we have before us in transitioning a whole host of contracts that don't have an appropriate fallback or any fallback at all.

All that being said, and with the additional preamble of me not being a lawyer but always being concerned about the rights of parties to contracts, I wanted to ask Mr. Van Der Weide, do you have any trepidation or concern about the notion that the Fed is going to pick a rate, and that rate is going to be conclusive and binding upon parties that have agreed to a contract, and they, at least as I read the legislation, will not be afforded any sort of litigation avenue, cause of action, or other redress should they disagree with that? Is that concerning to you? I understand the problem that we have ahead of us, but are we going too far in saying presumptively that if you don't contest it, this is the rate, but instead saying, this is the rate, period, your only option is to contest this law altogether, not contest with the counterparty whether that is the right rate?

Mr. VAN DER WEIDE. I do agree with the impulse here that it should be a rare situation when Congress or legislators are overriding private contracts, and you only want to do that in a very narrow way for a very important government purpose. I think we have a very important government purpose here, to prevent financial stability negative effects and the litigation that may come by mid-June. We want to do this in the most narrowly tailored way possible, because I do think the Federal legislation needs to be strictly limited to legacy contracts. It should not be relevant looking forward to new contracts. It should only apply to legacy contracts that have no fallback rate or an inappropriate fallback rate, and people should have the ability to opt out of a rate that is set by the legislation.

Exhibit 1
Page 39

32

So, should contracting parties take a look at where the government-recommended rate is if they don't like it and they want to go a different route? They should be able to amend their contract and opt out. I think that is the way to maximize the benefits here.

Mr. HOLLINGSWORTH. I really appreciate that very thorough answer. I certainly concur that this is a big problem ahead of us. I certainly concur with your hesitation or desire to narrowly do this. And this is the first time I have actually heard someone say there should be an opt out or a means of redress should they disagree with that. That is something, a bar that I also agree with.

I have a little bit of concern—I like the idea of minimizing the logistical hurdles by saying this is the rate unless you contest it otherwise, and maybe even setting timeframes around that, that this is going to be your reference rate going forward. But I want people to have the ability to contest that, because they are ultimately the parties to that contract, and if they believe that is inappropriate, they should have their day in court to go argue before a judge and have that judge determine whether it is appropriate or inappropriate, what has been done.

Is that kind of what you are saying, as well? Not to characterize what you are trying to say.

Mr. VAN DER WEIDE. I think the fundamental issue here is, do you want to have a legislature step in and provide clarity to the financial markets about what some of these replacement rates are going to be for that tranche of contracts that are legacy?

Mr. HOLLINGSWORTH. Yes. But as you said, we don't want that clarity to come at too high a cost. If we, by principle of government, believe you should have access to the Judicial Branch to argue in front of a judge and have a judge decide what is appropriate or inappropriate, I believe that if you abandon your principles at a time when a big problem is afoot, then you probably didn't have those principles to start with.

Mr. VAN DER WEIDE. I think the balance you have to strike is between the clarity that we really need when LIBOR goes away in 2023 and the judicial right of review. I think the more judicial right of review you are going to have, the more litigation we are going to have, the more uncertainty we are going to have in the financial markets. So, we have to strike the right balance between those two.

Mr. HOLLINGSWORTH. I think you are exactly right. "Balance" is the operative term, and certainly I would love to work with Chairman Sherman in further fine-tuning. I think he is on the right track, but we should strike that balance to make sure there is a means for a party who has agreed to a contract to take it before a judge. That is really important to me.

Thank you. I yield back my time.

Chairman SHERMAN. Thank you.

One clarification for the record. I think the record was already clear. The Americans for Financial Reform, the National Consumer Law Center, and the Student Borrower Protection Center have not endorsed Federal legislation. They have not endorsed the drafts that I have circulated. They have endorsed the New York bill, which is substantively identical to the Federal legislation that we are discussing here today. That is as far as they have gone. I think

Exhibit 1
Page 40

33

I have correctly characterized them twice in this hearing already, but that will be a clarification.

At this point, I believe we have heard from all members who have asked their questions. What I am going to suggest is that Mr. Huizenga grace us with a 1-minute closing statement. I will then deliver a 1-minute closing statement, and at that point our members and witnesses can zoom off to their next meeting.

Mr. Huizenga?

Mr. HUIZENGA. Thank you, Mr. Chairman. We will zoom off to our votes, as well.

I do appreciate your having this hearing. I know this is something that has been important. What I am hoping for in the next hearing is that we are going to be able to hear from market participants, those who are going to be affected by this material change in those contracts.

As I had started to explore a little earlier, it sounds like we may have some legal experts in here as well to just comment on the constitutionality of this. I know you believe that you have addressed this, or you certainly attempted to address this, but looking at what the legality of this effort is is an important part of this process in my mind.

As has been noted, June of 2023 is that sort of drop-dead time. In classic Washington experience, that would mean May of 2023 is when we would get to it. But we are well ahead of that time, and I commend you for that, and I am glad to be a part of it and look forward to working with you on this.

Chairman SHERMAN. I look forward to working with you. The importance of this issue is at least $2 trillion in instruments that will still be outstanding after the middle of next year that do not have a fallback position. But if I heard Mr. Van Der Weide's testimony correctly, his number is closer to $10 trillion. I realize we are dealing with $200 trillion in evaluating what is so many different instruments, and applying it is difficult. So, we may be dealing with a problem that involves $10 trillion in instruments.

As to the sanctity of contracts, I think that we can deal with the Office of the Legislative Counsel and maybe the experts at the Congressional Research Service (CRS). I don't anticipate having another hearing where we bring in legal experts, but if we don't get a clear answer from them, then we do have to make sure that our bill will be constitutional.

I will point out that the principle of the sanctity of contracts is a principle important to all of us in every circumstance, but as a constitutional matter is applicable to State legislation.

I will also point out that New York State has passed legislation that would govern many of these instruments unless we pass our bill. Adding to the confusion is that the constitutionality of their bill is much less certain.

And finally, let's point out, as far as sanctity of contracts, the 95-percent-plus of drafted contracts that are clear as to how they would apply in a LIBOR-less world, the sanctity of those contracts is being respected. Where the parties didn't agree, it is much more efficient to have a bill than to have hundreds and hundreds of lawsuits. Although as an old-time lawyer, the idea of my colleagues

Exhibit 1
Page 41

34

billing thousands and thousands and thousands of hours is something that they would want me to support.

With that, we stand adjourned.

[Whereupon, at 3:51 p.m., the hearing was adjourned.]

Exhibit 1
Page 42

# A P P E N D I X

April 15, 2021

(35)

Exhibit 1
Page 43

CONTROLLED

Written Testimony
Daniel E. Coates, Senior Associate Director
Federal Housing Finance Agency

**House Financial Services Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets**
**"The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Products"**

April 15, 2021

Chairman Sherman, Ranking Member Huizenga, and distinguished members of the Subcommittee, thank you for the opportunity to appear at today's hearing.

My name is Dan Coates. I serve as the Senior Associate Director of Risk Analysis and Modeling in the Federal Housing Finance Agency's (FHFA) Division of Federal Home Loan Bank Regulation. I have over 30 years of experience in the federal government and today marks my first time testifying before Congress.

FHFA regulates and oversees Fannie Mae, Freddie Mac, and the Federal Home Loan Bank System – together, the regulated entities. Since 2008, FHFA has also served as conservator of Fannie Mae and Freddie Mac – together, the Enterprises.

I lead an office of economists and financial analysts who support a range of topics including financial analysis, credit risk modeling, and market risk modeling for our examination, supervision, and regulation of the Federal Home Loan Banks (FHLBanks). Since the 2017 announcement of London Interbank Offered Rate's (LIBOR) future discontinuation, I have overseen FHFA's response to emerging issues stemming from the LIBOR transition. I established the Agency's ten working groups, involving 89 FHFA staff working on the LIBOR transition alongside other duties. These working groups were organized to monitor – and in some cases direct – the regulated entities as they move away from LIBOR to more robust reference rates. I established and serve as Chair of the Agency's Reference Rate Transition Steering Committee to provide oversight to those working groups. I also serve as the FHFA representative to the Alternative Reference Rates Committee (ARRC).

LIBOR has been the world's most widely used interest rate benchmark. The LIBOR transition is the largest financial infrastructure change to date, surpassing in size and complexity the conversion to the Euro and the Y2K conversion. Preparing for this transition has been and will continue to be an enormous undertaking with a variety of implications for all participants in the global financial system. FHFA and its regulated entities have been leaders in this effort and I am proud of what has been accomplished to date.

37

CONTROLLED

As Director Calabria has made clear, FHFA's efforts to transition away from LIBOR are guided by the same core objectives that direct all the Agency's work: ensuring the safety and soundness of our regulated entities, supporting liquidity and resilience in our nation's housing finance markets, and protecting homeowners and renters.  While important work remains, I am confident that we will meet our goal of fully transitioning the Enterprises and FHLBanks away from LIBOR by the end of 2021.

Although the date of the LIBOR cessation has been extended for most U.S. Dollar LIBOR products until June 30, 2023, FHFA is continuing to execute our timeline as planned.  FHFA's actions to prepare for this transition are consistent with the guidance issued on November 30, 2020, by the Federal Reserve, the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation stating their concerns that continued new LIBOR use after the end of 2021 would constitute a safety and soundness threat.

FHFA's regulated entities have been working diligently to transition away from LIBOR.  We have a reasonable expectation that there will be an orderly transition with minimal disruption to the financial markets upon the cessation of LIBOR thanks to the efforts of the Federal Reserve, the Federal Reserve Bank of New York, the ARRC, and the International Swaps and Derivatives Association (ISDA).  However, if enough market participants fail to prepare for the transition away from LIBOR, there could be considerable systemic consequences upon its discontinuation. In addition, there are a number of contracts that did not contemplate the permanent cessation of LIBOR.  Disputes over the interpretation of those contracts will likely be lessened with the passage of federal legislation to provide clarity about the transition.

One of the most significant challenges has been the development of new products and markets focused on non-LIBOR products.  Here, FHFA's regulated entities have led the transition by being the first and most significant issuers of Secured Overnight Financing Rate-indexed (SOFR) debt and by developing SOFR-based alternatives to their existing LIBOR products.  Thanks to FHFA's leadership, the FHLBanks and the Enterprises have stopped purchasing and issuing LIBOR-based products, with only limited exceptions.

Of all the LIBOR-indexed products owned, guaranteed, or issued by its regulated entities, FHFA has been particularly focused on ensuring a seamless transition away from LIBOR for those with adjustable-rate mortgages (ARMs).  While these products represent a small fraction of the LIBOR exposure of FHFA's regulated entities, they are among the most consumer-facing.  We have been and continue to work with the Consumer Financial Protection Bureau (CFPB), the Federal Reserve, and others in the regulatory community, along with the Consumer Products Working Group of the ARRC which includes representatives of consumer groups with the goal of assuring that those with LIBOR indexed ARMs do not suffer a payment shock at the time that LIBOR goes away.

**Background**

According to the ARRC, LIBOR is referenced in $223 trillion in financial contracts in the United States, with 96 percent of that exposure estimated to reside in derivatives contracts.  According to its administrator, ICE Benchmark Administration (IBA), "the LIBOR methodology is

2

Exhibit 1
Page 45

38

CONTROLLED

designed to produce an average rate that is representative of the rates at which large, leading internationally active banks with access to the wholesale, unsecured funding market could fund themselves in such market in particular currencies for certain tenors."

However, the number of actual unsecured borrowing transactions backing the quotes that panel banks submit has fallen over the years as firms increasingly rely on other sources of funding. As a result, panel banks have increasingly relied on "expert judgement" as a basis for their submissions to the LIBOR administrator.

In the summer of 2017, Great Britain's Financial Conduct Authority (FCA) Chairman Andrew Bailey, regulator of the LIBOR administrator, announced that he had secured the commitment of LIBOR panel banks to continue submitting quotes that are the basis for LIBOR until December 31, 2021. The FCA would not compel panel banks to submit quotes after that date. In subsequent speeches, Mr. Bailey warned that LIBOR could be stopped outright or declared unrepresentative soon after that date.

FHFA's regulated entities have referenced LIBOR in many of their previously issued products. For example, the FHLBanks used to offer LIBOR-indexed floating rate advances, issue debt in cash or synthetic forms that were indexed to LIBOR, invest in LIBOR-based floating rate securities, and engage in swaps and other derivatives tied to LIBOR. The Enterprises used to purchase floating rate single- and multifamily mortgages and securitize those assets with LIBOR-based interest rates. The Enterprises used to create collateralized mortgage obligations (CMOs) with interest rates tied to LIBOR. The Enterprises' credit risk transfer (CRT) products were similarly tied to LIBOR. While the Enterprises no longer issue debt tied to LIBOR, they continue to engage in derivative transactions tied to LIBOR. However, we expect that activity to decline as liquidity in SOFR derivatives increases.

On November 17, 2014, the Federal Reserve convened the ARRC with the support of the U.S. Department of the Treasury, the U.S. Commodity Futures Trading Commission, and the Office of Financial Research. The ARRC was convened to identify a set of alternative U.S. dollar reference rates that are more firmly based on transactions from a robust underlying market than U.S. dollar LIBOR and that are compliant with standards such as the International Organization of Securities Commissions' (IOSCO) *Principles for Financial Benchmarks*. The ARRC issued a number of recommendations to facilitate the voluntary acceptance and use of these alternative reference rates.

**Transition to the Secured Overnight Financing Rate**

On June 22, 2017, the ARRC identified SOFR as the U.S. recommended replacement for LIBOR. SOFR is derived from overnight repurchase agreement contracts where the collateral posted is U.S. Treasury securities. Since SOFR first was published in April 2018, daily transaction volume in the markets underlying SOFR has averaged more than $980 billion. Transaction volume often has exceeded $1 trillion and it has never been less than $700 billion. Importantly, SOFR is compliant with IOSCO principles developed as a set of "best practices" for reference rate production to ensure reference rates used in the future would be based on actual

3

Exhibit 1
Page 46

39

CONTROLLED

market transactions in a transparent manner by an unbiased administrator subject to regular audits.

Since choosing SOFR as its recommended successor to LIBOR, the ARRC was reconstituted in 2018 to facilitate the smooth transition to SOFR. The ARRC established a number of guiding principles and regularly reminds its members of the voluntary nature of its recommendations. The ARRC regularly publishes the minutes of its meetings, and requests public comment on its proposed recommendations. The Federal Reserve Bank of New York and the Federal Reserve established the ARRC and serve as its Secretariat. Fannie Mae, Freddie Mac, and the Federal Home Loan Banks, through the FHLBank of New York, serve as voting members of the ARRC.

**FHFA's Work to Transition from LIBOR**

FHFA recognized the need for our regulated entities to prepare for the likelihood of a LIBOR cessation. We established our Agency's Reference Rate Transition Steering Committee and started the work to ensure our regulated entities prepared for the transition. FHFA was invited to join the ARRC in late 2017, and we have been participating as a non-voting "ex officio" member since the ARRC was reconstituted in early 2018.

At FHFA, our approach has been straightforward. We have worked to ensure our regulated entities adequately account for their LIBOR exposures across all of their business lines. We have also worked to ensure the entities have adequate governance structures in place to manage the transition. And we have evaluated the entities' transition plans.

We are actively involved in supervising our regulated entities' transitions away from LIBOR. We have established ten working groups across FHFA. While the Enterprise working groups have a more direct role than the FHLBank working groups owing to the Enterprises being in conservatorship, the underlying goal is the same: to ensure that each regulated entity transitions away from LIBOR in a safe and sound manner.

