# Exhibit 2


S. HRG. 117–357

# THE LIBOR TRANSITION: PROTECTING CONSUMERS AND INVESTORS

# HEARING

BEFORE THE

# COMMITTEE ON
# BANKING, HOUSING, AND URBAN AFFAIRS
# UNITED STATES SENATE

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

ON

EXAMINING HOW THE FINANCIAL SYSTEM CAN MOVE ON FROM THE LIBOR SYSTEM

NOVEMBER 2, 2021

Printed for the use of the Committee on Banking, Housing, and Urban Affairs



Available at: https://www.govinfo.gov/

U.S. GOVERNMENT PUBLISHING OFFICE

48–451 PDF                    WASHINGTON : 2023

Exhibit 2
Page 105

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

SHERROD BROWN, Ohio, *Chairman*

| | |
|---|---|
| JACK REED, Rhode Island | PATRICK J. TOOMEY, Pennsylvania |
| ROBERT MENENDEZ, New Jersey | RICHARD C. SHELBY, Alabama |
| JON TESTER, Montana | MIKE CRAPO, Idaho |
| MARK R. WARNER, Virginia | TIM SCOTT, South Carolina |
| ELIZABETH WARREN, Massachusetts | MIKE ROUNDS, South Dakota |
| CHRIS VAN HOLLEN, Maryland | THOM TILLIS, North Carolina |
| CATHERINE CORTEZ MASTO, Nevada | JOHN KENNEDY, Louisiana |
| TINA SMITH, Minnesota | BILL HAGERTY, Tennessee |
| KYRSTEN SINEMA, Arizona | CYNTHIA LUMMIS, Wyoming |
| JON OSSOFF, Georgia | JERRY MORAN, Kansas |
| RAPHAEL WARNOCK, Georgia | KEVIN CRAMER, North Dakota |
| | STEVE DAINES, Montana |

LAURA SWANSON, *Staff Director*
BRAD GRANTZ, *Republican Staff Director*

ELISHA TUKU, *Chief Counsel*

DAN SULLIVAN, *Republican Chief Counsel*

CAMERON RICKER, *Chief Clerk*
SHELVIN SIMMONS, *IT Director*
CHARLES J. MOFFAT, *Hearing Clerk*

(II)

Exhibit 2
Page 106

# C O N T E N T S

---

### TUESDAY, NOVEMBER 2, 2021

|  | Page |
|---|---|
| Opening statement of Chairman Brown | 1 |
| Prepared statement | 26 |
| Opening statements, comments, or prepared statements of: | |
| Senator Toomey | 3 |
| Prepared statement | 27 |

### WITNESSES

| | Page |
|---|---|
| Thomas Wipf, Chair of The Alternative Reference Rate Committee (ARRC) and Managing Director, Morgan Stanley | 5 |
| Prepared statement | 28 |
| Responses to written questions of: | |
| Senator Warren | 43 |
| Andrew Pizor, Staff Attorney, National Consumer Law Center | 7 |
| Prepared statement | 30 |
| Responses to written questions of: | |
| Senator Warren | 44 |
| J. Christopher Giancarlo, Senior Counsel, Willkie Farr & Gallagher LLP, and Former Chairman, U.S. Commodity Futures Trading Commission | 8 |
| Prepared statement | 34 |
| Michael Bright, Chief Executive Officer, Structured Finance Association | 10 |
| Prepared statement | 38 |

### ADDITIONAL MATERIAL SUPPLIED FOR THE RECORD

| | Page |
|---|---|
| ICBA letter | 46 |
| LIBOR letter | 47 |
| CAMAC letter | 49 |
| NAFCU letter | 50 |
| Brookline Bank letter | 51 |
| Statement submitted by SIFMA | 52 |

(III)

Exhibit 2
Page 107

Exhibit 2
Page 108

# THE LIBOR TRANSITION: PROTECTING CONSUMERS AND INVESTORS

—————

### TUESDAY, NOVEMBER 2, 2021

U.S. SENATE,
COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS,
*Washington, DC.*

The Committee met at 10 a.m., via Webex and in room 538, Dirksen Senate Office Building, Hon. Sherrod Brown, Chairman of the Committee, presiding.

### OPENING STATEMENT OF CHAIRMAN SHERROD BROWN

Chairman BROWN. The Committee on Banking, Housing, and Urban Affairs will come to order. Welcome to the witnesses, who I will introduce in a moment.

This hearing is in a hybrid format. Members have the option to appear either in person or virtually. I think all my colleagues know the rules of that and the procedures. Our speaking order will be as usual, that is by seniority of the Members who have checked in before the gavel comes down, either in person or virtually, and then by seniority of Members arriving later, alternating between Republicans and Democrats.

I often begin these hearings by taking us back to 2008, and to the years that followed, because we are still living with the fallout, and in the case of the LIBOR scandal, we are still cleaning up a mess caused by the biggest banks in the world, still cleaning up a mess more than a decade later.

As the housing market crashed and more than eight million workers lost their jobs, central bankers began to realize just how many markets were broken in the global economy.

One of those was the interest rate system. Most people had never heard, maybe still have never heard of LIBOR. Like so much in the financial system, it is an opaque term for something that affects millions of people's bills and bank accounts and ultimately lives. LIBOR has been the most widely used interest rate benchmark around the world. It is used to set payments for millions of student loans, mortgages, and small business and auto loans. Some $300 trillion—three hundred thousand billion dollars—was tied to LIBOR at its peak. With that kind of money involved, it should surprise no one that bankers figured out a way to conspire to rig the interest rate, to enrich themselves.

After the scandal broke in 2012, uncovering the banks' manipulation of LIBOR, this Committee and the Federal financial regulators studied the problems to determine who was at fault. U.S. and foreign regulators imposed billions of dollars in fines on several global

(1)

Exhibit 2
Page 109

2

banks for manipulating the interest rate and taking advantage of consumers and investors.

Now, nearly a decade later, our financial system is finally transitioning away from LIBOR. Today we will consider how the financial system can move on from this benchmark set by a handful of the world's largest banks, a system we found out was ripe for exploitation. Part of that transition involves dealing with trillions of dollars in legacy contracts tied to LIBOR, and that will continue after the rate is discontinued in June of the year after next, of 2023.

After a slow start, the Federal Reserve Bank of New York and the Federal Reserve Board here, along with industry stakeholders and consumer advocates, have established a path forward. They developed, as we know, a new, more reliable and transparent benchmark rate called SOFR, the Secured Overnight Financing Rate, and they have put forward a framework to address legacy loans and contracts that were written assuming that LIBOR would always exist.

Because LIBOR is so widely used, homeowners and students who have never heard of LIBOR will be at risk when it is discontinued if we do not take action, and I am particularly appreciative of Senator Tester and Elizabeth and the work they are doing, and Senator Tillis also on that. If their loans do not have specific instructions about what happens if LIBOR disappears, or if their loans give loan servicers the discretion to pick a different rate, those borrowers would be in for a shock.

Small and large businesses could be in a similar situation, forced to negotiate a loan tied to LIBOR at a time when they are just getting back on their feet from the pandemic.

Banking agency officials and stakeholders have all said Federal legislation would help address those long-term loans and contracts, and reduce the potential for time-consuming and costly litigation.

Our colleagues on House Financial Services began bipartisan work on a bill that addresses these problems, and as I mentioned, Senators Tester and Tillis are preparing a Senate companion. If done right, this legislation can help borrowers who do not have the ability to bargain with their student loan lender or mortgage banker, while also providing certainty to lenders. We know we need to act, and I appreciate these efforts by Members of our Committee.

Under the current proposal, lenders with legacy contracts that do not specify a LIBOR alternative can transition to SOFR, so long as they do not make other changes that could harm borrowers. That would allow them to avoid potentially complicated litigation.

It is frustrating that we are forced to spend taxpayers' time and money cleaning up after the biggest banks, again and again and again. Unfortunately, if we do not work to mitigate the damage from another big bank scandal it is always family businesses and homeowners and students and consumers who will pay the price.

Our witnesses and their organizations have developed a narrow and consistent solution that protects small businesses, and families with mortgages, and Americans paying off student loans.

I look forward to hearing from our witnesses, and to working with my colleagues to protect consumers and to protect the economy. We have proven we can come together on this Committee. We

Exhibit 2
Page 110

3

try to do it often and we succeed sometimes, to find areas of agreement, and to advance commonsense solutions for the people whom we serve. My hope is we can do the same on LIBOR.

Senator Toomey.

**OPENING STATEMENT OF SENATOR PATRICK J. TOOMEY**

Senator TOOMEY. Thank you, Mr. Chairman, and welcome, and thank you to our witnesses today.

LIBOR, the London Interbank Offered Rate, has long been the most widely used U.S. dollar-denominated benchmark interest rate across all types of financial contracts. In 2013, the G20 launched a global review of interest rate benchmarks after cases of misconduct in the reporting of LIBOR rates by a small number of banks and the significant decline in interbank lending volumes.

As the breadth and depth of interbank loan deposit market liquidity greatly diminished it became clear that alternative rates with greater volume and a larger number of market participants would be more appropriate than LIBOR. In the United States, the Federal Reserve Board and the New York Fed convened the Alternative Reference Rates Committee, or ARRC, to identify an alternative to LIBOR.

In 2017, the ARRC identified the Secured Overnight Financing Rate, or SOFR, as its recommended alternative. SOFR measures the cost of overnight or short-term borrowings collateralized by U.S. Treasury securities.

Last year, the Fed, FDIC, and OCC directed banks to stop entering into new LIBOR contracts as soon as possible and no later than the end of 2021. The administrator of LIBOR will stop publishing all LIBOR settings by June 30, 2023. And although most existing contracts referencing LIBOR will have matured by that date, a number of contracts will not, and some lack the fallback language to replace LIBOR with a non-LIBOR index. As a result, many have called for Federal legislation to address these so-called "tough legacy contracts."

Now I agree banks should stop writing new LIBOR contracts as soon as it is practical, and Federal legislation is likely needed to address tough legacy contracts. The unique and anomalous circumstances related to the LIBOR transition probably require action by Congress to amend contracts between private parties, but such congressional action should be a last resort.

As we consider this measure, any legislation that addresses these tough legacy contracts must be very narrowly tailored, should not change the equities of these contracts, and they certainly should not affect any new contracts.

In July, the House Financial Services Committee approved a bill that would replace LIBOR in these legacy contracts with a Fed-selected, SOFR-based benchmark. The bill takes a reasonable approach, and the Senate should carefully review it. In so doing, we should consider targeted amendments, such as ensuring that qualified non-SOFR benchmark rates are not disfavored in future contracts.

While it is appropriate to mandate a SOFR-based index for this relatively small universe of tough legacy contracts, for new contracts banks should have the option to choose among qualified

Exhibit 2
Page 111

4

benchmark rates, including credit-sensitive rates, to the extent they are appropriate for their business models. Risk-free rates like SOFR may work well for some derivatives contracts and for some institutions active in the Treasury repo market, but they may not be well-suited for loans or certain community or regional banks.

The funding costs for such banks typically increase relative to SOFR during periods of stress, which could create an asset-liability mismatch if loans were required to reference only SOFR. The Fed, FDIC, and OCC have previously acknowledged this dynamic. They have said the use of SOFR is voluntary and a bank may use, and I quote, "any reference rate for its loans that the bank determines to be appropriate for its funding model and customer needs," end quote.

An even broader group of regulators said, in the context of bank lending, that, and I quote, "supervisors will not criticize firms solely for using a reference rate (or rates) other than SOFR," end quote. I think that is very important, which is why I am concerned this may be what the Biden administration financial regulators are actually not pursuing.

Just last week, the Acting Comptroller of the Currency said the OCC's supervisory efforts will, quote, "initially focus on non-SOFR rates," end quote, which suggests to me that the OCC may apply heightened supervisory scrutiny to non-SOFR rates. And last month, a senior New York Fed official said that banks that use a non-SOFR rate must do, quote, "extra work," end quote, to ensure that the bank is, quote, "demonstrably making a responsible decision," end quote.

The SEC Chairman, Gary Gensler, has been even more explicit. On multiple occasions he has criticized one particular credit-sensitive rate. So these statements raise serious concerns that regulators, some regulators, are pressing all banks to use SOFR without any transparency or public input. It seems to me if a bank wants to price its loan off a rate it believes is a better reflection of its cost of funding or its customer needs than SOFR and regulators should not prohibit the bank from doing so.

This pressure, however, pales in comparison to the preferred approach of President Biden's proposed nominee to lead the OCC. Professor Saule Omarova has written that widely used benchmark rates should either be preapproved by the Government, or worse, subject to, quote, "utility-style regulation," end quote. In other words, the Government, not the market, would have a direct role in actually setting benchmark rates as it deems appropriate.

This is just one example of the many radical ideas that Professor Omarova has proposed that demonstrate a clear aversion for democratic capitalism, and a clear preference for an administrative State where economic and market decisions are made by technocrats who think they know more than the market.

Regulators should never disfavor qualified rates, and banks should have the choice to use any rate that meets well-established criteria for benchmark rates.

I hope to hear from today's witnesses about the transition from LIBOR, the potential for targeted Federal legislation to address these tough legacy contracts, and ways to preserve benchmark rate choice.

Exhibit 2
Page 112

5

Thank you, Mr. Chairman.

Chairman BROWN. Thank you, Senator Toomey.

I will introduce today's witnesses. Mr. Thomas Wipf serves as Chair of the Alternative Reference Rate Committee, which was convened by the Federal Reserve Board to help ensure successful transition from LIBOR to a more modest reference rate. Mr. Wipf is a Managing Director at Morgan Stanley.

Mr. Andrew Pizor is Staff Attorney at the National Consumer Law Center's Washington office, where he works on issues related to mortgage financing and defending homeowners from foreclosures. He has served as an expert witness on mortgage origination and servicing issues.

The Honorable Christopher Giancarlo is a Senior Counsel at Willkie Farr & Gallagher and previous Chair of the Commodity Futures Trading Commission. I often saw him on the Agriculture Committee and sometimes here. In that role, he oversaw regulation of futures options and swaps derivatives markets. He has testified often about financial and derivatives markets before Congress and to the EU Parliament.

Mr. Michael Bright, also no stranger here, is Chief Executive Officer of the Structured Financial Association. He is Executive Vice President and COO of Government National Mortgage Association, Ginnie Mae. He was a director at the Milken Institute Center for Financial Markets, and we first worked with him when he worked in the office of Senator Robert Corker.

Mr. Wipf, please begin. You are recognized for 5 minutes.

**STATEMENT OF THOMAS WIPF, CHAIR OF THE ALTERNATIVE REFERENCE RATE COMMITTEE (ARRC) AND MANAGING DIRECTOR, MORGAN STANLEY**

Mr. WIPF. Thank you, Chairman Brown, Ranking Member Toomey, and Members of the Committee. I am honored to be here today on behalf of the Alternative Reference Rates Committee, the ARRC, to testify on the need for Federal legislation to address U.S. dollar LIBOR transition for legacy products and support the efforts of the Committee to bring that to fruition.

The ARRC is comprised both of a broad set of private-sector firms and associations representing a range of perspectives on the LIBOR transition as well as a broad set of U.S. agencies, including the Federal Reserve, the CFTC, the SEC, Treasury, the OCC, the FDIC, and the FHFA, who observe our work. We were convened by the Federal Reserve Board and the Federal Reserve Bank of New York in 2014, in order to help address the financial stability risks that the Financial Stability Oversight Council had publicly identified concerning the use of LIBOR in the financial system.

ARRC working groups have involved thousands of participants across more than 300 different institutions including lenders, borrowers, investors, and consumer advocacy groups. The ARRC has estimated that U.S. dollar LIBOR is referenced in over $200 trillion notional financial contracts alone, and that roughly a third of these contracts will remain outstanding as of June 30, 2023, when LIBOR will cease.

The ARRC was convened to help facilitate a smooth transition and was asked to identify a robust alternative to U.S. dollar

Exhibit 2
Page 113

6

LIBOR, one that was appropriate to base trillions of dollars of contracts on, and to address risks to legacy LIBOR contracts.

The ARRC selected the Secured Overnight Financing Rate, or SOFR, which is the U.S. Treasury repo market, as its recommended alternative, based on the fact that it is by far the most robust alternative to LIBOR available.

There will always be a U.S. Treasury repo market both in good times and bad, and based on the widespread support from a broad range of market participants including end users and borrowers, we now expect that many market participants will choose to use SOFR, and many have already done so or are actively preparing to do so. However, we also support choice, and we have been clear since our inception that our recommendations are voluntary. At the end of the day, the market will determine which rates are used in the future.

For many existing legacy contracts that reference LIBOR, however, things are much less simple. Many legacy non-financial corporate contracts referencing LIBOR have no fallback language whatsoever. Many financial contracts have fallbacks that would require parties to poll an unnamed set of banks in an attempt to recreate LIBOR, which we believe would be both burdensome and unsuccessful. Others refer only to the last published value of LIBOR, effectively converting what were floating-rate instruments into fixed-rate instruments. These contracts are difficult or impossible to change in the absence of a legislative solution. Without legislation, parties to these tough legacy contracts will face significant operational and market disruptions, contractual disputes, and economic hardship.

To help address this risk to these tough legacy contracts, the ARRC developed and promoted legislation for contracts governed by New York law to avoid the disruptions, market uncertainties, and confusion that would otherwise occur when LIBOR ends. The passage of State legislation in New York, and subsequently also in Alabama, has been extraordinarily important, helping to address the risks of the LIBOR transition. In particular, many financial contracts are covered under New York law. However, we know that many nonfinancial corporate contracts, consumer loans, and securitizations are not covered.

So while the ARRC is prepared to advocate for similar legislation in other States, we cannot reasonably hope for a comparable legislative solution in all 50 States and the District of Columbia. Federal legislation can help to ensure an equal outcome for all Americans. The legislative proposal before your Committee would help to ensure that equal outcome.

As with the legislation passed in New York and Alabama, the legislative proposal is purposefully narrow, intended only to address contracts that could not otherwise be changed. For contracts that already allow one party the right to choose a new rate, a feature of most consumer contracts referencing LIBOR, the proposed legislation does not alter the right of the designated party to determine the successor rate, but the legislation does provide safe harbor to encourage a choice based on SOFR, which has had the strong support of consumer advocacy groups in addition to lenders

Exhibit 2
Page 114

7

and investors, and this is intended to help ensure that consumers are treated fairly in this transition.

For contracts that have no fallback language or language that only refers only to a poll of banks or some past value of LIBOR, the proposed legislation recognizes that a unique successor rate must be named in order to avoid legal conflict. We believe that this form of tailored legislation is appropriate and necessary to avoid disruption to the economy.

We support the legislative proposal before your Committee, are grateful for your consideration of it, and on behalf of the ARRC I thank you.

Chairman BROWN. Thank you, Mr. Wipf. Mr. Pizor, you are recognized for 5 minutes. Thank you for joining us.

### STATEMENT OF ANDREW PIZOR, STAFF ATTORNEY, NATIONAL CONSUMER LAW CENTER

Mr. PIZOR. Chairman Brown, Senator Toomey, and Members of the Committee, we thank you for the opportunity to testify today on the importance of protecting consumers from potentially higher loan costs that could be triggered when the benchmark LIBOR index ends. I provide my testimony here today on behalf of NCLC's low-income clients.

My primary message is to encourage the Senate to support H.R. 4616 but within a central change, a more limited safe harbor. With this change, H.R. 4616 will protect both consumers and the credit industry from possibly devastating consequences from the transition away from the LIBOR.

The LIBOR is used to adjust the rate on more than $1 trillion of consumer mortgages, student loans, and other credit contracts. When LIBOR ends in less than 2 years, the credit industry must substitute a new index. If the transition is not done correctly the resulting higher loan payments could force millions of consumers into default and lead to widespread litigation against industry.

The typical adjustable-rate loan allows the creditor broad discretion to choose a replacement index, but there is no exact replacement for the LIBOR. So without clear legal protections, both consumers and industry could be at risk, consumers from higher payments that could trigger defaults and industry from lost profits and litigation.

Additionally, some contracts require other adjustments when a new index is used. These adjustments are called conforming changes because they bring the contract into conformity with the replacement index. However, there is no consensus on how to determine what these conforming changes are or their legality.

Based on our experience with predatory lending and problems in the loan servicing industry, we are concerned that some companies may abuse or mismanage their discretion by trying to gouge consumers. There are several possible scenarios for how this could happen. Our biggest fear is that the lender could pick a replacement index that unfairly increases the loan payments, or under the guise of conforming changes a lender might change the method for calculating payments or the margin used to set the interest rate. Consumers have no control over this process. If harmed, their only recourse will be to sue.

Exhibit 2
Page 115

8

Because this issue affects such a broad range of the economy, industry participants, Government regulators, and consumers groups have been meeting to discuss possible solutions. These meetings have produced a consensus that the best replacement for the LIBOR is the SOFR. But these groups cannot force anyone to use it, and it is not clear how many companies will voluntarily adopt it for legacy contracts. We understand that note-holders are delaying this decision because of concern over litigation risk.

Currently the House is considering H.R. 4616. This bill includes several provisions that deal with replacing the LIBOR. For consumers, the single most important creates a safe harbor for note-holders that voluntarily use the appropriate version of the SOFR to replace the LIBOR.

