# Exhibit 3

American farmers face high fees and barriers to getting their commodities into shipping containers.

After defying the odds of weather and many other issues that our farmers face, it is unconscionable that our perishable exports are left sitting in warehouses to rot.

This bill provides the first significant Federal update of the Federal Maritime Commission's powers since 1998 and will significantly improve our farmers' access to affordable shipping.

Mr. Speaker, I am a proud cosponsor of the Ocean Shipping Reform Act of 2021, and I urge my colleagues to support this important bill.

Mr. GARAMENDI. Mr. Speaker, I continue to reserve the balance of my time.

Mr. JOHNSON of South Dakota. Mr. Speaker, I am prepared to close, and I yield myself the balance of my time.

Mr. Speaker, there are a few things that I know for sure. The first is that when you use American ports you should be subjected to some very basic rules of the road. Things like not being allowed to unreasonably discriminate against American cargo, that is one thing I know for sure.

Another thing I know for sure is that although this bill is not a silver bullet, and nobody is alleging that it is only the ocean carriers that are responsible for this supply chain crunch, this will help. This better aligns the interests of the ocean carriers with the interests of American manufacturers and American farmers and ranchers. That will go a long way toward helping to resolve the supply chain crunch.

Mr. Speaker, finally, one more thing that I know for sure, and that is when you have 360 national, State, and local groups, when you have 90 Members of Congress, when you have a bipartisan coalition that has come together to embrace this concept in what is all too often a partisan environment, then I think you know you have a good policy solution.

With that in mind, I once again thank the gentleman from California for his leadership, and I urge all of my colleagues to support the bill, and ask the Senate for their expeditious consideration of it.

Mr. Speaker, I yield back the balance of my time.

Mr. GARAMENDI. Mr. Speaker, I yield myself the balance of my time.

Occasionally, we toss words back and forth across the aisle here, and I would like to toss a word back across the aisle to Mr. JOHNSON.

He said compliments my way. The actual compliments go his way. It is not often that we spend time, and we spend a good deal of time working together on these bills, and we ought to do more across the aisle.

Mr. Speaker, it has been a pleasure working with Mr. JOHNSON and his team, and I thank him. I thank him for stepping forward, as have other Members on your side and my side of the aisle, stepping forward and saying, Hey, there is a problem. It is a problem out there. There are problems of retention and demurrage charges that are, Well, how could that be.

An importer of plastic Christmas trees and wreaths and other ornaments from China could not get his containers off of the port. Yet, he was being charged $4 million, which pretty much puts him out of business. He is not the biggest company in the world, but he would like to be. And given the unfair situation that he was facing, he may never become a major company in the United States. So we need to set up rules of the road, words that Mr. JOHNSON laid out so clearly. Rules of the road; the guardrails. Within these rules, operations, free enterprise, market competition can take place, but right now, it is a wide-open system in which there is a gunfight on the street, and that is leading to companies not being able to get their goods on the ships to export.

And comments that you have already heard from Mr. COSTA, California is a big agricultural export, and so is South Dakota, and so is the Midwest, and so is the Southeast. All of America wants to export, but when you cannot get a container, you are not going to export and you are likely to be out of business, and you are going to incur a very, very significant charge.

So we set up a system in which these charges and the availability are regulated in a mechanism that will be conducted by the Federal Maritime Commission. We can go on and on here, and we probably ought to, but I won't take my full 10 minutes. I will say, as Mr. JOHNSON said earlier, this isn't the silver bullet, this isn't going to solve all the problems, but when you consider what has already occurred in legislation here—specifically, the Infrastructure Investment and Jobs Act, that piece of legislation will provide $2.5 billion to the ports so that they can upgrade their facilities, so that they can, the next time around, be able to avoid the kind of congestion that is plaguing all of the commerce in this Nation.

We also look to the Build Back Better legislation, which has another $2.5 billion in it to deal with additional infrastructure that is necessary to connect the ports to the rest of the transportation system in this Nation.

Mr. Speaker, we need this bill. We, the American farmer, needs this bill. We, the American export industry—whether it is heavy, light—and the import community, all need this bill. So I urge my colleagues to support the legislation, and in that process, we will, I believe, have a much better market system here in the United States, one that has guardrails, one that provides an equitable and balanced system for the importers and the exporters.

Mr. Speaker, I want to take an opportunity here to thank some very important people. The staff that put this together, on our side of the aisle, Matt Dwyer, the lead person on the Subcommittee on Coast Guard and Maritime Transportation; CheriAnn Thompson on that committee; Cheryl Dickson; and Iain Hart from my own staff.

Mr. Speaker, I yield 1 minute to the gentleman from South Dakota (Mr. JOHNSON) if he would like to thank his staff.

Mr. JOHNSON of South Dakota. Mr. Speaker, I would just echo the thoughts of Mr. GARAMENDI that there have been so many who have worked together, and really a broad national coalition, and he is exactly right to call attention to the people who do the work behind the scenes.

Mr. GARAMENDI. Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from California (Mr. GARAMENDI) that the House suspend the rules and pass the bill, H.R. 4996, as amended.

The question was taken.

The SPEAKER pro tempore. In the opinion of the Chair, two-thirds being in the affirmative, the ayes have it.

Mr. GARAMENDI. Mr. Speaker, on that I demand the yeas and nays.

The SPEAKER pro tempore. Pursuant to section 3(s) of House Resolution 8, the yeas and nays are ordered.

Pursuant to clause 8 of rule XX, further proceedings on this motion are postponed.

☐ 1130

## ADJUSTABLE INTEREST RATE (LIBOR) ACT OF 2021

Mr. SHERMAN. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 4616) to deem certain references to LIBOR as referring to a replacement benchmark rate upon the occurrence of certain events affecting LIBOR, and for other purposes, as amended.

The Clerk read the title of the bill.

The text of the bill is as follows:

H.R. 4616

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''Adjustable Interest Rate (LIBOR) Act of 2021''.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—The Congress finds that—

(1) LIBOR is used as a benchmark rate in more than $200 trillion of contracts worldwide;

(2) a significant number of existing contracts that reference LIBOR do not provide for the use of a clearly defined or practicable replacement benchmark rate when LIBOR is discontinued; and

(3) the cessation or non-representativeness of LIBOR could result in disruptive litigation related to existing contracts that do not provide for the use of a clearly defined or practicable replacement benchmark rate.

(b) PURPOSE.—It is the purpose of this Act—

(1) to establish a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate, without affecting the ability of

Exhibit 3
Page 172

parties to use any appropriate benchmark rate in new contracts;

(2) to preclude litigation related to existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate; and

(3) to allow existing contracts that reference LIBOR but provide for the use of a clearly defined fallback and practicable replacement rate, to operate according to their terms.

(c) RULE OF CONSTRUCTION.—Nothing in this Act shall be construed to disfavor the use of any benchmark rate on a prospective basis.

**SEC. 3. DEFINITIONS.**

As used in this Act, the following terms shall have the following meanings:

(1) ''Benchmark'' shall mean an index of interest rates or dividend rates that is used, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment or other measurement.

(2) ''Benchmark Administrator'' means a person that publishes a Benchmark for use by third parties.

