# Exhibit 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 001-34416

## PennyMac Mortgage Investment Trust
**(Exact name of registrant as specified in its charter)**

| **Maryland** | | **27-0186273** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (IRS Employer Identification No.) |
| **3043 Townsgate Road, Westlake Village, California** | | **91361** |
| (Address of principal executive offices) | | (Zip Code) |

**(818) 224-7442**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol (s) | Name of Each Exchange on Which Registered |
|---|---|---|
| 8.125% Series A Cumulative Redeemable Preferred Shares of Beneficial Interest, $0.01 Par Value | PMT/PRA | New York Stock Exchange |
| 8.00% Series B Cumulative Redeemable Preferred Shares of Beneficial Interest, $0.01 Par Value | PMT/PRB | New York Stock Exchange |
| 6.75% Series C Cumulative Redeemable Preferred Shares of Beneficial Interest, $0.01 Par Value | PMT/PRC | New York Stock Exchange |
| 8.50% Senior Note Due 2028 | PMTU | New York Stock Exchange |
| Common Shares of Beneficial Interest, $0.01 Par Value | PMT | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of June 30, 2023, the aggregate market value of the registrant's common shares of beneficial interest, $0.01 par value ("common shares"), held by nonaffiliates was $1,159,710,039 based on the closing price as reported on the New York Stock Exchange on that date.

As of February 20, 2024, there were 86,646,365 common shares of the registrant outstanding.

**Documents Incorporated By Reference**

| Document | Parts Into Which Incorporated |
|---|---|
| **Definitive Proxy Statement for 2024 Annual Meeting of Shareholders** | **Part III** |

Exhibit 4
Page 180

# PART I

**Item 1. Business**

*The following description of our business should be read in conjunction with the information included elsewhere in this Report. This description contains forward-looking statements that involve risks and uncertainties. Actual results could differ significantly from the projections and results discussed in the forward-looking statements due to the factors described under the caption "Risk Factors" and elsewhere in this Report. References in this Report to "we," "our," "us," "PMT," or the "Company" refer to PennyMac Mortgage Investment Trust and its consolidated subsidiaries, unless otherwise indicated.*

**Our Company**

We are a specialty finance company that invests primarily in mortgage-related assets. We conduct substantially all of our operations, and make substantially all of our investments, through our subsidiary, PennyMac Operating Partnership, L.P. (our "Operating Partnership") and its subsidiaries. A wholly-owned subsidiary of ours is the sole general partner, and we are the sole limited partner, of our Operating Partnership. Certain of the activities conducted or investments made by us that are described below are conducted or made through a wholly-owned subsidiary that is a taxable REIT subsidiary ("TRS") or through other subsidiaries of our Operating Partnership.

The management of our business and execution of our operations are performed on our behalf by subsidiaries of PennyMac Financial Services, Inc. ("PFSI"). PFSI is a specialty financial services firm separately listed on the New York Stock Exchange focused on the production and servicing of loans and the management of investments related to the U.S. mortgage market. Specifically:

- We are managed by PNMAC Capital Management, LLC ("PCM" or our "Manager"), a wholly-owned subsidiary of PFSI and an investment adviser registered with the United States Securities and Exchange Commission ("SEC") that specializes in, and focuses on, U.S. mortgage assets.
- Our loan production and servicing activities (as described below) are performed on our behalf by another wholly-owned PFSI subsidiary, PennyMac Loan Services, LLC ("PLS" or our "Servicer").

Our investment focus is on residential mortgage-backed securities ("MBS") and mortgage-related assets that we create through our correspondent production activities. Correspondent production activities include purchasing, pooling and selling newly originated prime credit quality residential loans ("correspondent production"). Through our correspondent production activities, we create and hold mortgage servicing rights ("MSRs"), non-Agency MBS, credit risk transfer ("CRT") agreements ("CRT Agreements"), and other CRT securities (together, "CRT arrangements").

Our business includes four segments: credit sensitive strategies, interest rate sensitive strategies, correspondent production, and corporate.

- The credit sensitive strategies segment represents our investments in CRT arrangements, subordinate MBS, distressed loans and real estate.
- The interest rate sensitive strategies segment represents our investments in MSRs, excess servicing spread ("ESS") purchased from PFSI, Agency and senior non-Agency MBS and the related interest rate hedging activities.
- The correspondent production segment represents our operations aimed at serving as an intermediary between lenders and the capital markets by purchasing, pooling and reselling newly originated prime credit quality loans either directly or in the form of MBS, using the services of PCM and PLS.
- We primarily sell the loans we acquire through our correspondent production activities to government-sponsored entities ("GSEs") such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") or to PLS for sale into securitizations guaranteed by the Government National Mortgage Association ("Ginnie Mae"). Fannie Mae, Freddie Mac and Ginnie Mae are each referred to as an "Agency" and, collectively, as the "Agencies."
- Our corporate segment includes management fee and corporate expense amounts and certain interest income.

The Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act") requires all states to enact laws that require all individuals acting in the United States as mortgage loan originators to be individually licensed or registered if they intend to offer mortgage loan products. These licensing requirements include enrollment in the Nationwide Mortgage Licensing System, application to state regulators for individual licenses and the completion of pre-licensing education, annual education and the successful completion of both national and state exams.

We must comply with a number of federal consumer protection laws, including, among others:

- the Real Estate Settlement Procedures Act ("RESPA"), and Regulation X thereunder, which require certain disclosures to mortgagors regarding the costs of mortgage loans, the administration of tax and insurance escrows, the transferring of servicing of mortgage loans, the response to consumer complaints, and payments between lenders and vendors of certain settlement services;

- the Truth in Lending Act ("TILA"), and Regulation Z thereunder, which require certain disclosures to mortgagors regarding the terms of their mortgage loans, notices of sale, assignments or transfers of ownership of mortgage loans, new servicing rules involving payment processing, and adjustable rate mortgage change notices and periodic statements;

- the Equal Credit Opportunity Act and Regulation B thereunder, which prohibit discrimination on the basis of age, race and certain other characteristics, in the extension of credit;

- the Fair Housing Act, which prohibits discrimination in housing on the basis of race, sex, national origin, and certain other characteristics;

- the Home Mortgage Disclosure Act and Regulation C thereunder, which require financial institutions to report certain public loan data;

- the Homeowners Protection Act, which requires the cancellation of private mortgage insurance once certain equity levels are reached, sets disclosure and notification requirements, and requires the return of unearned premiums;

- the Servicemembers Civil Relief Act, which provides, among other things, interest and foreclosure protections for service members on active duty;

- the Gramm-Leach-Bliley Act and Regulation P thereunder, which require us to maintain privacy with respect to certain consumer data in our possession and to periodically communicate with consumers on privacy matters;

- the Fair Debt Collection Practices Act, which regulates the timing and content of debt collection communications;

- the Fair Credit Reporting Act and Regulation V thereunder, which regulate the use and reporting of information related to the credit history of consumers; and

- the National Flood Insurance Reform Act of 1994, which provides for lenders to require borrowers/owners of properties in special flood hazard areas to purchase flood insurance for such properties, or for lenders to purchase flood insurance on behalf of such borrowers/owners.

Many of these laws are further impacted by the SAFE Act and implementation of new rules by the CFPB.

**Our Manager and Our Servicer**

We are externally managed and advised by PCM pursuant to a management agreement. PCM specializes in and focuses on investments in U.S. mortgage assets.

PCM is responsible for administering our business activities and day-to-day operations, including developing our investment strategies, and sourcing and acquiring mortgage-related assets for our investment portfolio. Pursuant to the terms of the management agreement, PCM provides us with our senior management team, including our officers and support personnel. PCM is subject to the supervision and oversight of our board of trustees and has the functions and authority specified in the management agreement.

We also have a loan servicing agreement with PLS, pursuant to which PLS provides primary and special servicing for our portfolio of residential loans and MSRs. PLS' loan servicing activities include collecting principal, interest and escrow account payments, accounting for and remitting collections to investors in the loans, responding to customer inquiries, and

