1  UMHOFER, MITCHELL & KING LLP
2  Matthew Donald Umhofer (SBN 206607)
   Jonas P. Mann (SBN 263314)
3  767 S. Alameda St., Suite 270
   Los Angeles, California 90021
4  Telephone: (213) 394-7979
   Facsimile: (213) 529-1027
5  matthew@umklaw.com
   jonas@umklaw.com
6  *Attorneys for Defendants PennyMac*
7  *Mortgage Investment Trust and PNMAC*
   *Capital Management LLC*
8  Steven M. Farina (*pro hac vice*)
9  Melissa B. Collins (*pro hac vice*)
   sfarina@wc.com
10 mcollins@wc.com
   WILLIAMS & CONNOLLY LLP
11 680 Maine Avenue, SW
   Washington, DC  20024
12 Telephone: 202-434-5000
   Facsimile: 202-434-5029
13 *Attorneys for Defendant PennyMac*
   *Mortgage Investment Trust*
14

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17

18 ROBERTO VERTHELYI, on behalf      Case No. 2:24-cv-05028-MWF
   of himself and all others similarly
19 situated,                          **PENNYMAC MORTGAGE**
                                      **INVESTMENT TRUST'S REPLY**
20              Plaintiff,            **IN SUPPORT OF ITS MOTION TO**
                                      **DISMISS PLAINTIFF'S**
21      v.                           **COMPLAINT**

22 PENNYMAC MORTGAGE                  Hearing Date:  Nov. 18, 2024
   INVESTMENT TRUST; PNMAC           Time:  10:00 a.m.
23 CAPITAL MANAGEMENT, LLC,          Place:  Courtroom 5A
                                      Judge: Michael W. Fitzgerald
24              Defendants.

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT....................................................................................... 2

    A.    Maryland Law Governs, Precluding Plaintiff's Claim Under California's Unfair Competition Law. ....................................................... 2

    B.    Plaintiff Fails to State a Claim that PennyMac's Dividend Rates Are "Unlawful" Under the UCL. ................................................... 5

        1.    Fixed Rates Are Not Excluded from "Benchmark Replacements" Under the LIBOR Act. ........................................ 5

        2.    A Fallback Provision Need Not Have Envisioned the Permanent Cessation of LIBOR To Be Given Effect. ...................... 10

        3.    Plaintiff's Reliance on Legislative History is Misplaced, and In Any Event, That History Belies Plaintiff's Arguments....... 11

    C.    Plaintiff Fails to State a Claim that PennyMac's Dividend Rates Are "Unfair" Under the UCL. ...................................................... 14

    D.    Leave to Amend Should Be Denied......................................................... 17

III.  CONCLUSION ................................................................................. 18

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE(S)**

*Advoc. Health Care Network v. Stapleton*,
  581 U.S. 468 (2017) ...................................................................................12

*Ariz. Elec. Power Co-op., Inc. v. United States*,
  816 F.2d 1366 (9th Cir. 1987) ....................................................................11

*Brown v. Gardner*,
  513 U.S. 115 (1994) .......................................................................................9

*Carrico v. City & County of San Francisco*,
  656 F.3d 1002 (9th Cir. 2011) ...............................................................17, 18

*Cir. City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) .....................................................................................12

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) .......................................................................................5

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018) .........................................................................................9

*Hertzberg v. Dignity Partners, Inc.*,
  191 F.3d 1076 (9th Cir. 1999) .....................................................................13

*Kelly v. Robinson*,
  479 U.S. 36 (1986) .......................................................................................13

*Loughrin v. United States*,
  573 U.S. 351 (2014) .......................................................................................7

*Mike's Novelties, Inc. v. Grav, Inc.*,
  2018 WL 5094959 (C.D. Cal. May 9, 2018) ...............................................17

*Mohamad v. Palestinian Auth.*,
  566 U.S. 449 (2012) .....................................................................................11

*Ochoa v. Zeroo Gravity Games LLC*,
  2023 WL 4291650 (C.D. Cal. May 24, 2023) ...............................................4

*Ojeda v. Kaiser Permanente Int'l, Inc.*,
  2022 WL 18228249 (C.D. Cal. Nov. 29, 2022) ...........................................17

*Ratzlaf v. United States*,
  510 U.S. 135 (1994) .....................................................................................14

*Regan v. Wald*,
  468 U.S. 222 (1984) .....................................................................................12

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

*United States v. Lemus*,
  93 F.4th 1255 (9th Cir. 2024) ........................................................................... 7

*United States v. Woods*,
  571 U.S. 31 (2013) ........................................................................................ 8, 9

*Urica, Inc. v. Pharmaplast, S.A.E.*,
  2013 WL 12123305 (C.D. Cal. Jan. 10, 2013) ................................................. 4

*W. Va. Univ. Hosps., Inc. v. Casey*,
  499 U.S. 83 (1991) ......................................................................................... 14

*Walters v. Metro. Educ. Enters., Inc.*,
  519 U.S. 202 (1997) ......................................................................................... 8

*Zuniga v. Bank of America N.A.*,
  2014 WL 7156403 (C.D. Cal. Dec. 9, 2014) ................................................... 17

**STATE CASES**

*Impac Mortg. Holdings, Inc. v. Timm*,
  255 A.3d 89 (Md. 2021) ................................................................................... 3

*Jolley v. Chase Home Finance, LLC*,
  213 Cal. App. 4th 872 (2013) ......................................................................... 17

*Nedlloyd Lines B.V. v. Superior Ct.*,
  3 Cal. 4th 459 (1992) ....................................................................................... 5

