# Exhibit D

| 117TH CONGRESS | | | |
|---|---|---|---|
| 1st Session | } | HOUSE OF REPRESENTATIVES | { REPT. 117–206 Part 1 |

# ADJUSTABLE INTEREST RATE (LIBOR) ACT OF 2021

DECEMBER 7, 2021.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Ms. WATERS, from the Committee on Financial Services, submitted the following

# R E P O R T

[To accompany H.R. 4616]

The Committee on Financial Services, to whom was referred the bill (H.R. 4616) to deem certain references to LIBOR as referring to a replacement benchmark rate upon the occurrence of certain events affecting LIBOR, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| Purpose and Summary | 5 |
| Background and Need for Legislation | 5 |
| Section-by-Section Analysis of the Legislation | 8 |
| Hearings | 9 |
| Committee Consideration | 10 |
| Committee Votes | 10 |
| Committee Correspondence | 11 |
| Committee Oversight Findings | 16 |
| Statement of Performance Goals and Objectives | 16 |
| New Budget Authority and C.B.O. Cost Estimate | 16 |
| Committee Cost Estimate | 16 |
| Federal Mandates Statement | 16 |
| Advisory Committee Statement | 16 |
| Applicability to Legislative Branch | 17 |
| Congressional Earmarks, Limited Tax Benefits, and Limited Tariff Benefits | 17 |
| Duplicative Federal Programs | 17 |
| Changes in Existing Law Minority Views | 17 |

The amendment is as follows:
Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Adjustable Interest Rate (LIBOR) Act of 2021".

29–006

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—The Congress finds that—

(1) LIBOR is used as a benchmark rate in more than $200 trillion of contracts worldwide;

(2) a significant number of existing contracts that reference LIBOR do not provide for the use of a clearly defined or practicable replacement benchmark rate when LIBOR is discontinued; and

(3) the cessation or non-representativeness of LIBOR could result in disruptive litigation related to existing contracts that do not provide for the use of a clearly defined or practicable replacement benchmark rate.

(b) PURPOSE.—It is the purpose of this Act—

(1) to establish a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate, without affecting the ability of parties to use any appropriate benchmark rate in new contracts;

(2) to preclude litigation related to existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate; and

(3) to allow existing contracts that reference LIBOR but provide for the use of a clearly defined fallback and practicable replacement rate, to operate according to their terms.

(c) RULE OF CONSTRUCTION.—Nothing in this Act shall be construed to disfavor the use of any benchmark rate on a prospective basis.

**SEC. 3. DEFINITIONS.**

As used in this Act, the following terms shall have the following meanings:

(1) "Benchmark" shall mean an index of interest rates or dividend rates that is used, in whole or in part, as the basis of or as a reference for calculating or determining any valuation, payment or other measurement.

(2) "Benchmark Administrator" means a person that publishes a Benchmark for use by third parties.

(3) "Benchmark Replacement" shall mean a Benchmark, or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or in respect of a LIBOR Contract.

(4) "Benchmark Replacement Conforming Changes" shall mean any technical, administrative, or operational changes, alterations, or modifications that—

(A) the Board establishes for the purpose of facilitating the implementation, administration, and calculation of the Board-Selected Benchmark Replacement; or

(B) in the reasonable judgment of a Calculating Person, are otherwise necessary or appropriate to permit the implementation, administration, and calculation of the Board-Selected Benchmark Replacement under or in respect of a LIBOR Contract after giving due consideration to any Benchmark Replacement Conforming Changes under subparagraph (A).

(5) "Board" means the Board of Governors of the Federal Reserve System.

(6)(A) "Board-Selected Benchmark Replacement" shall mean a Benchmark Replacement identified by the Board that is based on SOFR.

(B) The Board shall adjust the Board-Selected Benchmark Replacement for each category of LIBOR Contract that the Board may identify to—

(i) apply to each LIBOR tenor; and

(ii) incorporate the relevant Tenor Spread Adjustment.(C) For Consumer Loans, the Board-Selected Benchmark Replacement shall initially reflect the spread between the Board-Selected Benchmark Replacement and LIBOR immediately before the LIBOR Replacement Date and shall incorporate the relevant Tenor Spread Adjustment over a one-year transition period.

(7) "Calculating Person" shall mean, with respect to any LIBOR Contract, any person (which may be the Determining Person) responsible for calculating or determining any valuation, payment, or other measurement based on a Benchmark.

(8) "Consumer Loan" shall mean a consumer credit transaction. For purposes of this paragraph, the terms "consumer" and "credit" have the meaning given those terms, respectively, under section 103 of the Truth in Lending Act (15 U.S.C. 1602).

(9) "Determining Person" shall mean, with respect to any LIBOR Contract, any person with the authority, right, or obligation, including on a temporary

3

basis, (as identified by the provisions of the LIBOR Contract, or as identified by the governing law of the LIBOR Contract, as appropriate) to determine a Benchmark Replacement.

(10) "Fallback Provisions" shall mean terms in a LIBOR Contract for determining a Benchmark Replacement, including any terms relating to the date on which the Benchmark Replacement becomes effective.