As an example of the type of reviews we have been engaged in, when we review the regulated entities' transition plans we evaluate a number of factors: the entities' exposures to LIBOR, their transition governance and reporting structure, their budgets and staffing related to the transition, and their evaluation of the fallback provisions in contracts binding on the institution. In addition, we evaluate the entities' own operational readiness including, but not limited to, readiness of their own systems and those of their vendors. We also review the entities' plans to reduce their LIBOR exposures, their outreach to counterparties, and their communications plans for any products affecting their customers and other counterparties.

To facilitate our review and supervision and to direct the entities under conservatorship, we have deployed an exposure template for each entity to use when reporting to us on a quarterly basis. This exposure template ensures we receive information in a form that allows us to compare one entity's exposure to another's.

4

Exhibit 1
Page 47

40

CONTROLLED

We continue to have regular meetings with the Enterprises to ensure the transition moves
forward. We have working group level meetings regularly, and I meet with the executives in
charge of the LIBOR transition team at each Enterprise. I also have regular meetings with the
Chief Risk Officer at each Enterprise.

**Fannie Mae and Freddie Mac's Transition from LIBOR**

FHFA has worked to ensure that the Enterprises provided leadership to the ARRC's Consumer
Products Working Group in areas related to mortgages. This is appropriate given their
significant role in mortgage purchases and securitization. FHFA has worked with the CFPB, the
Federal Reserve, and the ARRC to ensure consumer groups have had a seat at the table and that
their views have been heard. We have joined meetings of the ARRC Consumer Products
Working Group hosted by the CFPB and the Board, and we have hosted an ARRC Consumer
Products Working Group and other meetings with consumer groups. Director Calabria opened
one of those meetings and stressed the importance of consumers' views.

Our work with the Enterprises was carefully sequenced. First, we worked to get more updated
and transparent language for new LIBOR products that would fully anticipate the end of LIBOR.
Second, we ensured new replacement products were developed in time to be ready and on the
market prior to LIBOR's demise. Third, we cut off the purchase and production of LIBOR
products as the new SOFR-based products came online. Since then, we have been working on
issues related to the transition away from LIBOR of previously issued, or "legacy," LIBOR
products.

One of our first transition projects was to ensure the Enterprises provided leadership in
developing new "fallback language" supporting new ARMs. This language describes more
clearly how the coupon rate on the mortgage would be switched to a replacement rate should the
coupon rate no longer be produced or be deemed unrepresentative. This was a critically
important improvement to achieve first in order to reduce the uncertainty around newly issued
LIBOR ARMs. The Enterprises and FHFA worked closely with consumer groups, other
regulators, lenders, servicers, and investors in developing this more modern contract language,
which has been required for single-family uniform ARM instruments that closed on or after June
1, 2020.

The second major step took place in 2019 when the Enterprises and FHFA worked with
members of the ARRC Consumer Products Working Group to develop parameters of an
adjustable rate mortgage that would be acceptable to *all* market participants, including groups
representing consumers, other regulators, lenders, servicers, and investors. This resulted in an
ARRC white paper that explained the basic structure of future ARMs based on SOFR. The
Enterprises then built the systems to purchase and securitize SOFR-indexed ARMs. On April 1,
2020, the Enterprises published additional details about their new SOFR-based ARM products
and announced they would begin purchasing SOFR-indexed ARMs in the second half of 2020.

During the summer of 2019, FHFA instructed the Enterprises to stop purchasing LIBOR-indexed
ARMs that were issued more than six months earlier. On February 5, 2020, the Enterprises

5

Exhibit 1
Page 48

41

CONTROLLED

announced that they would no longer purchase LIBOR-indexed single-family and multifamily
ARMs with application dates beyond September 30, 2020. They also announced their intention
to no longer purchase any LIBOR-based single-family and multifamily ARMs after December
31, 2020.

In areas not as visible to consumers, the Enterprises started offering SOFR-indexed CMOs for
settlement in July 2020. Additionally, under the guidance of FHFA, Freddie Mac and Fannie
Mae have since ceased taking on new LIBOR-indexed CMO exposure. The Enterprises ceased
LIBOR-indexed CRT transactions after 2020 and now offer SOFR-indexed CRTs. Freddie Mac
issued three SOFR-indexed single-family CRTs in the fourth quarter of 2020 and issued three
SOFR-indexed single-family CRTs and one SOFR-indexed multifamily CRT in the first quarter
of this year. Fannie Mae is now operationally ready to do so. Each Enterprise has adopted the
"ISDA protocol," a set of industry-adopted amendments aimed at an orderly transition to SOFR
upon any LIBOR cessation for derivatives contracts.

The Enterprises have been providing leadership in the transition since Fannie Mae issued the first
SOFR-based debt in July 2018. Freddie Mac and the FHLBanks soon followed, and the
FHLBanks are now the largest issuers of SOFR-based floating-rate debt.

On May 28, 2020, the Enterprises jointly produced a "Playbook" describing the steps they were
planning to take in the transition away from LIBOR. They also jointly produced a "Frequently
Asked Questions" document. Those documents have been updated on a monthly basis since.

The Enterprises have helped lead the ARRC's Consumer Products Working Group devoted to
determining a path forward for legacy ARMs. One of the Enterprise's staff serves as a co-chair
for that working group. FHFA, the U.S. Department of the Treasury, CFPB, the Federal
Reserve, and other regulators have worked with this working group to ensure that representatives
of consumer groups were active participants in finding a solution to the legacy LIBOR products.
The result of this effort was the final spread-adjusted rate recommendations for consumer
products, which we expect the ARRC to announce soon.

We also expect the Enterprises to make announcements about the successor rates for all of their
legacy LIBOR products this year.

**The Federal Home Loan Banks' Transition from LIBOR**

The FHLBanks have been working to educate their members on the LIBOR transition. They
have been offering their members SOFR-indexed loans, known as advances, for some time now.
However, the number of members taking such advances has been limited to date, potentially
reflecting the downward trend in members asking for advances in a time of sustained low interest
rates and a strong base of deposits.

We have been hard at work ensuring that the FHLBanks are prepared for the upcoming
transition. We requested their transition plans and offered feedback on those plans. We sent
them a Supervisory Letter in September 2019 instructing them that as of December 31, 2019,

6

Exhibit 1
Page 49

42

CONTROLLED

they must cease purchasing LIBOR-linked investments with maturities beyond December 31, 2021. The Letter also requested that as of March 31, 2020, they cease all other transactions involving LIBOR with maturities beyond December 31, 2021. Due to the COVID-19 pandemic, we extended the March deadline to June 30, 2020.

The most important exception to this instruction pertains to collateral. As the FHLBanks' mission involves providing liquidity to its members so they can accomplish their housing finance roles, FHFA has left it up to each Bank to determine its approach to LIBOR-based collateral from their members. We asked the FHLBanks to request additional information from their members about their LIBOR collateral so that they could understand their potential exposures and adjust their valuations and lending values based on such collateral as the market for LIBOR-based collateral changes.

We also took the unusual step to make the 2019 Supervisory Letter publicly available. We did this in a manner that revealed no supervisory information about the FHLBanks, but did reveal to their members, vendors, and other market participants that FHFA was serious about ensuring that the FHLBanks move away from LIBOR. We sent this letter in our role as prudential supervisor and regulator of the FHLBanks: in our view, exposure to LIBOR beyond 2021 represents a significant risk to the FHLBanks and the letter represents our best supervisory judgment for ensuring the FHLBanks transition away from this risk in a safe and sound manner.

FHFA and the FHLBanks continue to prepare transitioning away from LIBOR. Last fall, we sent the FHLBanks a letter urging them to sign the ISDA protocol for resolving LIBOR derivatives. We similarly made this letter public. All of the FHLBanks have signed the ISDA protocol.

**Conclusion**

At FHFA, we continue to look for ways we can enhance awareness of the importance of this transition. In addition to our work with the regulated entities, we have established a LIBOR transition page on FHFA's website. We look forward to continuing our work with the CFPB, the Fed, the other ex officio members of the ARRC, and the ARRC's Consumer Products Working Group and representatives from consumer advocacy groups to ensure all parties are given sufficient information to ensure their concerns are addressed as we move forward with this large and complex financial infrastructure transition.

I will be glad to answer your questions.

Thank you.

7

Exhibit 1
Page 50

43

**Written Testimony of John Coates**
**Acting Director, Division of Corporation Finance**
**U.S. Securities and Exchange Commission**
**Washington D.C.**

**Before the U.S. House of Representatives Committee on Financial Services**
**Subcommittee on Investor Protection, Entrepreneurship aud Capital Markets**

**Hearing: "The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation**
**for Mortgages, Student Loans, Business Borrowing, and Other Financial Products"**

**April 15, 2021**

Chair Sherman, Ranking Member Huizenga and Members of the Subcommittee:

I appreciate the opportunity to testify before you today on behalf of the Division of
Corporation Finance of the Securities and Exchange Commission ("SEC" or the "Commission")[1]
about the transition away from LIBOR[2] and the Securities and Exchange Commission staff's
efforts to monitor the transition.[3]

The announced discontinuation of LIBOR will have significant impacts on the financial
markets and market participants.  LIBOR's discontinuation and transition to an alternative
reference rate may present material risks for public companies, investment advisers, investment

---

[1] The views expressed in this testimony are those of the author and do not necessarily represent
the views of the SEC, the Commissioners, or other members of the SEC staff.
[2] Formerly an acronym for the London Interbank Offered Rate, LIBOR is common parlance for
its current official name ICE LIBOR.  For further information about the current state of the
transition, see Federal Financial Institutions Examination Council, *Joint Statement on Managing
the LIBOR Transition* (Jul. 1, 2020), *available at* https://www.ffiec.gov/press/pr070120.htm.
[3] For further information, see Division of Corporation Finance, Division of Investment
Management, Division of Trading and Markets and Office of the Chief Accountant, *Staff
Statement on LIBOR Transition* (Jul. 12, 2019) [hereinafter "Staff Statement on LIBOR
Transition"], https://www.sec.gov/news/public-statement/libor-transition; SEC Office of
Compliance, Inspections and Examinations, *Risk Alert: Examination Initiative: LIBOR
Transition Preparedness* (Jun. 18, 2020) [hereinafter "EXAMS Risk Alert"], *available at*
https://www.sec.gov/exams; SEC Office of Municipal Securities, *Staff Statement on LIBOR
Transition in the Municipal Securities Market* (Jan. 8, 2021) [hereinafter "OMS Staff
Statement"], https://www.sec.gov/municipal/oms-staff-statement-libor-transition-municipal-
securities-market.  These statements represent the views of the staffs of the respective Divisions
and Offices.  They are not rules, regulations, or statements of the Commission.  The Commission
has neither approved nor disapproved their content.  These statements, like all staff statements,
have no legal force or effect: they do not alter or amend applicable law, and they create no new
or additional obligations for any person.

Exhibit 1
Page 51

44

companies, broker-dealers, and, ultimately, investors. Those risks will be greater if an orderly transition is not completed in a timely manner—including important work to be done this year, and work still to be finished. A cross-agency team of Commission staff collaborates regularly on LIBOR transition matters, and the staff is actively monitoring the extent to which market participants are identifying and addressing these risks in preparing for the transition.

The federal securities laws are designed in part to elicit disclosure of timely, comprehensive, and accurate information about risks and events that a reasonable investor would consider important to an investment decision. The Commission's three-part mission is to protect investors, maintain fair, orderly and efficient markets, and facilitate capital formation. We will be pursuing each part of that mission during the LIBOR transition. The Division of Corporation Finance ("CF") has encouraged public companies to plan for the LIBOR transition and to consider their disclosure obligations, control systems, and risks to their businesses that the transition may present. Areas in which existing rules or regulations may require disclosure related to the discontinuation of LIBOR include disclosure of risk factors,[4] management's discussion and analysis,[5] board risk oversight,[6] and financial statements.[7] To meet their disclosure obligations, companies also may need to adjust their information technology systems, internal controls, and related policies and procedures to reflect the transition. CF has encouraged companies to keep investors informed about the progress toward risk identification and mitigation and any anticipated material impact, and also has issued guidance for companies to consider in deciding what disclosures are relevant and appropriate.[8]

The Division of Trading and Markets ("TM") has been monitoring the impact that the discontinuation of LIBOR will have on broker-dealers, central counterparties, and exchanges. These entities may need to consider transition-related impacts due to: issuing instruments, or being a party to a transaction, referencing LIBOR; making investments that reference LIBOR; making a market in instruments that reference LIBOR; or underwriting, placing, or advising on the issuance of instruments referencing LIBOR. In addition, broker-dealers should be especially mindful of their sales practice obligations. In particular, broker-dealers are subject to Regulation

---

[4] Item 105 of Regulation S-K and Item 3.D of Form 20-F require companies to provide a discussion of the material factors that make an investment in the company or offering speculative or risky and, in making these disclosures, to explain concisely how each risk affects the company or the securities being offered.

[5] Item 303 of Regulation S-K and Item 5 of Form 20-F require companies to identify, among other items, known trends or known demands, commitments, events, or uncertainties that will result or that are reasonably likely to result in a material increase or decrease in liquidity, and to describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income.

[6] Item 407(h) of Regulation S-K requires companies to disclose the extent of its board's role in the risk oversight of the company, such as how the board administers its oversight function and the effect this has on the board's leadership structure.

[7] Changes in the reference rate included in financial instruments resulting from the expected discontinuation of LIBOR may affect a company's accounting for financial assets and financial liabilities thereby affecting its financial statements.

[8] *See* Staff Statement on LIBOR Transition, *supra* note 3.

Exhibit 1
Page 52

45

Best Interest when recommending LIBOR-linked securities to retail customers, which requires the broker-dealer, among other things, to understand the potential risks, rewards, and costs associated with the recommendation and to have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile. This consideration may include whether the investments or related contracts at issue have clear fallback language providing for an alternative rate when LIBOR is discontinued and whether any replacement rate has economic differences that make the investment less compatible with their retail customer's investment objectives or risk tolerance. Regulation Best Interest also requires broker-dealers to make relevant disclosures and address conflicts of interest. Finally, TM has encouraged its regulated entities to analyze how the LIBOR transition will impact them, including their business, systems, models, processes, risk management frameworks, and clients.[9] Regulated entities should respond accordingly in order to mitigate the impacts, including disclosure where appropriate.

The Division of Examinations ("EXAMS") has engaged in efforts to assess the impact that the discontinuation of LIBOR will have on registered entities subject to SEC oversight, including investment advisers, investment companies, broker-dealers, transfer agents, municipal advisors, and clearing agencies, and has encouraged early preparation among registered entities. Last year, it launched an examination initiative to assess industry preparation efforts and identify challenges confronting the industry in transition efforts.[10] EXAMS also issued a risk alert highlighting to the financial services industry issues to consider to facilitate a successful transition.[11] As part of its LIBOR transition preparedness initiative, EXAMS has thus far conducted approximately 75 examinations of a wide range of registrants. EXAMS is continuing its examinations, focusing on retail advisers, and continuing to message the importance of preparation.