The current bill includes broad immunity from lawsuits when SOFR is selected and the related conforming changes are made. We support the concept of a safe harbor, but the current language is just too broad and could allow bad actors to escape responsibility, even when they hurt consumers.

Now we have discussed this problem with industry and we have agreed on some adjustments to the safe harbor language that would enable us to support it. My written testimony has the details on this point.

But overall, it is very important for Congress to adopt legislation that encourages note-holders to use the SOFR in legacy contracts when the LIBOR ends. This is important enough that we are actually supporting creating a safe harbor for note-holders, something we would not normally do, but it is equally important that the safe harbor be narrowly tailored so it is not abused.

I want to conclude by thanking industry, the Members of this Committee, and the House Committee for working with us to find a solution that helps everyone, and I am happy to answer any questions you may have. Thank you.

Chairman BROWN. Thank you. Mr. Giancarlo, you are recognized for 5 minutes. Thank you for joining us.

**STATEMENT OF J. CHRISTOPHER GIANCARLO, SENIOR COUNSEL, WILLKIE FARR & GALLAGHER LLP, AND FORMER CHAIRMAN, U.S. COMMODITY FUTURES TRADING COMMISSION**

Mr. GIANCARLO. Chairman Brown, Ranking Member Toomey, and Members of the Committee, thank you very much. It is good to be before you once again.

I am Chris Giancarlo, Senior Counsel at Willkie Farr & Gallagher. I am the former Chairman of the CFTC, an agency that has led and continues to lead the transition away from LIBOR. I am also an independent director of the American Financial Exchange.

I have extensive experience both as a market regulator and as a business executive with financial benchmarks, and particularly with LIBOR. During my 5 years at the CFTC I traveled across the country to meet with Americans and businesses who depend on futures markets to hedge the prices of products and commodities they produce. I walked factor floors in Illinois, pecan farms in Georgia, grain elevators in Montana, feed lots in Kansas, and power plants in Ohio. I went 900 feet underground in a Kentucky coal mine, 90

Exhibit 2
Page 116

9

feet in the air in a North Dakota natural gas rig, and flew 900 feet in the air in an Arkansas crop duster.

Almost all of the small and medium-sized businesses that I met were supported by America's community, minority, and regional banks. I support open and competitive U.S. markets, but my comments today are frankly less about the need for competition but more about choice of complementary benchmarks.

America's trading markets feature a diverse set of pricing benchmarks serving different needs. In our grain futures markets, there are multiple pricing benchmarks, including Chicago's soft red winter wheat, Kansas City hard red winter wheat, and Minneapolis hard red spring wheat. The different benchmarks serve to establish the cost of different varieties of wheat used in different bread products. Pizza dough, for example, is made from different wheat than breakfast cereals.

In our oil markets there are also different benchmarks. West Texas Intermediate and Brent crude oil, again, setting distinct prices for different fuel products like domestic auto gas or industrial oil.

And, of course, in our equity markets there are multiple benchmarks like the Dow Jones Industrials, the S&P 500, and the Russell 2000 to measure the different performance of large multinationals compared to early stage growth companies.

Such variety of specifically designed benchmarks allows market participants to make choices that are right for their investment needs rather than a one-size-fits-all approach. Choice of benchmarks is a reason why U.S. futures and equity markets are the envy of the world.

Strangely, one U.S. market that has not a similar range of choice of benchmarks is bank lending, where LIBOR has been dominant for decades. In fact, the ubiquity of LIBOR in American commercial lending is one of the reasons why ending it presents such a potential crisis today. Lack of choice of benchmark is itself a systemic risk.

The United States banking industry is unlike any other in the world. On one hand, our large money center and Wall Street investment banks lead the world in global trading, investment banking, and large project finance. But on the other hand, our community, our minority, and our regional banks spread out across the urban, suburban, and rural landscape finance the everyday needs of America's consumers, small and medium-sized businesses, minority communities, and domestic job creators.

A banking industry that is so varied, so complex, and so essential to our economy needs the diversity and durability that comes from choice of interest rate benchmark. A one-size-fits-all approach would be a source of systemic risk to the U.S. economy.

As we move away from LIBOR, we must be clear that lending institutions, be they large money center banks or local, regional, or MDI banks, should have the flexibility to choose amongst appropriate benchmark alternatives that meet their customer needs.

I urge you to consider legislation ensuring that America's community lenders have the ability to choose among sound and properly qualified benchmark replacement that meet the international standards based upon robust markets with transparent price dis-

Exhibit 2
Page 117

10

covery. Having choice among multiple qualified benchmarks not only facilitates the transition away from LIBOR but it also enhances efficiency, reduces systemic risk, and encourages economic growth for generations to come.

Thank you.

Chairman BROWN. Thank you. Mr. Bright, welcome to the Committee. You are recognized for 5 minutes.

### STATEMENT OF MICHAEL BRIGHT, CHIEF EXECUTIVE OFFICER, STRUCTURED FINANCE ASSOCIATION

Mr. BRIGHT. Chairman Brown, Ranking Member Toomey, and other Members of the Committee, my name is Michael Bright, CEO of the Structured Finance Association, or SFA. On behalf of the member companies of SFA I thank you for inviting me to testify. I also thank you for your focus on finalizing the transition away from LIBOR for millions of consumers and investors.

The Structured Finance Association is a consensus-driven trade association with over 370 institutional members. SFA members include issuers and investors, data and analytic firms, law firms, servicers, accounting firms, and trustees. Importantly, our investor firms are fiduciaries to their clients. Unlike some trade associations, before we take any advocacy position our governance requires us to achieve consensus rather than a simple majority.

Let me first make abundantly clear that many of SFA member companies were impacted by the LIBOR scandal. We need to ensure that this never happens again. Contracts based on a floating rate index must be able to rely on the integrity of that index. This is a critical component of the work SFA is engaged in today.

The cessation of LIBOR has been an enormous challenge overhanging the capital markets since 2017. At that time, the Financial Conduct Authority, LIBOR's regulator based in London, announced that the production of LIBOR would likely end in 2021. Over the subsequent years, extensive progress has been made to move away from these rates. Today, out of over $200 trillion of contracts that are tied to LIBOR in the U.S., nearly all have managed to put in place a plan for transition.

Even with this multiyear effort, however, SFA estimates that roughly $16 trillion of contracts have no realistic means to be renegotiated and amended. These so-called "tough legacy contract" were made prior to knowing LIBOR was going away. These include mortgages, student loans and business loans, and therefore impact a broad range of American households and communities. Sixteen trillion dollars is a large sum, posing serious risk to the financial system.

After lengthy deliberation and debate, a consensus position across the entire market has emerged that a Federal safe harbor for the transition of these tough legacy contracts is the only option to avoid costly litigation and consumer disruption. The many other alternatives examined simply did not work. We now see that absent Federal legislation to provide a safe harbor, retirees and savers will be forced to absorb tens of billions of dollars in legal costs.

But legislation can offer a solution. A tailored safe harbor can provide certainty for all parties in a LIBOR contract. If done properly, SFA believes that legislation will respect some important

Exhibit 2
Page 118

11

principles. For one, legislation to address LIBOR should not create any value transfer among contractual parties. The safe harbor should be as narrow as possible. Legislation should not impact choices of rates for new contracts but should instead focus solely on legacy contracts. And finally, legislation should not disrupt contracts that have adequate fallback language in them already.

With these principles in mind, SFA is strongly supportive of the bill that recently passed out of the House Financial Services Committee. Simultaneously, on behalf of the entire membership of SFA, I specifically want to thank Senators Tester and Tillis for the leadership they are providing on this issue in the Senate. We are here to provide any assistance that you all need.

Timing is critical. While market participants are working tirelessly to transition contracts that allow it, loans and tough legacy contracts are in limbo. Rulemaking by the Fed takes time, as will implementation of those rules. So while the formal date for the end of most LIBOR rates is now mid-2023, the problems and legal costs begin much sooner.

In conclusion, let me thank you all again for your focus on helping to move our markets away from LIBOR once and for all. This work is critical to ensuring that all investors, consumers, and businesses are treated fairly. It also will help to prevent billions of dollars of potential litigation where no one wins but savers and retirees foot the bill.

Thank you, and I look forward to answering any questions that you have.

Chairman BROWN. Thank you, Mr. Bright. All of you obviously have been essential in your work on the LIBOR transition. I would like to ask each of you, and I will start with Mr. Wipf, to concisely and briefly just tell us why it is important to have Federal legislation to deal with the problematic legacy loans and contracts. Mr. Wipf.

Mr. WIPF. Thank you, Senator. As it relates to tough legacy, as we work through this, there have been many, many contracts that will be amended bilaterally by market participants. As we get down to the most challenging contracts with a tough legacy it is critical that we have legislation to the extent that it will help smooth that over, and as has been mentioned here, minimize value transfer, and present a fair, effective, and clear approach. And that clarity to reduce uncertainty for those borrowers and lenders in those contracts will be critical, and I think time is of the essence because we are really in a position where absent a solution, many of those note-holders and others may have to take action away from that.

So our goal really here is to present that fair, effective, and clear solution to those toughest legacy contracts, which really is one of the final pieces of this transition puzzle and will help us close the book on this.

Chairman BROWN. Mr. Pizor.

Mr. PIZOR. Thank you. We are concerned that the industry is just paralyzed by litigation risk at this point. They need some clarity because they are worried that no matter what index they choose they are going to be sued. If payments go up or if payments go down, consumers and investors will be affected.

Exhibit 2
Page 119

12

So our first choice would be that Congress require use of the SOFR in legacy contracts, but we understand that is not going to happen. So we think a safe harbor will be a good inducement to choose the SOFR. It will eliminate the litigation risk and we are confident that it has been carefully vetted that it is the closest to the LIBOR.

Congress needs to do this because there just is not time for all 50 States to do it, and that will provide the clear guidance, clear playing field for the legacy contracts to move forward until they are terminated.

Chairman BROWN. Thank you. Mr. Giancarlo.

Mr. GIANCARLO. Quite briefly, it is about moving away from the benchmark that is deeply engrained to the U.S. economy and has been for four or five decades now, underlying so much of what we do, from the consumer level all the way up to our large institutions, and to do so in a way to move away from this with a minimum amount of adverse impact on our economy, legal costs, legal uncertainty, economic costs. So it is about clarity, legal certainty, and reducing the trauma to the economy of this transition.

Chairman BROWN. Mr. Bright.

Mr. BRIGHT. Yeah. Echoing everything everyone here has said, without legislation, contractual parties are going to see court guidance on what rates to use, and if they do that, consumers will get different rates and maybe disparate treatment there, and also importantly, that costs a lot of money, tens of billions of dollars, we estimate. Those costs float down through to the investor because often savers, retirees, and so it is just court costs that we should avoid.

Chairman BROWN. Thank you. Mr. Pizor, you mentioned the discussions among consumer and industry groups on consensus language to further tailor the legislation to better protect consumers. Give me your thoughts on why that is important, benefiting borrowers and lenders.

Mr. PIZOR. I am sorry. I did not hear your quite——

Chairman BROWN. Why those changes protecting consumers are important and why they would benefit borrowers and lenders?

Mr. PIZOR. Well, there are certain expectations that all the parties have had going into these contracts. And again, I just want to emphasize we are focusing on the legacy contracts. People have had expectations about what the LIBOR would do, what their rates would be like in the future. And so it is appropriate that whatever index replaces that should be as close as possible to the LIBOR to match those expectations, and that will be the SOFR.

Now we are willing to support a safe harbor to encourage companies to do this, but it needs to be properly tailored so the safe harbor only encourages selection of the SOFR and making appropriate conforming changes. We do not want bad actors to see this as an opportunity to encourage some extra transfer of value.

The current language in the House bill, we are concerned, is so broad that it would allow bad actors to escape liability for taking opportunity to gouge consumers. But we think we have agreed with industry on some substitute language that will meet everyone's needs. It will give a safe harbor for doing the proper conforming

Exhibit 2
Page 120

13

changes, for choosing the SOFR, but it will not allow people to run amok. And we think it is a very viable option.

Chairman Brown. Thank you. Mr. Wipf, last question. LIBOR will not be published until June 2023, as you know, and you and ARRC and other stakeholders have indicated it is important for Congress to act soon, even though that is 2 years away. Mr. Bright said timing is critical just a moment ago. What will that lead time allow for? Is there a risk of acting too slowly?

Mr. Wipf. Yes, I think there is. I think our history in the New York legislation gives us a sense that that builds a lot of confidence. So as market participants see these outcomes taking place and they see progress on these legislative paths that gives comfort to the market and I think allows good market functioning while these things take place. But we are in a pretty short time zone with 18 months after the end of this year that, you know, you think about investors that hold these securities, borrowers and lenders who do not have the ability to amend these contracts may have to take other action, whether that be—you know, and we want to reduce the prospect of fire sale on these securities and we want to reduce the prospect of, you know, litigation as we get there.

But the goal really is to provide that confidence to the market that we are moving down a path, and I think that certainly the New York State legislation showed us that that can be helpful, so I think we are in a pretty tight shot clock right now.

Chairman Brown. Thank you. Thank you all. Senator Toomey.

Senator Toomey. Thanks, Mr. Chairman. For Chairman Giancarlo, in your testimony you talked about two fatal flaws that required and led to the transition of LIBOR. One was the shallowness of liquidity, by which I think you were referring to a thin trading volume. The other one was the narrowness of liquidity, as you put it, by which I think you meant a small number of banks that would participate in establishing LIBOR.

So it seems that a problem with inadequate liquidity is that the rate that is determined might not accurately reflect actual borrowing and lending costs, and therein lies problem. So could you help explain for us how it is that SOFR, Ameribor, and maybe other alternatives rates avoid these pitfalls, which is the shallowness and narrowness of liquidity not a problem in these other rates?

Mr. Giancarlo. Thank you, Senator Toomey. You know, both at my 5 years at the CFTC but also the decade and a half I spent before that as a senior executive of a firm that actually managed marketplaces for market makers, one of the largest marketplaces for a range of sophisticated financial products called swaps, and others, so I have spent part of my professional career considering the challenge of liquidity in trading markets.

And there is a phrase called the "liquidity puzzle," that people that are active in marketplaces understand. Liquidity is never one number or one feature. There are a number of facets that go into liquidity. And LIBOR suffered from a failure in at least two of the most important facets, and that is that the trading volume was actually quite shallow. In a number of the tenors of LIBOR there is less than a dozen trades a day. But another factor was the limited

Exhibit 2
Page 121

14

number of actually participants in that market, a half dozen or so
Wall Street banks.

So there is a lot that goes into healthy liquidity. As we talked
about, depth is one. Breadth and diversity of market participants
is another. Concentration is another. Is the liquidity provision con-
centrated amongst a small number of firms?

And then there is the question of access to the liquidity. Is the
liquidity available to all participants, and if so, at what cost? Are
there different cost factors for some participants? And then finally
dynamics. Under what market conditions does that liquidity dimin-
ish or does it expand?

Senator TOOMEY. And just briefly, do these other indices, are
they clearly superior in all of these aspects of liquidity to LIBOR?

Mr. GIANCARLO. Indeed. I think a lot of the qualified benchmarks
that we are talking about today address a lot of the shortcomings
of LIBOR, but address it in different ways, because—and the point
I am looking to make is that market participants have different
needs for liquidity at different times and different types of liquid-
ity, and the different alternative benchmarks present superior as-
pects to LIBOR and a number of these different liquidity factors.

Senator TOOMEY. And I think you shared the view that that is
part of the reason why it is important that financial institutions
have a range of choices in setting a benchmark that suits their
business model, their customers' needs, and so on.

Let me move on to another issue, which is, as I mentioned ear-
lier. President Biden's nominee to lead the OCC, Professor Saule
Omarova has proposed a fundamentally different approach to
benchmark rate regulations. In a paper on, quote, "systemically im-
portant prices," end quote, or SIPIs, as she calls them, she pro-
poses, and I quote, "requiring licensure or preapproval of private
institutions that establish or maintain widely used benchmarks
which receive SIPI designation," end quote. And alternatively she
suggests something that she describes as utility-style regulation of
benchmark rates, for example, through a SIPI rates ports.

So, in other words, what she is advocating is that the Govern-
ment, not just the market but the Government play a direct role
in actually setting interest rates to be used in commercial con-
tracts.

Given your experience as a regulator in the private sector, do you
think it is a good idea for the Government to decide what interest
rates are generally on a given day?

Mr. GIANCARLO. So I have experience with this, because the Eu-
ropean approach, the continental EU approach, is often to dictate
what components go into a benchmark and what the formula must
be. And the problem with that is benchmark providers then design
their benchmark to meet regulatory standards, as opposed to what
I might call the more American approach is that benchmark devel-
opers develop the benchmark to meet commercial standards.

And there is a big difference between a benchmark that is de-
signed to meet the commercial needs and where commercial enter-
prises, if they do not feel that benchmark adequately reflects the
characteristics they are looking to can go to a different benchmark,
as opposed to regulators saying, "We are only going to let there be
so many benchmarks and they need to meet these regulatory re-

Exhibit 2
Page 122

15

quirements," which then can be abused politically, because you could see that regulators say, "Well, we have a constituent here who feels he is underweighted in your benchmark so you need to adjust your benchmark to meet these political—"

Senator TOOMEY. I get that distinction in how you design the benchmark, but is it not an order of magnitude beyond that if you are advocating that there be some Government representation in terms of the actual setting of the rate on a given day?

Mr. GIANCARLO. Yes, indeed.

Senator TOOMEY. Yeah. Thank you, Mr. Chairman.

Chairman BROWN. Thank you, Senator Toomey. Senator Reed of Rhode Island is recognized for 5 minutes.

Senator REED. Thank you very much, Mr. Chairman. Let me thank the witnesses for their very hard and thoughtful work on this very important topic. I appreciate all you have done.

Mr. Pizor, what kind of protections should Congress and the banking agencies consider in order of prioritizing interest of consumers during this transition?

Mr. PIZOR. Well, I think it is very important that Congress prioritize fairness in the selection of the rates. As I mentioned, people who have the LIBOR already in their contract, they know what their payments are going to be, they have expectations about how much the payments are going to change, and the SOFR is really the only one that can match those expectations going forward for legacy contracts.

So we need Congress to ensure that this fairness in the selection of the rate, that no one uses that as an opportunity to, you know, seek it as a profit-making opportunity. It is really just about fairness of continuing these contracts on the standards that are already in place.

Senator REED. So essentially one of the goals would be to maintain a constant, in parentheses, rate, one that a borrower expected to have throughout the course of the contract. Is that fair?

Mr. PIZOR. Yes, exactly.

Senator REED. Thank you. Mr. Wipf—let me find my notes here—what design features of SOFR ensure that the vulnerability of LIBOR will not reappear down the road, that we will not reinvent a LIBOR?

Mr. WIPF. Thank you, Senator. When the ARRC began our work we looked at what we saw were the fault lines within LIBOR, and the single biggest, I say, point of failure was the reliance on expert judgment. So as Mr. Giancarlo described, if we have a very few underlying transactions that represent the interbank lending market the rest was filled in by expert judgment by the panel banks. So we knew that our path at the ARRC was to determine a rate that will be robust and transaction-based, and have no reliance on expert judgment.

That path that led us to SOFR over a 2-year public consultation period was defined at the top priority, that we could construct a rate that consisted of actual transactions that could be administered and transparent, durable, robust over good times and bad. So we identified SOFR as the most suitable alternative for LIBOR for institutions of all sizes. It is based on over $800 to $1 trillion in daily transactions in the highly liquid, overnight U.S. Treasury

Exhibit 2
Page 123

16

repo market, from a wide range of market participants, and is administered by the New York Fed.

So based on the daily repo market transactions, SOFR is, by intent and construction, a reliable representative indicator, and most importantly, puts no reliance on expert judgment, is entirely transaction based, is robust, durable, and will work in good times and bad.

Senator REED. Thinking back to the LIBOR crisis, it was not expert, it was self-interest that caused the deviations from what everyone thought was a completely interest-free measure. And in the mechanism you are setting up there is no financial self-interest in any of the rate setters. Is that fair?

Mr. WIPF. By having a large dataset of transactions we reduce that significantly to near zero. The goal really is to make sure that this is transaction-based, no reliance on expert judgment, and has a wide dataset, so that $800 to a trillion, put that side by side with, as Mr. Giancarlo said, less, perhaps, than $1 billion that was underpinning LIBOR and that reliance on expert judgment, which we have removed.

Senator REED. Final question, that is, this has been adopted in Alabama and New York. Is there any experience yet in those two States? Has it gone into effect?

Mr. WIPF. So I think at this point what we have seen is that, you know, certainly contracts are covered by New York law and provide a lot of confidence for those market participants, but until we get to the end of LIBOR we are not going to see how those play out. But the actual fallbacks that are in place are the same fallbacks that we are talking about here today.

Senator REED. So you have seen that contracts have been rewritten already to include SOFR in New York State?

Mr. WIPF. Yes. So that would be the fallback that would be applied at the end of LIBOR.

Senator REED. Well, thank you all again very much for the hard work you have done. This is a very important topic. Thank you.

Chairman BROWN. Thank you, Senator Reed. Senator Hagerty from Tennessee is recognized for 5 minutes.