(3) ''Benchmark Replacement'' shall mean a Benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or in respect of a LIBOR Contract.

(4) ''Benchmark Replacement Conforming Changes'' shall mean any technical, administrative, or operational changes, alterations, or modifications that—

(A) the Board determines, in its discretion, would address one or more issues affecting the implementation, administration, and calculation of the Board-Selected Benchmark Replacement in LIBOR contracts; or

(B) solely with respect to a LIBOR Contract that is not a Consumer Loan, in the reasonable judgment of a Calculating Person, are otherwise necessary or appropriate to permit the implementation, administration, and calculation of the Board-Selected Benchmark Replacement under or in respect of a LIBOR Contract after giving due consideration to any Benchmark Replacement Conforming Changes under subparagraph (A).

(5) ''Board'' means the Board of Governors of the Federal Reserve System.

(6)(A) ''Board-Selected Benchmark Replacement'' shall mean a Benchmark Replacement identified by the Board that is based on SOFR.

(B) The Board shall adjust the Board-Selected Benchmark Replacement for each category of LIBOR Contract that the Board may identify to—

(i) apply to each LIBOR tenor; and

(ii) incorporate the relevant Tenor Spread Adjustment.

(C) For Consumer Loans, the Board-Selected Benchmark Replacement shall initially reflect the spread between the Board-Selected Benchmark Replacement and LIBOR immediately before the LIBOR Replacement Date and shall incorporate the relevant Tenor Spread Adjustment over a one-year transition period.

(7) ''Calculating Person'' shall mean, with respect to any LIBOR Contract, any person (which may be the Determining Person) responsible for calculating or determining any valuation, payment, or other measurement based on a Benchmark.

(8) ''Consumer Loan'' shall mean a consumer credit transaction. For purposes of this paragraph, the terms ''consumer'' and ''credit'' have the meaning given those terms, respectively, under section 103 of the Truth in Lending Act (15 U.S.C. 1602).

(9) ''Determining Person'' shall mean, with respect to any LIBOR Contract, any person with the authority, right, or obligation, including on a temporary basis, (as identified by the provisions of the LIBOR Contract, or as identified by the governing law of the LIBOR Contract, as appropriate) to determine a Benchmark Replacement.

(10) ''Fallback Provisions'' shall mean terms in a LIBOR Contract for determining a Benchmark Replacement, including any terms relating to the date on which the Benchmark Replacement becomes effective.

(11) ''LIBOR'' shall mean the overnight and 1-, 3-, 6-, and 12-month tenors of U.S. dollar LIBOR (formerly known as the London interbank offered rate) as administered by ICE Benchmark Administration Limited (or any predecessor or successor thereof). LIBOR shall not include the 1-week or 2-month tenors of U.S. dollar LIBOR.

(12) ''LIBOR Contract'' shall mean, without limitation, any contract, agreement, indenture, organizational documents, guarantee, mortgage, deed of trust, lease, Security (whether representing debt or equity, and including any interest in a corporation, a partnership, or a limited liability company), instrument, or other obligation or asset that, by its terms, continues in any way to use LIBOR as a Benchmark as of the applicable LIBOR Replacement Date.

(13) ''LIBOR Replacement Date'' shall mean the first London banking day after June 30, 2023, unless the Board determines that any LIBOR tenor will cease to be published or cease to be representative on a different date.

(14) ''Security'' shall have the meaning assigned to such term in section 2(a) of the Securities Act of 1933 (15 U.S.C. 77b(a)).

(15) ''SOFR'' shall mean the Secured Overnight Financing Rate published by the Federal Reserve Bank of New York (or a successor administrator).

(16) ''Tenor Spread Adjustment'' shall mean—

(A) 0.00644 percent for overnight LIBOR;
(B) 0.11448 percent for 1-month LIBOR;
(C) 0.26161 percent for 3-month LIBOR;
(D) 0.42826 percent for 6-month LIBOR; and
(E) 0.71513 percent for 12-month LIBOR.

**SEC. 4. LIBOR CONTRACTS.**

(a) On the LIBOR Replacement Date, the Board-Selected Benchmark Replacement shall, by operation of law, be the Benchmark Replacement for any LIBOR Contract that, after giving any effect to subsection (b)—

(1) contains no Fallback Provisions; or
(2) contains Fallback Provisions that identify neither—

(A) a specific Benchmark Replacement; nor
(B) a Determining Person.

(b) On the LIBOR Replacement Date, any references in the Fallback Provisions of a LIBOR Contract to—

(1) a Benchmark Replacement that is based in any way on any LIBOR value, except to account for the difference between LIBOR and the Benchmark Replacement, or

(2) a requirement that a person (other than a Benchmark Administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates,

shall be disregarded as if not included in the Fallback Provisions of such LIBOR Contract and shall be deemed null and void and without any force or effect.

(c) Subject to subsection (g)(2), a Determining Person shall have authority under this Act, but shall not be required, to select the Board-Selected Benchmark Replacement as the Benchmark Replacement.

(d) Any selection by a Determining Person of the Board-Selected Benchmark Replacement pursuant to subsection (c) shall be—

(1) irrevocable;
(2) made by the earlier of the LIBOR Replacement Date and the latest date for selecting a Benchmark Replacement according to the terms of such LIBOR Contract; and
(3) used in any determinations of the Benchmark under or in respect of such LIBOR Contract occurring on and after the LIBOR Replacement Date.

(e) If a Determining Person has authority to select the Board-Selected Benchmark Replacement under subsection (c) but does not select a Benchmark Replacement by the date specified in subsection (d)(2), then, on the LIBOR Replacement Date, the Board-Selected Benchmark Replacement shall, by operation of law, be the Benchmark Replacement for the LIBOR Contract.

(f) If the Board-Selected Benchmark Replacement becomes the Benchmark Replacement for a LIBOR Contract pursuant to subsection (a), (c), or (e) then all Benchmark Replacement Conforming Changes shall become an integral part of such LIBOR Contract by operation of law. For the avoidance of doubt, a Calculating Person shall not be required to obtain consent from any other person prior to the adoption of Benchmark Replacement Conforming Changes.

(g) The provisions of this Act shall not alter or impair—

(1) any written agreement specifying that a LIBOR Contract shall not be subject to this Act;
(2) any LIBOR Contract that contains Fallback Provisions that identify a Benchmark Replacement that is not based in any way on any LIBOR value (including, but not limited to, the prime rate or the Effective Federal Funds Rate), except that such LIBOR Contract shall be subject to subsection (b);
(3) any LIBOR Contract subject to subsection (c) as to which a Determining Person does not elect to use a Board-Selected Benchmark Replacement pursuant to subsection (c), except to the extent that such LIBOR Contract is subject to subsection (b) or (e);
(4) the application to a Board-Selected Benchmark Replacement of any cap, floor, modifier, or spread adjustment to which LIBOR had been subject pursuant to the terms of a LIBOR Contract; or
(5) any provisions of Federal consumer financial law that require creditors to notify borrowers regarding a change-in-terms or that govern the reevaluation of rate increases on credit card accounts under open-end (not home-secured) consumer credit plans.

(h) Except as provided in section 5(c), the provisions of this Act shall not alter or impair the rights or obligations of any person, or the authorities of any agency, under Federal consumer financial law (as defined in section 1002(14) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 5481(14)).