16

Exhibit 4
Page 182

- We have a substantial amount of indebtedness, which may limit our financial and operating activities, expose us to substantial increases in costs due to interest rate fluctuations, expose us to the risk of default under our debt obligations and adversely affect our ability to incur additional debt to fund future needs.
- We finance our investments with borrowings, which may materially and adversely affect our return on our investments and may reduce cash available for distribution to our shareholders.
- We may not be able to raise the debt or equity capital required to finance our assets or grow our business.
- Hedging against interest rate exposure may materially and adversely affect our results of operations and cash flows.
- Our correspondent production activities could subject us to increased risk of loss.
- Our correspondent production activities depend, in part, upon PLS' and other PFSI subsidiaries' ability to adapt to and implement technological changes and to successfully develop, implement and protect their proprietary technology.
- We are not an approved Ginnie Mae issuer and an increase in the percentage of government loans we acquire could be detrimental to our results of operations.
- Cybersecurity risks, cyber incidents and technology failures may adversely affect our and our Manager's business by causing a disruption to our or our Manager's operations, a compromise or corruption of our or our Manager's confidential information or personal customer information, and/or damage to our or our Manager's business relationships, all of which could negatively impact our financial results.
- Our retention of credit risk underlying loans we sell to the GSEs is inherently uncertain and exposes us to significant risk of loss.
- A portion of our investments is in the form of residential loans, and the loans in which we invest subject us to costs and losses arising from delinquency and foreclosure, as well as the risks associated with residential real estate and residential real estate-related investments, any of which could result in losses to us.
- Our acquisition of mortgage servicing rights exposes us to significant risks.
- Climate change, adverse weather conditions, man-made or natural disasters, pandemics, terrorist attacks, and other long term physical and environmental changes and conditions could adversely impact properties that we own or that collateralize loans we own or service, as well as geographic areas where we conduct business.
- We may be materially and adversely affected by risks affecting borrowers or the asset or property types in which our investments may be concentrated at any given time, as well as from unfavorable changes in the related geographic regions.
- Many of our investments are illiquid and we may not be able to adjust our portfolio in response to changes in economic and other conditions.
- Fair values of many of our investments are estimates and the realization of reduced values from our recorded estimates may materially and adversely affect periodic reported results and credit availability, which may reduce earnings and, in turn, cash available for distribution to our shareholders.
- We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances, which could adversely affect our business, financial condition, liquidity, results of operations and ability to make distributions to our shareholders.
- **We are dependent upon PCM and PLS and their resources and may not find suitable replacements if any of our service agreements with PCM or PLS are terminated.**
- The management fee structure could cause disincentive and/or create greater investment risk.
- Termination of our management agreement is difficult and costly.
- Certain provisions of Maryland law, our staggered board of trustees and certain provisions in our declaration of trust could each inhibit a change in our control.

19

Exhibit 4
Page 183

can only be financed at a steep discount to their repurchase price, if at all. Repurchased loans are also typically sold at a discount to the unpaid principal balance, which in some cases can be significant. Significant repurchase activity could materially and adversely affect our business, financial condition, liquidity, results of operations and our ability to make distributions to our shareholders.

*Our counterparties may terminate our MSRs, which could adversely affect our business, financial condition, liquidity and results of operations.*

As is standard in the industry, under the terms of our master servicing agreements with the Agencies in respect of Agency MSRs that we retain in connection with our loan production, the Agencies have the right to terminate us as servicer of the loans we service on their behalf at any time (and, in certain instances, without the payment of any termination fee) and also have the right to cause us to sell the MSRs to a third party. In addition, our failure to comply with applicable servicing guidelines could result in our termination under such master servicing agreements by the Agencies with little or no notice and without any compensation. The owners of other non-Agency loans that we service may also terminate certain of our MSRs if we fail to comply with applicable servicing guidelines. If the MSRs are terminated on a material portion of our servicing portfolio, our business, financial condition, liquidity and results of operations could be adversely affected.

*We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances, which could adversely affect our business, financial condition, liquidity, results of operations and ability to make distributions to our shareholders.*

During any period in which a borrower is not making payments, we may be required under our servicing agreements in respect of our MSRs to advance our own funds to pay property taxes and insurance premiums, legal expenses and other protective advances, and may be required to advance principal and interest payments to security holders of the MBS into which the loans are sold. We also advance funds under these agreements to maintain, repair and market real estate properties on behalf of investors. As home values change, we may have to reconsider certain of the assumptions underlying our decisions to make advances and, in certain situations, our contractual obligations may require us to make advances for which we may not be reimbursed. In addition, if a loan serviced by us is in default or becomes delinquent, the repayment to us of the advance may be delayed until the loan is repaid or refinanced or a liquidation occurs. Federal, state or local regulatory actions may also result in an increase in the amount of servicing advances that we are required to make, lengthen the time it takes for us to be reimbursed for such advances and increase the costs incurred while the loan is delinquent. A delay in our ability to collect advances may adversely affect our liquidity, and our inability to be reimbursed for advances could have a material adverse effect on our business, financial condition, liquidity, results of operations and ability to make distributions to our shareholders.

**Risks Related to Our Management and Relationship with Our Manager and Its Affiliates**

*We are dependent upon PCM and PLS and their resources and may not find suitable replacements if any of our service agreements with PCM or PLS are terminated.*

We are externally advised and managed by PCM, a subsidiary of PFSI, and we also have other separate contract agreements with other PFSI subsidiaries, such as PLS, to provide various services. Under our management agreement, PCM makes all or substantially all of our investment, financing and risk management decisions, and has significant discretion as to the implementation of our operating policies and strategies. Under our loan servicing agreement with PLS, PLS provides servicing for our portfolios of loans and MSRs, and under our mortgage banking services agreement with PLS, PLS provides fulfillment and disposition-related services in connection with our correspondent production business. The costs of these services impact our operating costs and may reduce our net income, but we rely on PCM and PLS to provide these services under these contractual agreements because we have limited in-house capabilities to perform the activities independently.