*Wash. Mut. Bank, F.A. v. Superior Ct.*,
  24 Cal. 4th 906 (2001) ..................................................................................... 4

**STATUTES**

12 U.S.C. § 5801(b)(3) .................................................................................... 14

12 U.S.C. § 5802(1) ......................................................................................... 6

12 U.S.C. § 5802(3) ................................................................................*passim*

12 U.S.C. § 5803(a)(2) ..................................................................................... 6

12 U.S.C. § 5803(f)(2) ................................................................................. 6, 14

12 U.S.C. § 5803(b) ................................................................................*passim*

12 U.S.C. § 5803(b)(1) ............................................................................. 13, 14

Md. Code Ann. Corps. & Ass'ns § 8-101(b) ................................................. 3, 5

**OTHER AUTHORITIES**

H.R. Rep. No. 117-206 (2021) ........................................................................ 12

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

*The End of LIBOR:* Transitioning *To an Alternative Interest Rate Calculation for
Mortgages, Student Loans, Business Borrowing, and Other Financial Productions:
Virtual Hearing Before the Subcommittee on Investor Protection, Entrepreneurship,
and Capital Markets of the H. Comm. on Fin. Serv.,*
117th Cong., 1st Sess., 1 (2021) ..............................................................................13

*The LIBOR Transition: Protecting Consumers and Investors: Hearing on H.R. 4616
Before the S. Comm. On Banking, Housing, and Urban Affairs,* 117th Cong., 1st
Sess., 1 (2021)..........................................................................................................14

*House Legislative Counsel's Manual on Drafting Style* (Dec. 2020) ...........................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

1    **I.    <u>INTRODUCTION</u>**

2        PennyMac fulfills its duties to all of its shareholders—Preferred and common

3    alike—by honoring the commitments it made about how it would operate.  This includes

4    with respect to the dividend rates owed on the Series A and Series B Preferred Shares if

5    a LIBOR rate is unavailable, a scenario directly addressed by the governing corporate

6    documents, the Articles Supplementary.  PennyMac applied the terms of the Articles,

7    subject to clear direction from the federal LIBOR Act about which provisions to

8    disregard and which to leave unaltered, to arrive at its current dividend rates.  Plaintiff

9    asks the Court to rewrite the statute to reach his desired result, to the detriment of

10   common shareholders.  Complying with the statute and the Articles, without a preference

11   to ***any*** class of shareholders, is both lawful and fair.

12       As a threshold matter, the Court need not wade into Plaintiff's strained

13   grammatical arguments or cherry-picked snippets of legislative history, because

14   Plaintiff's rights under PennyMac's Articles Supplementary are governed by Maryland

15   law and therefore cannot form the basis for a California Unfair Competition Law claim.

16   But if the Court were to reach such arguments, they fail.

17       Plaintiff contends that the fallback provision in PennyMac's Articles should not

18   be given effect because it did not contemplate the permanent cessation of LIBOR and it

19   results in a fixed rate.  This means, Plaintiff insists, that "the Articles have no adequate

20   fallback provision." Opp'n 3.[1]  But Plaintiff's proffered standard for what is "adequate"

21   has no basis in any statutory requirement.  The LIBOR Act directs parties to disregard

22   only limited and specific fallback provisions—those based on LIBOR or bank polling—

23   and PennyMac's fallback provision is neither.  Plaintiff strains to invent an additional

24   exclusion for fixed rates within the statutory definition of "benchmark replacement,"

25   asking the Court to "remov[e]" from that definition an entire clause providing that a

26

27       [1] PennyMac Mortgage Investment Trust's ("PennyMac") Notice of Motion and
     Motion to Dismiss Plaintiff's Complaint, Aug. 20, 2024, ECF No. 34, is referred to
28   herein as "Mot."  Plaintiff's Opposition to Defendant PennyMac Mortgage Investment
     Trust's Motion to Dismiss, Oct. 11, 2024, ECF No. 37, is referred to as "Opp'n."

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

"benchmark replacement" can be any interest rate or dividend rate. Opp'n 13. But this reading defies both the ordinary meaning of the text and principles of statutory construction. Under the plain—and correct—reading of the statute, PennyMac's fallback rate survives the LIBOR Act and should be given effect. That is precisely what PennyMac has done.

In an effort to create ambiguity where there is none, Plaintiff overreads statements by individuals at Congressional hearings as the supposed intent of Congress as a whole. But Plaintiff's unmoored statutory reading would preclude parties from agreeing to **any** fixed-rate fallback—the type of government interference with contract that the statute and its legislative history disclaim.

Because PennyMac is following, not violating, the LIBOR Act, Plaintiff cannot state a claim under either the "unlawful" or "unfair" prong of the UCL. Plaintiff's request that this Court nevertheless mandate a switch to SOFR is preempted by the LIBOR Act itself, and PennyMac's actions are further protected by the UCL's safe harbor for permitted conduct. More fundamentally, Plaintiff has not explained, and cannot explain, why PennyMac's compliance with the terms of the statute and its Articles is unfair.

The text of the LIBOR Act and the Articles are fatal to Plaintiff's claim, and neither is going to change upon repleading. Accordingly, the Court should dismiss Plaintiff's claim with prejudice.

**II.    ARGUMENT**

    **A.    Maryland Law Governs, Precluding Plaintiff's Claim Under California's Unfair Competition Law.**

Plaintiff's attempt to state a claim under the UCL is foreclosed at the threshold because Maryland law governs. As PennyMac explained in its opening brief, the choice-of-law provision in PennyMac's Declaration of Trust applies to Plaintiff's dispute regarding his rights as a Preferred Shareholder. Mot. 8–10. Plaintiff argues variously

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

that the choice-of-law provision is inapplicable, too narrow in scope, or supplanted by California public policy, but none of these arguments passes muster.