(11) "LIBOR" shall mean the overnight and 1-, 3-, 6-, and 12-month tenors of U.S. dollar LIBOR (formerly known as the London interbank offered rate) as administered by ICE Benchmark Administration Limited (or any predecessor or successor thereof). LIBOR shall not include the 1-week or 2-month tenors of U.S. dollar LIBOR.

(12) "LIBOR Contract" shall mean, without limitation, any contract, agreement, indenture, organizational documents, guarantee, mortgage, deed of trust, lease, Security (whether representing debt or equity, and including any interest in a corporation, a partnership, or a limited liability company), instrument, or other obligation or asset that, by its terms, continues in any way to use LIBOR as a Benchmark as of the applicable LIBOR Replacement Date.

(13) "LIBOR Replacement Date" shall mean the first London banking day after June 30, 2023, unless the Board determines that any LIBOR tenor will cease to be published or cease to be representative on a different date.

(14) "Security" shall have the meaning assigned to such term in section 2(a) of the Securities Act of 1933 (15 U.S.C. 77b(a)).

(15) "SOFR" shall mean the Secured Overnight Financing Rate published by the Federal Reserve Bank of New York (or a successor administrator).

(16) "Tenor Spread Adjustment" shall mean—
    (A) 0.00644 percent for overnight LIBOR;
    (B) 0.11448 percent for 1-month LIBOR;
    (C) 0.26161 percent for 3-month LIBOR;
    (D) 0.42826 percent for 6-month LIBOR; and
    (E) 0.71513 percent for 12-month LIBOR.

**SEC. 4. LIBOR CONTRACTS.**

(a) On the LIBOR Replacement Date, the Board-Selected Benchmark Replacement shall, by operation of law, be the Benchmark Replacement for any LIBOR Contract that, after giving any effect to subsection (b)—
    (1) contains no Fallback Provisions; or
    (2) contains Fallback Provisions that identify neither—
        (A) a specific Benchmark Replacement; nor
        (B) a Determining Person.

(b) On the LIBOR Replacement Date, any references in the Fallback Provisions of a LIBOR Contract to—
    (1) a Benchmark Replacement that is based in any way on any LIBOR value, except to account for the difference between LIBOR and the Benchmark Replacement, or
    (2) a requirement that a person (other than a Benchmark Administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates,

shall be disregarded as if not included in the Fallback Provisions of such LIBOR Contract and shall be deemed null and void and without any force or effect.

(c) Subject to subsection (g)(2), a Determining Person shall have authority under this Act, but shall not be required, to select the Board-Selected Benchmark Replacement as the Benchmark Replacement.

(d) Any selection by a Determining Person of the Board-Selected Benchmark Replacement pursuant to subsection (c) shall be—
    (1) irrevocable;
    (2) made by the earlier of the LIBOR Replacement Date and the latest date for selecting a Benchmark Replacement according to the terms of such LIBOR Contract; and
    (3) used in any determinations of the Benchmark under or in respect of such LIBOR Contract occurring on and after the LIBOR Replacement Date.

(e) If a Determining Person has authority to select the Board-Selected Benchmark Replacement under subsection (c) but does not select a Benchmark Replacement by the date specified in subsection (d)(2), then, on the LIBOR Replacement Date, the Board-Selected Benchmark Replacement shall, by operation of law, be the Benchmark Replacement for the LIBOR Contract.

(f) If the Board-Selected Benchmark Replacement becomes the Benchmark Replacement for a LIBOR Contract pursuant to subsection (a), (c), or (e) then all Benchmark Replacement Conforming Changes shall become an integral part of such LIBOR Contract by operation of law. For the avoidance of doubt, a Calculating Per-

4

son shall not be required to obtain consent from any other person prior to the adoption of Benchmark Replacement Conforming Changes.

(g) The provisions of this Act shall not alter or impair—

(1) any written agreement specifying that a LIBOR Contract shall not be subject to this Act;

(2) any LIBOR Contract that contains Fallback Provisions that identify a Benchmark Replacement that is not based in any way on any LIBOR value (including, but not limited to, the prime rate or the Effective Federal Funds Rate), except that such LIBOR Contract shall be subject to subsection (b);

(3) any LIBOR Contract subject to subsection (c) as to which a Determining Person does not elect to use a Board-Selected Benchmark Replacement pursuant to subsection (c), except to the extent that such LIBOR Contract is subject to subsection (b) or (e);

(4) the application to a Board-Selected Benchmark Replacement of any cap, floor, modifier, or spread adjustment to which LIBOR had been subject pursuant to the terms of a LIBOR Contract; or

(5) any provisions of Federal consumer financial law that requires creditors to notify borrowers regarding a change-in-terms.

(h) Except as provided in section 5(c), the provisions of this Act shall not alter or impair the rights or obligations of any person, or the authorities of any agency, under Federal consumer financial law (as defined in section 1002(14) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 5481(14)).

**SEC. 5. CONTINUITY OF CONTRACT AND SAFE HARBOR.**

(a) A Board-Selected Benchmark Replacement and the selection or use of a Board-Selected Benchmark Replacement as a Benchmark Replacement under or in respect of a LIBOR Contract, as well as any Benchmark Replacement Conforming Changes, by operation of section 4 shall constitute—

(1) a commercially reasonable replacement for and a commercially substantial equivalent to LIBOR;

(2) a reasonable, comparable, or analogous rate, index, or term for LIBOR;

(3) a replacement that is based on a methodology or information that is similar or comparable to LIBOR;

(4) substantial performance by any person of any right or obligation relating to or based on LIBOR; and

(5) a replacement that has historical fluctuations that are substantially similar to those of LIBOR for purposes of the Truth in Lending Act and its implementing regulations.