The Division of Investment Management ("IM") is focused on general preparedness and risk management among advisers and funds related to the discontinuance of LIBOR. IM has encouraged investment advisers to consider the effect the discontinuation of LIBOR will have on LIBOR-based investments when recommending them to clients or monitoring them for clients. This consideration may include whether the investments or related contracts at issue have clear fallback language providing for an alternative rate when LIBOR is discontinued and whether any replacement rate has economic differences that make the investment less compatible with their client's risk strategy or tolerance. Another key aspect of preparing for the transition involves updating systems and operational processes. Among other things, advisers and funds that transact in LIBOR-based investments will need to make sure that their systems are able to handle the ongoing calculation of interest accruals and payment calculations for instruments tied to replacement rates for LIBOR, and to accommodate alternative rate instruments so that they can transact in them as they become available. IM has provided guidance on fund disclosures, including encouraging affected funds to provide disclosures tailored based on the fund's investment objective, holdings, investment strategies, and structure. Disclosures should address

---

[9] *See id.*
[10] *See* EXAMS Risk Alert, *supra* note 3.
[11] *See id.*

Exhibit 1
Page 53

46

all material risks associated with LIBOR-linked instruments in offering documents and other communications so that investors can make informed investment decisions.[12]

The Office of the Chief Accountant ("OCA") continues to monitor the activities of preparers, auditors, standard-setters, and other regulators to address financial reporting issues that might arise in connection with a transition from LIBOR to alternative benchmark reference rates. OCA staff has encouraged ongoing discussion and analysis of questions in this area in interactions with various stakeholders, including the Financial Accounting Standards Board and the International Accounting Standards Board. Both boards have updated their accounting standards to address potential accounting implications arising from the anticipated transition away from LIBOR, and continue to monitor this area for other potential accounting and financial reporting implications that may need to be addressed through standard setting. In addition, through continued engagement with stakeholders, OCA staff have supported efforts to raise awareness of the potential accounting considerations and to encourage disclosure of potential material impacts of, and issuer progress relating to, the transition.[13]

The Office of Municipal Securities ("OMS") has encouraged municipal issuers and municipal advisors to focus on issues specifically relevant to the municipal securities market, including with respect to existing and new contracts with LIBOR exposure, the need to keep investors informed through primary and secondary municipal security market disclosures, and municipal advisors' preparation for the transition away from LIBOR.[14] Municipal issuers have exposure primarily through their debt obligations, derivative transactions, and investment portfolios, although some may additionally be exposed to LIBOR through their services, supply and other commercial contracts. OMS staff has actively engaged in industry outreach with key market participants on the need to take appropriate steps proactively to deal effectively with the LIBOR transition. In addition to moderating a LIBOR transition discussion during last year's municipal market disclosure conference hosted by OMS, this year the OMS director has discussed LIBOR transition issues and outlined material disclosure issues arising from the LIBOR transition with municipal market participants in meetings and at conferences.

Thank you for the opportunity to discuss the SEC staff's work related to the LIBOR transition.

---

[12] *See* Staff Statement on LIBOR Transition, *supra* note 3.
[13] *See id.*
[14] *See* OMS Staff Statement, *supra* note 3.

Exhibit 1
Page 54

47

**Testimony of Brian Smith**
**Deputy Assistant Secretary for Federal Finance, U.S. Department of the Treasury**
**House Financial Services Subcommittee on Investor Protection, Entrepreneurship, and**
**Capital Markets**

**April 15, 2021**

Thank you to Chair Sherman and Ranking Member Huizenga for calling a hearing on this important issue. As Treasury's Deputy Assistant Secretary for Federal Finance, I oversee the Department's work on the LIBOR transition.

Though LIBOR is used in more than $200 trillion of outstanding financial contracts today, two tenors of USD LIBOR will cease being published at the end of 2021, and the remainder will cease by June 2023. LIBOR's widespread use in the financial system but short remaining lifespan underscores the urgency of a timely and effective transition.

In recent years, Treasury has played an active role in highlighting the risks associated with the continued use of LIBOR and encouraging a market participant-led transition. Since 2013, annual reports of the Financial Stability Oversight Council, which the Treasury Secretary chairs, have called attention to LIBOR-related financial stability risks, encouraged market participants to formulate and execute transition plans, and recommended that member agencies use their authorities to facilitate transition. Treasury has served as an ex officio member of the Alternative Reference Rates Committee (ARRC) since that group was convened in 2014 by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York. The ARRC is composed of a diverse set of private-market participants working towards a successful transition away from LIBOR. As an alternative to LIBOR, the ARRC has recommended the Secured Overnight Financing Rate (SOFR), which is a robust rate based on nearly $1 trillion in daily transactions. The ARRC has also recommended robust contract fallback language for various financial products and worked closely with regulators to identify and tackle potential roadblocks to transition. Treasury applauds the passage of LIBOR transition legislation in New York State, which will provide meaningful relief for the transition of legacy contracts written under New York law. In addition, Treasury has also taken initial steps to address the potential tax consequences of modifying contracts that reference LIBOR, although some of the relevant tax statutes lack a grant of regulatory authority, which limits the tax relief that Treasury can provide.

Despite this progress, challenges for the transition remain, and federal legislation is needed. As Secretary Yellen described in recent testimony before the House Financial Services Committee, legislation is necessary for so-called "tough legacy" contracts that do not specify a workable fallback rate and are not feasible for private-sector actors to modify on their own. Federal legislation could also ensure that Treasury has sufficient authority to address the tax consequences of the LIBOR transition and amend the Higher Education Act of 1965's reference

Exhibit 1
Page 55

48

to LIBOR for Special Allowance Payments under the legacy guaranteed federal student loan program.

With LIBOR's cessation dates approaching quickly, market participants must make progress on transitioning legacy contracts, where feasible, and new contracts should begin referencing alternative rates like SOFR. In addition, in the case of consumer loans, it is imperative that lenders engage with consumers about how this transition will affect them and provide them timely notice of any changes. Lenders need to act responsibly so that consumers are not caught by surprise.

With that, I will conclude my remarks. Chair Sherman and Ranking Member Huizenga, thank you again for your interest and engagement on this important issue. I look forward to your questions.

Exhibit 1
Page 56

49

For release on delivery
2:00 p.m. EDT
April 15, 2021

Statement by

Mark Van Der Weide

General Counsel

Board of Governors of the Federal Reserve System

before the

Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets

of the

Committee on Financial Services

U.S. House of Representatives

April 15, 2021

Exhibit 1
Page 57

50

Chairman Sherman, Ranking Member Huizenga, and members of the subcommittee, thank you for the opportunity to appear today.  My testimony will discuss the importance of ensuring a smooth, transparent, and fair transition away from LIBOR (formerly known as the London interbank offered rate) to more durable replacement rates, as well as some of the challenges posed by this transition.  Before I delve into those issues, however, it may be helpful to review how LIBOR is used and why it will be discontinued.

LIBOR measures the average interest rate at which large banks can borrow in wholesale funding markets for different periods of time, ranging from overnight to one month, three months, and beyond.  LIBOR is an unsecured rate that measures interest rates for borrowings that are made without collateral.  Over the past few decades, LIBOR became a benchmark rate used to set interest rates for commercial loans, mortgages, derivatives, and many other products. In total, U.S. dollar LIBOR is used in more than $200 trillion of financial contracts worldwide.

By now the flaws of LIBOR are well documented.[1]  One of the fundamental problems is that LIBOR purported to be a representation of the actual funding costs of large banks in the London interbank market, but the evolution of that market over the years meant that, for many tenors, banks were estimating the likely cost of such funding rather than reporting the actual cost. This increasing element of subjectivity and discretion, coupled with the mechanisms that had been adopted to aggregate various banks' inputs into the determination of LIBOR, made the rate vulnerable to collusion and manipulation.  Particularly after the global financial crisis of 2008, as banks sharply reduced their reliance on wholesale unsecured funding, there were few actual funding transactions on which to base a rate for many tenors of LIBOR.

---

[1] Jerome H. Powell, Reforming U.S. Dollar LIBOR: The Path Forward (speech at the Money Marketeers of New York University, New York, NY, September 4, 2017), https://www.federalreserve.gov/newsevents/speech/powell20140904a.htm.

Exhibit 1
Page 58

51

- 2 -

While banks are, of course, not required to price their credit as a direct function of their cost of funding or on any amalgam of actual transaction data, the LIBOR mechanism—by purporting to be a measure of such costs even though there were not sufficient transactions to justify that perception—had become potentially misleading to many of those relying on it for credit pricing and other decisions.  Over time, with a large number of contracts referencing a thinly traded rate, the incentive to manipulate LIBOR grew and actual manipulation of LIBOR abounded.

Following the exposure of these weaknesses, and the imposition of material legal penalties on a number of banks and individuals that engaged in misconduct related to the setting of LIBOR rates, the great majority of the banks that had provided submissions to be used in the setting of LIBOR (the so-called panel banks) determined that they would not continue participating in the process.  This was not the result of a regulatory or legal requirement to end LIBOR.  It was a private sector decision to stop providing what had always been a completely voluntary service, given the firms' assessment of the costs and benefits of doing so.  While regulators are appropriately focusing on whether financial firms have prepared themselves for the date when the panel banks have said they will no longer provide LIBOR, the decision to end LIBOR itself has not been a governmental decision, but a private sector development.

Last month, LIBOR's regulator in the United Kingdom announced that the one-week and two-month U.S. dollar LIBOR term rates will cease to be published at the end of 2021, while overnight and other LIBOR term rates will cease to be published on a representative basis in mid-2023.[2]  This definitive announcement about the end of panel-based LIBOR underscores the importance of transitioning away from this moribund benchmark rate.

---

[2] See https://www.fca.org.uk/news/press-releases/announcements-end-libor.

Exhibit 1
Page 59

52

- 3 -

**Efforts to Transition Away from LIBOR**

Market participants, regulatory agencies, consumer groups, and other stakeholders have put in a great deal of work to prepare for life after LIBOR. Beginning in 2013, the domestic Financial Stability Oversight Council and the international Financial Stability Board expressed concern that the decline in unsecured short-term funding by banks could pose serious structural risks for unsecured benchmarks like LIBOR.[3] To mitigate these risks and promote a smooth transition away from LIBOR, the Federal Reserve convened the Alternative Reference Rates Committee (ARRC) in November 2014. Recognizing that the private sector must drive this transition, the ARRC's voting members are private-sector firms. The Federal Reserve and the other agencies testifying today are ex-officio members of the ARRC.

The ARRC set about to identify alternative reference rates that were rooted in transactions from an active and robust underlying market. In June 2017, the ARRC identified the Secured Overnight Financing Rate (SOFR) as its recommended alternative to U.S. dollar LIBOR. SOFR is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities. The Federal Reserve Bank of New York publishes SOFR each morning. Unlike LIBOR, SOFR is based on a market with a high volume of underlying transactions— regularly around $1 trillion daily. The ARRC developed a multi-step plan in October 2017 to facilitate the transition from LIBOR to SOFR.

The Federal Reserve and other agencies also sponsored a series of workshops with lenders and borrowers that focused on the use of credit-sensitive alternative reference rates for loans. Relatedly, the Federal Reserve, Office of the Comptroller of the Currency (OCC), and

---

[3] See Financial Stability Oversight Council, *2013 Annual Report* (Washington: Department of the Treasury, 2013), https://www.treasury.gov/initiatives/fsoc/studies-reports/Pages/2013-Annual-Report.aspx; and Financial Stability Board, *Reforming Major Interest Rate Benchmarks* (Basel, Switzerland: Financial Stability Board, July 2014), https://www.fsb.org/2014/07/r_140722/.

Exhibit 1
Page 60

53

- 4 -

Federal Deposit Insurance Corporation (FDIC) issued a statement last year to emphasize that a bank may use any reference rate for its loans that the bank determines to be appropriate for its funding model and customer needs.[4]  The statement also noted, however, that a bank's loan contracts should include robust fallback language that provides for a clearly defined alternative reference rate to be used if the initial reference rate is discontinued.

**Supervisory Efforts**

Beginning in 2018, Federal Reserve staff began outreach to supervised institutions and examiners to raise awareness about, and encourage preparation for, the transition away from LIBOR.  In 2019, we established a LIBOR Transition Working Group to coordinate monitoring of the transition and develop supervisory plans to assess banks' preparation efforts.

In November 2020, the Federal Reserve, OCC, and FDIC sent a letter to the banking organizations that we regulate, noting that there are safety and soundness risks associated with the continued use of U.S. dollar LIBOR in new transactions after 2021.[5]  Accordingly, we have encouraged supervised entities to stop using LIBOR in new contracts as soon as practicable and, in any event, by the end of this year.  Federal Reserve Vice Chair for Supervision Randal Quarles emphasized in a recent speech that banking firms should be aware of the intense supervisory focus the Federal Reserve is placing on the LIBOR transition, and especially on plans to end issuance of new LIBOR contracts by year-end.[6]

---

[4] SR letter 20-25: Interagency Statement – Reference Rates for Loans,
https://www.federalreserve.gov/supervisionreg/srletters/SR2025.htm.
[5] SR letter 20-27: Interagency Statement on LIBOR Transition,
https://www.federalreserve.gov/supervisionreg/srletters/SR2027.htm.
[6] Randal K. Quarles, Keynote Remarks (speech via webcast at the SOFR Symposium, New York, NY, March 22, 2021), https://www.federalreserve.gov/newsevents/speech/quarles20210322a.htm.  See also SR letter 21-7: Assessing Supervised Institutions' Plans to Transition Away from the Use of the LIBOR,
https://www.federalreserve.gov/supervisionreg/srletters/SR2107.htm.

Exhibit 1
Page 61

54

- 5 -

**Legacy Contracts**

      A key question is whether existing LIBOR-based contracts (legacy contracts) can seamlessly transition to alternative reference rates when LIBOR ends.  The ARRC recently estimated that 35 percent of legacy contracts will not mature before mid-2023.  Some of these legacy contracts have workable fallback language to address the end of LIBOR, but others do not.  For example, most business loans have workable fallback language—by their terms, business loans generally fall back to an alternative floating rate, such as the prime rate.  Similarly, most derivatives are governed by a master agreement published by the International Swaps and Derivatives Association (ISDA), and ISDA has published a "protocol" that allows derivative counterparties to amend their master agreements, on a multilateral basis, so that their derivative contracts fall back to a floating SOFR-based rate for counterparties that adhere to the protocol.  Conversely, many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR.  Moreover, the rate terms in floating-rate notes and securitizations can typically be changed only with the unanimous consent of all noteholders, which typically would be difficult to secure.

      The end of LIBOR may result in significant litigation.  For example, if a legacy contract converts to a fixed rate when LIBOR ends, a party disadvantaged by that conversion might request that a court reform the contract by substituting an alternative floating rate for LIBOR.[7]  Parties also might request that a court reform or void a legacy contract that lacks any fallback

---

[7] An aggrieved party might cite a variety of common law doctrines to justify judicial reformation, including mutual mistake, impracticability, and frustration of purpose.  Although each of these doctrines sets a high bar for voiding or reforming contracts, it is difficult to predict how courts might rule on a contract-by-contract basis.

Exhibit 1
Page 62

55

- 6 -

language if the parties cannot agree bilaterally on a successor rate.[8]  Similarly, in instances where a legacy contract allows a person to select a replacement rate when LIBOR ends, a party disadvantaged by the replacement rate might argue that the manner in which another person—for example, a bond trustee—selected the replacement rate violates the implied covenant of good faith and fair dealing.[9]

Chair Powell and Vice Chair Quarles have publicly stated their support for federal legislation to mitigate risks related to legacy contracts.  Federal legislation would establish a clear and uniform framework, on a nationwide basis, for replacing LIBOR in legacy contracts that do not provide for an appropriate fallback rate.[10]  Federal legislation should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, or that convert to fixed-rate instruments.  Federal legislation should not affect legacy contracts with fallbacks to another floating rate, nor should federal legislation dictate that market participants must use any particular benchmark rate in future contracts.  Finally, to avoid conflict of laws problems, federal legislation should pre-empt any outstanding state legislation on legacy LIBOR contracts.