Senator HAGERTY. Thank you, Chairman Brown and Ranking Member Toomey. I appreciate your holding this hearing. And I want to thank our esteemed panel. I appreciate you being here, making your testimony today. This is indeed an important topic, as we all know.

It is important to discuss what is potentially needed from Congress here, as our financial sector transitions from the LIBOR benchmark rate, which is embedded, literally, in trillions of dollars of contracts. This issue impacts everyone. It includes mortgages, student loans, small business loans, and it needs to be addressed.

The question is how do we accomplish this transition in an orderly and timely fashion? How do we do it in a manner that minimizes cost and uncertainty? How do we do it in a way that protects the interest of consumers and investors? And let me be clear here. To the extent that preemption of State law is necessary here, it should be done in a narrowly tailored manner, one that minimizes adverse Presidential effects.

Exhibit 2
Page 124

17

I am deeply concerned by the potential ramifications if third-party trustees, who administer certain contractual provisions in the structured finance market are required to seek direction through protracted judicial proceedings. I have seen the estimates that there may be roughly $16 trillion of legacy contracts, including mortgages, student loans, small business loans still outstanding after mid-2023, that would not contain fallback language that would address this transition from LIBOR.

I have also heard that certain transaction parties, such as trustees and fixed income deals, have already begun to notify bond-holders that they will indeed approach the courts for guidance some 12 to 18 months out prior to the cessation of LIBOR so that they can be ensured to have legally protected resolution to continue to make bond payments on time.

So I would like to ask each of the panelists, in turn, to opine on why legislation is required to fix this as well as the potential costs and the impact of not getting Federal legislation and the importance of getting this done very quickly.

First, Mr. Bright, I would like to turn to you.

Mr. BRIGHT. Thank you, Senator. I think you articulated it exceptionally well. The reason is that trustees will need to seek judicial guidance in order to select what rate, you know, they are going to administer for these contracts that are silent or that do not have adequate fallback language embedded in them. And that process is lengthy, which means it will be very disruptive and confusing for consumers——

Senator HAGERTY. And not necessarily consistent either.

Mr. BRIGHT. Completely inconsistent. There is absolutely no certainty that there is anything that would be followed as a precedent in these contracts. We have analyzed this in great detail. These contracts are all very different. They have slight differences that could lead, you know, one judge to see it differently than someone else. And so yes, consumers would not be treated equally. So that is absolutely critical.

The other point that you make, which I completely agree with, is that these court costs, not only are they lengthy but they are expensive, and the way these trustee contracts are set up, these securitization deals are set up, those costs will flow through to the end investor, and the end investor, these are fixed-income deals, these are largely retirees, these are, you know, stable, pension, 401(k) type investors, and they are going to bear the costs. We have put some estimates down that we have it in the tens of billions of dollars that just seems needless, and hopefully with everybody's work we can avoid that.

Senator HAGERTY. Got it. Mr. Wipf, I will turn to you next.

Mr. WIPF. Thank you. I think the way we have looked at this is that with the work of the ARRC and the work across the industry on the voluntary solutions to these problems that when we look at the numbers of $200-plus trillion a third of that remaining post June of 2023, and working down to this tough legacy, that what we have seen is an ability for counterparties to amend these contracts, working all the way through, and we get down to this small—not relatively small but very large tough legacy position, where the

Exhibit 2
Page 125

18

parties to those contracts need to take action and need to do something soon.

So I think to the extent that we have seen, again, the history of the New York State legislation shows us that when that legislation is in place we can create confidence, and I think that the legislation that will provide sort of fair, effective, and clear conclusions. So that is certainty, and removing that uncertainty from these contracts is absolutely mission critical to the transition, and as I said earlier, really one of the last pieces of the puzzle to help us close the book.

Senator HAGERTY. Got it. Mr. Pizor.

Mr. PIZOR. The problem with everyone going to court to try and get a solution to this is it is time consuming, there are going to be various decisions across the country, and the delay, all those factors are going to create instability, which will harm access to credit in the future, it could affect the price of credit. And those things are certainly bad for consumers and they are bad for industry as well. So the sooner Congress can address this the sooner everyone will know what the roadmap is going forward, and that is just going to make for a smoother transition.

Senator HAGERTY. I appreciate the sense of urgency. I would like to finish with my good friend, my former classmate, the Honorable Chris Giancarlo.

Mr. GIANCARLO. It is nice to address you as Senator. The last time I did I think it was as Ambassador, so it is a delight to see you here in the Senate.

As a great fan of our Federalist system, which I think has provided so many benefits to our citizens, I think, like you, cautious whenever we take up Federal legislation that would override States' rights. But I think this is one case where, done properly, done in a very narrowly tailored way, I think this can provide great benefit to the very market participants you have mentioned, trustees and others, that need legal certainty here and do not have to overly burden our court system to try to work out what is the intent here.

But the narrow tailoring is very important. You know, the American people do not like it when they feel the Federal Government or others are tipping the scales in favor of perhaps winners or losers, and I think it is very important we make clear, outside of tough legacy contracts, that market participants have choice of benchmark to suit their unique needs.

Senator HAGERTY. Got it. Thank you. Thank you, Mr. Chairman.

Chairman BROWN. Senator Menendez of New Jersey is recognized for 5 minutes.

Senator MENENDEZ. Thank you, Mr. Chairman. Let me welcome Mr. Giancarlo, a fellow New Jerseyan, to the Committee, and I certainly thank you for your previous service.

Today, 3.3 million private student loan borrowers owe an estimated $80 billion in loans that reference LIBOR. As lenders transition away from LIBOR, I am concerned about a lack of protections for borrowers in private student loan contracts. Mr. Pizor, as lenders transition away from LIBOR does the existing language in many private student loan contracts allow those private lenders to

Exhibit 2
Page 126

19

choose a replacement reference rate that is systematically higher than LIBOR, thereby increasing the borrowers' interest rates?

Mr. PIZOR. Yes, it does, and that is one of our concerns.

Senator MENENDEZ. So how can Congress and regulators ensure that lenders choose a replacement rate that is fairest to the borrower?

Mr. PIZOR. Well, short of mandating the rate, the best thing Congress can do is to offer a safe harbor from litigation that will encourage investors to choose that particular rate. That eliminates the risk of litigation to them, which is costly and destabilizing. The end result will work for consumers. And as long as it is narrowly tailored and does not create an opportunity for other misconduct we think a safe harbor is the best way to go to for SOFR.

Senator MENENDEZ. In addition, as you know, the CFPB proposed rules in June of 2020 that would help facilitate the transition away from LIBOR. Those rules were supposed to go into effect back in March of 2021, but they still have not been finalized. How important would it be for the CFPB to finish its guidance to private lenders as they transition away from LIBOR, to ensure that borrowers are not stuck permanently paying higher interest rates?

Mr. PIZOR. That is very important. The guidance cannot be left to the last minute. Industry needs time to adapt, and so we hope they will release them as soon as possible.

Senator MENENDEZ. Let me also ask you, most private student loan contracts include a mandatory arbitration provision which says that borrowers cannot sue lenders if a problem comes up. Instead, borrowers have to undergo a one-sided, back-door arbitration process. Is it possible that a lender could game the transition away from LIBOR in a way that leads borrowers to face higher interest loans?

Mr. PIZOR. Yes, it is certainly possible, and the existence of the arbitration clauses in class waivers heightens that risk, because it effectively eliminates consumers' recourse if there is misconduct.

Senator MENENDEZ. And would a mandatory arbitration clause and a class action waiver, both which are common in private student loan contracts, leave the borrower with no meaningful path to challenge a lender's actions?

Mr. PIZOR. That is correct. Although industry characterizes arbitration as fair and neutral in practice, we have seen evidence that it is put into the contracts to essentially eliminate the opportunity for consumers to challenge misconduct.

Senator MENENDEZ. Well, our Republican colleagues successfully repealed the CFPB's arbitration rule. Student borrowers have little recourse if industry chooses to force them into higher reference rates. And it is up to Congress and the CFPB to ensure that student borrowers are not stuck paying higher interest rates as it goes. We are talking about $80 billion. These are young people who are trying to get underway in their careers, but between the debt and then the potential multiplier of the interest rates the consequences are you have to delaying maybe the purchase of your home, delay the start of a family, the delay of being an entrepreneur. And that is why I raise these questions.

Exhibit 2
Page 127

20

Finally, as the Committee discusses LIBOR, I think it is important to keep the average consumer in mind. Mr. Pizor, is the average consumer aware that their loan references the LIBOR rate?

Mr. PIZOR. No, I do not think so. It is a complicated issue and people are not aware of it.

Senator MENENDEZ. Is the average consumer going to have a say in choosing their replacement rate?

Mr. PIZOR. No. None at all.

Senator MENENDEZ. If the lender chooses a rate that causes a borrower's payment to become unaffordable, do many lenders offer flexible repayment options?

Mr. PIZOR. Unfortunately not.

Senator MENENDEZ. And these are all the consequences that I am fearful of on the consumer side of the equation, which is one of the reasons I appreciate your testimony. Thank you very much.

Mr. PIZOR. Thank you.

Senator MENENDEZ. And, Mr. Chairman, I have yielded back 30 seconds.

Chairman BROWN. Thank you. That is very generous of you.

Senator Tillis is recognized from his office, remote.

[No response.]

Chairman BROWN. Senator Tester, who I have tried to avoid, is recognized.

Senator TESTER. Yeah, thanks. I do appreciate the extra 30 seconds that the Chairman is putting on my time to ask questions. Thanks for having this hearing, Mr. Chairman and Ranking Member. Thank you all for being here today. I appreciate your testimony.

I am going to start with you, Mr. Pizor. LIBOR does impact everybody's lives and families in ways that most people do not realize. Can you talk to me about how a LIBOR ending is going to impact regular folks' lives?

Mr. PIZOR. Well, it actually remains to be seen what will happen, but the risk is pretty significant that payments will go up, the changes in payments could become more volatile and unpredictable, and that affects people's ability to budget. And people are just recovering from the financial trauma of the pandemic, and to have this instability in monthly payments that are pretty critical to their lives—home, student loans—it is a very significant issue.

Senator TESTER. Mr. Bright, do you have anything to add to that?

Mr. BRIGHT. No. I mean, I think you are all addressing the right concerns. It is going to be very confusing for consumers. Once they realize this happens, I think the prior question mentioned that a lot of consumers do not even know that their rates are tethered to LIBOR. I mean, this would be very disconcerting, I think, information to get. So if we can all align on a similar replacement rate with similar communication strategy, all working together, I think that would really help quite a bit.

Senator TESTER. Mr. Giancarlo.

Mr. GIANCARLO. Yes. Thank you. You know, it is important to remember, as we talk about this, that all borrowers are not the same. All loans are not the same. Some loans are highly secured with

Exhibit 2
Page 128

21

very liquid capital and collateral. Other loans are unsecured or secured with fairly illiquid collateral.

You know, the real economy of home builders and auto dealerships and small manufacturers use collateral that is quite illiquid. They put plant and equipment liens up, or auto leases, or home mortgages. And so that type of collateral causes the borrowers to hold that collateral that they then need to use—sorry, the lenders—to fund their own operations.

And so one of the reasons why diversity of choice of benchmark is so important is because those lenders need to be able to use what collateral they have, relatively illiquid in many cases, to fund their own operations. And so there needs to be choice of both credit-sensitive and risk-free borrowing for an economy as diverse and as deep and as important as the U.S. economy.

Senator TESTER. OK. Mr. Wipf, with your work on ARRC, are there any other impacts that you think will happen?

Mr. WIPF. What we believe is that the legislation would provide a structural bridge where these contracts fail, and remove uncertainty, minimize value transfer, reduce disruption, and preserve good market functioning. And we think that for the legacy piece of this we think that SOFR is, you know, far and away the best choice. We think a single rate is the best choice. And on a go-forward basis, the ARRC's message has always been know what is in your reference rate and give the market those opportunities.

Senator TESTER. And I will just stay with you, Mr. Wipf. Do you see it necessarily as it is just going to happen, that rates will go up?

Mr. WIPF. I cannot comment on that.

Senator TESTER. OK. And does anybody want to comment on that? Bright, you always comment on something.

Mr. BRIGHT. With the transition from LIBOR to SOFR?

Senator TESTER. With the transition with LIBOR going away and choice being there.

Mr. BRIGHT. So I think if we transition from LIBOR to SOFR, the recommendations that have come out of a the ARRC committee and the recommendations that we are looking at, there is, with a smoothing mechanism of a look-back period so that the spread between SOFR and LIBOR is calculated over this 5-year average, and then there is a 1-year onramp to move to that.

So every effort is being made to ensure that there is no payment shock, rate shock, that those disruptions are as minimum as possible. You know, since there are still 2 years of interest rate fluctuations that are getting included in the calculation of that 5-year lookback, that is hard to predict, but nobody wants that. That would be very bad.

Senator TESTER. OK. So, Michael, I will just stick with you. So let's just say we have got two folks that live side by side, and they each have a mortgage, pretty equivalent mortgage. It is possible that those two neighbors, with LIBOR going away, is it possible those two neighbors, both at the same rate today, could end up with different rates as the benchmark goes away?

Mr. BRIGHT. Without the safe harbor legislation?

Senator TESTER. Yes.

Exhibit 2
Page 129

22

Mr. BRIGHT. Yes, that is a real possibility and a concern. The safe harbor would greatly minimize to eliminate that as a risk.

Senator TESTER. OK. Well, thank you all for your testimony. I will yield back my 10 seconds, Mr. Chairman.

Chairman BROWN. Thank you, Senator Tester. Senator Cortez Masto is recognized from her office.

Senator CORTEZ MASTO. Thank you. Thank you, Mr. Chairman. Thank you to the panel members. This is such an important conversation. And let me also echo what Bob Menendez said, and I think a panel member said. Most consumers really do not understand the significance of what LIBOR means and the transition away from it. So what you all are doing and what we get right here is so important.

I do commend ARRC's work on making SOFR a robust rate, on a durable basis. But let me ask you this because we are talking about the risks right now. Does anybody on the panel not support transitioning to SOFR? I am just curious. And if you do not support it, why not?

Mr. BRIGHT. For legacy contracts I do not think anybody has a problem with SOFR. But I know the Honorable Giancarlo would like to comment.

Mr. GIANCARLO. Agree, but for tough legacy contracts only. I think Americans traditionally enjoy and benefit from diversity of choice to suit their individual needs. As I explained in my testimony, we have a very diverse U.S. economy. We have large Wall Street banks and we have small community and minority depository institutions that make loans against very little or very illiquid collateral, and they have to have the flexibility that comes from benchmarks that reflect their cost of funding and not necessary the cost of funding of Wall Street banks.

So having choice, for everything but tough legacy LIBOR contracts is critically important, I believe, to the U.S. economy.

Senator CORTEZ MASTO. And when you talk about choice, Mr. Giancarlo—and thank you for those comments—choice based on what? I mean, whose decision? Who gets to determine the rate? How do you determine that choice?

Mr. GIANCARLO. Well, benchmarks have traditionally been choice by the marketplace. It is actually rare to have Government authorization of benchmarks. I mean, our lenders are in the best position to know what benchmarks are probably most appropriate for their customers and for their cost of funding.

We have both risk-free rates, which are very important and serve very well for large banks that are primary dealers of Treasury securities and have large inventory of Treasury securities, but for our minority, our urban banks, our rural banks that are not primary dealers of Treasury or hold illiquid securities, credit-sensitive rates serve their needs quite well.

And so I think it is not important that we do not put our fingers on the scale. Now, that does not mean every benchmark is suitable. I mean, banks are subject to appropriate prudential standards. They have got to have the right benefits. And benchmarks that are widely based, all these facets of liquidity that I talked about, a number of participants not concentrated amongst a few large deal-

Exhibit 2
Page 130

23

ers, is a very important aspect, and one of the dynamics of that liquidity as well.

So there are a lot of factors that go in, and I think the legislation in the House talks about qualified benchmarks, meaning benchmarks that meet certain global standards. The International Association of Securities Commissions has put out global standards that most of the major benchmarks meet, and I think those standards are important.

So it is not just any willy nilly benchmark. Banks, though, do know best what meets the needs of their borrowers and their own cost of funding.

Senator CORTEZ MASTO. And so Mr. Pizor and Mr. Wipf, do you agree with that, that the banks and financial institutions and other agencies should have that choice? And if you do not agree with it, why?

Mr. WIPF. Our view at the ARRC has been, from the beginning, we go back to first principles. We go back to what was wrong with LIBOR. And our path to SOFR was to find something that was robust and durable that other things could be built upon. So when we look at SOFR, and why we chose this path, it is the most robust, durable, transparent over time.

Our guidance from the ARRC has been know what is in your reference rate, because I think if we look back and we look at the history of LIBOR, that has always been good advice. So when we look at some of these other rates that are out there, we would encourage market participants—borrowers, lenders, issuers, investors—to understand what is in those reference rates, to know how they are constructed, to understand how they perform over time—I think we have a reference point back to March of 2020, that could provide real data—and how do these things hold up?

We know what SOFR does, and that is why we had a 2-year public consultation to get to the point of selecting SOFR in 2017. So from the ARRC's perspective, we believe it is far and away the best choice. As it relates to things that can happen over and above that for different products, we think that SOFR still stands as the foundation. Nonetheless, you know, the ARRC's message is if you are going to use other rates, know your reference rate.

Senator CORTEZ MASTO. Well, and is not the point here also to guard against any type of manipulation, like we have seen in the past with LIBOR?

Mr. WIPF. Our view has been that when we did our work at the ARRC, and we began our work, we looked at what we thought the fault lines of LIBOR were. We felt that that is what brought us to a rate that is entirely based on transactions, and certainly the most liquid product, the overnight Treasury repo market, $800 to $100 trillion in transactions, and we believe that we have minimized that risk as much as can possibly be minimized.

So because of that, we believe that that solves the problem that we were trying to solve, which was the ARRC was never set out to recreate LIBOR. We were trying to find a better solution to go forward, and we believe SOFR is the best solution.

Senator CORTEZ MASTO. Thank you. Thank you, Mr. Chairman.

Chairman BROWN. Thank you, Senator Cortez Masto. Senator Sinema from Arizona is recognized from her office.

Exhibit 2
Page 131

24

Senator SINEMA. Thank you, Chairman Brown, and thank you to
Ranking Member Toomey for holding this hearing today.

LIBOR and other benchmark interest rates play an important
role in our global financial system. They enable banks and other
financial institutions to manage interest rate risk and to anticipate
changing loan costs. These rates, including LIBOR, have a very
real impact on Arizonans who have taken out student loans, or
mortgages, who have opened lines of credit, or who have started or
invested in a business. So the transition from LIBOR to the SOFR
will be a challenging but important step toward securing the sta-
bility of our financial system for all investors and consumers.

My first question is for Mr. Bright. Thank you for being here.
There has been some concern about how prepared financial institu-
tions are to make the transition from LIBOR to SOFR, and how
prepared is the industry to make this transition by the currently
prescribed deadline?

Mr. BRIGHT. Yeah. Thank you very much, Senator, for the ques-
tion. It is an important one. So for all contracts that allow this
transition to take place, that is contracts that have fallback lan-
guage or are clear that the trustee can make decisions, or that, you
know, the lender can make decisions, an enormous amount of work
has gone into this.

So I feel reasonably confident that industry is there. I think it
is worth everybody being, you know, continuing to be diligent. The
bureau is continuing to promulgate rules for the industry to use to
make sure it communicates with consumers clearly, and we will fol-
low all of those, and I think that is important work.

It is the legacy contracts that have been—you know, that do not
have clarity around what rate to transition to, that is the subject
of a lot, I think, of discussion today, and on that one we are in
limbo and we need to get safe harbor passed so that we can borrow
from the preparation work that has been done, you know, in the
other contracts and other loans.

Senator SINEMA. Thank you. So my understanding is that the op-
tical character recognition technology, or OCR, will be useful in
helping companies identify and amend large volumes of contracts
at a relatively low cost. So what other innovative products or serv-
ices exist on the market that will help companies transition from
LIBOR to SOFR?

Mr. BRIGHT. So I had not heard of that technology until your
staff mentioned it to us this week, so we researched it a little. It
looks like a helpful tool in helping to identify what contracts could
fall into the umbrella of needing legacy help or you can do word
search and the smart AI type stuff. So I am not an expert on that
but it seems really interesting.

I think as far as technology, you know, you want to look at the
exchanges. So the Chicago Mercantile Exchange and the Chicago
Board of Options Exchange, the CBOE and the CME, respectively,
have done a lot of groundbreaking work to prepare the markets for
this transition. And so those are two places that I think technology
is helpful as well.

Senator SINEMA. Well, that is encouraging to hear, but making
this transition more logistically feasible does not fully resolve the
challenges of the tough legacy contracts that reference LIBOR. So

Exhibit 2
Page 132

25

to help Arizonans and Americans make this transition, what ambiguities need to be clarified by Congress?

Mr. BRIGHT. Again, I think that the legislation that passed the House does this. It clarifies that if you are in a contract that is inadequate or lack of clear fallback language that you have a safe harbor in your transition to SOFR. The Fed will promulgate rules for that transition. And if the safe harbor is appropriately tailored, all consumer protections will stay in place to ensure that communication with consumers is done in the appropriate and adequate manner.