**SEC. 5. CONTINUITY OF CONTRACT AND SAFE HARBOR.**

(a) A Board-Selected Benchmark Replacement and the selection or use of a Board-Selected Benchmark Replacement as a Benchmark Replacement under or in respect of a LIBOR Contract, as well as any Benchmark Replacement Conforming Changes, by operation of section 4 shall constitute—

(1) a commercially reasonable replacement for and a commercially substantial equivalent to LIBOR;
(2) a reasonable, comparable, or analogous rate, index, or term for LIBOR;
(3) a replacement that is based on a methodology or information that is similar or comparable to LIBOR;
(4) substantial performance by any person of any right or obligation relating to or based on LIBOR; and

Exhibit 3
Page 173

(5) a replacement that has historical fluctuations that are substantially similar to those of LIBOR for purposes of the Truth in Lending Act and its implementing regulations.

(b) Neither of (1) the selection or use of a Board-Selected Benchmark Replacement as a Benchmark Replacement or (2) the determination, implementation, or performance of Benchmark Replacement Conforming Changes, in each case by operation of section 4, shall (A) be deemed to impair or affect the right of any person to receive a payment, or to affect the amount or timing of such payment, under any LIBOR Contract or (B) have the effect of (i) discharging or excusing performance under any LIBOR Contract for any reason, claim, or defense (including, but not limited to, any force majeure or other provision in any LIBOR Contract), (ii) giving any person the right to unilaterally terminate or suspend performance under any LIBOR Contract, (iii) constituting a breach of any LIBOR Contract, or (iv) voiding or nullifying any LIBOR Contract.

(c) No person shall be subject to any claim or cause of action in law or equity or request for equitable relief, or have liability for damages, arising out of—

(1) the selection or use of a Board-Selected Benchmark Replacement,

(2) the implementation of Benchmark Replacement Conforming Changes, or

(3) with respect to a LIBOR Contract that is not a Consumer Loan, the determination of Benchmark Replacement Conforming Changes,

in each case after giving effect to the provisions of section 4; provided, however, that in each case any person (including a Calculating Person) shall remain subject to the terms of a LIBOR Contract that are not affected by this Act and any existing legal, regulatory, or contractual obligations to correct servicing or other ministerial errors under or in respect of a LIBOR Contract.

(d) The selection or use of a Board-Selected Benchmark Replacement or the determination, implementation, or performance of Benchmark Replacement Conforming Changes, in each case by operation of section 4, shall not be deemed to—

(1) be an amendment or modification of any LIBOR Contract for the purpose of the governing law of such LIBOR Contract; or

(2) prejudice, impair, or affect any person's rights, interests, or obligations under or in respect of any LIBOR Contract.

(e) Except as provided in either subsections (a), (b), or (c) of section 4, the provisions of this Act shall not be interpreted as creating any negative inference or negative presumption regarding the validity or enforceability of—

(1) any Benchmark Replacement (including any method for calculating, determining, or implementing an adjustment to the Benchmark Replacement to account for any historical differences between LIBOR and the Benchmark Replacement) that is not a Board-Selected Benchmark Replacement; or

(2) any changes, alterations, or modifications to or in respect of a LIBOR Contract that are not Benchmark Replacement Conforming Changes.

### SEC. 6. PREEMPTION.

(a) This Act and the regulations hereunder shall supersede any and all laws, statutes, rules, regulations, or standards of any State, the District of Columbia, or any territory or possession of the United States, insofar as they provide for the selection or use of a Benchmark Replacement or related conforming changes.

(b) No provision of State or local law that expressly limits the manner of calculating interest, including the compounding of interest, shall apply to the selection or use of a Board-Selected Benchmark Replacement or Benchmark Replacement Conforming Changes.

### SEC. 7. TRUST INDENTURE ACT OF 1939.

Section 316 of the Trust Indenture Act of 1939 (15 U.S.C. 77ppp) is amended—

(1) by striking ''and'' after ''of subsection (a),'' in subsection (b); and

(2) by inserting '', and except that the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security shall not be deemed to be impaired or affected by any change occurring by the application of section 4 of the Adjustable Interest Rate (LIBOR) Act of 2021 to any indenture security'' after ''subject to such lien'' in subsection (b).

### SEC. 8. RULEMAKING.

Not later than 180 days after the date of enactment of this Act, the Board shall issue such regulations as may be necessary or appropriate to enable it to administer and carry out the purposes of this Act.

### SEC. 9. REVISED CALCULATION RULE TO ADDRESS INSTANCES WHERE 1-MONTH USD LIBOR CEASES OR IS NON-REPRESENTATIVE.

Section 438(b)(2)(I) of the Higher Education Act of 1965 (20 U.S.C. 1087–1(b)(2)(I)) is amended by adding at the end the following:

''(viii) REVISED CALCULATION RULE TO ADDRESS INSTANCES WHERE 1-MONTH USD LIBOR CEASES OR IS NON-REPRESENTATIVE.—

''(I) SUBSTITUTE REFERENCE INDEX.—The provisions of this clause apply to loans for which the special allowance payment would otherwise be calculated pursuant to clause (vii).

''(II) CALCULATION BASED ON SOFR.—For loans described in subclause (III) or (IV), the special allowance payment described in this subclause shall be substituted for the payment provided under clause (vii). For each calendar quarter, the formula for computing the special allowance that would otherwise apply under clause (vii) shall be revised by substituting 'of the quotes of the 30-day Average Secured Overnight Financing Rate (SOFR) in effect for each of the days in such quarter as published by the Federal Reserve Bank of New York (or a successor administrator), adjusted daily by adding the Tenor Spread Adjustment, as that term is defined in the Adjustable Interest Rate (LIBOR) Act of 2021, for 1-month LIBOR contracts of 0.11448 percent' for 'of the 1-month London Inter Bank Offered Rate (LIBOR) for United States dollars in effect for each of the days in such quarter as compiled and released by the British Bankers Association'. The special allowance calculation for loans subject to clause (vii) shall otherwise remain in effect.

''(III) LOANS ELIGIBLE FOR SOFR-BASED CALCULATION.—Except as provided in subclause (IV), the special allowance payment calculated under subclause (II) shall apply to all loans for which the holder (or, if the holder acts as an eligible lender trustee for the beneficial owner of the loan, the beneficial owner of the loan) at any time after the effective date of this clause notifies the Secretary that the holder or beneficial owner affirmatively and permanently elects to waive all contractual, statutory, or other legal rights to a special allowance paid under clause (vii) or to the special allowance paid pursuant to any other formula that was previously in effect with respect to such loan, and accepts the rate described in subclause (II). Any such waiver shall apply to all loans then held, or to be held from time to time, by such holder or beneficial owner; provided that, due to the need to obtain the approval of one of the following, demonstrated to the satisfaction of the Secretary—

''(aa) one or more third parties with a legal or beneficial interest in loans eligible for the SOFR-based calculation, or

''(bb) a nationally recognized rating organization assigning a rating to a financing secured by loans otherwise eligible for the SOFR-based calculation,

the holder of the loan (or, if the holder acts as an eligible lender trustee for the beneficial owner of the loan, the beneficial owner of the loan) may elect to apply the rate described in subclause (II) to specified loan portfolios established for financing purposes by separate notices with different effective dates. The special allowance rate based on SOFR shall be effective with respect to a portfolio as of the first day of the calendar quarter following the applicable effective date of the waiver received by the Secretary from the holder or beneficial owner and shall permanently and irrevocably continue for all subsequent quarters.