No assurance can be given that the strategies of PCM, PLS or their affiliates under any of these agreements will be successful, that any of them will conduct complete and accurate due diligence or provide sound advice, or that any of them will act in our best interests with respect to the allocation of their resources to our business. The failure of any of them to do any of the above, conduct the business in accordance with applicable laws and regulations or hold all licenses or registrations necessary to conduct the business as currently operated would materially and adversely affect our ability to continue to execute our business plan.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

We are a specialty finance company that invests in mortgage-related assets. Our objective is to provide attractive risk-adjusted returns to our investors over the long-term, primarily through dividends and secondarily through capital appreciation. A significant portion of our investment portfolio is comprised of mortgage-related assets that we have created through our correspondent production activities, including mortgage servicing rights ("MSRs"), subordinate mortgage-backed securities ("MBS"), and credit risk transfer ("CRT") arrangements, which include CRT Agreements ("CRT Agreements") and CRT strips that absorb credit losses on certain of the loans we have sold. We also invest in Agency and senior non-Agency MBS, subordinate credit-linked MBS and interest-only ("IO") and principal-only ("PO") stripped MBS. We have also historically invested in distressed mortgage assets (distressed loans and real estate acquired in settlement of loans ("REO")), which we have substantially liquidated.

We are externally managed by PNMAC Capital Management, LLC ("PCM"), an investment adviser that specializes in and focuses on U.S. mortgage assets. Our loans and MSRs are serviced by PennyMac Loan Services, LLC ("PLS"). PCM and PLS are both indirect controlled subsidiaries of PennyMac Financial Services, Inc. ("PFSI"), a publicly-traded mortgage banking and investment management company separately listed on the New York Stock Exchange.

During the year ended December 31, 2023, we purchased newly originated prime credit quality residential loans with fair values totaling $87.5 billion as compared to $88.1 billion and $181.4 billion for the years ended December 31, 2022 and December 31, 2021, respectively, in our correspondent production business. To the extent that we purchase loans that are insured by the U.S. Department of Housing and Urban Development through the Federal Housing Administration, or insured or guaranteed by the U.S. Department of Veterans Affairs or U.S. Department of Agriculture, we and PLS have agreed that PLS will fulfill and purchase such loans, as PLS is a Ginnie Mae approved issuer and we are not. This arrangement has enabled us to compete with other correspondent aggregators that purchase both government and conventional loans. During the year ended December 31, 2023, our sales of loans to PLS also included $31.1 billion in in unpaid principal balance ("UPB") of conventional loans in order to allow us to optimize our use and allocation of capital.

Our loan sales volume included $72.4 billion, $50.6 billion and $67.9 billion of loans we sold to PLS during the years ended December 31, 2023, 2022 and 2021, respectively. We receive a sourcing fee from PLS based on the UPB of each loan that we sell to PLS under such arrangement, and earn interest income on the loan for the period we hold it before the sale to PLS. During the years ended December 31, 2023, 2022 and 2021 we received sourcing fees totaling $7.2 million, $5.0 million and $6.5 million, respectively.

We operate our business in four segments: Credit sensitive strategies, Interest rate sensitive strategies, Correspondent production and our Corporate operations, as described below.

*Our Investment Activities*

*Credit Sensitive Investments*

CRT Arrangements

We have not entered into any CRT arrangements since 2020. We held net CRT-related investments (comprised of deposits securing CRT arrangements, CRT derivatives, CRT strips and an interest-only security payable) totaling approximately $1.1 billion at December 31, 2023.

Subordinate Credit-Linked Mortgage-Backed Securities

Subordinate credit-linked MBS provide us with a higher yield than senior securities. However, we retain credit risk in the subordinate credit-linked MBS since they are the first securities to absorb credit losses relating to the underlying loans. We purchased approximately $87.3 million of subordinate credit-linked MBS during the year ended December 31, 2023. We held subordinate credit-linked MBS with fair values totaling approximately $301.2 million at December 31, 2023.

As the result of the Company's consolidation of the variable interest entities that issued certain subordinate MBS as described in Note 6 – *Variable Interest Entities – Subordinate Mortgage-Backed Securities* to the consolidated financial statements included in this Report, we include the loans underlying these transactions with UPB totaling approximately $1.7 billion on our consolidated balance sheet as of December 31, 2023.