First, Plaintiff contends that the choice-of-law provision in the Declaration of Trust does not apply because the Articles Supplementary are not considered part of the Declaration.  But the statutory definition of "declaration of trust" says otherwise, defining the term as "the declaration of trust filed with the Department for the purpose of forming a real estate investment trust . . . either as originally accepted for record *or as . . . supplemented by . . . articles supplementary* . . . ."  Md. Code Ann., Corps. & Ass'ns § 8-101(b).[2]  This definition reflects the common-sense proposition that, with respect to a REIT like PennyMac, articles supplementary are a supplement to, and a part of, the declaration of trust; Plaintiff does not suggest they supplement anything else.  Indeed, when considering articles supplementary under an analogous provision for corporations, the Maryland Court of Appeals was clear:  articles supplementary "are simply an amendment of the corporate charter."  *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md. 2021); *see id*. at 94 n.3 ("Under the Maryland General Corporation Law, 'articles supplementary' are a part of a corporation's charter.").[3]  And PennyMac's Declaration of Trust confirms that "[t]he rights of all shareholders *and the terms of all Shares*" are subject to its terms.  PMT Ex. C. § 6.9.[4]

Plaintiff's principal response is that the Articles state that they "may become part of Article VI of the Declaration" upon "any restatement of the Declaration of Trust."  PMT Ex. A at 1; PMT Ex. B at 1; *see* Opp'n 19. This, Plaintiff contends, suggests they are not already part of the declaration of trust.  But that provision describes *where*

---

[2] All emphases are added unless otherwise noted.
[3] Plaintiff attempts to distinguish *Impac* by referring to language in Impac's articles supplementary, Opp'n 19, but the *Impac* court's analysis was of articles supplementary in general, so as to "set the stage for [the] reader who does not live in [the] world" of "corporate finance," and was not limited to Impac's particular language. *See Impac*, 255 A.3d at 93.
[4] Exhibits to Defendants' Request for Judicial Notice, Aug. 20, 2024, ECF Nos. 36-2, 36-3, and 36-4, are referenced herein as "PMT Ex. __," and exhibits to the Declaration of Catherine Pratsinakis, Oct. 11, 2024, ECF Nos. 40-1 – 40-6 are referenced herein as "Pl. Ex. __."

3

(Article VI) the Articles Supplementary would go upon restatement, and does not change the statutory definition of "declaration of trust" or how articles supplementary are considered under Maryland corporate law.

Next, Plaintiff argues that this dispute falls outside the provision's scope. But this argument is grounded in the fallacy that a dispute over application of the Articles is somehow distinct from a dispute arising from the Declaration of Trust, *see* Opp'n 20, when in fact the Articles legally are a component of the Declaration of Trust, *see supra* 2–3; Mot. 8–10.[5]

Finally, Plaintiff contends that, even if the Maryland choice-of-law provision applies to Plaintiff's claims, then the court "still should not enforce it." Opp'n 20. California courts generally enforce contractual choice-of-law provisions when the chosen state bears "a substantial relationship to the parties or their transaction." *Wash. Mut. Bank, F.A. v. Superior Ct.*, 24 Cal. 4th 906, 917 (2001). Here, Plaintiff concedes that Maryland has a substantial relationship to the parties because PennyMac is organized under Maryland law. *See* Opp'n 21 & n 15. Accordingly, the burden falls on Plaintiff to show "both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." *Wash. Mut. Bank*, 24 Cal. 4th at 917. He has not done so.

Plaintiff contends that the application of Maryland law is contrary to California policy because it would deprive him of the ability to seek "equitable relief for the public." Opp'n 21. But the relief Plaintiff seeks here on behalf of PennyMac's Preferred Shareholders has nothing to do with "relief for the public." And the mere fact that Plaintiff can bring a UCL claim under California law and cannot under Maryland law is insufficient; as PennyMac explained in its opening brief, California courts routinely

---

[5] The two cases Plaintiff cites, Opp'n 20, are inapposite, as neither arose from contractual language subject to a choice-of-law provision. *Ochoa v. Zeroo Gravity Games LLC*, 2023 WL 4291650, at *11 (C.D. Cal. May 24, 2023) (claims arose from allegedly deceptive advertisements, not terms-of-service agreement); *Urica, Inc. v. Pharmaplast, S.A.E.*, 2013 WL 12123305, at *11 (C.D. Cal. Jan. 10, 2013) (claims did not "involve construing or interpreting the terms of the contract").

4

apply other states' laws pursuant to choice-of-law provisions, even when that results in dismissal of a UCL claim.  Mot. 9–10 & n.7.

In addition, Plaintiff has not pled facts sufficient to show that California has a greater interest than Maryland in applying its law.  *See Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 466 (1992) (explaining that courts determine whether California has a materially greater interest than the chosen state only if there is a "fundamental conflict with California law").  Although the Complaint pleads that defendants have headquarters in California, Compl. ¶¶ 28-29, PennyMac is organized under the laws of Maryland, *see id.* ¶ 28, and the Articles Supplementary at issue are themselves creatures of Maryland law, *see, e.g.*, Md. Code Ann., Corps. & Ass'ns § 8-101(b).  Meanwhile, Plaintiff is a resident of New Jersey who does not allege that he purchased PennyMac shares or was in any way harmed in California.  Compl. ¶ 27.  And "the State has no legitimate interest in protecting nonresident shareholders."  *Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982).  Plaintiff has therefore failed to prove that California has a materially greater interest than Maryland in applying its law.