(b) Neither of (1) the selection or use of a Board-Selected Benchmark Replacement as a Benchmark Replacement or (2) the determination, implementation, or performance of Benchmark Replacement Conforming Changes, in each case by operation of section 4, shall (A) be deemed to impair or affect the right of any person to receive a payment, or to affect the amount or timing of such payment, under any LIBOR Contract or (B) have the effect of (i) discharging or excusing performance under any LIBOR Contract for any reason, claim, or defense (including, but not limited to, any force majeure or other provision in any LIBOR Contract), (ii) giving any person the right to unilaterally terminate or suspend performance under any LIBOR Contract, (iii) constituting a breach of any LIBOR Contract, or (iv) voiding or nullifying any LIBOR Contract.

(c) No person shall be subject to any claim or cause of action in law or equity or request for equitable relief, or have liability for damages, arising solely out of the selection or use of a Board-Selected Benchmark Replacement or the determination, implementation, or performance of Benchmark Replacement Conforming Changes, in each case by operation of section 4; provided, however, that any person (including a Calculating Person) shall remain subject to any existing legal, regulatory, or contractual obligations to correct servicing or other ministerial errors under or in respect of a LIBOR Contract.

(d) The selection or use of a Board-Selected Benchmark Replacement or the determination, implementation, or performance of Benchmark Replacement Conforming Changes, in each case by operation of section 4, shall not be deemed to—

(1) be an amendment or modification of any LIBOR Contract; or

(2) prejudice, impair, or affect any person's rights, interests, or obligations under or in respect of any LIBOR Contract.

(e) Except as provided in either subsections (a), (b), or (c) of section 4, the provisions of this Act shall not be interpreted as creating any negative inference or negative presumption regarding the validity or enforceability of—

(1) any Benchmark Replacement (including any method for calculating, determining, or implementing an adjustment to the Benchmark Replacement to ac-

count for any historical differences between LIBOR and the Benchmark Replacement) that is not a Board-Selected Benchmark Replacement; or

(2) any changes, alterations, or modifications to or in respect of a LIBOR Contract that are not Benchmark Replacement Conforming Changes.

**SEC. 6. PREEMPTION.**

(a) This Act and the regulations hereunder shall supersede any and all laws, statutes, rules, regulations, or standards of any State, the District of Columbia, or any territory or possession of the United States, insofar as they provide for the selection or use of a Benchmark Replacement or related conforming changes.

(b) No provision of State or local law that expressly limits the manner of calculating interest, including the compounding of interest, shall apply to the selection or use of a Board-Selected Benchmark Replacement or Benchmark Replacement Conforming Changes.

**SEC. 7. TRUST INDENTURE ACT OF 1939.**

Section 316 of the Trust Indenture Act of 1939 (15 U.S.C. 77ppp) is amended—

(1) by striking "and" after "of subsection (a)," in subsection (b); and

(2) by inserting ", and except that the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security shall not be deemed to be impaired or affected by any change occurring by the application of section 4 of the Adjustable Interest Rate (LIBOR) Act of 2021 to any indenture security" after "subject to such lien" in subsection (b).

**SEC. 8. RULEMAKING.**

Not later than 180 days after the date of enactment of this Act, the Board shall issue such regulations as may be necessary or appropriate to enable it to administer and carry out the purposes of this Act.

**SEC. 9. INTERBANK OFFERED RATE TRANSITION RULE OF CONSTRUCTION.**

None of—

(1) the selection or use of a Board-Selected Benchmark Replacement as a Benchmark Replacement,

(2) the determination, implementation, or performance of Benchmark Replacement Conforming Changes; or

(3) the application to any LIBOR Contract of, or the agreement by parties thereto to terms consistent with, section 4,

shall be treated as a transfer, disposition, or conversion of property.

## PURPOSE AND SUMMARY

On July 22, 2021, Representative Brad Sherman introduced H.R. 4616, the Adjustable Interest Rate (LIBOR) Act of 2021, which would establish a process for certain financial contracts that reference the London Interbank Offered Rate (LIBOR) and do not contain sufficient language that would allow them to continue to function as originally intended after LIBOR is discontinued, to instead reference Secured Overnight Financing Rate (SOFR), or an appropriately adjusted form of SOFR without the need to be amended or subject to litigation. The bill directs the Federal Reserve Board to issue regulations regarding the appropriate SOFR or adjusted SOFR replacement reference interest rate that should be used for specific categories of LIBOR-based contracts that fall within the scope of the legislation.

## BACKGROUND AND NEED FOR LEGISLATION

The London Interbank Offered Rate (*LIBOR*) is a daily reported reference rate at which large banks indicate that they can borrow short-term, wholesale funds from one another on an unsecured basis.[1] In order to calculate LIBOR, a "self-selected, self-policing committee of the world's largest banks" self-report their daily estimated borrowing costs to the Financial Conduct Authority (FCA),

---

[1] Federal Reserve Bank of New York, *LIBOR: Origins, Economics, Crisis, Scandal, and Reform,* (Mar. 2014).