Thank you.  I look forward to your questions on this important matter.

---

[8] Again, parties might cite a variety of common law doctrines, including mutual mistake, impracticability, and frustration of purpose.
[9] This covenant, which is implied in all contracts, generally embraces a pledge that neither party will do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  See, e.g., *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 228-9 (N.Y. 2011).
[10] The New York State Legislature recently enacted legislation that is intended to mitigate risks related to legacy LIBOR contracts, but that bill would apply only to contracts governed by New York law.

Exhibit 1
Page 63

56

For Release Upon Delivery
2:00 p.m.
April 15, 2021

STATEMENT OF

KEVIN P. WALSH

DEPUTY COMPTROLLER FOR MARKET RISK POLICY
OFFICE OF THE COMPTROLLER OF THE CURRENCY

before the

SUBCOMMITTEE ON INVESTOR PROTECTION,
ENTREPRENEURSHIP AND CAPITAL MARKETS

COMMITTEE ON FINANCIAL SERVICES

UNITED STATES HOUSE OF REPRESENTATIVES
April 15, 2021

Statement Required by 12 U.S.C. § 250:
The views expressed herein are those of the Office of the Comptroller of the Currency and
do not necessarily represent the views of the President.

1

Exhibit 1
Page 64

57

Chairman Sherman, Ranking Member Huizenga, and members of the Subcommittee, thank you for the opportunity to appear today to discuss the upcoming cessation of the London Interbank Offered Rates (LIBOR), the Office of the Comptroller of the Currency's (OCC) efforts to ensure the institutions we supervise prepare for this transition, and legislation to provide certainty for the contracts held or serviced by national banks and federal savings associations (banks) that reference LIBOR.

I serve as the OCC's Deputy Comptroller for Market Risk Policy and I am responsible for directing market risk activities, including policy formulation and risk monitoring for trading activities, derivatives, structured products, liquidity, interest rate risk, asset management and asset servicing. I serve as the agency's ex-officio member of the Alternative Reference Rate Committee (ARRC), which is composed of private sector entities and other ex-officio members to address issues surrounding LIBOR cessation and replacement. I also oversee the agency's representation on other domestic and international committees associated with LIBOR's cessation.

The transition from LIBOR to other benchmarks is ongoing and will become more urgent at the end of 2021 when certain U.S. dollar LIBOR tenors will be discontinued.  In 2018, to prepare for the transition, the OCC began working with regulated institutions to promote their safe and sound transition away from LIBOR by encouraging them to develop transition plans, remain abreast of ongoing developments, and analyze the impact of this transition on their operations. The Secured Overnight Financing Rate (SOFR), developed by the ARRC and the Federal Reserve Bank of New York  is one of several  alternative reference rates that can replace LIBOR for contracts held or serviced by OCC-regulated large, midsize, and community banks.

2

Exhibit 1
Page 65

58

    In my testimony today, I will describe our supervisory approach to the LIBOR transition, including the regulatory guidance we have provided to the entities we supervise to support the transition, the preparedness of the industry, and our views on the draft "Adjustable Interest Rate (LIBOR) Act of 2021."

<u>Background</u>

    The OCC charters, supervises, and regulates nearly 1,200 national banks, federal savings associations, and federal branches of foreign banks (collectively, banks), that cover a broad spectrum of asset sizes and banking business models. Our supervised banks range in size from very small community banks to the largest, most globally active U.S. banks operating in the United States. The vast majority have less than $1 billion in assets, while more than 60 have greater than $10 billion in assets. Together, they hold $14.5 trillion in assets—almost 70 percent of all the assets of commercial U.S. banks.

    LIBOR is a key interest rate benchmark used since the 1970's and referenced in $223 trillion[1] worth of U.S. dollar contracts across global markets. In 2012, it became clear that some international bank employees manipulated LIBOR for profit, and this revealed shortcomings in the benchmark rate and the need for significant reforms. Today's LIBOR alternatives are supported by quantitative data rather than the qualitative support used for LIBOR.

<u>OCC's Supervisory Approach to the LIBOR Transition</u>

    OCC-regulated institutions use or are exposed to LIBOR in many different ways. The smallest community banks we supervise are exposed through third-party activities tied to LIBOR, while the largest banks we supervise rely heavily on LIBOR in their lending, derivatives

---

[1]  Federal Reserve staff calculations as of 4Q, 2020.

3

Exhibit 1
Page 66

59

activities, and market-making capacities. Therefore, the OCC, both individually and collectively with the other federal banking agencies, has been proactive to ensure that community, midsize and large banks are prepared for LIBOR's cessation.

The OCC has consistently advocated for thoughtful and timely preparedness on the part of the banks we supervise when considering the cessation of LIBOR. The OCC does not endorse any specific replacement rate for LIBOR, and the industry's efforts to develop replacement benchmarks continue. Nevertheless, there is much that banks can and have done to prepare, and the OCC has been working closely with the industry to this effect.

The OCC developed a phased approach to govern our expectations for banks while they prepare for the transition. We focused our efforts in 2019 on making banks aware of the transition and encouraging them to carefully inventory their exposures and become familiar with our supervisory expectations. In 2020, the OCC emphasized bank preparedness, and in 2021, we are turning our attention to banks that may need additional support or assistance for a smooth transition.

The OCC expects each bank to develop a comprehensive plan to address the potential effects of LIBOR cessation that is tailored to the bank's particular exposure to LIBOR under its current business model, risk profile, and strategic plan. As each bank evaluates its exposures to LIBOR, it should determine the scope of work necessary to manage the risks associated with those exposures, and to develop a concrete plan to perform that work. To date, more than 95 percent of the institutions we supervise have gone through the process to quantify their exposure.

The OCC has been actively engaged through banker outreach and supervision activities to convey this message and to assess banks' progress for the past several years. Starting in 2018,

4

Exhibit 1
Page 67

60

OCC hosted meetings and outreach sessions with bank Chief Executive Officers, Chief Financial Officers, Chief Risk Managers and Bank Directors to ensure their awareness of LIBOR's cessation, and to encourage them to consider their exposures, risk tolerances and future plans. We also first mentioned the need for LIBOR transition plans in our Semiannual Risk Perspective in 2018 and have continued to publish guidance documents to set forth our expectations of bank transition activities.

In 2019, the OCC developed an internal supervisory guidance document to assist our examiners in conducting discussions and assessing bank planning and preparation toward LIBOR cessation. As part of the Federal Financial Institutions Examination Council (FFIEC)'s LIBOR Coordination Group, the OCC also supported joint interagency guidance in July 2020[2] to highlight the importance of bank preparedness and the potential risks to banks if they do not prepare appropriately. The OCC expanded on the FFIEC's statement with OCC Bulletin 2020-68 which provided additional guidance and information to the industry about our risk management expectations.

In November 2020, the OCC published a joint letter[3] with the Federal Reserve Board (FRB) and the Federal Deposit Insurance Corporation (FDIC) to provide additional guidance on reference rate transition, particularly related to loans. This statement reiterated that the agencies were not endorsing a specific replacement rate for LIBOR for loans, but that a bank may use any reference rate for its loans that it determines to be appropriate for its funding model and customer needs. However, the statement noted that the bank should include fallback language in its

---

[2] See: OCC Bulletin 2020-68; https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-68.html
[3] See: OCC Bulletin 2020-98; https://el.occ/news-issuances/2020/bulletin-2020-98a.pdf

5

Exhibit 1
Page 68

61

lending contracts that provides for use of a robust fallback rate if the initial reference rate is discontinued. That same month, the OCC, FRB and FDIC issued a joint statement[4] that encouraged banks to cease entering new contracts that use LIBOR as a reference rate as soon as practicable, but no later than December 31, 2021. We reiterated that we expect banks to stop creating new LIBOR exposures as of the end of this year with only a few exceptions to support functioning markets. Internally, the OCC also developed a work program to assist examiners in assessing the appropriateness of banks' LIBOR transition planning, execution and related oversight, and reporting. This work program was made available to examiners last November. In February 2021, we issued a bulletin entitled "Libor Transition: Self-Assessment Tool for Banks"[5] which provided a resource for a bank to assess and evaluate the appropriateness of its LIBOR transition plan, bank management's execution of the bank's transition plan, and related oversight and reporting. The self-assessment tool included a series of questions related to bank exposure assessment and planning, consideration of replacement rates and spread adjustment methodologies, an analysis of fallback language, a view of bank progress, and oversight of LIBOR cessation preparedness. The tool is intended to help bank management evaluate, identify and mitigate the bank's transition risks.

OCC examiners have advised the banks we supervise to look outside their lending activities to determine whether they have LIBOR exposures in other contexts. For example, a bank may own a LIBOR-based loan participation interest, or may hold an instrument for the bank's investment or liquidity portfolio that pays LIBOR-based income or otherwise reflects LIBOR exposures. If the bank is using a third-party vendor to provide financial valuation

---

[4] See: OCC Bulletin 2020-104 https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-104.html
[5] See: OCC Bulletin 2021-7 https://www.occ.gov/news-issuances/bulletins/2021/bulletin-2021-7.html

6

Exhibit 1
Page 69

62

updates, or to provide cash flow analysis of borrower collateral or bank assets, the vendor may be employing discounting methods using LIBOR-based rates. Even if none of these considerations currently present issues for the bank, we believe management should be screening new investments and activities for embedded LIBOR exposures that may lead to future risks.

For those OCC-supervised banks that engage in LIBOR-based lending on a limited basis, such as commercial or residential real estate lending or small business loans, OCC examiners have consistently advised the banks of the limited amount of time the bank can continue to operate with the assurance that LIBOR rates will be available. These banks should be prepared to identify suitable replacement rates, to transition their future lending to those rates, to identify whether existing loans have terms extending beyond the LIBOR cessation, and to determine what transition and risk-management steps need to be taken. This process may present operational challenges that the banks will need to address depending on the bank's available resources, the scope of the exposure, and the relative financial sophistication of the bank's borrowers.

The OCC also supervises several globally-active banks with significantly larger balance sheets that have extensive LIBOR-based exposures. Most of these banks hold derivatives tied to LIBOR and a few of these banks are derivatives dealers that hold some of the largest blocks of LIBOR-sensitive asset and liability exposures in the marketplace. Because of the scope and size of their LIBOR exposures, the OCC's large bank examiners are actively engaged in monitoring the adequacy of their planning and the effectiveness of their implementation. That effort has been aided by two recent development that are expected to ease the transition from LIBOR: the

7

Exhibit 1
Page 70

63

new International Swap and Derivatives Association Protocols (ISDA)[6] and a recently enacted New York state law. The ISDA protocols have provided market participants with a mechanism to add standardized fallback provisions into derivatives contracts. The New York state law makes SOFR the default benchmark replacement rate for many derivatives contracts that do not include fallback provisions, while still allowing for the adoption of alternative replacement rates. Taken together the ISDA Protocols and the New York statute have significantly reduced the risk of market disruption in the derivatives market from LIBOR's cessation.

Unlike derivatives, loan and securities portfolios will be more complex given the nature of the instruments. Loans are typically negotiated between the parties and the applicability of a variety of state laws can make negotiations more complicated. Securities, notably securitized exposures, are complicated by the diverse investor bases that need to provide agreement to make changes to the rates. Banks continue to work on preparing these portfolios for the transition, but more work remains to be done.

Consumer products will also be affected by LIBOR cessation. Among the $223 trillion of U.S. dollar LIBOR contracts, about $1.4 trillion[7] are in retail mortgages and other consumer loans. For example, many adjustable rate mortgages are indexed to LIBOR. In addition, many home equity lines of credit, auto loans, student loans and credit cards may be tied to LIBOR. When LIBOR is retired, these loans will have to be reset to any fallback benchmark clearly stated in the loan document.

Transitioning these legacy contracts will impact consumers directly. First, the Truth in Lending Act, Regulation Z, could be implicated when changing the index in a contract. The

---

[6] ISDA protocols became effective January 25, 2021.
[7] Federal Reserve staff calculations as of 4Q, 2020.

8

Exhibit 1
Page 71

64

Consumer Financial Protection Bureau (CFPB) has proposed a rule to amend Regulation Z to address some of these issues. While the rule has not yet been finalized, it is important to note that the proposed rule provides a way under Regulation Z for a bank to transition from LIBOR without waiting for LIBOR to become unavailable as required under the current regulation. The proposed rule also requires that change-in-terms notices be sent for any home equity line of credit (HELOC) or credit card agreements when the LIBOR index is replaced, even if the margin is reduced. The CFPB has also provided guidance on LIBOR transition matters that do not require amendments to Regulation Z, such as how the LIBOR transition will affect adjustable rate mortgage (ARM) origination disclosures or ARM interest rate adjustment notices.

Because the OCC does not endorse any specific benchmark as a potential replacement for LIBOR, we anticipate banks may use more than one replacement as may be appropriate for different purposes. In every case, the OCC expects that each bank will make an informed analysis of which reference rates it should use to replace LIBOR. Those banks that have LIBOR exposures are in the process of determining the logistics of transitioning away from it and implementing necessary actions as appropriate including new data systems related to the replacement rates or re-hedging their books to reduce earnings impact from the end of LIBOR. During the supervisory process, the OCC will expect each bank to demonstrate that its selections are appropriate for the bank's particular products, funding needs, and operational capacities.

<u>Fallback Clauses</u>

One key aspect of the LIBOR transition guidance relates to fallback clauses. Fallback clauses are provisions in a contract's documentation that specify what will happen if the interest rate in the contract becomes unavailable prior to maturity. Banks that continue entering into new LIBOR-based contracts with maturities beyond December 2021 to support market conditions can

9

Exhibit 1
Page 72

65

significantly reduce their risks during the transition by ensuring they use well-developed fallback clauses. Ideally, these clauses would include a description of the conditions triggering the change to a replacement benchmark, a clear designation of the replacement benchmark, and a clear and swift process for determining any changes to any spread over the reference rate. In setting these terms, each bank should, where possible, seek to minimize any valuation changes that will be triggered by the switch to the fallback rate. The bank should also understand how the change will be implemented as an operational matter, and how to mitigate any associated impacts on the bank's liquidity risk and interest rate risk programs. For many types of contracts, banks may wish to consult model fallback language that has been developed and published by the ARRC and by relevant trade associations for different classes of credit products. For derivatives, banks will need to assess the extent to which the new ISDA protocols will cover all counterparties, or whether there are other documentation formats that need to be separately addressed.

Each bank will also need to assess the extent to which its agreements on existing LIBOR-based assets or liabilities contain fallback clauses. In many cases, legacy fallback clauses will not comprehensively resolve the bank's risk exposures if LIBOR were to permanently cease to be available. Most are designed primarily to address a temporary interruption of LIBOR because of natural disasters or other unexpected events.

Ineffective fallback clauses expose a bank to reputation, credit, and litigation risk if the bank and the other party to the credit agreement cannot reach mutually-acceptable terms for addressing the cessation of the LIBOR benchmark. The OCC expects banks to assess their litigation risk on an informed basis by thoroughly reviewing their contracts for contractual limitations. But, more broadly, banks will need to assess ineffective fallback clauses under a framework that takes into account the differing nature of customers and counterparties for

10

Exhibit 1
Page 73

66

different products. Communication and outreach to these customers may, in many cases, necessarily include an education component as the first step. Regardless of counterparty, the communication process and benchmark rate selections for all contracts must conform to all applicable regulatory requirements and standards.