So I think that I would look to that bill, and Senator Tester's and Tillis' work in the Senate as well. So that is probably the best framework.

Senator SINEMA. Thank you.

Mr. GIANCARLO. And, Senator, if I could just add to that answer, I think that in addition to the legal certainty for tough legacy contracts, I think it is very important the legislation make clear that for all other contracts that there is freedom of choice for market participants to choose qualified benchmarks that suit their needs. I think it is very important that there not be a Government imprimatur place upon one benchmark or another outside of the tough legacy area, that for outside of the tough legacy area that consumers and their bankers have choice of benchmark that suits their particular needs.

Senator SINEMA. Thank you. You know, for my last question I will ask Mr. Pizor. So I want to ask you, why is this type of legislative clarity that I was just discussing with Mr. Bright important to consumers in Arizona, including those who hold student loans and mortgages?

Mr. PIZOR. Well, clarity is especially important for those two groups of consumers because those payments tend to be very significant and as a result have a large impact on your monthly budget. Clarity is also needed in terms of selecting the rate, that most contracts do not give guidance, and the concept of conforming changes, which need to be made in conjunction with changing the rates. The proposed bill, we are hoping, will ask the Federal Reserve to define conforming changes, and that will reduce a lot of the ambiguity.

Senator SINEMA. Thank you. Thank you, Mr. Chairman.

Chairman BROWN. Thank you, Senator Sinema. We will conclude the hearing. Thank you to the witnesses for being here. Thank you for providing the testimony that you gave.

For Senators who wish to submit questions for the record they are due 1 week from today, on Tuesday, November 9th. To the witnesses, please submit your response to questions for the record within 45 days from the day you receive them.

Thank you again so much for being here. The hearing is adjourned.

[Whereupon, at 11:15 a.m., the hearing was adjourned.]

[Prepared statements, responses to written questions, and additional material supplied for the record follow:]

Exhibit 2
Page 133

26

## PREPARED STATEMENT OF CHAIRMAN SHERROD BROWN

I often begin these hearings by taking us back to 2008, and to the years that followed, because we are still living with the fallout—and in the case of the Libor scandal, we are still cleaning up a mess caused by the biggest banks in the world, more than a decade later.

As the housing market crashed and more than eight million workers lost their jobs, central bankers began to realize just how many markets were broken in the global economy.

One of those was the interest rate system. Most people have never heard of Libor—like so much in the financial system, it's an opaque term for something that affects millions of people's bills and bank accounts.

Libor has been the most widely used interest rate benchmark around the world, used to set payments for millions of student loans, mortgages, and small business and auto loans. Over three hundred trillion dollars was tied to Libor at its peak.

With that kind of money involved, it should surprise no one that bankers figured out a way to conspire to rig the interest rate, to enrich themselves.

After the scandal broke in 2012 uncovering the banks' manipulation of Libor, this Committee and the Federal financial regulators studied the problems with Libor, and who was at fault. U.S. and foreign regulators imposed billions of dollars in fines on several global banks for manipulating the interest rate and taking advantage of consumers and investors.

Now, nearly a decade later, our financial system is finally transitioning away from Libor. Today we will consider how the financial system can move on from this benchmark set by a handful of the world's largest banks—a system we found out was ripe for exploitation. Part of that transition involves dealing with trillions of dollars in legacy contracts that are tied to Libor, and that will continue after the rate is discontinued in June of 2023.

After a slow start, the Federal Reserve Bank of New York and the Federal Reserve Board, along with industry stakeholders and consumer advocates, have established a path forward. They developed a new, more reliable and transparent benchmark rate called SOFR—the Secured Overnight Financing Rate. And they have put forward a framework to address legacy loans and contracts that were written assuming that Libor would always exist.

Because Libor is so widely used, homeowners and students who have never heard of Libor will be at risk when it's discontinued if we don't take action.

If their loans don't have specific instructions about what happens if Libor disappears, or if their loans give loan servicers the discretion to pick a different rate, those borrowers could be in for a shock.

Small and large businesses could be in a similar situation—forced to renegotiate a loan tied to Libor at a time when they're just getting back on their feet from the pandemic.

Banking agency officials and stakeholders have all said Federal legislation would help address those long-term loans and contracts, and reduce the potential for time-consuming and costly litigation.

Our colleagues on the House Financial Services Committee began bipartisan work on a bill that addresses these legacy problems, and Senator Tester, working with Senator Tillis, is preparing a Senate companion.

If done right, this legislation can help borrowers who don't have the ability to bargain with their student loan lender or mortgage banker, while also providing certainty to lenders. We know we need to act, and I appreciate these efforts by Members of our Committee.

Under the current proposal, lenders with legacy contracts that don't specify a Libor alternative can transition to SOFR—so long as they don't make other changes that could harm borrowers. That would allow them to avoid potentially complicated litigation.

It's frustrating that we are forced to spend taxpayers' time and money cleaning up after the biggest banks, over and over again. Unfortunately, if we don't work to mitigate the damage from another big bank scandal, it's family businesses and homeowners and students who will pay the price.

Our witnesses and their organizations have developed a narrow and consistent solution that protects small businesses, and families with mortgages, and Americans paying off student loans.

I look forward to hearing from our witnesses, and to working with my colleagues to protect consumers and to protect the economy.

We have proven we can come together on this Committee to find areas of agreement, and to advance commonsense solutions for the people we serve.

My hope is we can do the same on Libor.

Exhibit 2
Page 134

27

**PREPARED STATEMENT OF SENATOR PATRICK J. TOOMEY**

Thank you, Mr. Chairman.

The London Interbank Offered Rate—or LIBOR—has long been the most widely used U.S. dollar-denominated benchmark interest rate across all types of financial contracts. LIBOR is the rate at which large banks report they can borrow from one another in the interbank market on a short-term, unsecured basis.

At the end of 2020, over $223 trillion in contracts referenced LIBOR, including loans, bonds, derivatives, and securitizations. In 2013, the G20 launched a global review of interest rate benchmarks after cases of misconduct in the reporting of LIBOR rates by a small number of banks and the significant decline in interbank lending volume.

As the breadth and depth of interbank loan market liquidity greatly diminished, it became clear that alternative rates with greater volume and a larger number of market participants would be more appropriate than LIBOR. In the United States, the Federal Reserve Board and the New York Fed convened the Alternative Reference Rates Committee—or ARRC—to identify an alternative to LIBOR.

In 2017, the ARRC identified the Secured Overnight Financing Rate—or SOFR—as its recommended alternative to LIBOR. SOFR measures the cost of overnight, or short-term, borrowing collateralized by U.S. Treasury securities.

In 2020, daily volumes underlying SOFR were consistently above $1 trillion. Last year, the Fed, FDIC, and OCC directed banks to stop entering into new LIBOR contracts as soon as possible and no later than the end of 2021.

Earlier this year, the administrator of LIBOR announced that it will stop publishing all LIBOR settings by June 30, 2023. Although most existing contracts referencing LIBOR will mature by that date, a number of contracts will not, and lack fallback language to replace LIBOR with a non-LIBOR rate. As a result, many have called for Federal legislation to address these so-called "tough legacy contracts."

I agree banks should stop writing new LIBOR contracts as soon as possible, and Federal legislation is likely needed to address tough legacy contracts. The unique and anomalous circumstances related to the LIBOR transition require action by Congress to amend contracts between private parties. Such congressional action should be a last resort.

As we consider this measure, any legislation that addresses tough legacy contracts must be very narrowly tailored, not change the equities of these contracts, and not affect any new contracts.

In July, the House Financial Services Committee approved a bill that would replace LIBOR in tough legacy contracts with a Fed-selected, SOFR-based benchmark. This bill takes a reasonable approach, and the Senate should carefully review it. In doing so, we should consider targeted amendments, such as ensuring that qualified non-SOFR benchmark rates are not disfavored in future contracts.

While it is appropriate to mandate a SOFR-based index for this relatively small universe of tough legacy contracts, for new contracts banks must have the option to choose among qualified benchmark rates—including credit-sensitive rates—as appropriate for their business models. Risk-free rates like SOFR may work well for derivatives contracts and institutions active in the Treasury repo market, but they may not be well-suited for loans or certain community or regional banks.

The funding costs for such banks typically increase relative to SOFR during periods of stress, which could create an asset-liability mismatch if loans were required to reference SOFR. The Fed, FDIC, and OCC have previously acknowledged this problem. They have said the use of SOFR is voluntary and a bank may use "any reference rate for its loans that the bank determines to be appropriate for its funding model and customer needs."

An even broader group of regulators said, in the context of bank lending, that "supervisors will not criticize firms solely for using a reference rate (or rates) other than SOFR." However, I am concerned this is exactly what Biden administration financial regulators are now seeking to do.

Just last week, the Acting Comptroller of the Currency said the OCC's supervisory efforts will "initially focus on non-SOFR rates." This suggests that the OCC may apply heightened supervisory scrutiny to non-SOFR rates. And last month, a senior New York Fed official said that banks that use a non-SOFR rate must do "extra work" to ensure that the bank is "demonstrably making a responsible decision."

SEC Chair Gensler has been even more explicit. On multiple occasions, he has criticized one particular credit-sensitive rate. These statements raise serious concerns that regulators are pressing all banks to use SOFR without any transparency or public input. If a bank wants to price its loan off a rate it believes is a better

Exhibit 2
Page 135

28

reflection of its cost of funding or customer needs than SOFR, regulators should not prohibit the bank from doing so.

This pressure, however, pales in comparison to the preferred approach of President Biden's nominee to lead the OCC. Professor Saule Omarova has written that widely used benchmark rates should either be pre-approved by the Government or, worse, subject to "utility-style regulation." In other words, the Government—not the market—would have a direct role in actually setting benchmark rates as it deems appropriate.

This is just one example of the many radical ideas that Professor Omarova has proposed that demonstrate a clear aversion for democratic capitalism, and a clear preference for an administrative State where decisions are made by technocrats who think they know more than the market.

Regulators should never disfavor qualified rates, and banks should have the choice to use any rate that meets well-established criteria for benchmark rates.

I hope to hear from today's witnesses about the transition from LIBOR, the potential for targeted Federal legislation to address tough legacy contracts, and ways to preserve benchmark rate choice.

———

## PREPARED STATEMENT OF THOMAS WIPF

CHAIR OF THE ALTERNATIVE REFERENCE RATE COMMITTEE (ARRC) AND MANAGING DIRECTOR, MORGAN STANLEY

NOVEMBER 2, 2021

Chairman Brown, Ranking Member Toomey, and Members of the Committee. I am honored to be here today on behalf of the Alternative Reference Rates Committee (or ARRC) to testify on the need for Federal legislation to address the LIBOR transition for legacy products and support the efforts of this Committee to bring that to fruition.

The ARRC is comprised both of a broad set of private-sector firms and associations representing a range of perspectives on the LIBOR transition as well as a broad set of U.S. agencies, including the Federal Reserve, the CFTC, the SEC, Treasury, the OCC, the FDIC, and FHFA, who provide oversight to our work.[1] We were convened by the Federal Reserve Board and Federal Reserve Bank of New York in 2014 in order to help address the financial stability risks that the Financial Stability Oversight Council had publicly identified concerning the use of LIBOR in the financial system.

Over time, LIBOR had grown to be a pervasive part of our economy; it has been referenced in nearly every floating rate business and consumer loan, floating rate debt and securitization contract, in nonfinancial corporate contractual agreements, and in a staggering amount of derivatives. The ARRC has estimated that U.S. dollar LIBOR is referenced in over $200 trillion financial contracts alone, roughly ten times the size of the annual U.S. gross domestic product. But despite the fact that so much of the financial system depended on LIBOR, few if any bothered to understand what this rate was based on, and in fact we now understand that it was based on very little. LIBOR had both a weak and opaque governance structure and was based on what had become a very thin market. As a result of these shortcomings, LIBOR was in danger of failing, and the official sector had to step in to prevent a sudden and disruptive end to it and instead has sought an orderly winddown. The ARRC was convened to help facilitate a smooth transition and was asked to identify a robust alternative to U.S. dollar LIBOR, one that was appropriate to base trillions of dollars of contracts on, and to address risks to legacy LIBOR contracts. I believe that the ARRC is a truly successful example of public–private sector cooperation, but it is important to understand that all of the ARRC's recommendations are voluntary; no one is required to follow them, and no one is required to use the ARRC's recommended rate, the Secured Overnight Financing Rate, or SOFR.

SOFR is based on overnight borrowing transactions in the U.S. Treasury repo market, the largest interest rates market in the world, a key source of secured fi-

---

[1] Reflecting the importance of its work, the ARRC's ex officio members include the Commodity Futures Trading Commission, Consumer Financial Protection Bureau, Federal Deposit Insurance Corporation, Federal Housing Finance Agency, Federal Reserve Bank of New York, Federal Reserve Board, National Association of Insurance Commissioners, New York Department of Financial Services, Office of Financial Research, Office of the Comptroller of the Currency, U.S. Department of Housing and Urban Development, U.S. Securities and Exchange Commission, and the U.S. Treasury. As the ARRC has explained, this "structure facilitates collaboration between the market and the official sector" and "allows the group to have diverse participation across financial services."

Exhibit 2
Page 136

29

nancing for a broad range of financial market participants, and a key component of overall Treasury markets in the United States. The ARRC selected SOFR after several years of work examining all potential alternatives and public consultation. The ARRC selected SOFR as its recommended alternative based on the fact that it is by far the most robust alternative to LIBOR available—there will always be a U.S. Treasury repo market both in good times and bad—and based on the widespread support from a broad range of market participants including end users and borrowers.

The ARRC believes that SOFR is an appropriate rate for new use in products that have historically referenced LIBOR, and that it is robust enough to ensure that we do not recreate the problems that we have had to deal with in LIBOR. We expect that many market participants will in fact choose to use SOFR, and many have already done so or are actively preparing to. However, we also support choice, and we have been clear since our inception that our recommendations are voluntary. At the end of the day, the market will determine which rates are used.

For many legacy products things are much less simple and will create additional challenges and considerations. The ARRC's Second Report, published in March 2018, provided a survey of contractual fallbacks in various cash products referencing LIBOR and noted that many of these contracts did not envision the possibility that LIBOR might permanently cease or had fallbacks that would not be economically appropriate if such an event occurred. Unlike derivatives, which are covered by standardized documentation and have developed efficient mechanisms allowing for contractual amendments, many cash instruments, such as floating rate bonds and securitizations, have fallback language that is difficult or impossible to change after they have been issued.

Based on the ARRC's work, we know that many legacy nonfinancial corporate contracts referencing LIBOR have no workable fallback language or no fallback language whatsoever and that many financial contracts have fallbacks that would require parties to poll an unnamed set of banks in an attempt to recreate LIBOR, which we believe would be both burdensome and unsuccessful, or refer only to the last published value of LIBOR, effectively converting what were intended to be floating rate instruments to fixed-rate instruments.

The ARRC established several working groups to work with market participants to develop more robust fallback language and publish consensus recommendations on such language. ARRC working groups have involved more than 300 different institutions, including lenders, borrowers, investors, and consumer advocacy groups. Recognizing the single importance of clarity and certainty with respect to fallbacks for consumer contracts, the ARRC published a separate set of Guiding Principles specifically designed for its work on consumer products. The ARRC's work on fallback recommendations included numerous consultations with market participants, each of which is publicly available. Many new issuances now contain ARRC-recommended fallback language thanks to this work.[2]

While developing recommended fallback language that could be adopted in new contracts referencing LIBOR, the ARRC also recognized that not all contracts can or will be amended by the time of LIBOR cessation and that there will be a significant amount of legacy contracts outstanding that will have no clear or effective reference rate when the main tenors of U.S. dollar LIBOR cease or become no longer representative immediately after June 30, 2023. To help to address this, the ARRC developed and promoted legislation for contracts governed by New York law to avoid the disruptions, market uncertainties, and confusion that would otherwise occur when LIBOR ends.

In March 2021, the New York State legislature passed legislation supported by the ARRC that provided clear fallbacks to any contract referencing LIBOR governed by New York law that otherwise has no effective fallback language, either because it is has no fallback or because it falls back to a LIBOR-based rate (or to a dealer poll to determine a LIBOR rate). The State of Alabama subsequently passed similar legislation. The passage of State legislation has been extraordinarily important in helping to address the risks of the LIBOR transition. In particular, many financial contracts are covered under New York law. However, we know that many nonfinancial corporate contracts, consumer loans, and securitizations are not covered by New York or Alabama State law. While the ARRC is prepared to advocate for similar legislation in other States, we cannot reasonably hope for comparable legislative solutions in all 50 States and the District of Columbia. Federal legislation can help to ensure an equal outcome for all Americans.

---

[2] Following the work of each working group and the consultations, the ARRC published recommended contractual fallback language for floating rate notes, syndicated and bilateral loans, securitizations, consumer adjustable rate mortgages, and student loans.

Exhibit 2
Page 137

30

The legislative proposal that I understand Members of this Committee are working on and that a House committee passed earlier in the year would help to ensure that equal outcome. As with the legislation passed in New York and Alabama, the legislative proposal is purposefully narrow, intended only to address contracts that could not otherwise be changed. For contracts that already allow one party the right to choose a new rate, a feature of most consumer contracts referencing LIBOR, the proposed legislation does not alter the right of the designated party to determine the successor rate, but it does provide a safe harbor to encourage a choice based on SOFR, which has had the strong support of consumer advocacy groups in addition to lenders and investors. For contracts that do not grant a particular party the right to name a successor rate to LIBOR and have no fallback language or language that refers only to a poll of banks or some past value of LIBOR, the proposal recognizes that a unique successor rate must be named in order to avoid legal conflict and it names a successor rate based on SOFR for that purpose, but again only for those contracts that will not otherwise work in the absence of a legislative solution. The proposed legislation has no impact for contacts that already specify a non-LIBOR floating rate if LIBOR is unavailable, which is the case for most legacy business loans. Parties may also opt out of the legislation at any time.

As I have noted, the ARRC represents a very diverse set of participants. We have worked by consensus to develop recommendations to help ensure that the U.S. economy can successfully transition from LIBOR. ARRC members have for some time strongly held the consensus view that legislation addressing legacy LIBOR contracts is an important component of the transition. We support your efforts to introduce legislation in the Senate and, in conjunction with your counterparts in the House, urge you to pass it as expeditiously as possible. We thank you in advance for your consideration and stand ready to be a resource in any way we can.

————

### PREPARED STATEMENT OF ANDREW PIZOR
STAFF ATTORNEY, NATIONAL CONSUMER LAW CENTER

NOVEMBER 2, 2021

Chairman Brown, Senator Toomey, and Members of the Committee, thank you for the opportunity to testify today on the importance of protecting consumers when the benchmark LIBOR index comes to an end. I have been an attorney with the National Consumer Law Center (NCLC)[1] for 12 years. I provide my testimony here today on behalf of NCLC's low-income clients.

**Introduction**

My primary message here today is to encourage the Members of this Committee, as well as the full Senate, to support H.R. 4616 but with a more limited safe harbor, as I will explain today. This bill will protect consumers and the credit industry from potentially devastating consequences that could otherwise occur as the credit world transitions away from the LIBOR index.

The LIBOR is currently written into more than a trillion dollars of outstanding consumer mortgages, student loans, and other consumer credit contracts. But it will cease to exist on June 30, 2023.[2] When that happens the companies that own and service those contracts must be ready to adapt by substituting a new index for the LIBOR. If the transition goes smoothly, few people will notice. But if they get it wrong, the consequences could force millions of consumers into default and lead to widespread litigation.

**Replacing the LIBOR Is a Complex Problem Fraught With Risk for Industry and Consumers**

The LIBOR is a benchmark interest rate compiled and maintained by ICE, a private corporation based in London, U.K. According to ICE, the LIBOR is "designed to produce an average rate that is representative of the rates at which large, leading

---

[1] Since 1969, the nonprofit National Consumer Law Centerr (NCLCr) has used its expertise in consumer law and energy policy to work for consumer justice and economic security for low-income and other disadvantaged people, including older adults, in the United States. NCLC's expertise includes policy analysis and advocacy; consumer law and energy publications; litigation; expert witness services, and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys, policymakers, and Federal and State Government and courts across the Nation to stop exploitive practices, help financially stressed families build and retain wealth, and advance economic fairness.

[2] Fed. Reserve. Bd., CFPB, FDIC, et al., Joint statement on Managing the LIBOR Transition at 1 (Oct. 20, 2021), available at *https://files.consumerfinance.gov/f/documents/cfpb—inter-agency-libor-transition-statement-2021-10.pdf*.

Exhibit 2
Page 138

31

internationally active banks with access to the wholesale, unsecured funding market could fund themselves in such market in particular currencies for certain tenors." [3] Currently the U.S. Dollar version of the LIBOR is based on data submitted voluntarily by sixteen contributor banks. [4] Due to various problems with the LIBOR, the U.K.'s Financial Conduct Authority has announced that on December 31, 2023, ICE will stop publishing the versions commonly used in consumer contracts. [5]

In relation to consumer transactions, the LIBOR is commonly used as an index in adjustable rate home mortgages and student loans. Typically, a loan contract will specify a starting interest rate that will change at regular intervals over the life of the loan. The new interest rate at each change is based on the current value of a benchmark index named in the contract. The index value is then added to a "margin" (a fixed number written into the contract), and that total becomes the new interest rate on the contract. The servicer then recalculates the monthly payment based on the new interest rate.