''(IV) FALLBACK PROVISIONS.—

''(aa) In the event that a holder or beneficial owner has not elected to waive its rights to a special allowance payment under clause (vii) with respect to a portfolio with an effective date of the waiver prior to the first of—

''(AA) the date on which the ICE Benchmark Administration ('IBA') has permanently or indefinitely stopped providing the 1-month United States Dollar LIBOR ('1-month USD LIBOR') to the general public,

''(BB) the effective date of an official public statement by the IBA or its regulator that the 1-month USD LIBOR is no longer reliable or no longer representative, or

''(CC) the LIBOR Replacement Date, as that term is defined in section 3 of the Adjustable Interest Rate (LIBOR) Act of 2021,

the special allowance rate calculation as described in subclause (II) shall, by operation of law, apply to all loans in such portfolio.

''(bb) In such event—

''(AA) the last determined rate of special allowance based on 1-month USD LIBOR will continue to apply until the end of the then current calendar quarter; and

''(BB) the special allowance rate calculation as described in subclause (II) shall become effective as of the first day of the following calendar quarter and remain in effect for all subsequent calendar quarters.''.

The SPEAKER pro tempore. Pursuant to the rule, the gentleman from California (Mr. SHERMAN) and the gentleman from Michigan (Mr. HUIZENGA) each will control 20 minutes.

The Chair recognizes the gentleman from California.

GENERAL LEAVE

Mr. SHERMAN. Mr. Speaker, I ask unanimous consent that all Members have 5 legislative days in which to revise and extend their remarks and include extraneous material on this legislation.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. SHERMAN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, today we show that the House of Representatives can deal with a really big problem before it becomes a crisis and before almost anybody even knows that there is a problem. We can deal with such a problem without drama, without deadlock, without partisanship. We can do it a year and a half before it all explodes, so as to give the Senate, the regulatory agencies,

Exhibit 3
Page 174

and the private sector the time that they need to do this job long before the impending uncertainty disrupts our economy.

As co-chair of the CPA Caucus, I am here to certify that this is the most important genuinely boring bill that will come before this House this year.

Mr. Speaker, there are trillions of outstanding loans that have adjustable interest rates. The adjustment of these loans is tied to the London Interbank Offered Rates, known as LIBOR. LIBOR has been referred to as the most important interest rate in the world.

We are dealing here with adjustable rate mortgages, business loans and securities, and even some student loans. For many years LIBOR was the index. When LIBOR went up, the interest rate on these instruments would go up. When LIBOR went down, the interest would go down. For many years it worked well.

LIBOR is based on a survey of British bankers. A few years ago some British bankers lied and some went to jail. Our friends across the pond said they would stop publishing the LIBOR index. We asked them to keep doing it. They are going to stop on June 30, 2023.

Some $16 trillion of loans and business instruments will still be outstanding. Those instruments will specify that you calculate the interest rate based on LIBOR, and LIBOR will not exist.

These $16 trillion of loans and other business instruments do not specify what is supposed to happen if you go to calculate the interest rate based on LIBOR and there is no LIBOR. That is why they are called tough legacy LIBOR instruments.

We could do what all too often happens in Washington—we could ignore the problem. We could then leave it up to tens of thousands of class action lawsuits, hundreds of thousands of regular lawsuits, as borrower and lender try to figure out what interest rate would apply. That would be terrible for our economy and our court system.

We have got a better idea. The legislation before us today, H.R. 4616, the Adjustable Interest Rate (LIBOR) Act, which will provide borrowers, investors, and all those in the financial space certainty as to what happens when LIBOR is no longer published.

Before I continue, I want to thank Chairwoman WATERS and Ranking Member MCHENRY, and their staff for working closely with me to get this bill on the floor today. I particularly want to thank Rob Robilliard of my staff who has poured his heart and soul into this bill for the entire year.

I am pleased to say that H.R. 4616 has received the support of 21 business organizations, I would say every business organization with a stake in this matter, including the American Bankers Association, the Independent Bankers, and the Chamber of Commerce.

I want to particularly thank Kristi Leo, President of the Structured Finance Association, for working with us on this bill. The legislation has also won the support of so many public interest groups, including the National Consumer Law Center and Americans for Financial Reform.

I particularly want to thank Andrew Pizor of the National Consumer Law Center for his assistance.

Not only has this legislation received support from these important organizations, but every word—and I mean every word—has been carefully reviewed by the Federal Reserve Board, the U.S. Treasury Department, the Securities and Exchange Commission, the Office of Controller of the Currency, the Federal Housing Finance Agency, and the Consumer Financial Protection Bureau. We have revised it again and again based on their comments.

Each of these agencies has cleared on every word of the bill before us today. Once again, I want to thank the staff, particularly of the Federal Reserve, for their excellent work for helping us draft this legislation: Mackenzie Gross, Evan Winerman, and Mark Van Der Weide.

This text before us is a consensus product and all the agencies have signed off. We have worked with over 100 different organizations and groups, and to my knowledge none oppose the text that is before us today.

I want to thank the Alternative Reference Rate Committee, which was convened by the New York Fed which created the structured overnight finance rates, which are based on the treasury markets. Those markets are public, transparent, and not subject to manipulation. It is a broad market. Unlike the LIBOR rate, it is not subject to manipulation.

This bill provides that as to that $16 trillion of tough legacy LIBOR, pursuant to regulations published by the Fed, the various SOFR rates that are applicable will stand in for the LIBOR rate once the LIBOR rate is no longer published. It sounds simple, but let me tell you it has been a hell of a year as you try to get consensus on a bill affecting $16 trillion.

Mr. Speaker, I want to talk a little bit about why this bill is necessary and why it is so important. Just 2 months ago, October 20, the Federal Reserve, the CFPB, the FDIC in conjunction with the State Bank and Credit Union Regulators issued a joint statement stating that failure to adequately prepare for LIBOR's discontinuance could undermine the financial stability and safety and soundness of the institutions they oversee.

The Financial Stability Oversight Council, which we created in response to the 2008 meltdown, said that a cessation of LIBOR has the potential to significantly disrupt our financial markets. The SEC similarly warned that LIBOR's discontinuance may pose a significant risk to our stock and bond markets.

Secretary Janet Yellen and Federal Reserve Board Chair Powell told us that we need legislation to deal with this matter at the Federal level, and it is bipartisan. Steve Mnuchin testified to the same thing when he was Secretary of the Treasury in the Trump administration.

Finally, I should point out that Federal Reserve Chair Powell has told us that failure to deal with this presents a big financial stability risk to our entire economy.

As to the scope of this bill, it deals only with tough legacy LIBOR. It does not deal with those instruments that expire while LIBOR is still published, nor does it deal with those instruments that are created in the future and do not reference LIBOR.