Maryland law governs; accordingly, the Court should dismiss Plaintiff's California state-law claim with prejudice.

**B.    Plaintiff Fails to State a Claim that PennyMac's Dividend Rates Are "Unlawful" Under the UCL.**

Plaintiff's claim under the "unlawful" prong of the UCL is premised on the notion that PennyMac's continued use of the initial dividend rates for its Series A and Series B Preferred Shares violates the LIBOR Act.  Because PennyMac is in full compliance with the LIBOR Act, this "unlawful" theory fails.  Mot. 11–17.

**1.    Fixed Rates Are Not Excluded from "Benchmark Replacements" Under the LIBOR Act.**

There is no dispute that, after disregarding LIBOR- and polling-based provisions in accordance with the LIBOR Act, PennyMac's Articles provide that PennyMac issue dividends at "the dividend rate in effect for the immediately preceding Dividend Period,"

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

which in this instance are the respective initial fixed rates for each series. *See* Mot. 14–15; Opp'n 13 ("The final clause at the end of the waterfall in Section 4(g) points to a fixed rate . . . ."); PMT Ex. A. ¶ 4(g); PMT Ex. B. ¶ 4(g). Nor is there any dispute that the LIBOR Act does not "alter or impair" contractual fallback provisions that specify a "benchmark replacement" that is not based on LIBOR, allowing those fallbacks to operate according to their terms. *See* 12 U.S.C. § 5803(a)(2), (f)(2); Mot. 11–15. Reading the statute and the Articles together, therefore, PennyMac's final fallback rates—the initial dividend rates—remain in effect, and the LIBOR Act does not mandate a transition to SOFR. Mot. 11–15.

Plaintiff's attempt to get around this plain reading fails. Plaintiff argues that the rates remaining in PennyMac's fallback provisions somehow do not qualify as "benchmark replacements" under 12 U.S.C. § 5802(3) because they are fixed rates. *See* Opp'n 11–14. Plaintiff would therefore read PennyMac's fallbacks out entirely. *Id.* But there is nothing in the statute precluding a fixed rate from constituting a "benchmark replacement," and Plaintiff's efforts to conjure such a bar run contrary to the express text and well-established principles of statutory interpretation.

The LIBOR Act is clear when directing which fallback provisions to "disregard": references to LIBOR or bank polling. 12 U.S.C. § 5803(b). The statute does ***not*** direct parties to disregard fixed rates. Instead, Plaintiff attempts to invent such a restriction by misreading the definition of the term "benchmark replacement." The statute defines a "benchmark" as "an index of interest rates or dividend rates that is used . . . as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." 12 U.S.C. § 5802(1). A "benchmark replacement," on the other hand, is separately defined as "a benchmark, ***or an interest rate or dividend rate*** (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract." *Id.* § 5802(3). Read together, the statute expressly provides that the replacement for a

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

benchmark—*i.e.*, a "benchmark replacement"—may be one of three things: (1) a benchmark; (2) an interest rate; or (3) a dividend rate. This makes sense, because any of these three options would allow a contract to function in the absence of LIBOR.

Plaintiff argues that, because a benchmark's "*index of* interest rates or dividend rates" would be understood to contemplate a floating rate tied to that index, then a "benchmark replacement" must likewise encompass only floating rates. Opp'n 12. But that is not what the statute says. The statue provides that a "benchmark replacement" need **not** be a benchmark itself, but can also be any "interest rate or dividend rate"—with no distinction between fixed or variable rates. 12 U.S.C. § 5802(3).

Plaintiff's effort to limit a "benchmark replacement" to only a "benchmark," and exclude any other interest or dividend rate not tied to an index, reads the second clause of the definition out of the statute entirely. Plaintiff acknowledges as much in his brief: "***Upon removing the appositive clause***, the statutory language reads: 'The term 'benchmark replacement' means a benchmark . . . to replace LIBOR or any interest rate or dividend rate based on LIBOR . . . .'" Opp'n 13.

But "removing" undesired clauses to change the reading is not how statutory interpretation works. Here, doing so would dramatically alter the scope of a "benchmark replacement." The statute provides that LIBOR-based rates may be replaced with rates from an index (a "benchmark"), *or* another interest rate or dividend rate that is not tied to an index. Plaintiff would have the Court remove two of the three options the statue expressly authorizes, and conclude instead that those options are prohibited. Such removal results in a substantially different meaning that the text does not support.

Statutory interpretation principles confirm that parties and courts cannot simply "remov[e]" a clause from a statute. Courts generally do not interpret statutory provisions so as to render them pointless or duplicative; to the contrary, a "cardinal principle of interpretation" is that courts "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotation marks omitted); *United States v. Lemus,* 93 F.4th 1255, 1259 (9th Cir. 2024) ("[W]e should

7

avoid reading a provision that would make any part of it inoperative or superfluous, void or insignificant." (internal quotation marks omitted)).  Here, giving effect to "every clause and word" of the statutory provision is simple:  a "benchmark replacement" can be a "benchmark" *or* "an interest rate or dividend rate."  12 U.S.C. § 5802(3).  If the "interest rate or dividend rate" clause meant what Plaintiff imagines—*i.e.*, nothing—then Congress could have simply omitted it.  It did not.