6

the U.K. financial regulator.[2] As of the 4th quarter of 2020, it is estimated that there are $223 trillion in outstanding exposures to U.S. Dollar (USD) LIBOR.[3]

LIBOR's self-reporting structure created opportunities for individuals or institutions to manipulate or falsify data. In the wake of the 2008 financial crisis, upon discovering a widespread culture of LIBOR manipulation built around industry relationships,[4] U.S. and U.K. regulators settled with various banking institutions, including some of the world's largest banks such as Barclays, JPMorgan Chase, Citigroup, and UBS, over allegations that these institutions manipulated LIBOR[5] by pressuring their colleagues to report artificially low or high interest rates in order to manufacture trading opportunities.[6]

Though its decision was not explicitly linked to the numerous LIBOR rigging scandals, the FCA announced in 2017 that it would no longer compel banks to report LIBOR after December 31, 2021, and would discontinue its publication.[7] However, in response to the global COVID–19 pandemic, the ICE Benchmark Administration (IBA) announced that it would not cease publication of the overnight and 1, 3, 6, and 12 months USD LIBOR settings until June 30, 2023.[8]

There are currently an estimated $16 trillion in outstanding loans, securities, and other financial instruments which reference USD LIBOR and, without intervention, will not be able to function as originally intended after LIBOR is discontinued.[9] These instruments are referred to as "tough legacy" LIBOR. It is widely understood that, without federal action, the discontinuation of LIBOR will result in widespread litigation stemming from the absence of fallback language or other contractual provisions. On October 20, 2021, the Board of Governors of the Federal Reserve System (Federal Reserve), Consumer Financial Protection Bureau (CFPB), Federal Deposit Insurance Corporation (FDIC), National Credit Union Administration (NCUA) and the Office of the Comptroller of the Currency (OCC), in conjunction with state bank and credit union regulators, issued a joint statement underscoring the importance of continued progress in transitioning away from LIBOR. The statement warned that "failure to adequately prepare for LIBOR's discontinuance could undermine financial stability and institutions' safety and soundness and create litigation, operational, and consumer protection risks."[10]

In annual reports going back to 2012, the Financial Stability Oversight Council (FSOC) has repeatedly identified the manipulation and inherent weaknesses of LIBOR as undermining market integrity, and has increasingly warned about the market's transition

---

[2] The Guardian, *LIBOR Scandal: The Bankers Who Fixed the World's Most Important Number,* (Jan. 2017).
[3] Federal Reserve Bank of New York, Alternative Reference Rates Committee, *Progress Report: The Transition from U.S. Dollar LIBOR,* (Mar. 31, 2021).
[4] The New York Times, *Deutsche Bank to Pay $2.5 Billion Fine to Settle Rate-Rigging Case,* (Apr. 23, 2015).
[5] The New York Times, *Tracking the LIBOR Scandal,* (Mar. 23, 2016).
[6] Council on Foreign Relations, *Understanding the LIBOR Scandal,* (Oct. 12, 2016).
[7] Lexology, *The end of LIBOR—what does that mean for international banks,* (Dec. 12, 2019).
[8] Bloomberg, *LIBOR enters 'final chapter' as global regulators set end dates,* (Mar. 11, 2021).
[9] Testimony of Michael R. Bright, CEO, Structured Finance Association, U.S. Senate Committee on Banking, Housing, and Urban Affairs, (Nov. 2, 2021).
[10] Federal Reserve, CFPB, FDIC, NCUA, OCC, and State Bank and Credit Union Regulators, *Joint Statement on Managing the LIBOR Transition,* (Oct. 20, 2021).

7

away from LIBOR as a source of systemic risk.[11] In 2019, FSOC identified the "cessation of degradation of LIBOR" as having the potential to "significantly disrupt" financial markets.[12] FSOC also expressed concerns that if market participants fail to "adequately adapt" to an alternative reference rate, there may be a risk to the liquidity and the stability of the markets.[13] These are concerns FSOC reaffirmed in its 2020 annual report.[14] The SEC has similarly warned that LIBOR's discontinuation may pose significant risks to the markets.[15] Treasury Secretary Janet Yellen and Chair of the Federal Reserve Jay Powell have endorsed federal legislation as the best solution to address the LIBOR transition for "tough legacy" contracts when they appeared before Congress.[16] Federal Reserve Chair Powell has also said previously that the secession of LIBOR, without legislation that clearly provides an alternative benchmark interest rate, presents a "big financial stability risk."[17] Former Treasury Secretary Steven Mnuchin also suggested that legislation may be necessary to address contracts that reference LIBOR and lack appropriate fallback language.[18]

Following enactment of federal legislation, additional time-consuming steps are still required to ensure the payments can be billed and made on time following the cessation of LIBOR. First, certain components of the law require rulemaking which, even on the expedited basis provided for in the legislation, will take six months. Moreover, following the completion of the rulemaking, paying agents, lenders, servicers and other service providers need significant time to operationalize the law and rulemaking, accurately calculate payments and communicate to borrowers and investors that ensure successful migration across the countless number of parties involved. These essential operational steps are estimated to take 9 to 12 months, given the extensive number of contracts and parties involved. Lastly, financial markets will look to have all this settled sufficiently ahead of LIBOR's termination to avoid market disruptions in trading, liquidity, and valuations.