Adjustable Interest Rate (LIBOR) Act of 2021

The OCC has reviewed the Adjustable Interest Rate (LIBOR) Act of 2021 and appreciates Congress' efforts to provide clarity to contracts that do not have a fallback provision or a new rate designated. The draft legislation will be helpful in addressing systemic risks associated with the LIBOR cessation by permitting financial counterparties to agree to an appropriate reference rate or otherwise designate SOFR as the replacement rate.  Further, the draft legislation would provide a safe harbor to help mitigate the potential for litigation which would be disruptive to the financial system, and clarity for individual banks, businesses and consumers who may be impacted by the transition. The OCC looks forward to working with the Subcommittee to perfect the language of the legislation to reduce ambiguity and provide a constructive roadmap for LIBOR participants.

Conclusion

The OCC has been actively working with our supervised institutions since 2018 to promote their preparation for the cessation of LIBOR. To avoid the risk of potential market disruptions, prolonged litigation, and financial impacts at the banks we supervise, the OCC has stressed the importance of making adequate transition plans—and successfully executing them— before LIBOR ceases to be reported. While the OCC does not endorse any specific replacement rate or rates that an individual bank determines are appropriate for continued operation of their

11

Exhibit 1
Page 74

67

business model in a safe and sound manner, we are actively working with the banks we supervise to ensure their full preparedness. We are optimistic that banks have been planning appropriately for the transition and look forward to working with the Subcommittee to perfect legislation to help minimize any potential disruption that the transition may cause for banks and customers that have contracts without fallback provisions.

12

Exhibit 1
Page 75

68

ALTERNATIVE REFERENCE RATES COMMITTEE

April 14, 2021

The Honorable Maxine Waters
Chairwoman
Committee on Financial Services
U.S. House of Representatives
Washington, DC 20510

The Honorable Patrick McHenry
Ranking Member
Committee on Financial Services
U.S. House of Representatives
Washington, DC 20510

The Honorable Brad Sherman
Chairman
Subcommittee on Investor Protection,
Entrepreneurship and Capital Markets
U.S. House of Representatives
Washington, DC 20510

The Honorable Bill Huizenga
Ranking Member
Subcommittee on Investor Protection,
Entrepreneurship and Capital Markets
U.S. House of Representatives
Washington, DC 20510

Dear Chairwoman Waters, Ranking Member McHenry, Rep. Sherman, and Rep. Huizenga:

On behalf of the Alternative Reference Rates Committee (ARRC), I appreciate the work you and the House Financial Services Subcommittee on Investor Protection, Entrepreneurship and Capital Markets are doing to facilitate a smooth transition away from U.S. dollar (USD) LIBOR. As you know, federal legislation is critical to establish a uniform process, at the federal level, for replacing LIBOR in legacy contracts that do not have effective fallbacks to replace LIBOR. Recent announcements from LIBOR's regulator and administrator – the Financial Conduct Authority (FCA) and ICE Benchmark Association (IBA), respectively – regarding the definitive endgame for LIBOR have only served to further underscore the urgency of preparing global markets for this important transition.

A substantial number of USD LIBOR-referencing contracts will mature after publication of USD LIBOR ceases for the major LIBOR settings in mid-2023, including many that will have no effective contractual provisions to replace LIBOR upon its cessation. To that end, we at the ARRC support your current draft legislation, the Adjustable Interest Rate (LIBOR) Legislative Act of 2021, and look forward to working with you as it moves forward. Notably, this legislation will shift legacy contracts to the Secured Overnight Financing Rate (SOFR), the ARRC's preferred alternative to LIBOR. The ARRC is confident that SOFR – which was developed and selected after more than two years of transparent research and public consultation – is the strongest alternative for institutions of all types and sizes.

The legislation will promote the equality of outcomes across consumers, businesses, investors, and other end users of LIBOR, and ensure that similarly situated parties are treated the same. Additionally, it will provide advance notice of changes that will occur to contracts, allowing market participants to plan for the transition in advance. In doing so, this legislation will significantly reduce operational and legal risks for the many market participants who hold these legacy contracts, while also alleviating the burden on courts, as legal uncertainty surrounding the transition would otherwise prompt disputes. This will provide greater certainty to investors, businesses, and consumers as the financial system transitions.

Exhibit 1
Page 76

69

**ALTERNATIVE REFERENCE RATES COMMITTEE**

This legislation builds on recent progress in New York State with the passage of Senate Bill 297B / Assembly Bill A164B in the New York State Legislature, which Governor Andrew Cuomo signed into law on April 7, 2021. The ARRC endorsed this development, and we are pleased to find that the Adjustable Interest Rate (LIBOR) Act of 2021 is similarly aligned with the New York State legislation and will expand its benefits on a consistent basis to all USD LIBOR contracts governed by U.S. federal or state law.

We at the ARRC are grateful that a growing and bipartisan group of U.S. regulators and lawmakers recognizes the critical need to pass robust federal legislation in order to support a smooth transition away from LIBOR. As Jerome Powell, Chair of the Federal Reserve, told lawmakers in February, "Federal legislation creating a path for a backup would be the best solution" to facilitating the transition away from LIBOR[1]. U.S. Treasury Secretary Janet Yellen echoed his sentiments weeks later at a House Committee on Financial Services hearing in which she agreed that "Congress does need to provide legislation for the LIBOR transition," particularly focusing on legacy contracts that do not provide for a workable fallback rate[2].

The ARRC commends your and the Subcommittee's continued dedication to and leadership on this important issue, which will provide key protections for consumers, institutions, and markets alike as the LIBOR transition progresses. On behalf of the ARRC, I look forward to working with you throughout the legislative process, including on any refinements and improvements regarding the legislation as currently drafted.

Sincerely,

Thomas Wipf
Chairman, ARRC

---

[1] https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=407168
[2] https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=407279

Exhibit 1
Page 77

70

 



April 14, 2021

The Honorable Brad Sherman
Chairman
Subcommittee on Investor Protection,
Entrepreneurship, and Capital Markets
U.S. House of Representatives
Washington, DC  20515

The Honorable Bill Huizenga
Ranking Member
Subcommittee on Investor Protection,
Entrepreneurship, and Capital Markets
U.S. House of Representatives
Washington, DC  20515

**Re: Subcommittee Hearing "The End of LIBOR:  Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Products"**

Dear Chairman Sherman and Ranking Member Huizenga:

We are writing on behalf of the Association for Financial Professionals, the National Association of Corporate Treasurers, and the U.S. Chamber of Commerce's Center for Capital Markets Competitiveness to provide our views to you in advance of your upcoming hearing on the LIBOR transition. Our respective organizations are members of the Alternative Reference Rates Committee (ARRC), a group convened by the Federal Reserve Board of Governors and the Federal Reserve Bank of New York to ensure a successful transition from U.S. dollar LIBOR to a more robust reference rate. We further participate in the ARRC's Nonfinancial Corporates Working Group, which includes approximately one hundred large and small Main Street companies from across the U.S.

As this Subcommittee considers the LIBOR transition, we would like to share with you the various challenges surrounding the transition to the community of nonfinancial corporates (NFCs) and encourage you to support legislation that would provide a benchmark replacement rate for contracts that currently reference LIBOR. Given the challenges facing NFCs as they navigate the LIBOR transition, it is important to minimize the legal uncertainty and adverse economic impacts to NFCs in the event that a contract does not contain fallback provisions for a LIBOR replacement rate.

Exhibit 1
Page 78

71

Page 2

**LIBOR Transition**

For several decades, the London Interbank Offered Rate (LIBOR), regulated by the United Kingdom's Financial Conduct Authority (FCA), has been the benchmark reference rate at which major banks will lend to one another for short-term loans. Following the 2008 financial crisis, a decision was made to transition away from LIBOR toward a replacement reference rate more closely based on U.S. Treasury market transactions. The ARRC has identified the Secured Overnight Financing Rate (SOFR) as the rate that represents the best practice for use in loans, certain new U.S. dollar derivatives, and other financial contracts. The ARRC's recommendation is based in part on remediating the volatility and unreliability of LIBOR where $500 million of underlying inter-bank transactions support the interest rate settings on $200 trillion of loans and other financial instruments.[1] This orders-of-magnitude difference becomes even more unbalanced for LIBOR and other credit-sensitive rates during times of financial market stress when transaction volumes shrink while rates spike up, causing a spiral of increasing unreliability for those rates.

The markets had been warned that all LIBOR rates were expected to end after 2021. However, in March 2021, the FCA announced that while certain U.S. dollar LIBOR rates, such as the two-month quotation, would cease as of year-end 2021, other maturities very commonly used in financial instruments and contracts, including those for one, three, and six months, would continue to be quoted until June 30, 2023, allowing some additional time for U.S. dollar instruments and contracts to be amended to provide alternate references to SOFR.

**Transition Impact to NFCs**

The transition away from LIBOR is important because the potential disruption or cessation of LIBOR poses a financial stability risk as well as a risk to the individual firms with LIBOR exposures.[2] Main Street borrowers need to be no worse off when SOFR becomes fully adopted. Otherwise, borrowers and issuers will bear higher interest and financing costs, which could ultimately result in cost-cutting elsewhere, including potential job cuts.

Most financial market participants are aware that LIBOR's administrator, the ICE Benchmark Administration, will cease publishing the LIBOR rate in the near future, forcing them to transition to a replacement rate. Nearly $200 trillion of financial contracts reference U.S. dollar LIBOR. These contracts must be amended through negotiations by the counterparties or there will be risk of a significant disruption in our financial system and the overall economy. Moreover, as Main Street companies navigate the transition for both legacy contracts and new loans, they face considerable operational, technological, accounting, tax, and legal challenges.

Specifically, NFCs strive to maintain close relationships with the banks they rely on to fund their operations. Many NFCs currently struggle in obtaining from their lenders specific proposals and processes for how their loan agreements will be amended and the mechanics of how the ARRC's recommended SOFR rate will substitute for LIBOR. The consistent feedback we have received from our working group's members and from a survey of their recent interactions with their bankers

---

[1] Second Report of the Alternative Reference Rates Committee, March 2018, https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report
[2] Alternative Reference Rates Committee, "Transition from LIBOR," https://www.newyorkfed.org/arrc/sofr-transition

Exhibit 1
Page 79

72

Page 3

has shown that fully two-thirds have been unable to receive detailed proposals or timelines for implementation from their bankers. Please refer to Appendix A for more details on responses from survey participants.

As you may be aware, Prudential Banking Regulators[3] recently warned that banks should cease making new LIBOR loans by year-end 2021; however, many banks are not yet offering SOFR-based loans even to large, well-capitalized NFCs. Several companies participating in our Nonfinancial Corporates Working Group have reported that while their banks have provided fallback provisions against the future cessation of LIBOR, they are unable to negotiate current access to SOFR borrowings, even with large multi-year credit agreements nearing renewal.

We understand that banks are also facing considerable challenges in preparing for the LIBOR transition. Yet, we are concerned that by the time the banks have fully prepared transition materials and processes, the NFCs awaiting that information would have little to no time to rework contracts, even with the extension provided by the FCA. It will be especially difficult for small- to medium-sized Main Street companies with smaller staffing to handle these complex issues while continuing to focus on their day-to-day business operations and recovery from the effects of COVID-19.

Another area of concern for NFCs regards those financings where they have limited contact with the counterparties, unlike their traditional relationship with bank lenders. Examples of such financings include:
- Term loans often syndicated by the arrangers among institutional investors;
- Floating rate notes sold to and freely traded among institutional investors; and
- Asset securitizations financing NFCs' purchases of business inventories and their customers' receivables, which often involve underlying loans traded among institutional investors.

These widely used financial instruments in almost all cases require the consent of all lenders for any amendment affecting the interest rate, such as would be necessary to reference SOFR instead of LIBOR. As you can imagine, renegotiating all such contracts would be an onerous undertaking, more so as corporations are still functioning within the constraints posed by the COVID-19 crisis.

In addition to this large segment of transactions with financial counterparties, there are other categories of exposure that Main Street companies must address, although there have been no meaningful estimates of the commercial exposure NFCs manage as a result of business contracts they enter into as part of their day-to-day operations. Examples include:
- Inter-affiliate and intra-group loans for cash management within a corporate group;
- Employee benefit payments to adjust for payment delays;
- Accounting uses to calculate the fair value of contracts, leases, derivatives, and for the capitalization of interest;
- Asset purchase and sale agreements to adjust for closing date changes and other timing differences;

---

[3] Interagency Statement on LIBOR Transition, November 30, 2020, https://www.federalreserve.gov/supervisionreg/srletters/SR2027a1.pdf

Exhibit 1
Page 80

73

Page 4

- <u>Supply agreements</u> to make adjustments for volume variances and payment date changes; and
- <u>Long-term capital goods purchases</u> to allow for milestone timing differences.

To illustrate the uncertainty NFCs are subject to in day-to-day commercial agreements, consider the examples below:

<u>Example - Worldwide Supply Agreement</u>

- In today's competitive marketplace, many Main Street companies enter into worldwide supply contracts in which they agree to buy all their needs for a particular commodity, or other input to their production process, if the supplier will give a volume discount for the quantity purchased.

- In many of these agreements, the discount is negotiated to be paid up-front in anticipation of annual targeted purchases.  If, however, the target is missed, the typical contract will call for a payment back to the supplier with the formula including LIBOR for the calculation.

- If LIBOR ceases to be quoted, the parties to most supply agreements will have to negotiate a mutually acceptable resolution.  During this negotiation, a supplier may suspend deliveries and a customer might withhold payments causing a major disruption in the economy.

- The parties whose contracts are in dispute could very likely tie up state and federal courts with a logjam of cases.

- Often in the case of long-term supply agreements, prices will have moved since inception and one of the parties will have an incentive to hold out for a price or quantity adjustment, making resort to the courts more likely by the advantaged party seeking to preserve its contractual benefit.

<u>Additional Example – Long-term Construction Agreement</u>

- Consider the purchase of a major piece of equipment where the construction process from order to delivery will take many months.

- For example, state-of-the-art machines for paper production cost several hundred million dollars and can take over two years to construct.  The paper company and the paper machine supplier enter into a multi-year purchase agreement that calls for periodic payments to be advanced by the customer upon the machine manufacturer's completion of designated milestones.

- If, however, the production of the paper machine falls behind schedule and a milestone is missed, the contract will call for a reduction in the purchase price based on a calculation using LIBOR.

- Most of these types of agreements outstanding today were negotiated without any thought of what rates would apply if LIBOR were no longer quoted and are without fallback provisions.

Exhibit 1
Page 81

74

Page 5

These are just two scenarios that demonstrate the various complexities – potential renegotiation of a replacement rate, delays in supplies and business operations, state and federal court cases, contracts without fallback provisions – that NFCs must navigate during the transition away from LIBOR. Despite the additional time granted by the FCA to comply with certain maturities of contracts, the transition away from LIBOR remains a daunting task. A major obstacle to a smooth transition is the sheer number of existing contracts that are impacted by the transition. It is impractical to require U.S. corporations to renegotiate many thousands of contracts, including those with foreign counterparties, given the LIBOR cessation event that was decided by the LIBOR administrator. It should be noted that regulators and responsible authorities in the U.S. and U.K. have warned that despite the hoped-for transition timetables, unforeseen disruptions in the financial markets could interrupt quotations of LIBOR at any time.