The typical contract also has a clause, known as "fallback language," that authorizes the noteholder to replace the index if the original one becomes unavailable. The fallback language is central to replacing the LIBOR. But it has never been used before, and the standard language in almost all legacy contracts is too vague. For example, until recently the fallback language in Fannie Mae and Freddie Mac's contract forms said: "If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information." Most non-GSE and student loan contracts use similar language. A minority of contracts give the noteholder unlimited discretion to select a replacement. Significantly, there is no accepted understanding or definition of what is "comparable." And the few regulations addressing the selection of a replacement index only apply to a small portion of the market. [6]

The complexity of selecting a replacement is compounded in other ways too. Most importantly, there is no alternative index that will perfectly match the cost and movement of the LIBOR. As a result, any replacement will entail some compromises and will risk imposing a cost on one party to the contract. Nobody can predict future interest rates, so—even if the transition is conducted fairly—it is difficult to predict who will bear the burden and how big a burden that will be.

A related problem is that some contracts may require other adjustments to incorporate the new index. These adjustments are generically called "conforming changes," because they are intended to bring the contract into conformity with the replacement index. One of the most significant conforming changes will be to the margin. Because the new index will almost certainly have a different starting and average rate, the margin will need to be changed to result in a "comparable" contract rate. Some contracts allow the noteholder to make this change but many do not. [7] Other adjustments may be necessary too. This is another source of risk and controversy because there is no consensus on what conforming changes are appropriate or whether the fallback language authorizes noteholders to make them.

The crux of the risk for consumers and industry participants is that making the wrong decisions will lead to an unreasonable transfer of value. One party to the contract will unfairly profit and the counterparty will be harmed.

As long-time representatives of consumers, we are very familiar with the devastating consequences of predatory lending. This underlies our concern that some noteholders may abuse or mismanage their broad discretion in a way that gouges consumers. There are a number of ways this might happen. Unscrupulous, or even just sloppy, lenders or mortgage loan servicers could—

- use a replacement index that is too volatile or that trends at a higher rate than the LIBOR;

- employ a different margin that is too high and results in a windfall for the noteholder;

- make other inappropriate and harmful changes to the contract under the guise of "conforming changes," such as by changing the method by which payments are calculated, or even changing the due date for payments;

---

[3] ICE website, available at *https://www.theice.com/iba/libor*.
[4] Id.
[5] U.K. Financial Conduct Authority, FCA announcement on future cessation and loss of representativeness of the LIBOR benchmarks (Mar. 3, 2021), available at *https://www.fca.org.uk/publication/documents/future-cessation-loss-representativeness-libor-benchmarks.pdf*.
[6] See, e.g., Reg. Z, 12 CFR §1026.40(f)(3)(ii) (replacing index for home equity line of credit); Reg. Z Off'l Interpretations, 12 CFR §1026.55(b)(2)-6 (replacing index for credit card).
[7] Regulation Z specifically allows creditors to change the margin for home equity lines of credit. 12 CFR §1026.40(f)(3)(ii). But there is no equivalent provision for closed-end mortgages.

Exhibit 2
Page 139

32

- fail to replace the LIBOR altogether, leaving the loan stuck at the last LIBOR and locking in a higher-than-market rate; or
- botch the mechanics of replacing the LIBOR, such as by using a different date to measure the applicable index in a way that unfairly benefits the lender.

Consumers have no control over what happens in this process and contracts provide them with no say in which index the noteholder selects. Their only recourse will be to complain or initiate litigation.

### The Credit Industry Should Adopt the ARRC's Recommended Replacement: The SOFR

For the past several years, a committee of industry participants, known as the Alternative Reference Rate Committee (ARRC)[8] has worked to prepare for this transition. NCLC and other consumer groups have participated in these deliberations. The ARRC has developed a set of well-vetted plans and recommendations that will protect consumers as well as industry. Unfortunately, their recommendations are non-binding. And, as the situation stands today, too few industry participants have committed to follow them. We believe fear of litigation is a major reason for the recalcitrance. They are worried that whatever index they choose, someone will sue them: either consumers, whose payments may increase, or investors, who may believe they are losing money.

The refusal of a significant part of the credit industry to agree to abide by the recommendations of the ARRC endangers consumers. This refusal also endangers the stability of the economy in the United States.

Replacing the index is the primary challenge of the LIBOR transition. Fortunately, the ARRC has identified the most suitable replacement index: the Secured Overnight Refinancing Rate (SOFR). The technical aspects of why the SOFR is appropriate are beyond the scope of NCLC's discussion today, but there is no doubt that the ARRC and the Federal Reserve Bank of New York have sufficiently vetted the SOFR. As a result of their work, it has become clear that the SOFR, when implemented as recommended by the ARRC,[9] will minimize any value transfer caused by the end of LIBOR. It is the best option for both industry and consumers.

### Congress Should Mandate Use of the SOFR or Offer a Safe Harbor for Voluntary Use

Despite the ARRC's recommendations, too few industry participants have announced that they will adopt the SOFR for legacy consumer contracts. Delaying this decision to the last minute will increase the risk of implementation errors and the potential for broader economic instability. NCLC and other consumer advocates have urged Federal regulators to adopt strong regulations that will compel industry to adopt the ARRC's recommendations, but they have not done so. States have limited ability to adequately address the problem because of Federal bank law preemption. However, leaving the transition entirely to the market poses too great a risk to the financial markets, to bank safety and soundness, and to millions of individual homeowners, student loan borrowers, and their families.

The best solution is for Congress to require noteholders to replace the LIBOR with the SOFR in all consumer contracts. But this proposal has been rejected by the credit industry, so we have agreed with industry trade groups on a suitable compromise. As an alternative to a mandate, Congress should create a safe harbor from litigation for noteholders that voluntarily adopt the ARRC's recommended benchmark replacement index.

The House of Representatives is already considering such a bill, H.R. 4616, the Adjustable Interest Rate (LIBOR) Act of 2021. We support the ideas behind H.R. 4616 but only with changes to the safe harbor that will prevent abuse.

While consumer advocates generally oppose safe harbors from litigation, we believe a narrowly tailored one is appropriate for this unique situation. A safe harbor provides a company with immunity from lawsuits by anyone claiming to have been harmed by conduct within the scope of the safe harbor. Safe harbor laws are often too broad, poorly drafted, and more likely to protect wrongdoers than to accomplish anything positive for society. But in this case, we have negotiated a narrowly fo-

---

[8] "The ARRC is a group of private-market participants convened to help ensure a successful transition from USD LIBOR to a more robust reference rate, its recommended alternative, the Secured Overnight Financing Rate (SOFR). It is comprised of a diverse set of private-sector entities, each with an important presence in markets affected by USD LIBOR, and a wide array of official-sector entities, including banking and financial sector regulators, as ex officio members." Fed. Reserve Bank of N.Y. website, *https://www.newyorkfed.org/arrc/about.*
[9] Including the recommended spread-adjustments.

Exhibit 2
Page 140

33

cused safe harbor law that—while not our first choice—will avoid the greater harm we expect if noteholders adopt indices other than the SOFR.

Specifically, we recommend that Congress adopt a safe harbor for consumer contracts that is limited to liability for:

- the selection or use of the SOFR recommended by the ARRC and Federal Reserve Board; and
- the implementation of necessary conforming changes.

While we support the concept of a safe harbor embodied in H.R. 4616, the language of the bill is currently too broad. In its current form, the safe harbor would also include consumer claims arising out of the determination and performance of conforming changes. We are concerned that disreputable actors could harm consumers by taking an overly broad interpretation of what conforming changes are necessary to implement a new index. If that happens, the current version of H.R. 4616 could immunize some of the misconduct I describe in section II, supra, of my testimony.

Based on our experience with consumer contracts, we believe that very few—if any—conforming changes will be needed. And those that may be needed will be so basic and ministerial that there is no reason to incentivize them with the offer of a safe harbor. Therefore, we have agreed with industry representatives that the safe harbor for consumer contracts will not include the determination of what conforming changes are necessary or the performance of conforming changes. Instead, the definition of "conforming changes" will be determined by the Federal Reserve Board (FRB). Only those changes will be within the scope of the safe harbor. Appendix A [*Ed.: Not included*] to my testimony is a document showing the changes that we and industry representatives recommend making to H.R. 4616. This document has already been shared with House and Senate staff.

In the statutory language that we have proposed, the selection of the replacement index refers only to the question of whether to use one index or another. If a noteholder selects the appropriate SOFR, that decision will be protected by the safe harbor. Selecting any other index will be outside the safe harbor. This will encourage noteholders to follow the ARRC and FRB's recommendation, but will not require them to do so.

Use of the replacement index refers only to routine performance of the contract once the new index has been substituted for the LIBOR. This primarily refers to the regular rate and payment changes called for by the loan contract. So, for example, if a borrower has an ARM that calls for annual rate changes, the safe harbor would cover calculation of the new interest rate and loan payment each year based on the SOFR. Neither a consumer nor an investor could claim that they were harmed because the new payment was based on the SOFR. But if the servicer makes a mistake in doing so, for example by using the SOFR from the wrong date, making a typo when entering the value into the computer, or miscalculating the new payment, those mistakes would not be protected by the safe harbor and the consumer would retain the right to seek appropriate relief.

**Conclusion**

NCLC represents the interests of millions of low-income consumers who will be directly affected by the end of the LIBOR. If industry participants replace the LIBOR with an inappropriate index; if they mismanage the transition; or if they take advantage of the opportunity to make other changes that cost consumers, many people will be harmed.

That risk can only be avoided if Congress acts by passing legislation to ensure that industry participants adopt the most appropriate replacement for the LIBOR—the Secured Overnight Refinancing Rate (SOFR). After extensive discussions, we have agreed with some of the most important industry trade groups that H.R. 4616 is the best vehicle for doing so—but only if it is amended to narrowly tailor the safe harbor in a way that will protect consumers.

Recommendation: The Senate should pass a bill modeled on H.R. 4616 but with a more limited safe harbor connected to a narrow definition of "conforming changes" to be provided by the Federal Reserve Board.

I want to conclude by praising industry, the Members of this Committee, and the House committee for working together to find a solution that is good for everyone. Thank you for considering the views of consumers. I am happy to answer any questions.

Exhibit 2
Page 141

34

### PREPARED STATEMENT OF J. CHRISTOPHER GIANCARLO

Senior Counsel, Willkie Farr & Gallagher LLP, and Former Chairman, U.S. Commodity Futures Trading Commission

November 2, 2021

#### Introduction

Thank you, Chairman Brown, Ranking Member Toomey, and Committee Members. It is an honor to appear before this Committee once again.

I am Chris Giancarlo, Senior Counsel at the law firm of Willkie Farr & Gallagher. I had the honor to serve our country as the thirteenth Chairman of the U.S. Commodity Futures Trading Commission (CFTC), a Federal agency that has led and continues to lead the transition away from the LIBOR interest rate benchmark, the subject of today's hearing. I am also an independent director of the American Financial Exchange.

I commend Chairman Brown and Ranking Member Toomey for holding this hearing. Congressional leadership on this issue is important to ensure banks and all financial institutions of every size, shape and location understand that LIBOR will be replaced and will be replaced soon.

Over 4 years ago, on the very day that the U.S. Senate unanimously confirmed my nomination as CFTC Chairman, Federal Reserve Chairman Jerome Powell and I published an opinion piece in the *Wall Street Journal*, entitled "How to Fix Libor Pains". In it, we wrote:

> . . . the time has come for market participants and regulators to work together on a plan for dealing with existing Libor-based contracts maturing after 2021. This plan must also address how to expand adoption of the broad Treasury repo rate into a wider array of products that rely on a benchmark . . . There is time for this transition to be done thoughtfully. Our agencies are prepared to help ensure that it is done cooperatively and smoothly.

I was committed then and remain committed today to do everything possible to assist the transition away from LIBOR. The transition is here and now. Beginning in January 2022, no new capital markets or lending contracts can be based on LIBOR.

Beginning in June 2023, all existing LIBOR contracts must be replaced with a LIBOR replacement. This hearing is an important step in getting it done.

#### The Shortcomings of LIBOR

As you well know, the London Interbank Offered Rate, or LIBOR, plays an important role in American finance. The credit cards, floating-rate mortgages and car loans of many of our fellow American citizens and even the day-to-day funding for the companies where they work are all influenced by LIBOR. This arcane interest rate is meant to reflect the rate that large banks must pay to borrow short term. It is used to calculate the rate of interest on more than half of American home mortgages. LIBOR is cited in financial contracts setting trillions of dollar-denominated loans, securitizations, and derivatives.

I have extensive experience, both as a market regulator and business executive, with financial benchmarks and, most particularly, with LIBOR. Before entering public service, I served as the Executive Vice President of GFI Group, a leading trading platform and technology vendor to global markets for OTC swaps and other financial derivatives, many of which refer to LIBOR. As former Chairman of the CFTC, I am familiar with the critical importance of reference benchmarks for the sound functioning of U.S. markets for risk mitigation and reliable price discovery.

The shortcomings of LIBOR first came to light during the 2008 financial crisis with reports of manipulation of the rates used to calculate it. My former agency, the Commodity Futures Trading Commission, was a leader in investigating and sanctioning a number of major banks for benchmark manipulation. Prosecution of many of those cases proceeded determinedly under my administration.

LIBOR is calculated daily from the quoted rates that a panel of a few large banks provide to ICE Benchmark Administration, an independent subsidiary of the Atlantabased firm Intercontinental Exchange. The quotes represent the rates at which the banks estimate they would be able to borrow in short-term money markets. Yet, apart from overnight transactions, the large banks providing those submissions no longer borrow much in those markets. There are very few actual loan transactions on which these quoted rates are based. In essence, a few large banks are contributing a daily judgment about something they no longer do.

Exhibit 2
Page 142

35

As a result, LIBOR suffers from two fatal flaws: shallowness of liquidity because of thin trading volume and narrowness of liquidity because of its reliance on only a handful of rate setters. When it comes to the potential for manipulation, the second shortcoming may be worse than the first.

Back in 2017 during my CFTC service, the U.K.'s Financial Conduct Authority, the agency primarily responsible for regulating LIBOR, called for a worldwide transition away from LIBOR because of these very shortcomings and the risk they present. Here in the United States, we welcomed this move. The CFTC's Market Risk Advisory Committee under the keen leadership of Commissioner Russ Benham, now Acting Chair and the President's nominee for CFTC Chairman, led agency efforts during my Administration and continues to lead efforts to spur the transition away from LIBOR.

### LIBOR Alternatives: SOFR

At the same time in 2017 as the CFTC was prosecuting LIBOR manipulators and considering its risk to financial markets, the Federal Reserve Board convened a group of institutional participants that broker and clear LIBOR transactions to form the Alternative Reference Rates Committee, known as ARRC. It is a pleasure to appear today alongside Tom Wipf of Morgan Stanley, who chairs ARRC. Tom has worked tirelessly on these issues and has ably led the ARRC Committee. Under his leadership, the ARRC is focused on ensuring a smooth transition away from LIBOR for existing and new contracts.

Following an extensive consultation, the ARRC committee recommended replacing LIBOR with a rate derived from short-term loans that are backed by a range of Treasury securities as collateral (known as Treasury repurchase agreements or "Repo"). The Treasury Repo market is a fully collateralized financing market that enables the largest institutions to lend and borrow amongst each other, typically on a very short term basis. This interest rate derived from this market is a measure of practically risk-free borrowing because U.S. Treasury securities serve as collateral. With such risk-free collateral, the interest rate does not reflect the credit quality of the market participants, but rather the status of U.S. Treasury securities as the world's safest investment.

Unlike LIBOR, SOFR is built upon actual market transactions of roughly $800 billion in daily activity. That provides much greater depth of trading liquidity than LIBOR. This feature directly addresses a key weakness of LIBOR: shallowness of trading liquidity.

The Treasury Repo market is not only critical to the world's largest financial institutions, but it is also critical for ensuring liquidity in the U.S. Treasury debt market.

The Federal Reserve Bank of New York is deeply involved in the Repo market in its role of managing Fed Open Market Operations in implementing Federal Reserve monetary policy. Widespread adoption of the SOFR benchmark is supportive of the U.S. Treasury debt market.

SOFR is complementary to the cost of funding for many of America's largest banks that are primary dealers of Treasury securities and can use them as collateral for funding. Combined, these institutions have over eleven trillion dollars in assets. SOFR is therefore a highly appropriate LIBOR replacement for a broad range of financial institutions, especially primary dealers of U.S. Treasuries and other large firms that participate in that essential marketplace. I am very supportive of widespread adoption of SOFR as a well-constructed and durable, risk free interest rate benchmark.

### LIBOR Alternatives: AMERIBOR

Away from Wall Street, America has almost 5,000 community and regional banks and lending institutions with another $11 trillion in assets. These institutions lend to the real economy of America's small to medium-sized businesses, including manufacturers, equipment dealers, service providers, agriculture producers, and home builders that are America's job creators. These community lenders generally do not hold U.S. Treasury securities and other risk free collateral. Rather, they lend against relatively illiquid collateral of plant and equipment liens, property mortgages, auto leases, and personal guarantees. In effect, these lenders take real risk. They are highly credit sensitive.

Over my 5 years at the CFTC, I traveled over half the country to meet with thousands of Americans who depend on CFTC-regulated markets to hedge the prices of agriculture, mineral, or energy commodities they produce. In the course of those travels, I descended 900 feet underground in a Kentucky coal mine, climbed 90 feet in the air on a North Dakota natural gas rig and flew 900 feet in the air in a Arkansas crop duster. I walked factory floors in Illinois, pecan farms in Georgia, grain ele-

Exhibit 2
Page 143

36

vators in Montana, feed lots in Kansas, and power plants in Ohio. Almost all of the
small and medium-sized businesses I met were supported by America's community,
State, and regional banks. I know how much those community banks, in turn, need
support from Washington.

Among other roles I have assumed since completing my service at the CFTC, I
serve as an independent member of the Board of Directors of the American Finan-
cial Exchange (AFX). AFX was founded in 2015 by Dr. Richard Sandor, American
economist and entrepreneur, who pioneered interest rate futures and created the
world's first trading exchange for the reduction and trading of greenhouse gas emis-
sions, for which he is known as, "The Father of Carbon Trading." My professional
relationship with Dr. Sandor began almost two decades ago in the private sector.
Upon completion of my Government service, I was delighted when Dr. Sandor in-
vited me to serve as an independent board member of AFX.

AFX is an electronic marketplace where banks in the U.S. can directly lend and
borrow short term funds to one another on an unsecured, credit sensitive basis. AFX
has over 225 members as well as over 1,000 correspondent American banks. The as-
sets of AFX members exceeds $5.3 trillion dollars. Measured by both the number
of U.S. banks and aggregate bank assets, AFX members constitute 25 percent
of America's banks and community lenders, including the 5th, 6th, and 7th largest
banks in the United States.

AFX member banks are in all 50 U.S. States, including States represented by
every Member of this Committee. AFX members include some of America's most re-
spected local and regional banks as U.S. Bank, Keybank, Zions, First Financial,
Citizens Trust, Brookline, East-West, Abacus Federal Savings, Cambridge Savings,
Cape Cod Five Cents Savings, Cathay Bank, Customers Bank, Dime Community,
Fulton Bank, Glacier Bank, Hope Bank, Asian Bank, Dollar Bank and Signature,
ServisFirst, Unity, and Truist Banks.

AFX members are highly representative of America's community, minority-owned
and regional banks. That includes a significant share of America's critical minority-
owned depository institutions that play a vital role in serving traditionally under-
served communities, often lending to businesses and entrepreneurs with minimal
collateral. By asset size, AFX members today represent about forty (40 percent) per-
cent of U.S. Minority Depository Institutions (MDIs), including some of America's
most innovative African-American, Asian-American, Hispanic and Native-American
banks. The National Bankers Association, the leading minority-owned bank trade
association in America, has endorsed AFX's interest benchmark as an approved rate
to be used for loan documentation for its members.

AFX was conceived and founded well before the decision to transition away from
LIBOR. AFX was not created to benefit from LIBOR's demise. Like all good ideas,
AFX was created to address a commercial need: to provide America's community
and regional banks with a way to lend to and borrow from each another in a regu-
lated, transparent market on a peer-to-peer basis. AFX offers America's community
and regional banks a complementary alternative to their traditional source of fund-
ing from large money center banks on Wall Street.

Every business day, tens of billions of dollars of loans are lent and borrowed by
hundreds of participants in the AFX institutional marketplace. The marketplace is
electronic, transparent and self-regulated under the scope of the CFTC's comprehen-
sive regulatory framework. It is compliant with standards developed by the Inter-
national Organization of Securities Commissions (IOSCO) for appropriate LIBOR
benchmark replacements. The interest rate at which AFX members independently
agree to borrow and lend are tracked and compiled into a series of benchmarks that
include the AMERIBOR® Term-30 index. The index is published nightly and dis-
played on almost all financial data feeds like Reuters and Bloomberg and financial
broadcast media.