There was an earlier draft of this bill that set forth the obvious, and that is the substitution of SOFR for the LIBOR index does not constitute a sale or exchange for tax purposes. We took that out because we wanted to move the bill quickly and not cause a referral to the Ways and Means Committee. Mostly we took it out because it was absolutely unnecessary.

It is very clear under existing tax law, the change of one index to another index that is incredibly similar, in this case, designed to be as close as humanly possible does not constitute a sale or exchange, but especially where that change is through the operation of law and where the change is necessitated because the original index is no longer published. The tax outcome is obvious and does not need to be part of the statute.

The last change we made in this bill was to add the words ''for purposes of the governing law of such LIBOR contracts'' to section 5(d). We did that to make it clear that we weren't dealing with any tax issue and anybody could hold it up to a magnifying glass and try to find a tax word in it. By putting these words in it we satisfied the Committee on Ways and Means. There is no taxation in this statute.

This law does deal and preempts the field with regard to all non-tax law, that means contract, commercial, financial law at both the Federal, State, and local level.

Finally, this act does not prescribe what interest rates ought to be used in the future. That is up to the parties involved. Nothing in this bill is designed to encourage the use of SOFR or any other particular benchmark interest rate, nor does it encourage or authorize any Federal regulatory agency to push any bank or other institution to use any particular rate in the future. That is up to them.

This bill deals with $16 trillion of tough legacy LIBOR. It is a consensus product. It is the result of the work of regulators, industry, and the public interest community.

Mr. Speaker, I urge its adoption and I reserve the balance of my time.

Exhibit 3
Page 175

HOUSE OF REPRESENTATIVES,
COMMITTEE ON WAYS AND MEANS,
*Washington, DC, December 7, 2021.*
Hon. MAXINE WATERS,
*Chairwoman, Committee on Financial Services, Washington, DC.*

DEAR CHAIRWOMAN WATERS: In recognition of the desire to expedite consideration of H.R. 4616, the ''Adjustable Interest Rate (LIBOR) Act of 2021,'' the Committee on Ways and Means agrees to waive formal consideration of the bill as to provisions that fall within the rule X jurisdiction of the Committee on Ways and Means.

The Committee on Ways and Means takes this action with the mutual understanding that we do not waive any jurisdiction over the subject matter contained in this or similar legislation, and the Committee will be appropriately consulted and involved as the bill or similar legislation moves forward so that we may address any remaining issues within our jurisdiction. The Committee also reserves the right to seek appointment of an appropriate number of conferees to any House-Senate conference involving this or similar legislation.

Finally, I would appreciate your response to this letter confirming this understanding and would ask that a copy of our exchange of letter on this matter be included in the Congressional Record during floor consideration of H.R. 4616.

Sincerely,
RICHARD E. NEAL,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, DC, December 7, 2021.*
Hon. RICHARD NEAL,
*Chairman, Committee on Ways and Means, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to acknowledge your letter dated December 7, 2021, regarding the waiver by the Committee on Ways and Means of any jurisdictional claims over the matters contained in H.R. 4616, the ''Adjustable Interest Rate (LIBOR) Act of 2021.'' The Committee on Financial Services confirms our mutual understanding that your Committee does not waive any jurisdiction over the subject matter contained in this or similar legislation, and your Committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that we may address any remaining issues within your jurisdiction.

The Committee on Financial Services further recognizes your interest in appointment of outside conferees from the Committee on Ways and Means should this bill or similar language be considered in a conference with the Senate.

Pursuant to your request, I will ensure that this exchange of letters is included in the Congressional Record during Floor consideration of the bill. I appreciate your cooperation regarding this legislation and look forward to continuing to work with you as this measure moves through the legislative process.

Sincerely,
MAXINE WATERS,
*Chairwoman.*

---

COMMITTEE ON EDUCATION AND LABOR, HOUSE OF REPRESENTATIVES,
*Washington, DC, December 7, 2021.*
Hon. MAXINE WATERS,
*Chairwoman, Committee on Financial Services, Washington, DC.*

DEAR CHAIRWOMAN WATERS: I write concerning H.R. 4616, the Adjustable Interest Rate (LIBOR) Act of 2021. This bill was primarily referred to the Committee on Financial Services, and additionally to the Committee on Education and Labor. As a result of your having consulted with me concerning this bill generally, I agree to forgo formal consideration of the bill so the bill may proceed expeditiously to the House floor.

The Committee on Education and Labor takes this action with our mutual understanding that by forgoing formal consideration of H.R. 4616, we do not waive any jurisdiction over the subject matter contained in this or similar legislation, and we will be appropriately consulted and involved as the bill or similar legislation moves forward so we may address any remaining issues within our Rule X jurisdiction. I also request that you support my request to name members of the Committee on Education and Labor to any conference committee to consider such provisions.

Finally, I would appreciate a response confirming this understanding and ask that a copy of our exchange of letters on this matter be included in the Committee Report filed by the Committee on Financial Services and in the Congressional Record during floor consideration of H.R. 4616.

Very truly yours,
ROBERT C. ''BOBBY'' SCOTT,
*Chairman.*

---

COMMITTEE ON FINANCIAL SERVICES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, December 7, 2021.*
Hon. BOBBY SCOTT,
*Chairman, House Committee on Education and Labor, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to acknowledge your letter dated December 7, 2021, regarding the waiver by the Committee on Education and Labor of any jurisdictional claims over the matters contained in H.R. 4616, the ''Adjustable Interest Rate (LIBOR) Act of 2021.'' The Committee on Financial Services confirms our mutual understanding that your Committee does not waive any jurisdiction over the subject matter contained in this or similar legislation, and your Committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that we may address any remaining issues within your jurisdiction.

The Committee on Financial Services further recognizes your interest in appointment of outside conferees from the Committee on Education and Labor should this bill or similar language be considered in a conference with the Senate.

Pursuant to your request, I will ensure that this exchange of letters is included in the Congressional Record during Floor consideration of the bill. I appreciate your cooperation regarding this legislation and look forward to continuing to work with you as this measure moves through the legislative process.

Sincerely,
MAXINE WATERS,
*Chairwoman.*

Mr. HUIZENGA. Mr. Speaker, I yield myself such time as I may consume. I appreciate the opportunity to be here today and to have this conversation.

This shouldn't be a surprise. We knew this day was coming since 2014. The Alternative Reference Rate Committee, the ARRC, has worked diligently to help ensure a successful transition from the aforementioned LIBOR rate system to a new system.

In fact, over the last several years, Republicans on the Financial Services Committee have raised this issue on numerous occasions with our prudential regulators, as well as the Secretary of the Treasury under even the last administration.

I, myself, have asked for a greater focus on this issue, but unfortunately, this request seemingly fell on some deaf ears. It was unfortunate that my colleagues on the other side seemed to sort of forge ahead without having a broader conversation. There was one hearing on this issue before we marked up this bill in July. We needed to do a better job in socializing this particular issue because now, Mr. Speaker, we have a problem.

We have Members of this Chamber who do not understand the issue and don't understand the process, and they look at this as being just rushed. They don't see the 2½, 3, 4, 5 years of having this discussion since the London Whale scandal happened where there was a manipulation of those international interest rates.