Plaintiff resorts to strained grammatical arguments about appositive clauses and Oxford commas, but they do not provide any basis to stray from the well-established principles that words are generally given their ordinary meaning and that each statutory clause is to be given effect.  *See Walters v. Metro. Educ. Enters., Inc*., 519 U.S. 202, 207–209 (1997) ("words in a statute are assumed to bear their ordinary, contemporary, common meaning" and "[s]tatutes must be interpreted, if possible, to give each word some operative effect" (internal quotation marks and citations omitted)).

Plaintiff's argument that the clause "or an interest rate or dividend rate" must be "an appositive clause intended to explain (not contradict) the term 'benchmark,'" Opp'n 13, assumes the premise that the clause cannot add anything to the term "benchmark." But the statute uses the word "or," which separates each term that comprises a benchmark replacement.  *See* 12 U.S.C. § 5802(3).  Although "or" "can sometimes introduce an appositive—a word or phrase that is synonymous with what precedes it ('Vienna or Wien,' 'Batman or the Caped Crusader')—its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings."  *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (internal quotation marks omitted).

Both the text and the structure of the statute support the ordinary use of "or" here as a disjunctive term, rather than as introducing a superfluous phrase.  First, an interest rate or dividend rate, singular, is not "synonymous" with an index of rates.  It is precisely *because* the terms are different that Plaintiff seeks to "remov[e]" an entire clause of the definition.  If "an interest rate or dividend rate" did not encompass anything beyond a "benchmark," Plaintiff would not need to read the phrase out of the statute.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Second, the statute already defines a "benchmark." There is no need to "explain" with an appositive phrase, Opp'n 13, a statutory term that is defined with precision in the very same section—let alone to do so using different (non-synonymous) words.

Third, the definition of "benchmark replacement" uses the word "or" twice: "benchmark, *or* interest rate *or* dividend rate." 12 U.S.C. § 5802(3). There is no dispute that the second "or" is disjunctive. Plaintiff's reading thus runs afoul of the "vigorous" presumption that, "when a term is repeated within a given sentence," it "is used to mean the same thing." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see Encino Motorcars, LLC v. Navarro,* 584 U.S. 79, 88 (2018) (rejecting interpretation that would render one "or" non-disjunctive while others were disjunctive, "all the while using the same word ('or') to signal both meanings").

Disregarding what "or" customarily means, Plaintiff also argues that the lack of an Oxford comma in § 5802(3) means the definition "does not convey a series." Opp'n 13 (emphasis omitted). The lack of such a comma, however, "cannot bear that much weight, given the compelling textual evidence to the contrary." *Woods*, 571 U.S. at 45. That is particularly true here, where the absence of a comma has its own function. As written, the parenthetical at the end of the clause—"or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR)"—applies both to an interest rate and to a dividend rate. It makes sense, then, that those two options are grouped together within a single clause. Inserting a comma prior to "or dividend rate," as Plaintiff insists is necessary to indicate a series, would materially alter the clause, leaving the parenthetical to modify only the last item in the series ("dividend rate") rather than both items ("interest rate or dividend rate"). 12 U.S.C. § 5802(3). The legislative drafting manual on which Plaintiff relies contemplates that the form in which a series is listed may be affected by how modifiers apply within that series. House

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Legislative Counsel's Manual on Drafting Style (Dec. 2020) at 45 (counseling drafters "to repeat the conjunction" if necessary to make modifiers clear).[6]

Ultimately, there is nothing in the text or structure of the statute to suggest that defining a "benchmark replacement" as a "benchmark, or an interest rate or dividend rate" means anything other than that a benchmark replacement can be any one of those three things. Nor is there anything in the text or structure of the statute to suggest that a fixed dividend rate does not qualify. In an effort to reach his desired result, Plaintiff's arguments otherwise run contrary to established rules of statutory interpretation and ordinary usage. There is no reason to depart from those principles here.

### 2.     A Fallback Provision Need Not Have Envisioned the Permanent Cessation of LIBOR To Be Given Effect.

Plaintiff also repeats an argument made in the Complaint, namely, that the Articles "did not contemplate the permanent cessation of LIBOR." Opp'n 10–11. Under the LIBOR Act, however, that is beside the point. As PennyMac has already explained, *see* Mot. 15–16, so long as the benchmark replacement meets all other statutory requirements, it is irrelevant whether the parties envisioned the fallback provision to be temporary or permanent. Indeed, the statute says so expressly, defining a "benchmark replacement" as encompassing rates "to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a ***temporary***, permanent, or indefinite basis." 12 U.S.C. § 5802(3). The statute then goes on to direct that only references to benchmark replacements based on LIBOR be "disregarded"; other benchmark replacements, even "temporary" ones, survive. 12 U.S.C. § 5803(b).

Separately, albeit half-heartedly, Plaintiff contends that the fallback provisions are not "workable" because the Articles require a "spread" of roughly 5% over LIBOR

---

[6] Plaintiff cites the drafting manual to argue that § 5802(3) does not list alternatives because, he says, when Congress creates a list, it generally includes the conjunction "or" at "the end of the next to-last item only." *See* Op. at 13 (citing House Legislative Counsel's Manual on Drafting Style (Dec. 2020) at 44). The cited rule, however, applies only "[i]f the list is preceded by a dash"—which is not the case here. *See id.*

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

during the floating-rate period. Opp'n 11. Yet the plain language of the relevant fallback provision does not by its terms require a spread adjustment. It states that, "if there was no such Dividend Period"—*i.e.*, if the immediately preceding Dividend Period did not use a Three-Month LIBOR rate—then "***the dividend*** shall be calculated ***at the dividend rate*** in effect for the immediately preceding Dividend Period." PMT Ex. A. ¶ 4(g); PMT Ex. B. ¶ 4(g). The "dividend rate" is the full rate from the preceding period, and does not require any spread-adjustment. *See* PMT Ex. A. ¶ 4(a); PMT Ex. B. ¶ 4(a).