In the absence of legislative direction, many trustees and other third parties responsible for calculating, billing, and making LIBOR-based payments have already notified the borrowers and investors of those contracts that they will need to seek court direction on how those payments should be calculated without LIBOR. These judicial proceedings can take 12–18 months; and those proceedings must be completed prior to the June 2023 cessation to ensure the correct payments can be billed and made on time. The magnitude of potential litigation costs will place a considerable and unnecessary strain on our nation's courts and businesses already significantly impacted by the global pandemic; and the uncertain court outcomes can undermine financial stability, and risk reducing liquidity and value of financial contracts including fixed income bonds held by pension plans and savings accounts.

---

[11] FSOC, *Annual Reports* (accessed Dec. 7, 2021).
[12] FSOC, *2019 Annual Report* (Dec. 4, 2019).
[13] *Id.*
[14] FSOC, *2020 Annual Report* (Dec. 3, 2020).
[15] SEC, *Staff Statement on LIBOR Transition,* (Jul. 12, 2019).
[16] American Banker, *Calls intensify for Congress to intervene on LIBOR,* (Mar. 26, 2021).
[17] Risk.net, *Fed's Powell: LIBOR Death is 'Big Stability Risk',* (Nov. 8, 2017).
[18] American Banker, *Congress may need to step in on LIBOR switch, Mnuchin Warns,* (Dec. 5, 2019).

8

*Scope*

This bill is designed to affect only those instruments, which, according to their terms, would require a calculation based on LIBOR after it is no longer published. Accordingly, it does not affect those financial instruments that will expire before the relevant tenor of LIBOR ceases to be published. Nor is this bill intended to apply to those instruments and contracts that clearly specify the rights of the parties and the calculations to be made in the event that the relevant LIBOR rate is no longer published, as where an instrument specifies a backup rate. This bill is designed to supersede all state, local, tribal, and territorial law.

*Taxation*

Nothing in this bill is designed to affect the revenue laws of the United States. Earlier versions of this bill included provisions stating that the application of the bill and the adjustment of a benchmark interest rate pursuant to this bill did not constitute a "sale or exchange," nor did it constitute "a transfer, disposition, or conversion of property." It was determined that such provisions were unnecessary since it under existing tax law the application of this bill would not constitute a sale or exchange or disposition of any asset. Furthermore, the inclusion of any provision simply restating existing tax law would unnecessarily delay this bill.

*Act does not prescribe what interest rates should be used in the future*

The sole purpose of this legislation is to provide a benchmark interest rate for those instruments which currently use U.S. Dollar LIBOR for those periods of time after LIBOR is no longer reported. Nothing in this bill is designed to encourage the future use of any particular benchmark interest rate, such as SOFR, or to preference SOFR or any other benchmark interest rate. Accordingly, no federal agency engaged in the regulation of depository or financial institutions shall, as a result of this Act, mandate, encourage, require or give preference to the use of SOFR or any other benchmark interest rate for use in any contract or instrument created after the enactment of the bill.

SECTION-BY-SECTION ANALYSIS

*Section 1. Short title*

This section establishes the short title of the bill as the "Adjustable Interest Rate (LIBOR) Act of 2021"

*Section 2. Findings & purpose*

This section details the reach of LIBOR, the significant number of existing contracts that do not provide for a replacement benchmark when LIBOR is discontinued, the potential of pending litigation for these contracts, and the need to establish a process to replace LIBOR, to limit disruption, preclude litigation, and to permit existing contracts to use an alternative replacement benchmark.

*Section 3. Definitions*

This section provides various definitions.

9

*Section 4. LIBOR contracts*

This section establishes that on the LIBOR replacement date, the Board of Governors of the Federal Reserve System (BOG–FRS) selected Benchmark Replacement will replace LIBOR for contracts that do not provide a clearly defined replacement rate, that any insufficient Fallback Provision in a LIBOR Contract will be null and void, a Determining Person may select the BOG–FRS Replacement Benchmark, that this selection is irrevocable, but if a selection is not made, the Benchmark Replacement shall replace LIBOR. If the Benchmark Replacement does replace LIBOR, the Benchmark Replacement will become part of the LIBOR contract. Nonetheless, this section does not alter or impair a LIBOR Contract that specifies a clearly defined and available replacement rate.

*Section 5. Continuity of contract and safe harbor*

This section clarifies that a BOG–FRS Benchmark Replacement for LIBOR is a commercially reasonable replacement, reasonable and comparable to LIBOR, and is substantial performance for a person benefitting or burdened by a LIBOR Contract. The replacement of LIBOR does not impair or affect a person's right to receive payment, discharge performance, unilaterally terminate, constitute a breach of contract, or void the LIBOR contract, and the use of BOG–FRA Benchmark Replacement will not amend or modify the LIBOR Contract. And, nothing in this section creates a negative inference for a non-BOG–FRS selected Benchmark Replacement.

*Section 6. Preemption*

This section permits the bill to preempt all federal and state laws, rules, and regulations for the selection of a benchmark replacement or how interest is calculated.

*Section 7. Trust Indenture Act of 1939*

This section amends section 316 of the Trust Indenture Act of 1939 by ensuring that the right of any bond holder of an indenture security to receive payment of principal or interest will not be impaired by LIBOR replacement.