Given these many challenges to NFCs as they transition away from LIBOR, it is imperative that Congress acts quickly to support a seamless transition effort. We urge this Subcommittee to consider how its oversight of financial market regulation as well as possible federal legislation could help to resolve affected legacy contracts following the cessation of LIBOR rate publication and to ensure conformity with the Trust Indenture Act of 1939.[4]

We thank you for considering our comments and welcome answering any questions on this issue.

Respectfully,

Thomas Hunt
Association for Financial
Professionals

Thomas C. Deas, Jr.
National Association of
Corporate Treasurers

Tom Quaadman
Center for Capital Markets
Competitiveness of the U.S.
Chamber of Commerce

---

[4] Trust Indenture Act of 1939 – 15 U.S.C. §§ 77

Exhibit 1
Page 82

75

Page 6

**Appendix A**
**Survey of Borrowers**
**Nonfinancial Corporates Working Group**
**Alternative Reference Rates Committee**
**March 2021**



Are banks offering your firm SOFR or other non-LIBOR borrowing alternatives?



If they are not offering such non-LIBOR borrowing products, are banks prospectively discussing potential alternative rate choices with your firm?



Does your firm wish to be offered a range of SOFR-based rate choices, including both in arrears and in advance options?



Among the potential non-LIBOR alternatives that banks could offer, would you prefer to borrow using alternatives based on SOFR or potential credit-sensitive rates that could move up like LIBOR has done in times of economic stress?

Exhibit 1
Page 83

76

**Statement for the Record**

*On behalf of the*

**Structured Finance Association**

*before the*

**Committee on Financial Services**
**Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets**

*of the*

**United States House of Representatives**

**April 14, 2021**



Exhibit 1
Page 84

77

2

## Introduction

The Structured Finance Association[1] (SFA) appreciates the opportunity to submit a statement for the record for the hearing titled, "The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Products." The discontinuation of the London Inter-Bank Offered Rate ("LIBOR") is one of the biggest challenges currently facing global financial markets. The subcommittee's attention to this important issue is both critical and timely.  Our comments primarily focus on the need for federal legislation to support the transition away from LIBOR for contracts that have no other realistic means to transition and the concern a state-by-state legislative approach could lead to an inconsistent patchwork of requirements, thus increasing the risks of a disruptive and costly transition with broad public and investor confusion.

SFA is well suited to provide this perspective given our founding mission to support a robust and liquid market while safeguarding essential protections for investors, consumers and the financial system. Importantly, our statements reflect the collective insights across our more than 370 members who represent all sides of the structured finance market – that comprise the largest cash (non-derivative) component of the tough legacy LIBOR contracts, as discussed further below – from investors (many of which are pension plan and mutual fund managers, insurance companies and depository financial institutions) to lenders, issuers and servicing agents.

## Discontinuation of LIBOR

Given significant concerns regarding the viability of LIBOR as a robust benchmark rate, a monumental multi-year global effort began over seven years ago to transition millions of contracts away from LIBOR. With approximately $400 trillion in financial contracts linked to LIBOR worldwide, the cessation of this benchmark presents significant risks across the global financial markets, impacting borrowers and consumers, lenders, investors, banks, and other market participants. The scale of the transition has rightly been compared to that of the multi-country currency changeover to the Euro currency.

On March 5, 2021, the U.K. regulator charged with LIBOR oversight, the Financial Conduct Authority, and the administrator and publisher of LIBOR, ICE Benchmark Administration, provided much-anticipated clarity regarding LIBOR's final cessation dates. In coordination with U.S. regulators, it was determined that the least used U.S. Dollar LIBOR rates, 1 Week and 2 Month tenors, will end on December 31, 2021, along with all other non-U.S. Dollar LIBOR rates, while the most used U.S. Dollar rates, overnight and 1-, 3-, 6- and 12-Month tenors, will end on June 30, 2023. Extending the publication of the heavily used U.S. Dollar

---

[1] The Structured Finance Association (SFA) is the leading securitization trade association representing over 370 member companies from all sectors of the securitization market. Our core mission is to support a robust and liquid securitization market and help its members and public policymakers grow credit availability and the real economy in a responsible manner. SFA provides an inclusive forum for securitization professionals to collaborate and, as industry leaders, drive necessary changes, advocate for the securitization community, share best practices and innovative ideas, and offers professional development for industry members through conferences and other programs. For more information, visit www.structuredfinance.org.

Exhibit 1
Page 85

78

3

LIBOR tenors was to support a smoother transition away from LIBOR by allowing many "legacy USD LIBOR contracts to mature before LIBOR experiences disruptions", according to U.S. regulators.[2]

In the United States, retail financial products from floating rate mortgages, student loans and even bond investments in traditional 401k or pension plans calculate interest based on LIBOR rates.  Similarly, it is also used in floating rate business loans, lines of credit, securities and interest rate hedges.  In fact, for the past 30+ years LIBOR has been used for almost every consumer and business floating rate product. At the end of 2020, LIBOR exposure in the United States accounted for over half of the $400 trillion globally, used as the benchmark for over $6.2 trillion outstanding consumer and corporate loans, $2.7 trillion cash investments, and $214.0 trillion hedging instruments.[3]

We believe significant disruption to consumers and businesses, as well as waves of litigation, are inevitable unless Congress works quickly to provide a meaningful solution that offers fair, equitable and consistent treatment for all tough legacy contracts that still lack an adequate replacement mechanism under U.S. law.

**Pressing Need for a Federal Solution to Address "Tough Legacy"**

Led in the U.S. by our financial regulators and the Fed-convened Alternative Reference Rate Committee (ARRC), the carefully choreographed changeover away from LIBOR, which will be a decade long undertaking by the mid-2023 cessation date, has already greatly minimized the legacy contracts that remain. Nevertheless, there remains a meaningful legacy population still including longer term, difficult to address contracts such as mortgages, student loans, business loans and capital market transactions that finance and hedge these legacy LIBOR-based contracts, thereby affecting a broad range of American households and businesses including pension plan and other retirement savers, millions of Americans with mortgages and student loans, small and large businesses, and financial institutions.

It is hardly surprising that, after more than 30 years of publication, the legacy contracts that were entered into prior to the announcement of LIBOR's likely end simply did not contemplate the cessation of LIBOR. Still, after the call to end LIBOR, the development and widespread adoption of a trusted replacement rate to LIBOR was required. Therefore, when LIBOR disappears it is unclear what benchmark rate will underpin interest payments unless the contracts are amended, but systemic operational and legal challenges make doing so for some contracts realistically impractical.

Even so, much progress has been made to address the $73.1 trillion[4] U.S. governed legacy LIBOR contracts that will remain outstanding after LIBOR's end. This effort includes the almost unimaginable task of amending of tens of trillions in U.S. contracts to incorporate an effective replacement rate mechanism where none existed. Even with this well-organized multi-year effort, we estimate that over $16 trillion

[2] Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (November 2020). *Statement on LIBOR Transition* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20201130a1.pdf
[3] Alternative Reference Rates Committee. (March 2021). *Progress Report: The Transition from U.S. Dollar LIBOR* https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/USD-LIBOR-transition-progress-report-mar-21.pdf
[4] Ibid.

Exhibit 1
Page 86

79

4

contracts have no realistic means to be renegotiated, so called "tough legacy" contracts, posing an enormous risk to the financial system and the underlying borrowers, investors and banks.

These tough legacy contracts often have very high legal and operational hurdles not the least of which is identifying, contacting, and negotiating with the large number of contractual parties who must consent to such an amendment. For instance, in each and every widely distributed bond, there is often upwards of many hundreds of bondholders who must be involved in the negotiation. Moreover, due to investor privacy constraints and operational hurdles, even simply identifying and communicating with bondholders is very challenging and time consuming, making unanimous consent across those bondholders to legally amend the benchmark rate practically impossible.

U.S. regulators have acknowledged the difficulty of these tough legacy contracts, and they have even supported the temporary extension of the most-used U.S. Dollar LIBOR tenors until mid-2023 to allow the natural roll off of even more contracts. In spite of this, there will still be over $16 trillion of tough legacy contracts outstanding after mid-2023.

Recognizing the significant economic, operational and legal risks of these $16 trillion contracts, SFA investors, bond issuers, lenders, paying agents and servicers members have worked extensively with each other, and with consumer groups, regulators and other sector participants, to evaluate potential solutions. Early in the process of managing away from LIBOR, many of these market participants expressed concern about the use of legislative action that would affect previously agreed contractual matters. However, the cessation of this critically important benchmark rate presents such a unique challenge that other alternatives examined were inoperable, led to potentially inequitable outcomes for investors, consumers and lenders, presented extensive and costly litigation risk, or all the above.

After much discussion amongst our members and stakeholders, SFA members found that legislation is not only the best option, but the only viable option to safely, fairly, and equitably transition tough legacy contracts while avoiding a legal and financial mess that would clog our court system for years. Moreover, it became clear that, absent congressional action, the remaining challenges of the LIBOR transition will create a great deal of confusion for borrowers and investors while degrading the value of bond investments for savers, pensioners, and retirees.

With that as background, SFA market participants identified five key principles of a legislative approach:

- **Minimize any value transfer among the contractual parties**

- **Use a single, consistent replacement benchmark for all similar LIBOR contracts** based upon a liquid, robust replacement benchmark, agreed to be Secured Overnight Financing Rate "SOFR"

- **Minimize litigation risk through a comprehensive but narrow safe harbor** that provides adequate operational flexibility for billing and paying agents to implement the use of the new replacement benchmark

- **Narrowly scope legislation to facilitate the transition away from LIBOR without impacting investor, consumer or other counterparty rights and protections**

- **Do not impact contracts that already have a sufficient replacement mechanism** unless contract parties opt-in on their own

Exhibit 1
Page 87

80

5

SFA is strongly supportive of this prospective federal legislation aligned with the ARRC's recommended legislative model, as it is consistent with our five key principles.

Further, as you likely know, recently, both Chairman Powell and Secretary Yellen expressed their support for federal legislation. On February 24, 2021, Jay Powell, Chair of the Federal Reserve, called federal legislation the "best solution" to address outstanding legacy contracts that will have not run off by June 2023. On March 23, 2021, Treasury Secretary Janet Yellen agreed with Chairman Powell's assertion and stated that the transition of certain legacy contracts would be difficult without legislation, specifically noting, "Congress does need to provide legislation for the LIBOR transition." We understand that these statements of support are the result of meaningful examination of the issues and challenges involved by both the Federal Reserve and Treasury Department.

Only a federal legislative approach to fixing inadequate LIBOR replacement provisions can offer a comprehensive solution that would apply a consistent, fair and transparent approach to protect all consumer and business borrowers, investors and lenders of tough legacy contracts under U.S. law and promote financial stability by eliminating ambiguity and confusion, thereby reducing legal uncertainty and risk of mass litigation, and reducing any adverse economic impact on financial contracts.

**State-by-State Patchwork Approach is not a Viable Solution**

On April 6, Governor Andrew Cuomo of New York signed AB164B[5] into law. The legislation provides businesses and consumers paying or receiving LIBOR-based payments crucial clarity, minimizing adverse economic impact and legal uncertainty in New York-based tough legacy contracts. The bill passed by the New York state legislature was consistent with the ARRC legislative model

This was a big, positive step forward in the orderly transition of LIBOR as we estimate almost half of tough legacy contracts are governed in New York State. Building off this legislation established in New York State, a uniform federal framework would expand the protections to also include the over $7 trillion tough legacy contracts remaining across the United States, allowing for all tough legacy LIBOR contracts to transition on time and in an equitable and fair manner. Timely and consistent treatment is crucial for the acceptance of the replacement rate by the investing and borrowing public. The success of the transition ultimately depends not only on the coordination across easily amendable contracts, but also on the positive and timely resolution of tough legacy contracts.

The most important reason for a federal legislative approach is to avoid the foreseeable downside risk to a state level approach. Simply put, a state-by-state approach would provide fewer comprehensive protections than what could be achievable at the federal level given the very limited time remaining until LIBOR's end in just over two years. Additionally, we risk a patchwork of varying state laws, which would compromise the very intent to provide a smooth transition.

State-by-state solutions cannot ensure all borrowers, lenders, investors, and financial intermediaries of tough legacy contracts have the same fair, equitable and consistent treatment across the country which

---

[5] https://legislation.nysenate.gov/pdf/bills/2021/A164B

Exhibit 1
Page 88

81

6

is paramount to ensuring the public and market confidence in the fairness, viability and liquidity of the replacement rate they receive for the remaining term of their contract.

Individuals would need to but would have no basis for understanding a different replacement rate used for an individual's mortgage versus their student loan and/or bond in their 401k. Retail and institutional investors may find themselves with certain bonds that have a new little-used replacement rate that decreases its liquidity and value. Securitization issuers may move from having LIBOR loans funded with LIBOR securities to those assets and liabilities referencing different rates – or a corporation with hedging instruments that are no longer providing the protection to the same reference rate. Any states that take no legislative actions will fail to articulate a path forward at all, leaving Americans and their businesses with potentially negative economic consequences and legal costs needed to protect their interests.

Given the ordinary complexity and significant time and resources required to move legislation through individual state government processes, attempting to also do so with one consistent model is unfathomable especially given the individualized state processes and underlying state laws, and limited time remaining until the mid-2023 deadline. Not to mention, federal legislative actions would still be necessary to address certain ambiguity, in some contracts, to the implementation of state legislation. As a result, borrowers, investors and lenders cannot rely on an approach that is dependent on separate and distinct state legislative sessions which vary extensively across the country.

In order to avoid the potential for wide-spread litigation, the timing of legislative action matters. Paying agents, lenders, servicers, investors and other service providers ideally need at least a year to operationalize, communicate and accurately bill borrowers and pay lenders and investors on millions of contracts – a task made much more difficult when a lack of national uniformity regarding changes in the benchmark rate exists. Without an appropriately authorized alternative solution, some parties responsible for directing LIBOR-based calculations in structured finance transactions have already notified bond investors and issuers that they will seek court direction to determine the appropriate replacement rate and mechanism. This approach would lead to a patchwork solution for consumers, and present a great deal of confusion.

But if this path were to be taken, in order to have sufficient time to not only seek that judicial direction through state courts on tens of thousands of contracts but to also implement the necessary operational and legal changes needed to calculate and bill those payments, calculation and paying agents will likely need at least 12 months prior to LIBOR's end to start the court process if a legislative solution fails to materialize. To be clear, this is an action market participants do not want to have to take. As such, they have been actively involved in every effort  outlined to find a viable solution to these tough legacy contracts.

By providing the certainty of an equitable, liquid and transparent replacement rate and eliminating the potential for costly litigation, the legislation recently passed in New York State will serve to protect New York consumers, investors and other market participants if their contracts are governed by New York law. Similar legislation – adopted at the federal level – would provide the same protections to help ensure all consumers, investors and borrowers receive equitable and fair treatment regardless of where their contract is governed.

Exhibit 1
Page 89

82

7

**Conclusion**

We are at a critical moment in the LIBOR transition and there is a need for absolute certainty as it relates to rates and products Americans rely on for legacy contracts. All borrowers and investors need a smooth transition away from LIBOR to avoid uncertainty, confusion, and potential mass litigation. The Structured Finance Association agrees that federal legislation is the best solution and is committed to working with you on responsible legislation that will ensure stability for consumers and businesses though this massive transition. Congress has the power to ensure as economic-neutral outcome as possible that can guarantee all U.S. tough legacy contracts are provided fair, consistent treatment thereby minimizing any value transfer and confusion. Failure to address the matter with comprehensive federal legislation risks foreseeable market disruption, confusion, and legal disputes for years to come.