These AMERIBOR benchmarks are complementary to the cost of funding for thou-
sands of AFX members and correspondent firms whose lending activities to the real
economy is highly credit sensitive and supported by relatively illiquid, physical col-
lateral, and personal guarantees. For these institutions, AMERIBOR best represents
their cost and risk of funding. As a result, AMERIBOR benchmarks are favored by
the thousands of AFX members and correspondent firms as an interest rate bench-
mark for commercial lending contracts. For this reason, I support adoption of
AMERIBOR by institutional lenders who require a well-constructed and durable,
credit sensitive interest rate benchmark.

**Market Diversity and Durability**

It will not surprise the Committee to hear that at my core I believe in open and
competitive U.S. markets. But my comments today are frankly less about the need
for competition in the LIBOR replacement market and more about choice. SOFR

Exhibit 2
Page 144

37

and AMERIBOR should not be viewed as competitive but as complementary. They are different. SOFR is a risk-free rate and AMERIBOR is a credit sensitive rate. They are alternatives for different needs and different sectors of the marketplace.

From my service at the CFTC, I know that most of America's important trading markets feature a diverse set of pricing benchmarks serving different needs. In our grain futures markets there are multiple pricing benchmarks, including Chicago soft red winter wheat, Kansas City hard red winter wheat, and Minneapolis hard red spring wheat. The different benchmarks serve to establish the cost of different varieties of wheat used in different bread products. (Pizza dough is made from different wheat than breakfast cereal). In oil markets there is West Texas Intermediate and Brent crude oil, again setting distinct prices for different fuel products, like domestic auto gas or industrial diesel. Of course, in our equity markets, there are multiple benchmarks like the Dow Jones Industrials, the S&P 500, and the Russell 2000 to measure the different performance of large cap and small cap companies. Such existence of a variety of specifically designed benchmarks allows market participants to engage in investment activities that are specifically crafted to their investment needs rather than a "one-size-fits-all" approach. Choice of benchmark is one reason why U.S. futures and equity markets are the world's deepest, most liquid, and most attractive to global capital.

Strangely, one U.S. market that has not traditionally enjoyed a similar choice of benchmark is bank lending, where LIBOR has been dominant for decades. In fact, the ubiquity of LIBOR and long absence of competing, commercially derived interest rate benchmarks is one of the reasons why the demise of LIBOR presents a potential crisis today. Lack of choice of interest rate benchmark is itself a systemic risk.

Nassim Nicholas Taleb, the well-known market observer who coined the phrase "Black Swan" has written about the increased fragility of today's top-down designed, overly complicated economic systems.[1] He warns that concentration in complex systems such as financial markets makes them more vulnerable, not less to cascading runaway chains of reactions and ultimately fragile in the face of outsized crisis events.

He posits that the opposite of such fragility is "antifragile," meaning systems that become stronger when subject to stress, the way a human body becomes immune to a disease through exposure or inoculation. He explains that financial markets that are allowed to grow organically through gain and loss with plenty of redundancy and choice best resemble biological organisms that adapt and, indeed, thrive.

The United States banking industry is quite unique and extraordinary. On the one hand, its large money center and Wall Street investment banks lead the world in sophisticated global trading, investment banking, and large project finance. On the other hand, America's community and regional banks spread out across the urban, suburban, and rural landscape finance the everyday needs of America's consumers, small and medium-sized businesses, and domestic job creators.

A banking industry that is so varied, so complex and so essential to the American economy needs the diversity and durability that comes from choice in interest rate benchmark. A one-size-fits-all response to the demise of LIBOR would be a source of systemic risk to the U.S. economy. As we rightfully move away from LIBOR, we should make clear that lending institutions—be they money center banks or local, regional or MDI banks—should have the flexibility to choose among IOSCO compliant benchmark alternatives that best meet both their lending activity and their customers' needs.

**Federal Legislation**

There is a clear consensus, that I share, that Federal legislation is necessary to ensure smooth and efficient transition away from LIBOR. As Treasury Secretary Janet Yellen stated in her testimony before the House Financial Services Committee earlier this year, legislation is necessary for tough legacy contracts that do not specify a workable fallback rate making it not feasible for private-sector actors to modify on their own.[2] Legal certainty is absolutely critical to ensuring that institutions with existing tough legacy contracts can replace their LIBOR benchmark before the end of June 2023, the termination date for all existing LIBOR contracts.

There is legislation moving through the House of Representatives, H.R. 4616, the Adjustable Interest Rate (Libor) Act of 2021, that would provide much needed legal certainty. The legislation makes clear that all LIBOR contracts must be converted

---

[1] See, generally, Nassim Nicholas Taleb, "Antifragile: Things That Gain From Disorder", (Random House) 2012.

[2] Oversight of the Treasury Department's and Federal Reserve's Pandemic Response. U.S. House Financial Services Committee (March 23, 2021), *https://www.youtube.com/watch?v=AQsLydo6mJI&t=3488s* at 58:44.

Exhibit 2
Page 145

38

to an alternative benchmark before June 30, 2023. Furthermore, if the contract does not provide clarity how an alternative benchmark can be reassigned, the institution would have legal certainty if LIBOR is replaced with SOFR. Also, as it relates to "new" contracts, the legislation, in the "Findings" section, provides helpful language that institutions entering into new contracts will have choice of which benchmark they can utilize. AFX supported this legislation when it was before the House Financial Services Committee where it was ordered to be reported to the full House.

Enactment of legislation providing legal certainty for the conversion of those tough legacy contracts is absolutely critical. I would also urge the Committee to consider providing stronger language ensuring that, as institutions are entering into new contracts, they have the clear ability to choose among properly qualified benchmark replacements. Qualifying factors could include, for example, benchmarks meeting the IOSCO standards and benchmarks that are built around market-based trading and fully transparent price discovery.

**Conclusion**

LIBOR has been the world's most used interest rate benchmark. A such, the transition away from LIBOR has been, and continues to be, a long journey. In less than 2 months LIBOR will cease as the benchmark for new contracts and in less than 20 months all legacy LIBOR contracts must be replaced with an alternative benchmark. SOFR and Ameribor and, no doubt others, will help us put LIBOR in the rear view mirror. But this Committee and this Congress can help facilitate that smooth transition by providing legal certainty as it relates to tough legacy contracts and responsible choice for new contracts.

If I can leave you with one thought, it is that there is simply no one-size-fits-all lending benchmark for an economy as unique and diverse as the United States. Having choice among multiple, properly qualified benchmarks not only facilitates the transition away from LIBOR, but it also enhances efficiency, reduces systemic risk and encourages economic growth as we progress through the transition process. Both SOFR and AMERIBOR represent the kind of home grown American ingenuity and innovation, along with a sound regulatory infrastructure, that has helped make U.S. markets the deepest, most liquid and most efficient markets in the world.

Thank you and I look forward to your questions on this important matter.

————

**PREPARED STATEMENT OF MICHAEL BRIGHT**

CHIEF EXECUTIVE OFFICER, STRUCTURED FINANCE ASSOCIATION

NOVEMBER 2, 2021

**Introduction and Background**

Chairman Brown, Ranking Member Toomey, and other Members of the Committee, my name is Michael Bright, CEO of the Structured Finance Association, or "SFA." On behalf of the member companies of SFA, I thank you for inviting me to testify. I also thank you for your focus on finalizing the transition away from LIBOR for millions of consumers and investors with loans or savings tethered to these rates.

The Structured Finance Association is a consensus-driven trade association with over 370 institutional members representing the entire value chain of the securitization market. By facilitating the issuance and investing of loans and securities, this market provides trillions of dollars of capital to consumers and businesses in communities across the country. Our members facilitate credit and capital formation across a wide breadth of asset types and industries, including auto loans, mortgage loans, student loans, commercial real estate, business loans, among others.

SFA members include issuers and investors, data and analytic firms, law firms, servicers, accounting firms, and trustees. Importantly, many of our investor members are fiduciaries to their customers. Unlike some trade associations, before we take any advocacy position our governance requires us to achieve consensus by agreement rather than majority vote, ensuring the perspectives of all our diverse membership are included. This diversity is our strength, as it builds healthy tension in arriving at our consensus positions. Because of this, we are methodical and thoughtful as we analyze the pros and cons of legislative and regulatory proposals, as well as market dynamics, before we reach a mutually acceptable position that represents the entirety of the capital markets.

Formed in 2013, the Structured Finance Association's stated mission is: "To help its members and public policy makers grow credit availability and the real economy

Exhibit 2
Page 146

39

in a responsible manner." [1] There are very few issues that touch on this core mission as much as the work we are doing to help responsibly transition away from U.S. dollar (USD) LIBOR. Further, this issue is one that has unified all participants in our membership—from issuer to investor, and everyone in between—on the need for Federal legislation to help ensure a final transition takes place smoothly and efficiently.

Absent Federal legislation to provide a consistent and fair solution as well as a safe harbor for certain so called "tough legacy" contracts—that is, USD LIBOR contracts lacking clear fallback language—retirees and savers will be forced to foot the bill for billions if not tens of billions of dollars in legal costs. This will occur as trustees would need to seek court guidance on which replacement rates to select and how to incorporate that rate into the existing contract. The absence of Federal legislation for these contracts also opens the possibility that consumers could be left in an uncertain position under contracts that fail to provide a fallback directive upon LIBOR's cessation. With legislation, however, there are critical incentives for lenders to provide consistent treatment to all consumers. I will outline in detail in my written testimony below how this dynamic has come about, and why, as to this remaining pool of legacy contracts, the market is unable to resolve this issue without enormous litigation expense.

Securitization and structured finance are critical elements of today's economy. The pooling of loans into a security, coupled with the separation of highest credit and prepayment risks from lower prepayment and credit risks, allow for efficient matching of borrower and investor preferences. This segmentation of risks lowers the cost of credit to the consumers and businesses that the capital markets fund while providing more tailored investment options to investors with varying risk preferences. Our members know that, when done properly, this work facilitates economic growth and capital formation across all communities.

**Background on LIBOR Transition to Date**

Let me first make abundantly clear that many of SFA's member companies were impacted by the LIBOR scandal. In particular, SFA investor members need to assured that this never happens again. All of our members must know that, going forward, contracts based on a floating rate index can rely on the integrity of that index. For these reasons, SFA has been an active member in the Federal Reserve's Alternative References Rate Committee, or "ARRC", a group whose purpose includes ensuring an orderly transition away from LIBOR.

Extensive progress has been made on this gigantic financial undertaking. Out of over $200 trillion of U.S. dollar-based contracts that are tied to LIBOR, nearly all have managed to put in place a plan for transition to a new rate. This was achieved across banking and financial sector regulators, market participants and consumer groups. As there wasn't a natural replacement rate for U.S. dollar LIBOR in existence, the transition started with the critical task of identifying and developing trusted and widely adopted alternative reference rates and ensuring those rates won't present the same flaws as LIBOR or other systemic deficiencies. As the alternative replacement rates were not previously published, groundbreaking work was launched to build market understanding, acceptance, and liquidity in these alternative rates required by borrowers, lenders, and investors.

With alternative rates available and the liquidity and market acceptance of those rates steadily building, attention quickly turned to ensuring that all new contracts that still referenced LIBOR incorporated so called "fallback" language. This fallback language is agreed to by all contract parties and clearly specifies what interest rate would be used in the event that LIBOR is unavailable or ceases to exist. In parallel to incorporating fallback language in new contracts, work began in large scale by lenders, borrowers and investors to amend millions of existing LIBOR contracts that mature after the expected cessation date of LIBOR. All this effort, significantly supported and helped by a widespread number of market participants, consumer groups, and regulators within product-specific working groups of the ARRC, has reduced the USD LIBOR exposure that will remain after the June 2023 LIBOR cessation date from over $200 trillion to an estimated $16 trillion. [2]

Meanwhile, market participants have continued to work to build liquidity and transparency in the alternative reference rates, which allow for the hedging of interest rate risk in a liquid capital market. That hedging allows borrowers to access

---

[1] *https://structuredfinance.org/about-us*
[2] This is a best guess estimate taken by surveying our member firms. This number includes many types of contracts, ranging from floating rate mortgage to student loans, loans to businesses, and embedded interest rate swaps in contracts.

Exhibit 2
Page 147

40

products like the fully prepayable fixed rate mortgage, or to issue corporate debt that matches a company's assets and cash flows.

Finally, new security issuance continues to increase in all product types. Building off the liquidity of a secondary market for hedging, the amount non-LIBOR floating rate contracts continues to increase each month.

**"Tough Legacy" Contracts, and Other Remaining Challenges**

Even with this well-organized multiyear effort, these estimated $16 trillion contracts have no realistic means to be renegotiated and amended. While small compared to the overall size of outstanding LIBOR contracts, this is still a large sum, posing an enormous risk to the financial system and the underlying borrowers, investors and banks if not dealt with properly. These so-called "tough legacy" contracts include mortgages, student loans, business loans, and capital market transactions that finance and hedge these legacy LIBOR-based contracts, and therefore impact a broad range of American households and businesses.

The simplest explanation for these contracts is that, after more than 30 years of publication and use in over 98 percent of U.S. dollar floating rate contracts, most contracts that were entered into prior to the announcement of LIBOR's end simply did not contemplate the permanent cessation of such a ubiquitous rate. While in hindsight today it may seem obvious that LIBOR could come and go, for many decades this simply and unfortunately was not the case.

These tough legacy contracts often have very high legal and operational hurdles to amending their terms, not the least of which is identifying, contacting, and negotiating with the large number of contractual parties who must consent to any such amendment. For instance, in all widely distributed bonds there are upwards of hundreds of bondholders who must be involved in the negotiation—and most often unanimous consent—that is required to change the interest rate of the bond. Moreover, even in normal market circumstances, due to investor privacy constraints and operational hurdles, identifying and communicating with bondholders in certain products is very challenging, if not impossible. On the massive scale required by the LIBOR transition, it is viewed as fruitless.

Finally, in the likely absence of meeting these impractical hurdles, the third-party trustees, who administer certain contractual provisions in the structured finance market, would need to seek direction through judicial proceedings to navigate the transition to a replacement rate. This is what will happen in the absence of safe harbor legislation, and—as per the contracts—most of the legal costs for structured finance bonds will be borne by the underlying investors and savers.

Recognizing the significant economic, operational and legal risks of these $16 trillion contracts, for the past few years SFA investors, bond issuers, lenders, trustees, paying agents and servicers members have worked extensively with each other, and with consumer groups, regulators and other sector participants. Early in the process of managing away from LIBOR, many of these stakeholders expressed concern about the use of legislative action that would affect previously agreed contractual matters. However, after lengthy deliberation and debate, a consensus position across the entire market emerged that the cessation of this critically important benchmark rate presents such a unique challenge that other alternatives examined were inoperable, could lead to inequitable outcomes for investors or consumers, presented extensive and costly litigation risk, or all the above. As such, firms that would under normal circumstances find legislation to amend contracts anathema, are now strong advocates for Federal legislation to ensure a smooth and fair transition.

**Principles of a Legislative Solution**

Again, after much discussion amongst our members and stakeholders, SFA members found that legislation is not only the best option, but the only viable option to safely, fairly, and equitably transition tough legacy contracts. Moreover, it became clear that, absent congressional action, the remaining challenges of the LIBOR transition will create a great deal of confusion for borrowers and investors while further degrading the value of these fixed-income investments for savers, pensioners, and retirees.

With that as background, SFA market participants identified five key principles of a legislative approach:

- Minimize any value transfer among the contractual parties
- Use a single, consistent replacement benchmark for all similar LIBOR contracts based upon a liquid, robust replacement benchmark

Exhibit 2
Page 148

41

- Minimize litigation risk through a comprehensive but narrow safe harbor that provides adequate operational flexibility for billing and paying agents to implement the use of the new replacement benchmark
- Narrowly scope legislation to facilitate the transition away from LIBOR without impacting investor, consumer, or other counterparty rights and protections
- Do not impact contracts that already have a sufficient replacement mechanism unless contract parties opt-in on their own

To be clear, SFA believes that legislation should in no way prohibit parties from agreeing together on a different replacement rate, if they so choose. Legislation should pay careful attention to all Constitutional rights embedded in contracts, and for this reason SFA has spent considerable time working with experts in this area of the law. And legislation should in no way contribute to wealth transfer between parties. These all represent important boundary conditions on how any law would work, and therefore discussions over every provision of proposed legislation have taken thousands of hours of work.

With these principles in mind, SFA is strongly supportive of the prospective Federal legislation that recently passed out of the House Financial Services Committee. We also know that legislation may undergo additional technical edits, and we know that the Senate is working on similar legislation with similar goals. With the principles enumerated above, we continue to be appreciative of all this legislative work. On behalf of the entire membership of SFA, I specifically want to thank Senators Tester and Tillis for the leadership they are providing on this issue.

As you likely know, recently, both Chairman Powell and Secretary Yellen also expressed their support for Federal legislation. On February 24, 2021, Jay Powell, Chair of the Federal Reserve, called Federal legislation the "best solution" to address outstanding legacy contracts that will have not run off by June 2023. On March 23, 2021, Treasury Secretary Janet Yellen agreed with Chairman Powell's assertion and stated that the transition of certain legacy contracts would be difficult without legislation, specifically noting, "Congress does need to provide legislation for the LIBOR transition." We understand that these statements of support are the result of meaningful examination of the issues and challenges involved.

**State-by-State Patchwork Approach Is Not Viable**

Recognizing the importance of legislative assistance to transition away from LIBOR, on April 6, New York State passed AB164B[3] into law. The legislation provides businesses and consumers paying or receiving LIBOR-based payments crucial clarity, minimizing adverse economic impact and legal uncertainty in New York-based tough legacy contracts. The bill passed by the New York State legislature was also consistent with our five key principles.

This was a big, positive step forward in the orderly transition of LIBOR as we estimate almost half of tough legacy contracts are governed by the law of New York State. But a uniform Federal framework would expand the protections to also include all other tough legacy contracts remaining across the United States, allowing for all tough legacy LIBOR contracts to transition on time and in an equitable and fair manner. Timely and consistent treatment is crucial for the acceptance of the replacement rate by the investing and borrowing public. The success of the transition ultimately depends not only on the coordination across easily amendable contracts, but also on the fair and timely resolution of tough legacy contracts.

The most important reason for a Federal legislative approach is to avoid the foreseeable downside risk to a State level approach. Simply put, a State-by-State approach would provide fewer comprehensive protections than what could be achievable at the Federal level given the very limited time remaining until LIBOR's end in just over 2 years. Additionally, we risk a patchwork of varying State laws, which would compromise the very intent to provide a smooth transition.

State-by-State solutions cannot ensure all borrowers, lenders, investors, and financial intermediaries of tough legacy contracts have the same fair, equitable and consistent treatment across the country which is paramount to ensuring the public and market confidence in the fairness, viability and liquidity of the replacement rate they receive for the remaining term of their contract. Ultimately, any States that take no legislative actions will fail to articulate a path forward at all, leaving Americans and their businesses with potentially negative economic consequences and legal costs needed to protect their interests. By providing the certainty of an equitable, liquid, and transparent replacement rate and eliminating the potential for costly litigation, the legislation recently passed in New York State will serve to protect New York consumers, investors and other market participants if their contracts are

---

[3] *https://legislation.nysenate.gov/pdf/bills/2021/A164B*

Exhibit 2
Page 149

42

governed by New York law. Similar legislation—adopted at the Federal level—would provide the same protections to help ensure all consumers, investors, and borrowers receive equitable and fair treatment regardless of where their contract is governed.

**Conclusion**

In conclusion, let me thank you all again for your focus on helping to transition our markets and economy away from LIBOR once and for all. The work that some Members of this Committee are currently undertaking is critical to ensuring that all investors, consumers, and business borrowers and lenders are treated equally and fairly. It also will help to prevent billions of dollars of potential litigation, where no one wins but savers and retirees foot the bill.

Please know that the membership of the Structured Finance Association has been committed to being part of the healthy evolution and productive improvements in our markets as they continue their final transition away from reliance on LIBOR, and we thank you for your work in helping to facilitate this important market evolution.

Exhibit 2
Page 150

43

### RESPONSES TO WRITTEN QUESTIONS OF SENATOR WARREN FROM THOMAS WIPF

**Q.1.** In a recent speech, Federal Reserve Governor Randal Quarles noted "a handful of firms have said that they may want more time to evaluate potential alternative rates" to SOFR. Please describe the consequences of these firms not following the recommendations of the Alternative Reference Rates Committee (ARRC) to transition to SOFR.

**A.1.** The ARRC believes that SOFR is the strongest alternative to USD LIBOR. However, the ARRC's recommendations have always been voluntary, and it recognizes that market participants may choose other rates. With that in mind, it is important to note that the ARRC has expressed its support for a vibrant and innovative market with reference rates that are robust, IOSCO compliant, and were available for use before the end of 2021 in order to promote a timely transition. (Source: Frequently Asked Questions Version: August 27, 2021)

**Q.2.** Please describe the consequences of some market participants potentially continuing to use LIBOR after 2021, including any potential risks to financial stability that could arise.

**A.2.** The Financial Stability Oversight Council, the Financial Stability Board and other domestic and global authorities have emphasized the clear risk to financial stability posed by the continued reliance on LIBOR. As such, the transition off of LIBOR, and toward robust alternative rates that do not reintroduce the vulnerabilities of LIBOR, is an important foundation for financial stability going forward.