Here we are today, once again, because of a truncated process, and it appears to some of our Members that we are rushing through a bill that is going to expand the Federal Government, that could cost the Federal Government something, that is going to interfere with private contracts. We simply have not done the work to normalize and socialize this particular issue.

This has been described as a once-in-a-generation event, and we are talking about financial instruments with hundreds of trillions of dollars at stake, including effects that we can't even totally foresee.

Fast-forward more than 2½ years, here we are less than a month from the deadline, and we are just now voting on a bill to address these legacy contracts for the transition from LIBOR.

□ 1145

This is Washington and, frankly, the process at its worst.

So how did we get here? Every day, thousands of financial contracts attach LIBOR as the interest rate. With LIBOR phasing out, the financial system needs legal certainty on what happens to those legacy contracts that have this rate already baked in.

This bill attempts to provide a solution. It offers an alternative rate to affected parties who cannot agree on a rate to replace LIBOR.

To be clear, the rate offered under this legislation is one option. It does not prevent these parties from agreeing to something better that suits those particular needs of that contract.

Again, this bill was passed out of committee in July. Now, 4 months later, the Committees on Ways and Means and Education and Labor were finally able to include their portions of this. That is 4 months of inaction that has caused some of that now, today, concern by many on this side of the aisle.

To make this situation more frustrating, we still don't know where the Senate stands. I don't, the chair doesn't, and certainly the industry doesn't know where the Senate is. Frankly, maybe the Senate doesn't know itself. But, hopefully, today will spur them into this conversation.

Exhibit 3
Page 176

The bottom line is this process could have been much, much better. In fact, it should have been much, much better. It must be better when we are talking about preventing systemic risk to our financial system.

Our regulators who supervise the financial system have stated that this is a satisfactory fix, but I would wager a bitcoin that they aren't happy with how we arrived here today.

As a whole, I would like to thank the regulators for their hard work, and, in fact, I do believe that this bill would not be here today without their guidance. But this is not the process that Financial Services Committee Republicans would have pursued, and it is certainly not quite the bill that we would have drafted. But there are trillions of dollars at stake, and the safety and soundness of our financial system is at the stake, and here we are with an eleventh hour scramble again. Unfortunately, that seems to define how Washington, D.C., is being run today.

I will not stand in the way of this process, of allowing this process, and the progress for our regulators to be able to supervise this financial system. But I do encourage my Republican colleagues to trust our regulators and support this legislation despite having some doubts about the process of what we are seeing here today.

Mr. Speaker, I reserve the balance of my time.

Mr. SHERMAN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I wish to respond to this gentleman's remarks about the process. First, this bill is a good bill. Vote for the bill. There is no doubt this bill is a good bill.

I don't need to talk about the process, but I will for just a second. As to whether we had sufficient hearings and enough hearings that match the interest of this House, we had a full hearing of my subcommittee on this, and it is not as if 400 Members of the House showed up and said: We are not a member of the subcommittee, but can we participate?

It is not as if the balcony is filled. It is not as if we deprived our colleagues of information they were anxious to obtain.

But it is not just one hearing of the subcommittee. I regarded at least a dozen of the hearings of the Financial Services Committee over the last 2 years as hearings on LIBOR. In my opening remarks, I quoted what Secretary Mnuchin said. He said that in response to my questions when he came before us at hearings. The gentleman knows that at least probably a dozen hearings that we have had at Financial Services where we had the Secretary of the Treasury, where we had the Chair of the Federal Reserve, where we had other experts, I asked a question about LIBOR. And if my colleagues had found this subject near as interesting as I do, they would have asked questions about LIBOR as well. So we had one hearing dedicated to LIBOR and a dozen and more hearings where those dedicated to LIBOR could have asked questions.

As to whether people in this House should think that we are interfering with the rights of businesses to transact business, I include in the RECORD a letter in support of this bill signed by 21 business groups basically, every business group that deals with any instrument tied to the LIBOR index.

DECEMBER 7, 2021.

Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*
Hon. KEVIN MCCARTHY,
*Republican Leader, House of Representatives,*
*Washington, DC.*

DEAR SPEAKER PELOSI AND REPUBLICAN LEADER MCCARTHY: We, the undersigned organizations, support H.R. 4616, the ''Adjustable Interest Rate (LIBOR) Act,'' to address ''tough legacy'' contracts that currently reference LIBOR. We respectfully request the House of Representatives expeditiously pass this legislation.

In June 2023, all tenors of US dollar LIBOR, one of the most important financial benchmarks that underpins nearly $200 trillion in financial contracts, will cease to be published. As a result, there are trillions of dollars of hard to modify financial contracts, securities, and loans that use LIBOR—known as ''tough legacy'' contracts—that are unable, before this end date, to either convert to a non-LIBOR rate or amend the contracts to add adequate fallback language to another rate. Without federal legislation to address these contracts, investors, consumers, and issuers of securities may face years of uncertainty, litigation, and a change in value. This would thereby create ambiguity that would lead to a reduction in liquidity and an increase in volatility.

H.R. 4616 provides a solution for these ''tough legacy'' contracts that have insufficient fallback language and cannot otherwise be amended among the parties. The legislation is narrowly crafted to allow parties to contracts that already have effective fallback provisions to opt-out of the legislation and to only apply to tough legacy contracts so that new or future business will not be affected. In addition, the legislation offers uniform, equitable treatment for all U.S. contracts that fall under the federal legislation. It creates a safe harbor from litigation for parties that are covered by the legislation and prevents otherwise inevitable litigation costs and gridlock. The need for uniform federal legislation has been expressed by consumer groups, investors, financial regulators, and industry participants.

We thank the House Committee on Financial Services for providing a bipartisan solution that offers fair, equitable and consistent treatment for all ''tough legacy'' contracts in support of the LIBOR transition by passing H.R. 4616 out of the committee by voice vote. We wholeheartedly support the Adjustable Interest Rate (LIBOR) Act and ask that you and all Members of the House of Representatives vote in favor of this critical legislation.

Sincerely,

Securities Industry and Financial Markets Association (SIFMA); Structured Finance Association (SFA); Bank Policy Institute; National Association of Corporate Treasurers; Education Finance Council; The Loan Syndications and Trading Association (LSTA); The International Swaps and Derivatives Association (ISDA); The Real Estate Roundtable; The Financial Services Forum; Institute of International Bankers; Government Finance Officers Association; Mortgage Bankers Association; Commercial Real Estate Finance Council (CREFC); Consumer Bankers Association; Investment Company Institute; Institute for Portfolio Alternatives; Independent Community Bankers of America; U.S. Chamber of Commerce, Center for Capital Markets Competitiveness; Housing Policy Council; Student Loan Servicing Alliance; American Bankers Association; The American Council of Life Insurers (ACLI).

Mr. SHERMAN. Finally, as to the issue, I agree with the gentleman that I would like to have had this bill come up 2½ years before LIBOR ceased to be published. We are bringing this to this House 1½ years before LIBOR ceases to be published. Compared to everything else in Washington, that is record time. I speak today on a fiscal year that began October 1 where we hope to pass the appropriations bills in February. Dealing with a problem 1½ years before it happens may not be 2½ years in advance, but it is good compared to everything else I have seen.

Mr. Speaker, I reserve the balance of my time.