Finally, Plaintiff argues that PennyMac's fallback provision "is part of a highly integrated clause that cannot be severed." Opp'n 11. But that runs directly afoul of the LIBOR Act, which specifically directs that certain "reference[s] in the fallback provisions of a LIBOR contract . . . be disregarded as if not included," 12 U.S.C. § 5803(b), while other language in those fallback provisions remains in effect, *id.* § 5803(a), (f).

### 3. Plaintiff's Reliance on Legislative History is Misplaced, and In Any Event, That History Belies Plaintiff's Arguments.

Plaintiff's resort to legislative history is both telling and unavailing; his proposed fixed rate exclusion is nowhere in the statutory text. Because the text is clear that a "benchmark replacement" may include any interest or dividend rate—including a fixed rate—"reliance on legislative history is unnecessary." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (citation omitted); *accord Ariz. Elec. Power Co-op., Inc. v. United States*, 816 F.2d 1366, 1375 (9th Cir. 1987) (explaining "an analysis of legislative history is proper only to ***solve***, not to ***create*** an ambiguity" (emphasis in original)).[7] In any event, the legislative history does not support Plaintiff's reading of the statute, and cannot create an exclusion that was not written into the text.

Consistent with the text of the LIBOR Act, much of the legislative history is focused on the principle of leaving unaltered the non-LIBOR, non-polling provisions of

---

[7] Plaintiff acknowledges that reliance on legislative history is appropriate only "if the statutory language is unclear or ambiguous." Opp'n 14.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

contracts with workable LIBOR replacements.  The House Committee Report makes this clear when addressing the bill's "scope": "The bill is designed to affect only those instruments, which according to their terms, would require a calculation based on LIBOR after it is no longer published."  H.R. Rep. No. 117-206, at 8 (2021); *see also id.* at 9 ("Nonetheless, this section does not alter or impair a LIBOR Contract that specifies a clearly defined and available replacement rate.").[8]

Meanwhile, in contrast to the official House Committee report, which says nothing about fixed versus variable rates, the legislative materials Plaintiff relies on "consist almost wholly of excerpts from committee hearings and scattered floor statements by individual lawmakers," precisely "the sort of stuff" the Supreme Court has long "called among the least illuminating forms of legislative history."  *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017) (internal quotation marks omitted).  For example, Plaintiff quotes extensively from a prepared statement made by the Counsel of the Federal Reserve, Mark Van Der Weide, during his congressional testimony in April 2021—nearly one year before Congress passed the LIBOR Act—in which he voiced aspirations for what the statute "should" do.  *See, e.g.,* Opp'n 3, 14–15.  From this, Plaintiff purports to ascribe what "Congress" as a whole "sought to" do when it eventually passed the legislation.  *E.g.*, Opp'n 3, 5.

But excerpts from hearing testimony cannot be confused with the intent of Congress.  "Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress.  It becomes far more so when we consult sources still more steps removed from the full Congress . . . ."  *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001); *see Regan v. Wald*, 468 U.S. 222, 237 (1984) (explaining that reliance on "[o]ral testimony of witnesses" would "open the door to the inadvertent, or perhaps even planned, undermining of the language

---

[8] The House Committee Report referenced herein is attached as Exhibit D to the accompanying Declaration of Matthew Donald Umhofer in Support of Defendants' Request for Judicial Notice, and the Court may take judicial notice of its contents for purposes of deciding this Motion to Dismiss.  *See* Request for Judicial Notice ("RJN").

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

actually voted on by Congress and signed into law by the President"). For that reason, both the Supreme Court and the Ninth Circuit "rel[y] on official committee reports when considering legislative history, not stray comments by individuals or other materials unrelated to the statutory language or the committee reports." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999); *see Kelly v. Robinson*, 479 U.S. 36, 51 n. 13 (1986) (declining to "accord any significance" to "statements" not made by a "Member of Congress" nor "included in the official Senate and House Reports").

Moreover, many of the concerns that Plaintiff cites are in the context of fallbacks that remain fixed at the last LIBOR rate, *e.g.*, Statement of Mark Van Der Weide, Pl. Ex. 1 at 62–63,[9] which the statute addresses directly, 12 U.S.C. § 5803(b)(1); there is no suggestion that parties could not agree to fall back to a fixed rate. And if the Court were to consider individual comments or testimony, numerous Congressional representatives and testifying individuals made clear their focus was to address the challenge of contracts that could not "continue to function" and were not "feasible" to amend, not on precluding parties from applying agreed-upon fallbacks to fixed rates. *See* Statement of Rep. Huizenga, Pl. Ex. 1 at 11–12 ("One of the biggest challenges . . . is the thousands of existing legacy contracts that . . . do not contain contractual, 'fallback language,' that allows for the contract to be amended, and continue to function should LIBOR be discontinued."); Testimony of Brian Smith, Deputy Assistant Secretary for Federal Finance, U.S. Department of the Treasury, Pl. Ex. 1 at 17 (legislation necessary for "contracts that do not specify a workable fallback rate and are not feasible for private-sector actors to modify on their own"); Statement of Rep. Sherman, Pl. Ex. 1 at 21 (draft bill "involve[s] inserting government only where the parties did not make an agreement that can be carried out"); Testimony of Kevin Walsh, Deputy Comptroller for Market

---

[9] *See The End of LIBOR: Transitioning To an Alternative Interest Rate Calculation for Mortgages, Student Loans, Business Borrowing, and Other Financial Productions: Virtual Hearing Before the Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets of the H. Comm. on Fin. Serv.*, 117th Cong., 1st Sess., 1 (2021) ("Pl. Ex. 1.").