*Section 8. Rulemaking*

This section requires the BOG–FRS to issue regulations to administer and carry out this Act.

*Section 9. Interbank offered rate transition rule of construction*

This section affirms that the selection or use of a BOG–FRS Benchmark Replacement and the implementation of conforming changes does not constitute a transfer, disposition, or conversion of property.

HEARINGS

For the purposes of section 3(c)(6) of House Rule XIII, the Committee on Financial Services' Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets on April 15, 2021 held a hearing to consider H.R. 4616 entitled, "The End of LIBOR: Transitioning to an Alternative Interest Rate Calculation for Mort-

10

gages, Student Loans, Business Borrowing and other Financial Products."

### COMMITTEE CONSIDERATION

The Committee on Financial Services met in open session on July 29, 2021, and ordered H.R. 4616 to be reported favorably to the House with an amendment in the nature of a substitute by a voice vote.

### COMMITTEE VOTES AND ROLL CALL VOTES

In compliance with clause 3(b) of rule XIII of the Rules of the House of Representatives, the Committee advises that no recorded votes occurred during consideration of H.R. 4616 and that the committee ordered H.R. 4616 to be reported favorably by a voice vote. In addition, an amendment in the nature of a substitute, offered by Mr. Sherman was agreed to by a voice vote. An amendment to the amendment in the nature of a substitute, offered by Mr. Sherman, was agreed to by a voice vote.

11

COMMITTEE CORRESPONDENCE

# Congress of the United States
## U.S. House of Representatives

RICHARD E. NEAL
MASSACHUSETTS,
CHAIRMAN

LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR, NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA
STACEY PLASKETT, VIRGIN ISLANDS

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

COMMITTEE ON WAYS AND MEANS
1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225-3625

Washington, D.C. 20515-0348

http://waysandmeans.house.gov

KEVIN BRADY
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS
LLOYD SMUCKER,
PENNSYLVANIA
KEVIN HERN, OKLAHOMA
CAROL MILLER, WEST
VIRGINIA

GARY ANDRES,
MINORITY STAFF DIRECTOR

December 7, 2021

The Honorable Maxine Waters
Chairwoman
Committee on Financial Services
2129 Rayburn House Office Building
Washington, D.C. 20515

Dear Chairwoman Waters,

In recognition of the desire to expedite consideration of H.R. 4616, the "Adjustable Interest Rate (LIBOR) Act of 2021," the Committee on Ways and Means agrees to waive formal consideration of the bill as to provisions that fall within the rule X jurisdiction of the Committee on Ways and Means.

The Committee on Ways and Means takes this action with the mutual understanding that we do not waive any jurisdiction over the subject matter contained in this or similar legislation, and the Committee will be appropriately consulted and involved as the bill or similar legislation moves forward so that we may address any remaining issues within our jurisdiction. The Committee also reserves the right to seek appointment of an appropriate number of conferees to any House-Senate conference involving this or similar legislation.

Finally, I would appreciate your response to this letter confirming this understanding and would ask that a copy of our exchange of letter on this matter be included in the *Congressional Record* during floor consideration of H.R. 4616.

Sincerely,

*/s/ Richard E. Neal*

Richard E. Neal
Chairman

cc:   The Honorable Nancy Pelosi
      The Honorable Patrick McHenry
      The Honorable Kevin Brady

12

MAXINE WATERS, CA
CHAIRWOMAN

PATRICK MCHENRY, NC
RANKING MEMBER

United States House of Representatives
Committee on Financial Services
2129 Rayburn House Office Building
Washington, D.C. 20515

December 7, 2021

The Honorable Richard Neal
Chairman
House Committee on Ways and Means
1102 Longworth House Office Building
Washington, DC 20515

Dear Mister Chairman:

    I am writing to acknowledge your letter dated December 7, 2021, regarding the waiver by the Committee on Ways and Means of any jurisdictional claims over the matters contained in H.R. 4616, the "Adjustable Interest Rate (LIBOR) Act of 2021." The Committee on Financial Services confirms our mutual understanding that your Committee does not waive any jurisdiction over the subject matter contained in this or similar legislation, and your Committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that we may address any remaining issues within your jurisdiction.

    The Committee on Financial Services further recognizes your interest in appointment of outside conferees from the Committee on Ways and Means should this bill or similar language be considered in a conference with the Senate.

    Pursuant to your request, I will ensure that this exchange of letters is included in the *Congressional Record* during Floor consideration of the bill. I appreciate your cooperation regarding this legislation and look forward to continuing to work with you as this measure moves through the legislative process.