Exhibit 1
Page 90

83



**Submission for the Record by the Securities Industry and Financial Markets Association (SIFMA)**

U.S. House Committee on Financial Services Committee
Subcommittee on Investor Protection, Entrepreneurship and Capital Markets

*"The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Products"*

April 15, 2021

Exhibit 1
Page 91

84

**Chairwoman Waters, Ranking Member McHenry, Subcommittee Chairman Sherman, Subcommittee Ranking Member Huizenga:**

The Securities Industry and Financial Markets Association[1] (SIFMA) submits this statement for the record for the hearing titled "The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing and Other Financial Products." We thank you for convening this important hearing and applaud your leadership for making the transition from LIBOR to alternative reference rates a priority for the committee

**Summary**

SIFMA believes that Federal legislative action is necessary to address the set of issues that we discuss further below in order to facilitate the smooth transition from LIBOR to alternative reference rates.  In particular, there is a large stock of existing contracts and instruments that, as a practical matter, cannot be amended to utilize alternative rates.  SIFMA is supportive of Federal legislation aligned with recommendations from the Alternative Reference Rates Committee ("ARRC") to address these situations where contracts cannot be easily transitioned from LIBOR due to legal or regulatory reasons.  We believe such legislation would benefit all market participants including LIBOR's end users, from investors to companies to consumers, and would provide four key benefits: (1) certainty of outcomes, (2) fairness and equality of outcomes, (3) avoidance of years of paralyzing litigation, and (4) preservation of liquidity and market resilience.

Our testimony today will provide background on the LIBOR transition, why it needs to happen, what has been done, and where we believe Federal legislation is appropriate and needed.

We look forward to working with the Committee to move this important legislation forward.

**Background on LIBOR and the Need for Transition**

LIBOR[2] is referenced by approximately $223 trillion of financial products.[3]  It is a shaky foundation because the underlying transactions upon which LIBOR was intended to be based have dwindled as financial markets and bank funding models have evolved.  Today's LIBOR is informed primarily (and sometimes entirely) by "expert judgement".  That is, LIBOR is derived from estimates of transactions, not actual transactions.  This means that LIBOR doesn't reflect

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's nearly 1 million employees, we advocate for legislation, regulation and business policy, affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

[2] LIBOR is a forward-looking interest rate benchmark derived from submissions from participating banks.  It is intended to reflect the cost of unsecured interbank funding across various tenors (lengths of time), and is published in 35 currency/tenor pairs, e.g., 3-month US Dollar, 6-month US Dollar, or 3-month Sterling.  LIBOR is published by in London by ICE Benchmark Administration, and is regulated by the U.K.'s Financial Conduct Authority.

[3] See "March 2021 Progress Report" from the ARRC: https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/USD-LIBOR-transition-progress-report-mar-21.pdf, page 3.

2

Exhibit 1
Page 92

85

the true cost of bank funding and is vulnerable to volatility and manipulation.  Global regulators saw the problem with placing the foundation for global financial markets on such a construct nearly a decade ago, and they began to examine how more robust alternative reference rates could be identified or developed to replace LIBOR.[4]  The key message from the regulatory community has been and continues to be that LIBOR is not suitable and market participants must transition to alternative reference rates.[5]

**LIBOR Will End – There Is No Doubt**

For a number of years, U.S. Dollar LIBOR appeared set to cease publication at the end of 2021.  However, in order to provide a smoother transition for legacy instruments, for certain tenors of LIBOR, agreement has been reached for a mid-2023 cessation.  On March 5, ICE Benchmark Administration confirmed its cessation plan for LIBOR.  Most non-U.S. Dollar LIBOR tenors will cease on December 31, 2021.  For U.S. Dollar denominated LIBOR, the largest and most important tenors of LIBOR, cessation will occur on June 30, 2023.[6]

Federal banking regulators have issued guidance that regulated entities should cease executing new LIBOR transactions by the end of 2021 and expeditiously transition existing contracts to new reference rates, noting that *"the agencies believe entering into new contracts that use USD LIBOR as a reference rate after December 31, 2021, would create safety and soundness risks and will examine bank practices accordingly"[7]* and have reiterated the *"intense"* supervisory focus on this issue.[8] This regulatory posture has been echoed in the U.K and Europe.  The bottom line is that LIBOR has a definitive end date, and regulators are demanding in no uncertain terms that their regulated institutions move away from LIBOR this year.

**U.S. Action – The ARRC**

In 2014 the U.S., the Federal Reserve Board and New York Federal Reserve convened the Alternative Reference Rates Committee, or ARRC.  The ARRC's membership is comprised of a broad set of private-market participants — including larger and smaller banks, asset managers, insurers, representatives of municipal interests, industry trade organizations, as well official sector ex-officio members such as the Federal Reserve, SEC, CFPB, OFR, US Treasury, CFTC, FHFA, HUD, OCC, FDIC, Federal Reserve Bank of NY, National Association of Insurance Commissioners, the New York Department of Financial Services, and others.[9]  Over 300

---

[4] See, e.g., "Reforming Major Interest Rate Benchmarks" published by the Financial Stability Board in 2014.
[5] Maybe most notably, these 2017 remarks from Andrew Bailey, then Chief Executive of the U.K.'s Financial Conduct Authority: https://www.fca.org.uk/news/speeches/the-future-of-libor
[6] IBA's statement is here:  https://ir.theice.com/press/news-details/2021/ICE-Benchmark-Administration-Publishes-Feedback-Statement-for-the-Consultation-on-Its-Intention-to-Cease-the-Publication-of-LIBOR-Settings/default.aspx
[7] See, e.g., https://www.federalreserve.gov/supervisionreg/srletters/SR2027.htm and https://www.federalreserve.gov/supervisionreg/srletters/SR2107.htm,
[8] See remarks by Federal Reserve Vice Chairman Quarles on March 22: https://www.federalreserve.gov/newsevents/speech/quarles20210322a.htm
[9] Full list of ARRC members here: https://www.newyorkfed.org/arrc/about#members

3

Exhibit 1
Page 93

86

institutions participate in the ARRC either as members or participants in ARRC committees.[10] SIFMA is a member of the ARRC.

The ARRC began with an initial goal of recommending an alternative to LIBOR.  The group reviewed a number of options for more robust reference rates, and in 2017 issued a recommendation that SOFR would be the preferred, robust alternative to LIBOR.  SOFR is a fully transaction-based rate, referencing the previous day's activity in the repurchase markets.  SOFR is based on approximately $1 trillion of daily transactions from a wide range of market participants and is administered by the New York Fed. SOFR is, by intent and construction, a reliable and representative indicator of market interest rates.  SOFR is published on a daily basis by the New York Fed.



**Graphic: A Robust Market Underpins SOFR**

Transaction Volume Underlying SOFR (US$ bn)

Source: ARRC, SOFR Starter Kit - Part 2

The ARRC followed this milestone with the development and publication of numerous recommendations, guidance documents, and reference materials.  These have addressed overall market and transition background,[11] a *Users Guide to SOFR*,[12] recommendations for business loans,[13] floating rate notes and securitizations,[14] consumer products such as adjustable rate mortgages and student loans,[15] derivatives,[16] enhanced fallback language for new transactions that reference LIBOR so that when LIBOR ceases publication the transactions can transition to alternative rates such as SOFR,[17] a fixed spread adjustment that creates symmetry

---

[10] https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC_Factsheet_2.pdf
[11] https://www.newyorkfed.org/arrc/publications/overall-transition-materials
[12] https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf
[13] https://www.newyorkfed.org/arrc/publications/business-loans
[14] https://www.newyorkfed.org/arrc/publications/floating-rate-notes-securitizations
[15] https://www.newyorkfed.org/arrc/publications/consumer-products
[16] https://www.newyorkfed.org/arrc/publications/derivatives
[17] ARRC contract language recommendations may be found here: https://www.newyorkfed.org/arrc/fallbacks-contract-language

4

Exhibit 1
Page 94

87

across most cash and derivatives products,[18] operations and infrastructure related issues,[19] regulatory relief and actions needed to facilitate the transition,[20] and other topics.  Importantly, and discussed further below, the ARRC also developed and published draft legislation to address issues with existing ("legacy") transactions.[21]

The ARRC has developed these materials in line with a steady progression towards a successful transition away from LIBOR in line with its Paced Transition Plan, which lays out goals and milestones for this important work.[22]  The market has broadly accepted this work, as shown by the usage of ARRC-recommended fallback language in new transactions, the issuance of significant amounts of debt referencing SOFR (over 1250 issuances totaling almost $1 trillion as of March 31, 2021),[23] and the execution of trillions of dollars of SOFR-based swaps and futures contracts.



Graphic: SOFR Issuance Activity – Cash Markets and Swaps/Futures

SOFR  Outstanding Notional and Total Volume

Source: ARRC, SOFR Starter Kit - Part 2 (2020)

**The "Tough Legacy" Problem**

So-called "legacy" transactions are LIBOR-based transactions that were executed prior to LIBOR cessation, and in many cases prior to the development/adoption of robust fallback language (e.g., 2019-2020).  They present special challenges for this transition.  Of the $223 trillion in

---

[18] See ARRC spread adjustment announcement: "The five-year median spread adjustment methodology matches the methodology recommended by the International Swaps and Derivatives Association (ISDA) for derivatives. For consumer products, reflecting support from both consumer advocacy groups and mortgage lenders responding to the consultation, the ARRC additionally recommended a 1-year transition period to this five-year median spread adjustment methodology", available here:
https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC_Recommendation_Spread_Adjustments_Cash_Products_Press_Release.pdf
[19] https://www.newyorkfed.org/arrc/publications/operations-infrastructure
[20] https://www.newyorkfed.org/arrc/publications/accounting-tax-regulation
[21] https://www.newyorkfed.org/arrc/publications/legislation
[22] https://www.newyorkfed.org/arrc/soft-transition#progress
[23] Source: Castle Oak Securities

5

Exhibit 1
Page 95

88

outstanding LIBOR transaction, the ARRC estimated that 67% would roll off by June 2023, leaving about $74 trillion in LIBOR exposure extending beyond June 2023. $68 trillion of this is comprised of swaps, futures, and related transactions.[24] Many (but not all) of these transactions can be amended and addressed by industry-wide protocols such at the ISDA protocol[25] or by actions by clearing houses to convert outstanding positions.[26]

The remaining $6 trillion of exposures are comprised of various types of "cash" products – bonds, notes, loans, asset backed securities and other extensions of credit. As shown below, ARRC estimates that about $1.9tr of this is comprised of bonds and securitizations, which commonly do not have adequate fallback provisions.



Graphic: Outstanding LIBOR Instruments

Table 1: USD LIBOR Market Footprint by Asset Class[1]

| | | Currently Outstanding ($TN) | Maturing After June 2023 ($TN) |
|---|---|---|---|
| Over-the-Counter Derivatives | Interest rate swaps | 81 | 45 |
| | Forward rate agreements | 47 | 0 |
| | Interest rate options | 20 | 12 |
| | Cross currency swaps | 23 | 6 |
| Exchange Traded Derivatives | Interest rate options | 32 | 0 |
| | Interest rate futures | 11 | 3 |
| Business Loans | Syndicated loans[3] | 2.0 | 1.5 |
| | Nonsyndicated business loans | 1.3 | 0.4 |
| | Nonsyndicated CRE/Commercial mortgages | 1.5 | 0.5 |
| Consumer Loans | Retail mortgages[3] | 1.3 | 0.8 |
| | Other Consumer loans | 0.1 | 0.1 |
| Bonds | Floating/Variable Rate Notes | 1.1 | 0.3 |
| Securitizations[2] | Mortgage-backed Securities (incl. CMOs) | 0.9 | 0.8 |
| | Collateralized loan obligations | 0.5 | 0.5 |
| | Asset-backed securities | 0.2 | 0.2 |
| | Collateralized debt obligations | 0.1 | 0.1 |
| Total USD LIBOR Exposure | | 223 | 74 |

[1] Source: Federal Reserve staff calculations, BIS, Bloomberg, CME, DTCC, Federal Reserve Financial Accounts of the United States, G.19, Shared National Credit, and Y-14 data. Data are gross notional exposures as of 2020Q4. [2] The figures for syndicated and nonsyndicated business loans do not include undrawn lines. Nonsyndicated business loans exclude CRE/commercial mortgage loans. [3] Estimated amounts maturing after June 2023 based on historical pre-payment rates

Source: ARRC Progress Report, March 2021

---

[24] March 2021 progress report at 3.
[25] https://www.isda.org/protocol/isda-2020-ibor-fallbacks-protocol/
[26] See, e.g., https://www.cmegroup.com/trading/interest-rates/files/cleared-swaps-considerations-for-ibor-fallbacks-and-conversion-proposal.pdf

6

Exhibit 1
Page 96

89

Many of these products were not designed at the time of issuance with a permanent cessation of LIBOR in mind, and in many cases, these products are difficult or effectively impossible to amend, due to regulatory constraints or practical issues such as identifying all of the holders of a widely distributed security. There are tens of thousands of floating rate securitization and corporate bond transactions. Some contracts don't have fallbacks. More commonly, the fallback provisions would result in a floating rate bond becoming a fixed-rate bond. Other contracts fall back to the judgement of an issuer, administrator, or other party.[27]

In other words, from a practical standpoint, the existing fallbacks aren't effective, as we will explain below. The outcome of a permanent cessation may frequently not be in line with the expectations of issuers, investors, or customers, and may lead to vast amounts of litigation that ties up courts for years and causes major disruption in financial markets and investor portfolios.

In the table below we lay out a common interest rate fallback regime in a legacy floating rate bond (FRN). There are variations on this approach, but this is a very common framework. Tens of thousands of floating rate bonds and notes would become fixed-rate instruments.

| Generalized FRN interest rate fallback waterfall | Impact of a permanent cessation of LIBOR |
|---|---|
| 1. The interest rate is LIBOR + a spread (e.g. 3-month LIBOR + 2%). | ⇒ LIBOR will not be available – go to step 2 |
| 2. If LIBOR is not available, the administrator is directed to poll U.S. or U.K. (or both) banks for what LIBOR is. | ⇒ It is not expected that banks will respond to requests for LIBOR quotes when LIBOR is no longer published. Go to step 3. |
| 3. If that poll is not successful, the rate shall be the last known LIBOR value. | ⇒ This is the likely outcome. This means that floating rate bonds will permanently become fixed-rate instruments. |

Our investor and issuer members view this potential outcome as highly disruptive. Investors who invest in floating-rate instruments and issuers who issue them do so purposefully. They invested in or issued floating rate instruments, hedged those floating rate instruments, are benchmarked as if they own floating rate instruments, and plan cashflows based on floating rate instruments. Floating rate instruments may be issued to hedge floating rate assets; if the instrument becomes fixed, a mismatch in cashflows may occur. From an investor standpoint, there are concerns about the valuation and liquidity of instruments should this outcome occur, and it is important to keep in mind that these instruments are held by a broad array of investors, including individuals, corporations, financial institutions, mutual funds, pension funds, 401k plans, and so on. The real-world impact will be felt broadly.

---

[27] Some products, such as syndicated loans, commonly fall back to a different interest rate benchmark, such as the Prime Rate.