In the U.S., banking regulators have stated that they believe there are safety and soundness concerns for supervised entities that continue new use of U.S. dollar LIBOR this year. The ARRC has supported this supervisory guidance and has encouraged all market participants to end new use of U.S. dollar LIBOR. Because LIBOR has been used in such a large volume and broad range of financial products and contracts, failing to take advantage of the next 15 months to wind down legacy positions and instead continuing to create new LIBOR contracts would pose a potential threat to individual financial institutions and to financial stability.

It is estimated that current outstanding contracts referencing USD LIBOR, including corporate loans, adjustable-rate mortgages, floating rate notes (FRNs), securitized products and a wide range of derivatives products, total more than $200 trillion, roughly equivalent to 10 times U.S. Gross Domestic Product. The ARRC has estimated that roughly 2/3 of these exposures will mature by June 2023; however, if new LIBOR contracts continued to be written then there would be a much larger set of contracts that would be forced to suddenly transition when LIBOR ends. Without advanced preparation, a sudden cessation of such a heavily used reference rate would cause considerable disruptions to, and uncertainties around the large gross flows of LIBOR related payments and receipts between many firms. It would also impair the normal functioning of a variety of markets, including markets for business and consumer lending. Continuing to use LIBOR would seem to ignore both its impending end and that its liquidity and usefulness will

Exhibit 2
Page 151

44

likely continue to diminish; it will also impede the ability of corporate borrowers and consumers to transition.

———

### RESPONSES TO WRITTEN QUESTIONS OF SENATOR WARREN FROM ANDREW PIZOR

**Q.1.** Do existing student loan contracts that use LIBOR generally specify the required replacement rate if LIBOR is terminated?

**A.1.** No. Most existing LIBOR contracts grant note holders sole discretion to choose a new rate to replace LIBOR without specifying any particular replacement and also to make adjustments at the note holder's sole discretion. For example, a recent student loan contract from Discover states:

> If the 3-month LIBOR Index is no longer available, we will substitute an index that is comparable, in our sole opinion, and we may adjust the Margin so that the resulting variable interest rate is consistent with the variable interest rate described in this paragraph. If at any time the fixed or variable interest rate as provided in this paragraph is not permitted by applicable law, interest will accrue at the highest rate allowed by applicable law.

It is also not clear that market participants have adjusted their contracts to reflect the upcoming cessation of LIBOR.

**Q.2.** Please describe the implications of student loan servicers having the discretion to choose an alternative rate to the Secured Overnight Financing Rate (SOFR), including the impact on student loan borrowers.

**A.2.** Allowing servicers the discretion to choose the replacement rate creates significant risk for consumers. The primary risk is that servicers will choose a rate that generates more profit for them and the note holder by being consistently higher than LIBOR, such as the prime rate. Or they may choose a rate that is unsuitable for other reasons, such as a rate that is more volatile, one that is less representative of market rates, one that is not based on actual transaction data, or one that is easily manipulated—as the LIBOR was. For example, as consumer advocates have noted, industry representatives had advocated for the use of Ameribor and the Constant Maturity Treasury (CMT) rate to replace LIBOR, even though Ameribor is based on an extremely thin market relative to the market SOFR references and CMT is based on "indicative" rate quotations instead of actual transaction data.

**Q.3.** Are existing rules sufficient to protect against companies putting any costs of the LIBOR transition onto consumers through an increase in interest rates? If not, what new protections are needed to mitigate any harms to student borrowers?

**A.3.** No, they are not. Right now, companies can readily replace LIBOR with rates that are more favorable to them at borrowers' expense, and many contracts allow note holders to make additional changes to the terms of consumer contracts (such as adjusting the margin on the loan) in the context of the adoption of a new reference rate that could put borrowers at risk.

Exhibit 2
Page 152

45

As we previously recommended to the Consumer Financial Protection Bureau, several measures are necessary to protect student borrowers:

- The CFPB should signal its expectation that industry participants will select SOFR as a replacement index and that failure to do so will invite increased scrutiny of compliance with Regulation Z.
- Consumers should be informed at each critical stage of the transition.
- The CFPB should require that lenders and servicers make information about the transition, including the new replacement rate, readily available to existing and prospective customers, even when their debts transition to spread-adjusted SOFR.
- It should be expected that institutions that continue making loans that use the LIBOR as an index ahead of the rate's cessation will add unambiguous language to their loan contracts clearly articulating the index that any LIBOR-based loan will fall back to upon LIBOR's cessation and any associated changes that will be made to the loan's margin at that time. Lenders that do not adopt the ARRC's recommendations for fallback language should be subjected to heightened scrutiny from the Bureau.
- The CFPB should use all available authorities to ensure the timely transition away from LIBOR.

The Bureau's recently announced final rule is a strong step in the right direction, but more is still necessary.

Exhibit 2
Page 153

46

ADDITIONAL MATERIAL SUPPLIED FOR THE RECORD

**ICBA LETTER**



November 2, 2021

The Honorable Sherrod Brown            The Honorable Patrick J. Toomey
Chairman                               Ranking Member
Committee on Banking, Housing,         Committee on Banking, Housing,
and Urban Affairs                      and Urban Affairs
United States Senate                   United States Senate
Washington, D.C. 20510                 Washington, D.C. 20510

Dear Chairman Brown and Ranking Member Toomey:

On behalf of community banks across the country, with more than 50,000 locations, I write to thank you for convening today's hearing on "The LIBOR Transition: Protecting Consumers and Investors." In connection with this hearing, we wish to express our support for House legislation that protect community banks during the transition, the Adjustable Interest Rate (LIBOR) Act of 2021 (H.R. 4616), sponsored by Rep. Brad Sherman. H.R. 4616 passed the House Committee on Financial Services by voice vote on July 29, 2021.

H.R. 4616 would address the numerous contracts with language that did not contemplate a permanent cessation of LIBOR, by providing a replacement benchmark rate that would go into effect when LIBOR is discontinued. The replacement of LIBOR has the potential to cause severe market disruption and litigation due to the existence of contracts that provide for no or inadequate fallback benchmark rates, many of which community banks are a party to. This legislation will ensure that there is no impact on legacy contracts that already have adequate fallback language in place and is consistent with changes recently made to New York law. We hope that this legislation will be considered by the Senate Banking Committee.

Thank you for scheduling today's hearing. ICBA looks forward to working with you to advance H.R. 4616.

Sincerely,
/s/
Rebeca Romero Rainey
President & CEO

CC: Members of the Senate Committee on Banking

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN

Exhibit 2
Page 154

47

# LIBOR LETTER

November 1, 2021

The Honorable Sherrod Brown
Chairman
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Patrick Toomey
Ranking Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

Dear Chairman Brown and Ranking Member Toomey:

We, the undersigned organizations, support federal legislation to address "tough legacy" contracts that currently reference LIBOR. We respectfully request the Committee move judiciously in enacting LIBOR legislation.

There are trillions of dollars of outstanding contracts, securities, and loans that use LIBOR for their interest rates but do not have appropriate contractual fallback language to facilitate the transition away from LIBOR when all US dollar tenors cease to be published in June 2023. These particular contracts are extremely difficult to amend and are known as "tough legacy." Without federal legislation to address these contracts, investors, consumers, and issuers of securities may face years of uncertainty, litigation, and a change in value, creating ambiguity that would lead to a reduction in liquidity and an increase in volatility.

We do not take lightly the amending of contracts. However, in this unique, once-in-a-lifetime financial event, we find no other feasible option for remediation of these tough legacy contracts without the risk of significant uncertainty and the potential for market disruption. As such, we commend senators Tester and Tillis for working on legislation that:

1) Provides a solution for those contracts that have insufficient fallbacks and cannot otherwise be amended among the parties;
2) Limits the scope of legislation so there is no interference with any contracts that have effective fallback provisions, allows parties to opt-out of the legislation, and will not affect contracts related to new or future business;
3) Offers uniform, equitable treatment for all U.S. contracts that fall under the federal legislation; and
4) Creates a safe harbor from litigation for parties that are covered by the legislation and prevents otherwise inevitable litigation costs and gridlock.

In October, the five federal financial institution regulatory agencies released a joint statement on managing the LIBOR transition[1]. They noted, "failure to adequately prepare for LIBOR's discontinuance could undermine financial stability and institutions' safety and soundness and create

---

[1] https://www.ots.treas.gov/news-issuances/bulletins/2021/bulletin-2021-48a.pdf

Exhibit 2
Page 155

48

litigation, operational, and consumer protection risks." We agree; with no realistic ability to amend tough legacy contracts we see a significant risk to the financial system and the underlying borrowers, investors, corporate issuers, and banks. In addition, at recent hearings before both the Senate Committee on Banking, Housing, and Urban Affairs and the House Financial Services Committee, Janet Yellen, Treasury Secretary, Jay Powell, Chair of the Federal Reserve, Randal Quarles, member of the Board of Governors of the Federal Reserve, Gary Gensler, Chair of the Securities and Exchange Commission, and Michael Hsu Acting Comptroller of the Currency, endorsed federal legislative action.

We thank Senator Tester, Senator Tillis, and the Committee for working towards a meaningful solution that offers fair, equitable and consistent treatment for all tough legacy contracts in support of the LIBOR transition. Thank you for your consideration and the opportunity to share our views on this matter. We look forward to working with Members of the Committee to move this important legislation forward.

Sincerely,

Securities Industry and Financial Markets Association (SIFMA)
Structured Finance Association
Institute of International Bankers
Consumer Bankers Association
Bank Policy Institute
Commercial Real Estate Finance Council (CREFC)
U.S. Chamber of Commerce, Center for Capital Markets Competitiveness
Mortgage Bankers Association
Government Finance Officers Association
The Loan Syndications and Trading Association (LSTA)
The International Swaps and Derivatives Association (ISDA)
Student Loan Servicing Alliance
Housing Policy Council
The Financial Services Forum
Investment Company Institute
The Loan Syndications and Trading Association (LSTA)
The Real Estate Roundtable
American Bankers Association
The American Council of Life Insurers (ACLI)
National Association of Corporate Treasurers

cc: Members of the Senate Committee on Banking, Housing, and Urban Affairs

Exhibit 2
Page 156

49

**CAMAC LETTER**

 **CAMAC** Kase Lawal | Chairman
1330 Post Oak Boulevard, Suite 2200 | Houston, Texas 77056 | Tel (713) 965 5100 | Fax (713) 965 5129 | www.camac.com

November 8, 2021

The Hon. Sherrod Brown, Chairman
The Hon. Patrick J. Toomey, Ranking Member

Dear Chairman Brown and Ranking Member Toomey:

Given the recent hearing on Libor Transition held by your committee last Tuesday, November 2, 2021, I wanted to bring your attention to AMERIBOR®, a transparent interest rate benchmark based on real transactions that take place in the American Financial Exchange (AFX). Unity National Bank of Houston, the only African American owned bank in Texas, is a member of the AFX. AFX is an electronic market for lending and borrowing for US banks, financial institutions, and corporations. Real transactions on AFX are the basis for the AMERIBOR® benchmark. AFX now has 229 Members representing 184 bank members (and over 1,000 downstream correspondent banks) and 45 non-bank members. The AFX bank members now represent over $5.3 trillion in U.S. bank assets (25% of total U.S. bank assets). AFX also represents 40% of U.S. Minority Depository Institutions (MDIs) by asset size.

Based on third-party audit performed by a top five accounting firm, AMERIBOR® and its 30-day term structure (AMERIBOR® Term-30) comply with all 19 principles of financial benchmarks as established by IOSCO.

AFX members are starting to use AMERIBOR as the transition away from Libor approaches. While we support SOFR, AMERIBOR® is representative of five thousand regional, community and minority depository institutions. For banks like ours, AMERIBOR® is a credible and robust rate which is easy to explain to customers, regulators, and market participants.

We strongly believe that AMERIBOR is an appropriate and robust rate for "Main Street" banks like ours that support America's small and medium-sized businesses.

Thank you for this opportunity to share AMERIBOR with you and members of the Committee.

Best,

Dr. Kase Lawal
Chairman
Unity National Bank of Houston

Energized to power the world

Exhibit 2
Page 157

50

**NAFCU LETTER**



3138 10th Street North
Arlington, VA 22201-2149
703.522.4770 | 800.336.4644
f: 703.524.1082
nafcu@nafcu.org | nafcu.org

**National Association of Federally-Insured Credit Unions**

November 1, 2021

The Honorable Sherrod Brown          The Honorable Pat Toomey
Chairman                             Ranking Member
Committee on Banking, Housing,       Committee on Banking, Housing,
   & Urban Affairs                      & Urban Affairs
U.S. Senate                          U.S. Senate
Washington, DC 20510                 Washington, DC 20510

**Re:**    **Tomorrow's Hearing, "The LIBOR Transition: Protecting Consumers and Investors"**

Dear Chairman Brown and Ranking Member Toomey:

I am writing on behalf of the National Association of Federally-Insured Credit Unions (NAFCU) to share our thoughts ahead of tomorrow's hearing, "The LIBOR Transition: Protecting Consumers and Investors." NAFCU advocates for all federally-insured not-for-profit credit unions that, in turn, serve over 127 million consumers with personal and small business financial service products. NAFCU thanks the Committee for their attention to this important topic.

With LIBOR sunsetting this year, many credit unions are in the process of transitioning their suite of financial products away from the LIBOR index. While our credit union members report they are no longer originating new loans that rely on LIBOR as a reference rate, some credit unions still have a small number of legacy LIBOR contracts in their consumer loan portfolios, some of which do not contain fallback language that would allow for the contract to be amended and continued when LIBOR sunsets. To ensure a smooth transition from LIBOR, and to prevent any unneeded disruption during this time of economic uncertainty, we support Congress taking action through legislation to establish a process for these legacy LIBOR contracts to be appropriately updated so they continue to function.

We thank you for your leadership, and we appreciate the opportunity to share our input on this important topic. Should you have any questions or require any additional information, please contact me or Lewis Plush, NAFCU's Associate Director of Legislative Affairs, at lplush@nafcu.org.

Sincerely,

*Brad Thaler*

Brad Thaler
Vice President of Legislative Affairs

cc:    Members of the U.S. Senate Committee on Banking, Housing, and Urban Affairs

**NAFCU** | Your Direct Connection to Federal Advocacy, Education & Compliance

Exhibit 2
Page 158

51

## BROOKLINE BANK LETTER

**Brookline**Bank
2 Harvard Street Brookline, MA 02445

The Hon. Elizabeth Warren
United States Senate
309 Hart Senate Office Building
Washington DC 20510

Dear Senator Warren,

I write to you today to ask for your help and continued support for small and medium sized banks as well as Massachusetts businesses of all sizes in allowing for choice, fair competition and a level playing field. Brookline Bank and the Massachusetts-based institutions signed below are members of the American Financial Exchange (AFX), an electronic market for lending and borrowing for US banks, financial institutions, and corporations.

Real transactions on AFX are the basis for the AMERIBOR® benchmark; a free market, non-governmentally developed solution to the replacement of the compromised and flawed rate that is LIBOR. AFX bank members now represent over $5.3 trillion in U.S. bank assets (25% of total U.S. bank assets) as well as 40% of U.S. Minority Depository Institutions (MDIs) by asset size. Membership consists of 229 institutions representing 184 bank members (and over 1,000 downstream correspondent banks) and 45 non-bank members.

AMERIBOR® is a transparent interest rate benchmark based on real, observable transactions that take place in the peer-to-peer AFX electronic trading platform. Based on third-party audit performed by a top five accounting firm, AMERIBOR® and its 30-day term structure (AMERIBOR® Term-30) comply with all 19 principles of financial benchmarks as established by IOSCO.

AFX members in general, and Brookline Bank in particular, are starting to use AMERIBOR® as we transition away from LIBOR. While many members plan to offer SOFR, AMERIBOR® is representative of five thousand regional, community and minority depository institutions. For banks like ours, AMERIBOR® is a credible and robust rate which is easy to explain to customers, regulators, and market participants and represents our costs of doing business not those of "Big" banks.

We strongly believe that AMERIBOR® is an appropriate and robust rate for "Main Street" banks like ours that support America's small and medium-sized businesses.

Thank you for this opportunity to share AMERIBOR® with you and hope you and members of the Senate Banking Committee will fight on the side of **CHOICE** in the replacement of LIBOR.

Respectfully,



Reed H. Whitman
Treasurer
Brookline Bank
2 Harvard Street Brookline, MA 02445
Rwhitman@brkl.com 617-927-4892

Co-signed: Dedham Savings, Fall River Five Cents Savings Bank

Member FDIC

Equal Housing Lender

Exhibit 2
Page 159

52

**STATEMENT SUBMITTED BY SIFMA**



Statement for the Record by the Securities Industry and Financial Markets Association

(SIFMA)


U.S. Senate Committee on Banking, Housing, and Urban Affairs


The Libor Transition: Protecting Consumers and Investors


November 2, 2021

Exhibit 2
Page 160

53

**Chairman Brown, Ranking Member Toomey:**

The Securities Industry and Financial Markets Association[1] (SIFMA) submits this statement for the record for the hearing titled "*The Libor Transition: Protecting Consumers and Investors*." We thank you for convening this important hearing and applaud your leadership for making the transition from LIBOR to alternative reference rates a priority for the committee

**Summary**

SIFMA believes  federal legislation is necessary to facilitate a smooth transition away from LIBOR for "tough legacy" contracts to an alternative reference rate. There are currently trillions of dollars of existing contracts and instruments that, as a practical matter, cannot be amended to utilize an alternative rate. SIFMA is supportive of federal legislation aligned with recommendations from the Alternative Reference Rates Committee ("ARRC") to address these situations where contracts cannot be easily transitioned from LIBOR due to legal or regulatory reasons. We believe such legislation would benefit all market participants including LIBOR's end users, who range from investors to companies to consumers.  The legislation would provide four key benefits: (1) certainty of outcomes; (2) fairness and equality of outcomes; (3) avoidance of years of paralyzing litigation; and (4) preservation of liquidity and market resilience.

Our testimony today will provide background on the LIBOR transition, why it is needed, what has been done, and why we believe federal legislation is appropriate and needed.

We look forward to continuing to work with the Committee on this important issue and to move this legislation forward.

**Background on LIBOR and the Need for Transition**

LIBOR[2] is referenced by approximately $223 trillion of financial products.[3] Today's LIBOR is informed primarily (and sometimes entirely) by "expert judgement" from estimates of transactions, not actual transactions. As a result, LIBOR doesn't necessarily reflect the true cost of bank funding and is vulnerable to volatility and manipulation. Global regulators saw the problem with placing the foundation for global financial markets on such a construct nearly a decade ago, and they began to examine how more robust alternative reference rates could be

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's nearly 1 million employees, we advocate for legislation, regulation and business policy, affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

[2] LIBOR is a forward-looking interest rate benchmark derived from submissions from participating banks. It is intended to reflect the cost of unsecured interbank funding across various tenors (lengths of time), and is published in 35 currency/tenor pairs, e.g., 3-month US Dollar, 6-month US Dollar, or 3-month Sterling. LIBOR is published by in London by ICE Benchmark Administration, and is regulated by the U.K.'s Financial Conduct Authority.

[3] See "March 2021 Progress Report" from the ARRC: https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/USD-LIBOR-transition-progress-report-mar-21.pdf, page 3.

2

Exhibit 2
Page 161

54

identified or developed to replace LIBOR.[4] As such, the regulatory community continues to believe that LIBOR is not a suitable rate and market participants must transition to alternative reference rates.[5]

**LIBOR Will End – There Is No Doubt**

On March 5, ICE Benchmark Administration confirmed its cessation plan for LIBOR. Most non-U.S. Dollar LIBOR tenors will cease on December 31, 2021. For U.S. Dollar denominated LIBOR, which includes the largest and most important tenors of LIBOR, cessation will occur on June 30, 2023.[6]

Federal banking regulators have issued guidance that regulated entities should cease executing new LIBOR transactions by the end of 2021 and expeditiously transition existing contracts to new reference rates, noting that *"the agencies believe entering into new contracts that use USD LIBOR as a reference rate after December 31, 2021, would create safety and soundness risks and will examine bank practices accordingly"[7]* and have reiterated the *"intense"* supervisory focus on this issue.[8] This regulatory posture has been echoed in the U.K and Europe and regulators are demanding in no uncertain terms that their regulated institutions move away from LIBOR this year.