Mr. HUIZENGA. Mr. Speaker, I will reserve my comments for our colloquy, but the gentleman certainly knows that communication has been slim at best between staff and Members.

Mr. Speaker, I yield such time as he may consume to the gentleman from Arkansas (Mr. HILL), who is a leader on this issue.

Mr. HILL. Mr. Speaker, I thank the distinguished ranking member of the House Financial Services Committee for yielding and, of course, the chairman of the Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, Mr. SHERMAN, for his leadership. On this side of the aisle, there is absolutely no debate that Mr. SHERMAN has the most passion on this topic as a certified public accountant and that his questions about improving this bill are unlimited.

I rise today in support of this effort, flawed as it might be, and support the Adjustable Interest Rate Act of 2021.

As the chairman of the subcommittee said, for decades, the London interbank market has been the institutional fixed income rate used by hundreds of market participants to benefit American families because that LIBOR rate has been a very competitive rate and facilitated securities being issued that facilitated in more houses being built for more families in America, a liquid market for our families' credit card debt, and important student loan debt.

So this rate is critically important, and it is a part of, also, the U.S. dollar, Mr. Speaker, being at the forefront of the global securities market.

As the ranking member on our Housing, Community Development, and Insurance Subcommittee, it was the go-to rate for mortgage-backed securities and for use of the government secondary mortgage market for Fannie Mae and Freddie Mac. I think the chairman has outlined the importance of this.

This bill deals with all those contracts that depended on that LIBOR

Exhibit 3
Page 177

rate that just stubbornly don't have an alternative right now. As we approach the end of the quote for this important interest rate, there are contracts—the chair says some $16 trillion of bonds outstanding—that need this replacement contractual rate.

This bill does not increase government. This bill does not increase regulatory power. This bill facilitates the private-sector bond market solving this tough, thorny issue for the stubborn minority of bond market transactions that we call these legacy issues.

Now, the gentleman from Michigan, the gentleman from California, and I have listened to and worked on this bill for years, and we thought the Federal Reserve and the regulators were going to solve this problem years ago. That is what they told us years ago.

But as those years have gone by, they found that they can't solve this problem in the regulatory agencies, and they have turned to Congress to legislate and craft a narrow fix to solve these tough contracts.

Mr. Speaker, that is why I am in favor of taking this action today. I encourage my colleagues on both sides of the aisle—this is a technical issue, and it is an eyes-glazed-over issue, but it affects all the families in our country. It affects the importance of the U.S. dollar in capital markets. When LIBOR concludes in June 2023, we don't want any gap, Mr. Speaker, in the ability to have those legacy contracts move forward.

I don't believe this is a bill that anyone should oppose. I think we all should support it. It has the support of the six regulatory agencies; it has the support of the financial industry; and it deals with reality.

Mr. Speaker, I want to thank my friend from Michigan for yielding me the time. I thank him for his work. Yes, this process was flawed, first in the hands of the regulators, and, secondly, I think it could have been far better in the majority, particularly as it relates to getting the views of the Ways and Means Committee and the Education and Labor Committee.

Mr. HUIZENGA. Mr. Speaker, I reserve the balance of my time.

Mr. SHERMAN. Mr. Speaker, I would simply say to my Republican colleagues who may be watching: You don't have to trust the 21 business groups who have signed the letter that I just included in the RECORD, and you don't have to trust me. Listen to the words you just heard from our colleague, Mr. HILL: This bill does not increase government or regulatory power. You ought to vote for the bill.

Mr. Speaker, I reserve the balance of my time.

Mr. HUIZENGA. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would like to ask the gentleman at this point to engage in a colloquy if he is so willing.

Mr. SHERMAN. Mr. Speaker, I would be thrilled.

Mr. HUIZENGA. I know this is an issue that is both thrilling and exciting, but let me just state that the problem I am hearing from some of my colleagues is they don't necessarily understand the depth, breadth, and work that has gone into this for years prior to this. They know that it is showing up. They are questioning whether there was a hearing; they are questioning whether there was a proper markup; and sadly, they are questioning that because it seems to be following a pattern as of late. That is why there are questions.

Mr. HILL, others from the committee, and I are trying to alleviate that. A number of our colleagues have expressed they haven't had time to really dive into it and come to us with those types of questions. So we are trying to deal with that.

But as far as our colloquy here, we both described in our respective remarks that it is regulators who ultimately worked on that.

Mr. Chairman, is that correct?

Mr. SHERMAN. Will the gentleman yield?

Mr. HUIZENGA. I yield to the gentleman from California.

Mr. SHERMAN. This bill reflects an awful lot of work by the regulators, particularly the Fed.

Mr. HUIZENGA. Yes, and the Securities and Exchange Commission, OCC, FHA, CFPB, and, of course, the Fed. I appreciate the technical advice that each of them has lent and, ultimately, their comments. They actually reviewed every change that was made to this bill as sufficient to address the issue.

It is fair to say that it is a fix that these regulators have requested. Is that fair?

Mr. SHERMAN. Absolutely.

Mr. HUIZENGA. Let's turn to the Senate here.

It is my understanding, however, that there is no consensus in the Senate and that it is unlikely, frankly, that any action in the Senate will specifically, exactly reflect this bill. Would that be a characterization that you have as well?

Mr. SHERMAN. I have long advocated for a unicameral legislature.

Mr. HUIZENGA. I think we can let that reflect as a yes.

The Senate will probably be acting. We know that they will be acting, as has been expressed by the players on the Senate.

Mr. SHERMAN. If I can comment on that further?

Mr. HUIZENGA. Please.

Mr. SHERMAN. The Senate has addressed this issue, and they have discussed the bill. Most of the commentary has been positive. There was a recent hearing.

In particular, I believe that Mr. TOOMEY had a concern that somehow this bill would influence future instruments and that somehow regulators would be pushing banks, particularly smaller banks, to use SOFR in the instruments they draft in the future. That is why the report that accompanies this bill makes it excruciatingly clear that nothing in this bill authorizes, directs, encourages, or allows a regulator to point to this bill and say: Now, bank, you need to use SOFR in the instruments used in the future.

Nothing in this bill authorizes a regulator to push or give a preference to any other regulation. The report language was drafted with Senator TOOMEY in mind.

☐ 1200

Mr. HUIZENGA. Mr. Speaker, reclaiming my time on that; that would be my understanding of that. And a concern that I had of not having "coercion" is the word that I would use, that private entities could be coerced into using a particular declared rate.

Mr. Speaker, I am prepared to close. I continue to reserve the balance of my time.

Mr. SHERMAN. Mr. Speaker, I yield myself such time as I may consume.

I will simply comment again, for the record. This bill deals with tough legacy LIBOR instruments drafted in the past, and nothing in it—and you can look at every word of all 22 pages—nothing in it would allow anyone to say you have got to use SOFR, or you ought to use SOFR, or we give you a preference to use SOFR, or any other benchmark in any instrument you draft in the future. And just in case that wasn't excruciatingly clear, we put in the report as well.

Mr. Speaker, I believe I have the right to close. I have no other speakers, so I will reserve the balance of my time.

Mr. HUIZENGA. Mr. Speaker, I yield myself the balance of my time. And I will just make a few final points on this bill.