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

Risk Policy, Office of the Comptroller of the Currency, Pl. Ex. 1 at 24 (concern over litigation in the absence of Federal legislation for "contracts that do not have fallback language"); Statement of Thomas Wipf, Chair of the Alternative Reference Rate Committee and Managing Director, Morgan Stanley, Pl. Ex. 2 at 114 (2021) ("the legislative proposal is purposefully narrow, intended only to address contracts that could not otherwise be changed").[10]

Ultimately, courts need "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). The LIBOR Act itself is the "best evidence" of what Congress intended to do. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991). In enacting the LIBOR Act, Congress sought to allow workable contracts "to operate according to their terms." 12 U.S.C. § 5801(b)(3). The statutory definitions and operative provisions further that purpose, providing that only certain, specific contractual language be disregarded, *id*. § 5803(b); substituting SOFR for LIBOR only for contracts with no surviving fallbacks that include a specific benchmark replacement or a determining person, *id*. § 5803(a); and expressly not "alter[ing] or impair[ing]" surviving contractual provisions relying on non-LIBOR-based fallback rates, *id.* § 5803(f)(2). Applying those statutory provisions to the Articles makes clear that PennyMac has complied with the LIBOR Act by continuing to issue dividends at the rates then in effect: the initial fixed rates.

## C.    Plaintiff Fails to State a Claim that PennyMac's Dividend Rates Are "Unfair" Under the UCL.

Plaintiff argues that, even if PennyMac's interpretation of the Articles "is not explicitly prohibited by the LIBOR Act," Opp'n 16, and therefore is not "unlawful," he nonetheless still can state a UCL claim under the "unfairness" prong. This argument fails. Although it is theoretically possible in some cases to state a claim for an unfair

---

[10] *See The LIBOR Transition: Protecting Consumers and Investors: Hearing on H.R. 4616 Before the S. Comm. On Banking, Housing, and Urban Affairs*, 117th Cong., 1st Sess., 1 (2021) ("Pl. Ex. 2").

practice under the UCL without a legal violation, *this* Plaintiff cannot do so.  As
PennyMac explained in its opening brief, Mot. 18, and Plaintiff's opposition
underscores, Plaintiff's "unfairness" theory fails for the same reasons the "unlawful"
theory fails:  PennyMac is complying with the LIBOR Act.

First, Plaintiff does not contest that the LIBOR Act preempts any state law that
would impose a different benchmark replacement rate than the LIBOR Act.  *See* Opp'n
17–18.  Accordingly, if a party follows the LIBOR Act, a plaintiff cannot look to state
law to impose a different result.   Here, because PennyMac arrived at its rate in
accordance with the LIBOR Act, Mot. 11–16; *supra* at 5–11, Plaintiff cannot rely on the
UCL to require a different rate than that directed by the federal statute.

Plaintiff argues that his claim "that Defendants violated federal law" is not
preempted, Opp'n 17–18, but that is beside the point, and not in dispute.   What *is*
preempted is Plaintiff's claim that, even if PennyMac's current rate is in full compliance
with the LIBOR Act (which it is), the UCL's concept of fairness requires a different rate.
Mot. 18–19.  On that, Plaintiff offers no response.  Accordingly, if the Court concludes
that PennyMac's conduct follows the LIBOR Act and is not unlawful, Plaintiff's UCL
claim must be dismissed in full, and cannot survive on an "unfairness" theory seeking
to impose different rate.

Second, Plaintiff's effort to avoid the UCL's safe harbor for government-
permitted conduct is unavailing.  Plaintiff's primary response is, again, that PennyMac's
conduct was not lawful, Opp'n 17, which fails for all of the reasons described above and
in PennyMac's opening brief.  *See supra* at 5–11; Mot. 11–16.  Plaintiff also asserts in
conclusory fashion that "even if PennyMac's actions were found to not be expressly
barred by the LIBOR Act," Opp'n 17, he could still assert an "unfairness prong" claim—
but offers no reasoning or legal support for that position, and it is incorrect.   As
PennyMac explained in its opening brief, PennyMac's conduct is not only not "expressly
barred" by the LIBOR Act, it is permitted:  the LIBOR Act makes clear that contractual
fallbacks that do not rely on polling or LIBOR are to be given effect.  Mot. 17.  This is

15

not a situation where the statute is silent on the topic at issue; the LIBOR Act provides express direction for all contracting parties to follow when evaluating fallback provisions, and PennyMac followed that direction.

Third, Plaintiff's theories of unfairness also are grounded in a supposed violation of the LIBOR Act, and Plaintiff does not explain why complying with the law and the terms of its contracts, as PennyMac did, would be unfair. For the reasons above, the Court need not address whether PennyMac's conduct somehow could be considered "unfair" under any of the UCL's various tests, but if the Court were to reach those issues, Plaintiff falls far short of stating a claim.