Sincerely,

*Maxine Waters*

MAXINE WATERS
Chairwoman

Cc: The Honorable Patrick McHenry

13

MAJORITY MEMBERS

ROBERT C. "BOBBY" SCOTT, VIRGINIA,
*Chairman*

RAUL M. GRIJALVA, ARIZONA
JOE COURTNEY, CONNECTICUT
GREGORIO KILILI CAMACHO SABLAN,
  NORTHERN MARIANA ISLANDS
FREDERICA S. WILSON, FLORIDA
SUZANNE BONAMICI, OREGON
MARK TAKANO, CALIFORNIA
ALMA S. ADAMS, NORTH CAROLINA
MARK DESAULNIER, CALIFORNIA
DONALD NORCROSS, NEW JERSEY
PRAMILA JAYAPAL, WASHINGTON
JOSEPH D. MORELLE, NEW YORK
SUSAN WILD, PENNSYLVANIA
LUCY MCBATH, GEORGIA
JAHANA HAYES, CONNECTICUT
ANDY LEVIN, MICHIGAN
ILHAN OMAR, MINNESOTA
HALEY M. STEVENS, MICHIGAN
TERESA LEGER FERNÁNDEZ,
  NEW MEXICO
MONDAIRE JONES, NEW YORK
KATHY E. MANNING, NORTH CAROLINA
FRANK J. MRVAN, INDIANA
JAMAAL BOWMAN, NEW YORK
MARK POCAN, WISCONSIN
JOAQUIN CASTRO, TEXAS
MIKIE SHERRILL, NEW JERSEY
JOHN A. YARMUTH, KENTUCKY
ADRIANO ESPAILLAT, NEW YORK
KWEISI MFUME, MARYLAND



**COMMITTEE ON
EDUCATION AND LABOR**
U S HOUSE OF REPRESENTATIVES
2176 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6100

MINORITY MEMBERS

VIRGINIA FOXX, NORTH CAROLINA,
*Ranking Member*

JOE WILSON, SOUTH CAROLINA
GLENN THOMPSON, PENNSYLVANIA
TIM WALBERG, MICHIGAN
GLENN GROTHMAN, WISCONSIN
ELISE M. STEFANIK, NEW YORK
RICK W. ALLEN, GEORGIA
JIM BANKS, INDIANA
JAMES COMER, KENTUCKY
RUSS FULCHER, IDAHO
FRED KELLER, PENNSYLVANIA
GREGORY F. MURPHY, NORTH CAROLINA
MARIANNETTE MILLER-MEEKS, IOWA
BURGESS OWENS, UTAH
BOB GOOD, VIRGINIA
LISA C. MCCLAIN, MICHIGAN
DIANA HARSHBARGER, TENNESSEE
MARY E. MILLER, ILLINOIS
VICTORIA SPARTZ, INDIANA
SCOTT FITZGERALD, WISCONSIN
MADISON CAWTHORN, NORTH CAROLINA
MICHELLE STEEL, CALIFORNIA
JULIA LETLOW, LOUISIANA
VACANCY

December 7, 2021

The Honorable Maxine Waters
Chairwoman
Committee on Financial Services
2129 Rayburn House Office Building
Washington, D.C. 20515

Dear Chairwoman Waters:

I write concerning H.R. 4616, the *Adjustable Interest Rate (LIBOR) Act of 2021*. This bill was primarily referred to the Committee on Financial Services, and additionally to the Committee on Education and Labor. As a result of your having consulted with me concerning this bill generally, I agree to forgo formal consideration of the bill so the bill may proceed expeditiously to the House floor.

The Committee on Education and Labor takes this action with our mutual understanding that by forgoing formal consideration of H.R. 4616, we do not waive any jurisdiction over the subject matter contained in this or similar legislation, and we will be appropriately consulted and involved as the bill or similar legislation moves forward so we may address any remaining issues within our Rule X jurisdiction. I also request that you support my request to name members of the Committee on Education and Labor to any conference committee to consider such provisions.

Finally, I would appreciate a response confirming this understanding and ask that a copy of our exchange of letters on this matter be included in the Committee Report filed by the Committee on Financial Services and in the *Congressional Record* during floor consideration of H.R. 4616.

Very truly yours,

Robert C. "Bobby" Scott
Chairman

14

cc: The Honorable Patrick McHenry, Ranking Member, Committee on Financial Services
    The Honorable Virginia Foxx, Ranking Member, Committee on Education and Labor
    The Honorable Nancy Pelosi, Speaker
    The Honorable Steny Hoyer, Majority Leader
    The Honorable Jason Smith, Parliamentarian

15

MAXINE WATERS, CA
CHAIRWOMAN

**United States House of Representatives**
**Committee on Financial Services**
2129 Rayburn House Office Building
Washington, D.C. 20515

PATRICK MCHENRY, NC
RANKING MEMBER

December 7, 2021

The Honorable Bobby Scott
Chairman
House Committee on Education and Labor
2176 Rayburn House Office Building
Washington, DC 20515

Dear Mister Chairman:

    I am writing to acknowledge your letter dated December 7, 2021, regarding the waiver by the Committee on Education and Labor of any jurisdictional claims over the matters contained in H.R. 4616, the "Adjustable Interest Rate (LIBOR) Act of 2021." The Committee on Financial Services confirms our mutual understanding that your Committee does not waive any jurisdiction over the subject matter contained in this or similar legislation, and your Committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that we may address any remaining issues within your jurisdiction.

    The Committee on Financial Services further recognizes your interest in appointment of outside conferees from the Committee on Education and Labor should this bill or similar language be considered in a conference with the Senate.

    Pursuant to your request, I will ensure that this exchange of letters is included in the *Congressional Record* during Floor consideration of the bill. I appreciate your cooperation regarding this legislation and look forward to continuing to work with you as this measure moves through the legislative process.

                                       Sincerely,

                                       MAXINE WATERS
                                       Chairwoman

Cc: The Honorable Patrick McHenry

16

### STATEMENT OF OVERSIGHT FINDINGS AND RECOMMENDATIONS OF THE COMMITTEE

In compliance with clause 3(c)(1) of rule XIII and clause 2(b)(1) of rule X of the Rules of the House of Representatives, the Committee's oversight findings and recommendations are reflected in the descriptive portions of this report.

### STATEMENT OF PERFORMANCE GOALS AND OBJECTIVES

Pursuant to clause (3)(c) of rule XIII of the Rules of the House of Representatives, the goals of H.R. 4616 would be to establish a process for certain financial contracts that reference LIBOR and do not contain sufficient language that would allow them to continue to function as originally intended after LIBOR is discontinued on December 31, 2021 while the Overnight and 1-, 3-, 6- and 12-Month USD LIBOR publication will cease on June 30, 2023, to instead reference SOFR or an appropriately adjusted form of SOFR without the need to be amended or subject to litigation. The bill directs the Federal Reserve Board to issue regulations regarding the appropriate SOFR or adjusted SOFR replacement reference interest rate that should be used for specific categories of LIBOR-based contracts that fall within the scope of the legislation.

### NEW BUDGET AUTHORITY AND CBO COST ESTIMATE

Pursuant to clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the *Congressional Budget Act of 1974*, and pursuant to clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 402 of the *Congressional Budget Act of 1974*, the Committee has requested but not yet received an estimate from the Director of the Congressional Budget Office.

### COMMITTEE COST ESTIMATE

Clause 3(d)(1) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison of the costs that would be incurred in carrying out H.R. 4616. After careful review, including consultation with the Congressional Budget Office, the Committee estimates that H.R. 4616 would not have a significant impact on spending.

### UNFUNDED MANDATE STATEMENT

Pursuant to Section 423 of the *Congressional Budget and Impoundment Control Act* (as amended by Section 101(a)(2) of the *Unfunded Mandates Reform Act,* Pub. L. 104–4), the Committee does not believe H.R. 4616 contains any unfunded mandates and adopts as its own any future estimate of federal mandates regarding H.R. 4616 as amended, as prepared by the Director of the Congressional Budget Office.

### ADVISORY COMMITTEE

No advisory committees within the meaning of section 5(b) of the Federal Advisory Committee Act were created by this legislation.

17

APPLICATION OF LAW TO THE LEGISLATIVE BRANCH

Pursuant to section 102(b)(3) of the *Congressional Accountability Act*, Pub. L. No. 104–1, H.R. 4616, as amended, does not apply to terms and conditions of employment or to access to public services or accommodations within the legislative branch.

EARMARK STATEMENT

In accordance with clause 9 of rule XXI of the Rules of the House of Representatives, H.R. 4616 does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as described in clauses 9(e), 9(f), and 9(g) of rule XXI.

DUPLICATION OF FEDERAL PROGRAMS

Pursuant to clause 3(c)(5) of rule XIII of the Rules of the House of Representatives, the Committee states that no provision of H.R. 4616 establishes or reauthorizes a program of the Federal Government known to be duplicative of another federal program, a program that was included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139, or a program related to a program identified in the most recent Catalog of Federal Domestic Assistance.

CHANGES TO EXISTING LAW

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, H.R. 4616, as reported, are shown as follows:

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, and existing law in which no change is proposed is shown in roman):

**TRUST INDENTURE ACT OF 1939**

\*       \*       \*       \*       \*       \*       \*

TITLE III—SHORT TITLE

\*       \*       \*       \*       \*       \*       \*

DIRECTIONS AND WAIVERS BY BONDHOLDERS; PROHIBITION OF IMPAIRMENT OF HOLDER'S RIGHT TO PAYMENT

SEC. 316. (a) The indenture to be qualified—
  (1) shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding (A) to direct the time, method, and place of conducting any proceeding for any remedy available to such

18

trustee, or exercising any trust or power conferred upon such trustee, under such indenture, or (B) on behalf of the holders of all such indenture securities, to consent to the waiver of any past default and its consequences; or

(2) may contain provisions authorizing the holders of not less than 75 per centum in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding to consent on behalf of the holders of all such indenture securities to the postponement of any interest payment for a period not exceeding three years from its due date.

For the purposes of this subsection and paragraph (3) of subsection (d) of section 315, in determining whether the holders of the required principal amount of indenture securities have concurred in any such direction or consent, indenture securities owned by any obligor upon the indenture securities, or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such obligor, shall be disregarded, except that for the purposes of determining whether the indenture trustee shall be protected in relying on any such direction or consent, only indenture securities which such trustee knows are so owned shall be so disregarded.

(b) Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a), 【and】 except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien, *and except that the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security shall not be deemed to be impaired or affected by any change occurring by the application of section 4 of the Adjustable Interest Rate (LIBOR) Act of 2021 to any indenture security*.

(c) The obligor upon any indenture qualified under this title may set a record date for purposes of determining the identity of indenture security holders entitled to vote or consent to any action by vote or consent authorized or permitted by subsection (a) of this section. Unless the indenture provides otherwise, such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of holders furnished to the trustee pursuant to section 312 of this title prior to such solicitation.

\* \* \* \* \* \* \*

○