7

Exhibit 1
Page 97

90

Other instruments (such as mortgage loans or some bonds) will have an interest rate fallback regime whereby a noteholder or administrator will have the power to choose a "comparable" rate when LIBOR is not available. This can also be problematic arrangement – it is not definitive and leaves the ultimate outcome up to the choice of that party which could create a diversity of outcomes for similar products, and of course what is 'comparable' is in the eye of the beholder. We expect that decisions about what is comparable will be highly litigated, and we understand from our members in such administrative roles that they are not typically comfortable making these determinations absent legal cover such as indemnities or court orders. In some cases, steps have already been taken to move these issues to the courts.

**Amendment is Not a Realistic Option for Tough Legacy Transactions**

The first thought many have regarding this problem is "why can't you just amend these problematic provisions?". Afterall, many swaps and other derivative contracts were amended en-masse by an industry-wide protocol. While this is a sensible question, the reality is that the ability to amend cash products generally falls in a range from "difficult" to "practically impossible". For one, cash market transactions are not as homogeneous as most swap and futures contracts. They are not typically exchange traded, and they are not based on industry-standard forms and documentation that can be amended on an industry-wide basis.

Starting with the simplest transaction, a bilateral LIBOR loan or credit facility, a lender and counterparty discussing an amendment makes sense - in the abstract. The problem is that lenders likely have hundreds or thousands (or more) of these loans, and each negotiation will take time and likely involve legal review (and expense) by both the lender and the customer. Given the actual scale of this problem, our members and the industry more broadly do not view negotiation as a practical option, certainly not by the end of 2021, and not even by June 2023. This means that once again, the likely outcome is uncertainty, disruption, and litigation.

For a more complicated situation we turn to a broadly held LIBOR-based floating rate corporate bond or securitization transaction. There may be hundreds of holders (or more) for these instruments. There are usually contractual or regulatory consent requirements for amendments to the terms of these transactions. In the U.S., amendments to the interest rate provisions of a transaction generally require a supermajority and in many cases 100% consent of holders.[28] This is generally viewed as impossible to achieve on a broad scale of tens of thousands of transactions, given the difficulty in contacting all noteholders, getting each of them to vote, and getting each of them to vote the same way.

Given the nature of securities markets, where bonds are held in street name for the benefit of the ultimate owners, it is not easy to determine who all of the holders are and to contact them. Notifications may be sent from a trustee or DTC or issuer to custodians or other parties, but it is not the case that they will always reach end holders, and not in a timely manner at that. In the worst case, even if they do, the 100% requirement means that every noteholder has to vote,

---

[28] See Trust Indenture Act discussion below.

8

Exhibit 1
Page 98

91

and on top of that, every noteholder has to vote in favor.  In other words, one noteholder out
of 1000, through inaction or a negative vote, could stop an amendment.  There have been some
successful amendments – related to LIBOR in the UK recently, and in the past in the U.S. related
to student loan transactions, for example.  However, this limited success on a dramatically
smaller scale in specific markets cannot be extrapolated to tens of thousands of transactions in
two years.

In some cases, the Trust Indenture Act ("TIA") is at the root of the consent requirement.  The
TIA provides that *"the right of any holder of any indenture security to receive payment of the
principal of and interest on such indenture security…shall not be impaired or affected without
the consent of such holder"*, which has been interpreted to apply to interest rate provisions.[29]
In transactions subject to the TIA, this is governing law.  In transactions not subject to the TIA, it
is common that the same, or similar, language will be inserted into a transaction.  This language
is sensible and protective of investors in the usual context.  However, in the context of the
transition away from LIBOR, this type of restriction is a roadblock to reform of transaction
provisions.  We believe narrow and targeted relief from certain provisions of the TIA,
implemented in a manner that does not compromise investor protections, is an important
component of any Federal legislation.

From a security investor perspective, where investment funds may hold hundreds of floating
rate instruments, the resources and time are simply not there to enter into negotiations with
each issuer of a bond that is held across a family of mutual funds, pension funds, and other
investment vehicles, especially given that the consent requirements discussed above make it
clear that your negotiation success depends on the actions (or inactions) of others.

**Legislation is Needed to Transition Tough Legacy Transactions that Lack Effective Fallback
Provisions – the ARRC Proposal**

Recognizing this problem, the ARRC created a working group to look at options and develop
recommendations for tough legacy transactions.  In March 2021, the ARRC published a proposal
for a statutory mechanism to address these ineffective tough legacy transaction fallback
provisions.  The legislation proposed by the ARRC would create a statutory safe harbor from
litigation and replace LIBOR-based fallbacks with those recommended by the ARRC, which
would be based on SOFR.[30]  The goals of the legislative approach are manifold: to provide
certainty of outcomes to contract participants, to provide equality of outcomes to market
participants, and ultimately to promote the liquidity and stability of financial markets.

---

[29] TIA §316(b)
[30] https://www.newyorkfed.org/arrc/publications/legislation

9

Exhibit 1
Page 99

92

Given that many financial contracts are governed by New York state law, the ARRC initially proposed this legislation in the state of New York.[31] In sum, the ARRC's proposed legislation would:

⇒ For contracts where fallbacks are ineffective, i.e. there are no fallbacks, the fallbacks involve a poll for LIBOR rates, or are otherwise based on LIBOR (such as last known LIBOR), the statute would have a mandatory application and replace such provisions with ARRC-recommended provisions;

⇒ For contracts where the fallbacks involve discretion, i.e. the responsible party may choose an alternative to LIBOR, the statute would create a safe harbor from litigation if the party chose an ARRC-recommended rate;

⇒ Allow contract parties to mutually opt-out of the legislation;

⇒ Have no effect on contracts or instruments where the fallback was to a non-LIBOR based rate, such as the Prime Rate, as is common in many syndicated loans and business loans.

SIFMA supported the publication of this language and advocated for its passage in New York.[32,33] The New York City Bar Association offered support for the legislation.[34] The legislation was also supported by consumer advocacy groups.[35]

After years of work and advocacy by the ARRC and others including SIFMA, on March 24th the New York Assembly and Senate passed legislation in line with the ARRC's recommendation on a nearly unanimous vote and the Governor signed the bill. While this is certainly a positive outcome, we believe there is more to be done at the Federal level.

**Uniform Federal Legislation Will Benefit Investors, Consumers, and Financial Markets**

The broad base of support for this legislation in New York stems from its of benefits to issuers, investors, and consumers. These benefits include:

⇒ **All parties will have certainty about the outcome of the LIBOR transition.** Investors, borrowers, and consumers will not be left to the whims of their issuer or lender to know what is going to happen in June 2023. They will know the outcome in advance and be able to plan, hedge, refinance, or take other actions they deem to be in their best interest. We have found in conversations with our members that this is a critical benefit of Federal legislation – our members and their peers do not have the resources or time

---

[31] Based on feedback SIFMA has received from market data vendors, we believe a very large majority of securitization contracts that are governed by U.S. law are governed by New York law, and that a majority of corporate bond contracts that are governed by U.S. law are governed by New York law.

[32] See SIFMA statement: https://www.sifma.org/resources/news/sifma-statement-on-transition-from-libor-to-alternative-rates-and-arrc-model-law-for-new-york-state/

[33] See SIFMA-coordinated letter from broad spectrum of entities in support of legislation: https://www.sifma.org/wp-content/uploads/2020/12/ARRC-Letter-of-Support-12.15.20.pdf

[34] Noting that "The Working Group has concluded that the Proposed Statute would survive a legal challenge based on any of these federal or New York State constitutional constraints", available here: https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/libor-replacement-legislation

[35] https://protectborrowers.org/wp-content/uploads/2021/03/Consumer-Group-Letter_LIBOR.pdf

10

Exhibit 1
Page 100

93

to go transaction-by-transaction to address this complicated issue. This would not be achieved with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **All parties will have the same outcome.** Investors, borrowers, and consumers will be treated the same as their counterparts and peers. In the absence of Federal legislation, one consumer could get a perceived better outcome than their neighbor. With Federal legislation, everyone will be treated the same. This is not likely to happen with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **The legislation will avoid litigation gridlock.** In the absence of Federal legislation, we expect that thousands of lawsuits would occur. There would likely be transaction administrators such as trustees seeking guidance from the courts in Article 77 proceedings in New York and similar proceedings in other states. There would also be the potential for a multitude of adversarial proceedings against trustees, issuers, underwriters, investment managers, etc. As with any court proceeding, the outcome is uncertain until the court issues its decision and appeals are exhausted (in contrast to the certainty provided by legislation noted in the previous two items). Absent Federal legislation, issuers, investors, and consumers may face years of uncertainty and significant costs due to litigation. This would not be ameliorated (and may in fact be complicated) with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **Market stability and liquidity will be preserved.** In the absence of Federal legislation, it could reasonably be expected that transactions subject to disputes could see a drop in value (or an increase in value), creating uncertainty that would cause a drop in liquidity and an increase in volatility. Broadly speaking, that is a negative outcome for holders of these instruments. This would not be avoided with a patchwork of inconsistent, or non-existent, state legislation.

**SIFMA Supports Enactment of Federal Legislation Modeled on the ARRC's Proposed Legislation**

SIFMA strongly recommends that Congress enact legislation that is aligned with the ARRC's approach. While the New York legislation is useful as regards certain New York law-governed instruments, it is not a full solution even for many of those instruments and does not address any non-New York law contracts or Federal issues such as the Trust Indenture Act. Only Federal legislation can address these problems.

Federal legislation can address <u>all</u> contracts governed by a state or federal law. There are, after all, 49 other states. While a majority of corporate bonds and securitizations are governed by New York law, a vast number of loans, credit facilities, bonds, and other instruments are governed by state laws other than New York. A uniform Federal law can promote the benefits we discussed above – contract certainty, fairness and equality of outcomes, avoidance of years of litigation, and market liquidity – across the nation. A patchwork of inconsistent, or non-existent, state legislation, cannot do this.

11

Exhibit 1
Page 101

94

Federal law can also address issues such as the Trust Indenture Act, discussed above, and provide narrow, targeted relief that allows contracts to transition to more robust reference rates without impossible to meet unanimous consent requirements.  Federal law can also ensure that there are not adverse tax or other consequences to issuers, holders, or consumers.

While U.S. Dollar LIBOR is expected to be published until June 2023, we believe time is of the essence as regards proposed legislation.  Bank regulators are highly focused on moving as much activity away from LIBOR as quickly as possible.  Additionally, once legislation is passed, it is not the case that the provisions of the law are implemented immediately.  There are a large number of parties involved in these transactions, and it will take meaningful amounts of time for all parties to revise internal systems and models to account for changes to interest rate calculations, for transaction-level changes to be communicated to end-users, and for other steps that need to be taken to happen.[36]

SIFMA and its members commend Representative Sherman and members of the subcommittee for holding this hearing and for moving this important issue forward. We also appreciate the opportunity to provide feedback on the discussion draft and for aligning the legislation with recommendations of the ARRC to the greatest extent possible and the goals and benefits described above. To that end, we strongly support a Federal solution as embodied in the discussion draft and look forward to working with the bill's sponsors to further refine the legislation as it moves through the legislative process.

We urge this Subcommittee to carefully consider this legislation in the context of our testimony today.  We believe Congress can provide a great service to consumers, businesses, lenders, and investors by enacting targeted Federal LIBOR transition legislation aligned with ARRC recommendations.

---

[36] Accordingly, as regards the discussion draft presented today, we also advocate for an expeditious regulatory process to choose a Board Selected Benchmark Replacement and confirm the spread adjustment so that market participants can move forward quickly with necessary updates to their systems, and a deep and liquid SOFR market with consistent market conventions across the various types of SOFR to be used in the broad array of cash products.

Exhibit 1
Page 102

95

April 14, 2021

| | |
|---|---|
| The Honorable Maxine Waters | The Honorable Patrick McHenry |
| Chairwoman | Ranking Member |
| Committee on Financial Services | Committee on Financial Services |
| U.S. House of Representatives | U.S. House of Representatives |
| Washington, DC 20510 | Washington, DC 20510 |
| | |
| The Honorable Brad Sherman | The Honorable Bill Huizenga |
| Chairman | Ranking Member |
| Subcommittee on Investor Protection, | Subcommittee on Investor Protection, |
| Entrepreneurship and Capital Markets | Entrepreneurship and Capital Markets |
| U.S. House of Representatives | U.S. House of Representatives |
| Washington, DC 20510 | Washington, DC 20510 |

Dear Chairwoman Waters, Ranking Member McHenry, Rep. Sherman, and Rep. Huizenga:

The undersigned organizations write in support of federal legislation to address "tough legacy" contracts that utilize LIBOR.

There are trillions of dollars of outstanding contracts, securities, and loans that use LIBOR for their interest rates but do not have appropriate contractual language to address a permanent cessation of US dollar LIBOR, which will occur in June 2023. Existing interest rate fallback provisions may not address the issue at all, may result in adjustable-rate contracts becoming fixed-rate contracts based on the last known LIBOR, or may defer to a party's judgement to replace LIBOR with a comparable interest rate index. In any case, it is likely that ineffective or ambiguous fallback provisions will result in uncertainty, litigation, and harm to consumers, businesses, and investors.

The Alternative Reference Rates Committee (ARRC) developed and published draft legislative language that would replace ineffective LIBOR-based fallback provisions with recommended fallbacks that will take effect when LIBOR ceases publication, create a safe harbor from litigation for parties that choose ARRC-recommended rates, and not affect contracts that have effective fallbacks that do not reference LIBOR. Legislation based on the ARRC's proposal was recently implemented in New York.

We believe that federal legislation is critical and necessary to solve this problem. Only federal legislation can uniformly address all 50 states, and only federal legislation can address issues such as the need for narrow relief from certain federal laws. Importantly, federal legislation will have a number of benefits to consumers, businesses, and investors:

- **All parties will have certainty about the outcome of the LIBOR transition**. Investors, borrowers, and consumers will not be left to wonder what is going to happen when LIBOR ends, and will be able to plan ahead accordingly.
- **All parties will have the same outcome.** Investors, borrowers, and consumers will be treated the same as their counterparts and peers. This would not be achieved with a

Exhibit 1
Page 103

96

patchwork of inconsistent, or non-existent state legislation. In the absence of federal legislation, one consumer could get a perceived better outcome than their neighbor.

- **The legislation will avoid litigation gridlock.** In the absence of federal legislation, we expect that thousands of lawsuits would occur. Without action, issuers, investors, and consumers may face years of uncertainty and cost due to litigation.
- **Market stability and liquidity will be preserved.** In the absence of legislation, it could reasonably be expected that transactions subject to disputes could see a decrease in value (or an increase in value), creating uncertainty that would cause a liquidity to suffer and volatility to increase.

We commend Representative Sherman and the Committee for addressing this important issue head on and appreciate your consideration of our views on this important subject. We look forward to working with Members of the Committee to move this important legislation forward.

Sincerely,

**The Securities Industry and Financial Markets Association (SIFMA)**
**Structured Finance Association**
**The Financial Services Forum**
**Consumer Bankers Association**
**Student Loan Servicing Alliance**
**Commercial Real Estate Finance Council**
**The Loan Syndications and Trading Association (LSTA)**
**Bank Policy Institute**
**The International Swaps and Derivatives Association (ISDA)**
**The Real Estate Roundtable**
**Government Finance Officers Association**
**Mortgage Bankers Association**
**Investment Company Institute**
**Housing Policy Council**
**Education Finance Council**
**The American Council of Life Insurers (ACLI)**
**Institute of International Bankers**
**The American Bankers Association (ABA)**

○

Exhibit 1
Page 104