In October, the five federal financial institution regulatory agencies issued a joint statement to emphasize expectations that supervised institutions with LIBOR exposure continue to progress toward an orderly transition away from LIBOR. They noted, *"failure to adequately prepare for LIBOR's discontinuance could undermine financial stability and institutions' safety and soundness and create litigation, operational, and consumer protection risks."[9]*

**U.S. Action – The ARRC**

In 2014 the U.S., the Federal Reserve Board and New York Federal Reserve convened the Alternative Reference Rates Committee, or he ARRC. The ARRC's membership is comprised of a broad set of private-market participants  including larger and smaller banks, asset managers, insurers, representatives of municipal interests, industry trade organizations, as well official sector ex-officio members such as the Federal Reserve, SEC, CFPB, OFR, US Treasury, CFTC, FHFA, HUD, OCC, FDIC, Federal Reserve Bank of NY, National Association of Insurance Commissioners, the New York Department of Financial Services, and others.[10] Over 300

---

[4] See, e.g., "Reforming Major Interest Rate Benchmarks" published by the Financial Stability Board in 2014.
[5] Maybe most notably, these 2017 remarks from Andrew Bailey, then Chief Executive of the U.K.'s Financial Conduct Authority: https://www.fca.org.uk/news/speeches/the-future-of-libor
[6] IBA's statement is here: https://ir.theice.com/press/news-details/2021/ICE-Benchmark-Administration-Publishes-Feedback-Statement-for-the-Consultation-on-Its-Intention-to-Cease-the-Publication-of-LIBOR-Settings/default.aspx
[7] See, e.g., https://www.federalreserve.gov/supervisionreg/srletters/SR2027.htm and https://www.federalreserve.gov/supervisionreg/srletters/SR2107.htm,
[8] See remarks by Federal Reserve Vice Chairman Quarles on March 22: https://www.federalreserve.gov/newsevents/speech/quarles20210322a.htm
[9] https://www.occ.gov/news-issuances/bulletins/2021/bulletin-2021-48a.pdf
[10] Full list of ARRC members here: https://www.newyorkfed.org/arrc/about#members

3

Exhibit 2
Page 162

55

institutions participate in the ARRC either as members or participants in ARRC committees.[11] SIFMA is a member of the ARRC.

The ARRC began with an initial goal of recommending an alternative to LIBOR. The ARRC reviewed several options for more robust reference rates, and in 2017 issued a recommendation that the Secured Overnight Financing Rate (SOFR) would be the preferred, robust alternative to LIBOR. SOFR is a fully transaction-based rate, referencing the previous day's activity in the repurchase markets. SOFR is based on approximately $1 trillion of daily transactions from a wide range of market participants and is administered by the New York Fed. SOFR is, by intent and construction, a reliable and representative indicator of market interest rates. SOFR is published on a daily basis by the New York Fed.



The ARRC followed this milestone with the development and publication of numerous recommendations, guidance documents, and reference materials. These have addressed overall market and transition background,[12] a *Users Guide to SOFR*,[13] recommendations for business loans,[14] floating rate notes and securitizations,[15] consumer products such as adjustable rate mortgages and student loans,[16] derivatives,[17] enhanced fallback language for new transactions that reference LIBOR so that when LIBOR ceases publication the transactions can transition to alternative rates such as SOFR,[18] a fixed spread adjustment that creates symmetry across most

[11] https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC_Factsheet_2.pdf
[12] https://www.newyorkfed.org/arrc/publications/overall-transition-materials
[13] https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/users-guide-to-sofr2021-update.pdf
[14] https://www.newyorkfed.org/arrc/publications/business-loans
[15] https://www.newyorkfed.org/arrc/publications/floating-rate-notes-securitizations
[16] https://www.newyorkfed.org/arrc/publications/consumer-products
[17] https://www.newyorkfed.org/arrc/publications/derivatives
[18] ARRC contract language recommendations may be found here: https://www.newyorkfed.org/arrc/fallbacks-contract-language

4

Exhibit 2
Page 163

56

cash and derivatives products,[19] operations and infrastructure related issues,[20] regulatory relief and actions needed to facilitate the transition,[21] and other topics. Importantly, and discussed further below, the ARRC also developed and published draft legislation to address issues with existing ("legacy") transactions.[22]

The ARRC has developed these materials to promote a steady progression towards a successful transition away from LIBOR in line with its Paced Transition Plan, which lays out goals and milestones for this important work.[23] The market has broadly accepted this work, as shown by the usage of ARRC-recommended fallback language in new transactions, the issuance of significant amounts of debt referencing SOFR (over 1250 issuances totaling almost $1 trillion as of March 31, 2021),[24] and the execution of trillions of dollars of SOFR-based swaps and futures contracts.



**Graphic: SOFR Issuance Activity – Cash Markets and Swaps/Futures**

Source: ARRC, SOFR Starter Kit - Part 2 (2020)

**The "Tough Legacy" Problem**

So-called "tough legacy" transactions are LIBOR-based transactions that were executed prior to LIBOR cessation, and in many cases prior to the development and adoption of robust fallback language (e.g., 2019-2020). They present special challenges for this transition. Of the $223

---

[19] See ARRC spread adjustment announcement: "The five-year median spread adjustment methodology matches the methodology recommended by the International Swaps and Derivatives Association (ISDA) for derivatives. For consumer products, reflecting support from both consumer advocacy groups and mortgage lenders responding to the consultation, the ARRC additionally recommended a 1-year transition period to this five-year median spread adjustment methodology", available here: https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC_Recommendation_Spread_Adjustments_Cash_Products_Press_Release.pdf

[20] https://www.newyorkfed.org/arrc/publications/operations-infrastructure

[21] https://www.newyorkfed.org/arrc/publications/accounting-tax-regulation

[22] https://www.newyorkfed.org/arrc/publications/legislation

[23] https://www.newyorkfed.org/arrc/sofr-transition#progress

[24] Source: Castle Oak Securities

5

Exhibit 2
Page 164

57

trillion in outstanding LIBOR transaction, the ARRC estimated that 67 percent would roll off by June 2023, leaving about $74 trillion in LIBOR exposure extending beyond June 2023. $68 trillion of this is comprised of swaps, futures, and related transactions.[25] Many (but not all) of these transactions can be amended and addressed by industry-wide protocols such at the ISDA protocol[26] or by actions by clearing houses to convert outstanding positions.[27]

The remaining $6 trillion of exposures are comprised of various types of "cash" products, including bonds, notes, loans, asset backed securities and other extensions of credit. As shown below, ARRC estimates that about $1.9 trillion of this is comprised of bonds and securitizations, which generally do not have adequate fallback provisions.

**Graphic: Outstanding LIBOR Instruments**

**Table 1: USD LIBOR Market Footprint by Asset Class[1]**

| | | Currrently Outstanding ($TN) | Maturing After June 2023 ($TN) |
|---|---|---|---|
| Over-the-Counter Derivatives | Interest rate swaps | 81 | 46 |
| | Forward rate agreements | 47 | 0 |
| | Interest rate options | 20 | 12 |
| | Cross currency swaps | 23 | 8 |
| Exchange Traded Derivatives | Interest rate options | 32 | 0 |
| | Interest rate futures | 11 | 2 |
| Business Loans | Syndicated loans[2] | 2.0 | 1.1 |
| | Nonsyndicated business loans | 1.3 | 0.4 |
| | Nonsyndicated CRE/Commercial mortgages | 1.5 | 0.8 |
| Consumer Loans | Retail mortgages[3] | 1.3 | 0.8 |
| | Other Consumer loans | 0.1 | 0.1 |
| Bonds | Floating/Variable Rate Notes | 1.1 | 0.3 |
| Securitizations[3] | Mortgage-backed Securities (incl. CMOs) | 0.8 | 0.8 |
| | Collateralized loan obligations | 0.5 | 0.5 |
| | Asset-backed securities | 0.2 | 0.2 |
| | Collateralized debt obligations | 0.1 | 0.1 |
| **Total USD LIBOR Exposure:** | | **221** | **74** |

[1] Source: Federal Reserve staff calculations, BIS, Bloomberg, CME, DTCC, Federal Reserve Financial Accounts of the United States, G.19, Shared National Credit, and Y-14 data.  Data are gross notional exposures as of 2020Q4. [2] The figures for syndicated and nonsyndicated business loans do not include undrawn lines. Nonsyndicated business loans exclude CRE/commercial mortgage loans.[3] Estimated amounts maturing after June 2023 based on historical pre-payment rates

Source: ARRC Progress Report, March 2021

---

[25] March 2021 progress report at 3.
[26] https://www.isda.org/protocol/isda-2020-ibor-fallbacks-protocol/
[27] See, e.g., https://www.cmegroup.com/trading/interest-rates/files/cleared-swaps-considerations-for-ibor-fallbacks-and-conversion-proposal.pdf

6

Exhibit 2
Page 165

58

Many of these products were not designed with a permanent cessation of LIBOR in mind. As a result, these products are difficult or effectively impossible to amend, due to regulatory constraints or practical issues such as identifying all the holders of a widely distributed security. There are tens of thousands of floating rate securitization and corporate bond transactions, many without fallback language. More commonly, the fallback provisions would result in a floating rate bond becoming a fixed-rate bond. Other contracts fallback to the judgement of an issuer, administrator, or other party. [28]

In the table below we lay out a common interest rate fallback regime in a legacy floating rate bond (FRN). There are variations on this approach, but this is a very common framework. Tens of thousands of floating rate bonds and notes would become fixed-rate instruments.

| Generalized FRN interest rate fallback waterfall | Impact of a permanent cessation of LIBOR |
|---|---|
| 1. The interest rate is LIBOR + a spread (e.g. 3-month LIBOR + 2%). | ⇒ LIBOR will not be available – go to step 2 |
| 2. If LIBOR is not available, the administrator is directed to poll U.S. or U.K. (or both) banks for what LIBOR is. | ⇒ It is not expected that banks will respond to requests for LIBOR quotes when LIBOR is no longer published. Go to step 3. |
| 3. If that poll is not successful, the rate shall be the last known LIBOR value. | ⇒ This is the likely outcome. This means that floating rate bonds will permanently become fixed-rate instruments. |

SIFMA believes this potential outcome would be highly disruptive. Investors who invest in floating-rate instruments and issuers who issue them do so purposefully. They invested in or issued floating rate instruments, hedged those floating rate instruments, are benchmarked as if they own floating rate instruments, and plan cashflows based on floating rate instruments. Floating rate instruments may be issued to hedge floating rate assets; if the instrument becomes fixed, a mismatch in cashflows may occur. From an investor standpoint, there are concerns about the valuation and liquidity of instruments should this outcome occur, and it is important to keep in mind that these instruments are held by a broad array of investors, including individuals, corporations, financial institutions, mutual funds, pension funds, 401k plans, and so on. The real-world impact will be felt broadly.

Other instruments (such as mortgage loans or some bonds) will have an interest rate fallback regime whereby a noteholder or administrator will have the power to choose a "comparable" rate when LIBOR is not available. This can also be problematic arrangement – it is not definitive and leaves the ultimate outcome up to the choice of that party which could create a diversity of

---

[28] Some products, such as syndicated loans, commonly fall back to a different interest rate benchmark, such as the Prime Rate.

7

Exhibit 2
Page 166

59

outcomes for similar products, and of course what is 'comparable' is in the eye of the beholder. We expect that decisions about what is comparable will be highly litigated, and we understand from our members in such administrative roles that they are not typically comfortable making these determinations absent legal cover such as indemnities or court orders. In some cases, steps have already been taken to move these issues to the courts.

**Amendment is Not a Realistic Option for Tough Legacy Transactions**

The first thought many have regarding this problem is "why can't you just amend these problematic provisions?". Afterall, many swaps and other derivative contracts were amended en-masse by an industry-wide protocol. While this is a sensible question, the reality is that the ability to amend cash products generally falls in a range from "difficult" to "practically impossible". For one, cash market transactions are not as homogeneous as most swap and futures contracts. They are not typically exchange traded, and they are not based on industry-standard forms and documentation that can be amended on a standardized, industry-wide basis.

Starting with the simplest transaction, a bilateral LIBOR loan or credit facility, a lender and counterparty discussing an amendment makes sense - in the abstract. The problem is that lenders likely have hundreds or thousands (or more) of these loans, and each negotiation will take time and likely involve legal review (and expense) by both the lender and the customer. Given the scale of this problem, our members and the industry more broadly do not view negotiation as a practical option, certainly not by the end of 2021, and not even by June 2023. This means that once again, the likely outcome is uncertainty, disruption, and litigation.

For a more complicated situation we turn to a broadly held LIBOR-based floating rate corporate bond or securitization transactions. There may be hundreds of holders (or more) for these instruments. There are usually contractual or regulatory consent requirements for amendments to the terms of these transactions. In the U.S., amendments to the interest rate provisions of a transaction generally require a supermajority and in many cases 100% consent of holders.[29] In the case of a multi-security issuance such as many securitizations, you would need unanimous consent for each security issued in the transaction. This is practically impossible to achieve on a broad scale of tens of thousands of transactions, given the difficulty in contacting all noteholders, getting each of them to vote, and getting each of them to vote the same way.

Notifications to holders of securities may be sent from a trustee or DTC or issuer to custodians or other parties, but it is not the case that they will always reach end holders, and not in a timely manner in any case. The 100% requirement means that every noteholder has to vote, and that every noteholder has to vote in favor. In other words, one noteholder out of 1000, through inaction or a negative vote, could stop an amendment. The process has a low probability of success and is resource intensive and time-consuming. There have been some successful amendments related to LIBOR in the UK recently, and in the past in the U.S. related

---

[29] See Trust Indenture Act discussion below.

8

Exhibit 2
Page 167

60

to student loan transactions, for example. However, this limited success on a dramatically smaller scale cannot be extrapolated to tens of thousands of transactions on a timeline shorter than two years.

In some cases, the Trust Indenture Act ("TIA") is at the root of the consent requirement. The TIA provides that *"the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security…shall not be impaired or affected without the consent of such holder"*, which has been interpreted to apply to interest rate provisions.[30] In transactions subject to the TIA, this is governing law. In transactions not subject to the TIA, it is common that the same, or similar, language will be inserted into a transaction. This language is sensible and protective of investors in the usual context. However, in the context of the transition away from LIBOR, this type of restriction is a roadblock to reform of transaction provisions. We believe narrow and targeted relief from certain provisions of the TIA, implemented in a manner that does not compromise investor protections, is an important component of any Federal legislation.

Investment funds such as mutual funds or pension plans may hold hundreds of floating rate instruments, and the resources and time are simply not there to enter into negotiations with each issuer of a bond that is held across a family of mutual funds, pension funds, and other investment vehicles, especially given that the consent requirements discussed above make it clear that your negotiation success depends on the actions (or inactions) of others. This has driven SIFMA's asset manager members to be supportive of federal legislation.

**Legislation is Needed to Transition Tough Legacy Transactions that Lack Effective Fallback Provisions – the ARRC Proposal**

Recognizing this problem, the ARRC created a working group to look at options and develop recommendations for tough legacy transactions. In March 2021, the ARRC published a proposal for a statutory mechanism to address these ineffective tough legacy transaction fallback provisions. The legislation proposed by the ARRC would create a statutory safe harbor from litigation and replace LIBOR-based fallbacks with those recommended by the ARRC, which would be based on SOFR.[31] The goals of the legislative approach are manifold: to provide certainty of outcomes to contract participants, to provide equality of outcomes to market participants, and ultimately to promote the liquidity and stability of financial markets.

Given that many financial contracts are governed by New York state law, the ARRC initially proposed this legislation in the state of New York.[32] In sum, the ARRC's proposed legislation would:

---

[30] TIA §316(b)

[31] https://www.newyorkfed.org/arrc/publications/legislation

[32] Based on feedback SIFMA has received from market data vendors, we believe a very large majority of securitization contracts that are governed by U.S. law are governed by New York law, and that a majority of corporate bond contracts that are governed by U.S. law are governed by New York law.

9

Exhibit 2
Page 168

61

⇒ For contracts where fallbacks are ineffective, i.e. there are no fallbacks, the fallbacks involve a poll for LIBOR rates, or are otherwise based on LIBOR (such as last known LIBOR), the statute would have a mandatory application and replace such provisions with ARRC-recommended provisions;

⇒ For contracts where the fallbacks involve discretion, i.e. the responsible party may choose an alternative to LIBOR, the statute would create a safe harbor from litigation if the party chose an ARRC-recommended rate;

⇒ Allow contract parties to mutually opt-out of the legislation;

⇒ Have no effect on contracts or instruments where the fallback was to a non-LIBOR based rate, such as the Prime Rate, as is common in many syndicated loans and business loans.

SIFMA supported the publication of this language and advocated for its passage in New York.[33],[34] The New York City Bar Association offered support for the legislation.[35] The legislation was also supported by consumer advocacy groups.[36]

After years of work and advocacy by the ARRC and others including SIFMA, on March 24 the New York Assembly and Senate passed legislation aligned with the ARRC's recommendation on a nearly unanimous vote and the Governor signed the bill. While this is certainly a positive outcome, we believe there is more to be done at the Federal level.

**Uniform Federal Legislation Will Benefit Investors, Consumers, and Financial Markets**

The broad base of support for this legislation in New York stems from its of benefits to issuers, investors, and consumers. Federal legislation will confer an enhanced version of these benefits to end users in all 50 states. These benefits include:

⇒ **All parties will have certainty about the outcome of the LIBOR transition.** Investors, borrowers, and consumers will not be left to the whims of their issuer or lender to know what is going to happen in June 2023. They will know the outcome in advance and be able to plan, hedge, refinance, or take other actions they deem to be in their best interest. We have found in conversations with our members that this is a critical benefit of Federal legislation – our members and their peers do not have the resources or time to go transaction-by-transaction to address this complicated issue. This would not be achieved with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **All parties will have the same outcome.** Investors, borrowers, and consumers will be treated the same as their counterparts and peers. In the absence of federal legislation,

---

[33] See SIFMA statement: https://www.sifma.org/resources/news/sifma-statement-on-transition-from-libor-to-alternative-rates-and-arrc-model-law-for-new-york-state/

[34] See SIFMA-coordinated letter from broad spectrum of entities in support of legislation: https://www.sifma.org/wp-content/uploads/2020/12/ARRC-Letter-of-Support-12.15.20.pdf

[35] Noting that "The Working Group has concluded that the Proposed Statute would survive a legal challenge based on any of these federal or New York State constitutional constraints", available here: https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/libor-replacement-legislation

[36] https://protectborrowers.org/wp-content/uploads/2021/03/Consumer-Group-Letter_LIBOR.pdf

10

Exhibit 2
Page 169

62

one consumer could get a perceived better outcome than their neighbor. With federal legislation, everyone will be treated the same. This is not likely to happen with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **The legislation will avoid litigation gridlock.** In the absence of federal legislation, we expect that thousands of lawsuits would occur. There would likely be transaction administrators such as trustees seeking guidance from the courts in Article 77 proceedings in New York and similar proceedings in other states. There would also be the potential for a multitude of adversarial proceedings against trustees, issuers, underwriters, investment managers, etc. As with any court proceeding, the outcome is uncertain until the court issues its decision and appeals are exhausted (in contrast to the certainty provided by legislation noted in the previous two items). Absent federal legislation, issuers, investors, and consumers may face years of uncertainty and significant costs due to litigation. This would not be ameliorated (and may in fact be complicated) with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **Market stability and liquidity will be preserved.** In the absence of federal legislation, it could reasonably be expected that transactions subject to disputes could see a drop in value (or an increase in value), creating uncertainty that would cause a drop in liquidity and an increase in volatility. Broadly speaking, that is a negative outcome for holders of these instruments. This would not be avoided with a patchwork of inconsistent, or non-existent, state legislation.

⇒ **Freedom of choice for new contracts will be preserved.**  The legislation will not impair anyone's ability to choose whichever rate they prefer for new loans, credit facilities, securities offerings, or other contractual arrangements.

**SIFMA Supports Enactment of Federal Legislation Modeled on the ARRC's Proposed Legislation**

SIFMA strongly supports federal legislation that is aligned with the ARRC's approach. While the New York legislation is useful for certain New York law-governed instruments, it is not a full solution to "tough legacy" contracts.

Federal legislation can address all contracts governed by a state or federal law. While a majority of corporate bonds and securitizations are governed by New York law, a vast number of loans, credit facilities, bonds, and other instruments are governed by state laws other than New York. A uniform federal law can promote the benefits we discussed above – contract certainty, fairness and equality of outcomes, avoidance of years of litigation, and market liquidity – across the nation. A patchwork of inconsistent, or non-existent, state legislation, cannot do this.

Federal law can also address issues such as the Trust Indenture Act, and provide narrow, targeted relief that allows contracts to transition to more robust reference rates without

11

Exhibit 2
Page 170

63

impossible to meet unanimous consent requirements. Federal law can also ensure that there are not adverse tax or other consequences to issuers, holders, or consumers.

While U.S. Dollar LIBOR is expected to be published until June 2023, we believe time is of the essence for a federal legislative solution. Financial regulators are highly focused on moving as much activity away from LIBOR as quickly as possible. Additionally, once legislation is passed, it is not the case that the provisions of the law are implemented immediately. There are many parties involved in these transactions, and it will take meaningful amounts of time for all parties to revise internal systems and models to account for changes to interest rate calculations, for transaction-level changes to be communicated to end-users, and for other steps that need to be taken to happen.

SIFMA and its members commend Senators Brown and Toomeyand members of the Committee for holding this hearing and moving forward on this important issue.  SIFMA strongly supports a federal legislative solution and looks forward to working with Senators Tester and Tillis on legislationas it moves through the legislative process.

We thank the Committee for the opportunity to provide our comments and we respectfully request you take them into consideration as you carefully consider federal LIBOR legislation to address tough legacy. We believe Congress can provide a great service to consumers, businesses, lenders, and investors by enacting targeted federal LIBOR legislation.

12

Exhibit 2
Page 171