There are trillions of dollars that are caught up in this, and this is about the safety and soundness of our financial system. Whether it is mortgages, car loans, you name it, this is an international stage where this is being played out on.

And as I have said, we could do better than an eleventh-hour scramble; should have done better than an eleventh-hour scramble, but here we are.

Again, this is not the process that I would have chosen or my colleagues on the Republican side would have pursued. It is not the bill necessarily that we would have drafted. But I will not stand in the way of allowing our regulators to supervise the financial system within checks, within proper checks.

This is not giving them free rein. I do expect that there will be changes to occur from the Senate. I look forward to hearing and listening to the regulators on those changes.

I do encourage my Republican colleagues to listen to our regulators, but, more so, listen to your Republican colleagues who have been working on this issue. And I ask that they support this legislation.

Exhibit 3
Page 178

And, no, we will not see an increase in government. No, we will not see an increase in the regulatory footprint. It clarifies how we are going to be dealing with and how these private companies are going to need to move forward with the legacy contracts that they have that no longer are within the parameters that are allowed because of this fraud that had happened within the LIBOR system.

Mr. Speaker, I yield back the balance of my time.

Mr. SHERMAN. Mr. Speaker, I yield myself such time as I may consume. I am prepared to close.

As to the process, we have had a dozen hearings with the top financial officials in the U.S. Government over a period of 2 or 3 years at the full committee, in which it was appropriate and, in my case, I used this opportunity to bring up the LIBOR issue. They have testified again and again that we need Federal legislation.

Then the six regulatory agencies involved each have reviewed this down to the comma, and we have had discussions, down to the comma. They have helped us draft legislation.

My hope is that we not only pass this legislation today, but that my Republican colleagues help me pass this bill through the Senate in the current form. You want a form that reflects the regulators? Every comma reflects what the regulators would like to see.

It is important that this bill not be held up in the Senate by those who want to change existing law and say, well, not only should this act not allow a regulator to push a bank toward this or that index, but if any other law gives the regulators the power to do that, we should strip that authority from them. That is not the purpose of this bill.

If somebody wants a bill titled, regulators shouldn't be pushed to telling banks what to do on indexes, I will work with the gentleman, if he wants to, on a freedom to pick your own index bill. This is a bill to just deal with LIBOR.

So my hope is that we will have Republican House Members who urge the Senate to move quickly because, yes, it would have been better to deal with this issue 2½ years in advance. We have dealt with it 1½ years in advance; a full hearing, a full markup, a full opportunity for anyone to submit amendments at that full markup, and a dozen hearings, at which it was appropriate to address questions—at least I did—of the top officials in our country dealing with financial matters about the importance of LIBOR.

This bill is important because it deals with $16 trillion of instruments where we will not be able to calculate how much the borrower must pay the lender after June 30 of 2023 unless we pass this bill.

This is a consensus product. The consumer and public interest groups, the business groups, the regulators, and we are passing it and need to pass it expeditiously so that we deal with this issue long before it disrupts our financial markets.

Mr. Speaker, I urge its adoption, and I yield back the balance of my time.

The SPEAKER pro tempore (Mr. KILDEE). The question is on the motion offered by the gentleman from California (Mr. SHERMAN) that the House suspend the rules and pass the bill, H.R. 4616, as amended.

The question was taken.

The SPEAKER pro tempore. In the opinion of the Chair, two-thirds being in the affirmative, the ayes have it.

Mr. CLOUD. Mr. Speaker, on that I demand the yeas and nays.

The SPEAKER pro tempore. Pursuant to section 3(s) of House Resolution 8, the yeas and nays are ordered.

Pursuant to clause 8 of rule XX, further proceedings on this motion are postponed.

───────────────

LIVESTOCK MANDATORY REPORTING EXTENSION

Mr. DAVID SCOTT of Georgia. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 5290) to extend authorization for livestock mandatory reporting.

The Clerk read the title of the bill.

The text of the bill is as follows:

H.R. 5290

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. LIVESTOCK MANDATORY REPORTING EXTENSION.**

(a) IN GENERAL.—Section 260 of the Agricultural Marketing Act of 1946 (7 U.S.C. 1636i) is amended by striking ''2020'' and inserting ''2022''.

(b) CONFORMING AMENDMENT.—Section 942 of the Livestock Mandatory Reporting Act of 1999 (7 U.S.C. 1635 note; Public Law 106–78) is amended by striking ''2020'' and inserting ''2022''.

The SPEAKER pro tempore. Pursuant to the rule, the gentleman from Georgia (Mr. DAVID SCOTT) and the gentleman from Pennsylvania (Mr. THOMPSON) each will control 20 minutes.

The Chair recognizes the gentleman from Georgia.

GENERAL LEAVE

Mr. DAVID SCOTT of Georgia. Mr. Speaker, I ask unanimous consent that all Members have 5 legislative days to revise and extend their remarks and include any extraneous material on the bill under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Georgia?

There was no objection.

Mr. DAVID SCOTT of Georgia. Mr. Speaker, I yield myself such time as I may consume.

I rise in strong support of H.R. 5290. Our agriculture industry is the best, the greatest in the world. And at the centerpiece of it is our livestock industry. And that is why we are gathered here.

Livestock mandatory reporting is an important tool that provides the necessary transparency information to our livestock producers. This legislation extends livestock mandatory reporting until the end of September 2022, and it has bipartisan support with Democrats and Republicans working together on this very, very important bill.

In talking to our great livestock producers, I have heard time and again how important it is to extend this mandatory reporting program; and that if we let it lapse it will cause significant problems for our farmers and ranchers.

We are working together to make sure we get the job done the right way. All of our industry groups agree on this important bill, and that is the 1-year extension immediately of our livestock reporting.

Our Agriculture Committee held a hearing earlier this year that extensively covered the importance of livestock reporting, mandatory reporting. In that hearing, we also heard from a variety of very distinguished industry representatives that, first and foremost, we need to extend this program.

My committee's work on this issue—and while I am at it, I want to really give great thanks and gratitude to our agriculture staff. They have worked very diligently on this, and we are grateful for the hard work and dedication of the House Agriculture Committee staff.

So, as I said, my work on this issue is indicative of how important the livestock industry is to our fellow committee members, both Democrats and Republicans, and to our Nation and the vital importance, as the leading force, in our Nation's economy. That is where our great agriculture system is today.

I am aware of some ongoing discussions and pending legislation that seeks to reform the cattle industry, and we are going to deal with that. We are dealing with that over in the Senate Agriculture Committee and in our House committee.

However, we should not let negotiations of those reforms that we are working with stand in the way of extending this vital program for 1 year. In recent months, we have seen cattle markets begin to recover; prices for producers have moved up. This change in market dynamics is important to account for as we look to reach a consensus point on the framework of our reforms.

This 1-year extension will help to settle the concerns in the livestock markets and provide certainty to our livestock industry, while also giving our Agriculture members in both the House and the Senate more time to come up with a consensus of the proposed reforms to cattle markets.

We, in our House committee, are working with the Senate Agriculture Committee. I am personally working with Senator GRASSLEY on the Senate committee so that we can have legislation going forward that has the vital input of both the House and the Senate, and we are giving it the time and

Exhibit 3
Page 179