Plaintiff's assertion that its claim is tethered to "a clear public policy mandate to transition to SOFR" "provid[ed]" by the LIBOR Act assumes the premise that the LIBOR Act requires the use of SOFR here, as do Plaintiff's declarations of what rates the Preferred Shareholders "should have" received. Opp'n 16.[11] And Plaintiff's conclusory assertions that PennyMac's conduct was "unethical and significantly harmful to consumers" under the balancing test and "PennyMac has no policy justification" to outweigh consumer harm under the FTC test simply restate the legal elements of the tests without any supporting facts or evidence. *Id.*

When it comes to PennyMac's actual arguments about fairness—(a) that it is fair to apply contractual terms as agreed to by the parties and modified by law, and would not be fair to deviate from those terms to the benefit of one class of shareholders (the Preferred Shareholders) over another (common shareholders), Mot. 20–21; and (b) that continuing to utilize the initial dividend rate does not inherently favor PennyMac over the Preferred Shareholders, or vice-versa, Mot. 21—Plaintiff has no response other than to repeat its chorus that PennyMac is violating the LIBOR Act, Opp'n 16 ("PennyMac

---

[11] Plaintiff insinuates that PennyMac should have adopted the SOFR rate because "its competitors" did. *See* Opp'n 5, 8; Compl. ¶¶ 18, 50. But the only specific competitor the Complaint mentions is Bank of America, Compl. ¶ 50, and it does so without providing Bank of America's fallback language to evaluate. What matters here is whether PennyMac complied with the LIBOR Act when interpreting and applying *its own* contractual fallback provisions.

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

does not owe common stockholders a duty to violate the law and its contractual obligations"); *id.* at 17 ("PennyMac's decision to violate the LIBOR Act"). But Plaintiff provides no argument, let alone legal basis, for why, absent a violation of the LIBOR Act, "fairness" would require PennyMac to disregard its contractual language and set a different rate at the behest of the Preferred Shareholders over the common shareholders. It does not.

Finally, Plaintiff urges the court to look to legislative history to support his notion of unfairness, but the full legislative history does not support Plaintiff's reading. *See supra* at 11–14. In any event, legislative history cannot supersede the enacted statutory language, which permits PennyMac's rate. Stray statements in legislative history do not render complying with the terms of a statute unfair.[12]

### D. Leave to Amend Should Be Denied.

In the alternative, Plaintiff seeks leave to amend the Complaint. A court may deny leave to amend if it would be futile, meaning "the pleading could not possibly be cured by the allegation of other facts." *Ojeda v. Kaiser Permanente Int'l, Inc*., 2022 WL 18228249, at *3 (C.D. Cal. Nov. 29, 2022) (Fitzgerald, J.) (citation and emphasis omitted). Here, amendment would be futile because the defects in Plaintiff's claims turn on pure questions of law. The facts "are relatively simple and were set forth fully." *Mike's Novelties, Inc. v. Grav, Inc*., 2018 WL 5094959, at *6 (C.D. Cal. May 9, 2018) (Fitzgerald, J.). Neither the text of the LIBOR Act nor the governing Articles are going to change. And Plaintiff does not "propose any specific allegations that might rectify [his] failure" to state a claim under the UCL. *Carrico v. City & County of San Francisco*,

---

[12] Plaintiff cites to *Zuniga v. Bank of America N.A.*, 2014 WL 7156403, at *9 (C.D. Cal. Dec. 9, 2014) for the proposition that "legislative history may contribute to a finding of unfairness," but it does not support the notion that legislative history can turn statutory compliance into grounds for "unfairness." The underlying case there, *Jolley v. Chase Home Finance, LLC*, analyzed new legislation that was enacted to address a particular mortgage foreclosure practice alleged in the lawsuit to be unfair. 213 Cal. App. 4th 872, 904–05 (2013). Although the new law did not apply retroactively to the conduct at issue in the case, the court concluded that the legislation and its history could be relevant to the unfairness inquiry. *Id.* at 907–08.

17

1    656 F.3d 1002, 1008 (9th Cir. 2011).  The Court should therefore dismiss Plaintiff's

2    Complaint with prejudice.

3    **III.    CONCLUSION**

4            For the foregoing reasons, this Court should dismiss Plaintiff's claim with

5    prejudice.

6

7    Dated: November 4, 2024                    Respectfully submitted,

8

9                                              */s/ Matthew Donald Umhofer*
                                               UMHOFER, MITCHELL & KING, LLP
10                                             Matthew Donald Umhofer
                                               Jonas P. Mann
11
                                               *Attorneys for Defendants PennyMac*
12                                             *Mortgage Investment Trust and PNMAC*
                                               *Capital Management LLC*
13
                                               WILLIAMS & CONNOLLY LLP
14                                             Steven M. Farina (*pro hac vice*)
                                               Melissa B. Collins (*pro hac vice*)
15
                                               *Attorneys for Defendant PennyMac*
16                                             *Mortgage Investment Trust*

17

18

19

20

21

22

23

24

25

26

27

28

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*

1

## **CERTIFICATE OF COMPLIANCE**

2

3        The undersigned, counsel of record for PennyMac Mortgage Investment Trust,

4   certifies the brief contains 6,274 words, which complies with the word limit of L.R.

5   11-6.1.

6

7   Dated: November 4, 2024          Respectfully submitted,

8                                    */s/ Matthew Donald Umhofer*
                                     UMHOFER, MITCHELL & KING, LLP
9                                    Matthew Donald Umhofer
                                     Jonas P. Mann
10
                                     *Attorneys for Defendants PennyMac*
11                                   *Mortgage Investment Trust and PNMAC*
                                     *Capital Management LLC*
12
                                     WILLIAMS & CONNOLLY LLP
13                                   Steven M. Farina (*pro hac vice*)
                                     Melissa B. Collins (*pro hac vice*)
14
                                     *Attorneys for Defendant PennyMac*
15                                   *Mortgage Investment Trust*

16

17

18

19

20

21

22

23

24

25

26

27

28

*PENNYMAC MORTGAGE INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT*