Nicole Lavallee (SBN 165755)
Email: nlavallee@bermantabacco.com
Daniel E. Barenbaum (SBN 209261)
Email: dbarenbaum@bermantabacco.com
Sean Micah Akchin (SBN 361186)
Email: sakchin@bermantabacco.com
**BERMAN TABACCO**
101 Montgomery Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Catherine Pratsinakis (admitted *pro hac vice*)
Email: cpratsinakis@dilworthlaw.com
Mariah Heinzerling (admitted *pro hac vice*)
Email: mheinzerling@dilworthlaw.com
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7013

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PENNYMAC MORTGAGE INVESTMENT TRUST and PNMAC CAPITAL MANAGEMENT, LLC,<br><br>Defendants | No. 2:24-cv-05028-MWF-AYP<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Roberto Verthelyi ("Plaintiff"), by and through his undersigned attorneys, brings this class action on behalf of himself individually and all others similarly situated, against Defendants PennyMac Mortgage Investment Trust ("PMIT") and PNMAC Capital Management, LLC ("PCM," and together, "PennyMac," the "Company," or "Defendants").

Plaintiff brings claims for violations of both the unlawful and unfair prongs of California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.* ("UCL"), breach of contract, and breach of the implied covenant of good faith and fair dealing. The allegations below are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, (i) a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by PennyMac; (ii) a review and analysis of testimony by regulators and industry members before the Senate and House of Representatives; (iii) floor statements by Senators and Congresspeople regarding the cessation of the London Interbank Offered Rate ("LIBOR") and the Adjustable Interest Rate (LIBOR) Act (the "LIBOR Act"), 12 U.S.C. § 5801 *et seq.*; (iv) the Company's press releases and other public statements; and (v) a review and analysis of reports, including media reports, about the Company.

## I. <u>SUMMARY OF THE ACTION</u>

1. This is a class action brought against PennyMac on behalf of all persons and entities who own or owned shares of PennyMac's Fixed-to-Floating Rate Series A Preferred Shares (NYSE: PMT-PA) and/or Series B (NYSE: PMT-PB) Preferred Shares (together, "Preferred Shares" or "Series A and B," respectively) from August 25, 2023, through the conclusion of this action (the "Class").

2. Commencing in 2017, PennyMac sold Series A and B "Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares" pegged to LIBOR, a key benchmark used to calculate interest rates on trillions of dollars of financial products sold in the United States.[1]

3. PennyMac's payment obligations are set forth in Section 4(a) of the Series A and B Articles Supplementary ("Articles"), which provides for two distinct payment periods: (a) the "Fixed Rate Period" and (b) the "Floating Rate Period."

(a) During the "Fixed Rate Period," Section 4(a) entitles holders of Series A shares to receive a fixed-rate dividend of 8.125% per annum through March 15, 2024; and Series B shares to receive a fixed-rate dividend of 8.00% per annum through June 15, 2024, based on the $25.00 per share liquidation preference.

(b) During the "Floating Rate Period" that followed, holders were and are entitled to dividends "at a floating rate equal to Three-Month LIBOR (as defined below) . . . plus a spread" of 5.831% (Series A) or 5.99% (Series B) per annum.

4. Section 4(g) of each Articles Supplementary guides the definition of "Three-Month LIBOR"—either the published LIBOR rate on the Dividend Determination Date or, if LIBOR is unavailable, a series of fallbacks.

5. The Articles Supplementary grant PMIT the right to redeem the Preferred Shares at $25.00 per share beginning on the first day of the Floating Rate Period for each Series. Holders have no right to redeem.

---

[1] The Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares were issued on March 2, 2017. The Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares were issued on June 27, 2017.

6. In 2023, LIBOR was discontinued and the Federal Reserve Board selected the Secured Overnight Financing Rate ("SOFR") to serve as LIBOR's replacement.

7. To facilitate the transition from LIBOR to SOFR, Congress passed the LIBOR Act, which replaces LIBOR-based contracts with SOFR where the contract fails to identify a suitable "benchmark replacement" for LIBOR. The LIBOR Act is designed to do nothing more than identify the proper benchmark replacement to use in place of LIBOR.

8. The LIBOR Act mandates that LIBOR-based contracts replace LIBOR with SOFR, except where there is a "clearly defined" or "practicable" replacement rate (§ 5801) that is "not based in any way on any LIBOR value" or "a poll," § 5803.

9. On August 25, 2023, after LIBOR permanently ceased publication on June 30, 2023, but before either Series A or B reached its Floating Rate Period, PennyMac shocked investors by announcing that it would continue paying the Fixed Rate Period rate in perpetuity on each of the Preferred Shares, instead of transitioning to the floating rate that Section 4(a) requires, which is based on two components: a benchmark component and a spread component.[2]

10. PennyMac claimed that it was contractually allowed under Section 4(g) of the Articles to convert this floating rate instrument into a lower-yielding fixed rate instrument without the spread component, pointing to the last clause of the last sentence of Section 4(g), which states:

---

[2] *See* Matt Levine, *Some Floating Rates Won't Float*, Bloomberg (Sept. 11, 2023), https://www.bloomberg.com/opinion/articles/2023-09-11/some-floating-rates-won-t-float; PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares* (Aug. 25, 2023), https://pmt.pennymac.com/news-events/press-releases/news-details/2023/PennyMac-Mortgage-Investment-Trust-Announces-LIBOR-Replacement-Rate-for-its-Series-A-and-Series-B-Preferred-Shares/default.aspx.

> If fewer than three New York, New York banks selected by the Company quote rates in the manner described above, the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.

11. But, as the Ninth Circuit held in *Verthelyi v. PennyMac Mortgage Investment Trust*, 187 F.4th 1217, 1229 (9th Cir. 2026), the LIBOR Act "closes gaps in contracts; it does not rewrite otherwise valid contracts." PennyMac's attempt to use the LIBOR Act to erroneously create a fixed-rate instrument undermines PennyMac's express contractual obligation to pay a floating rate based on two components: a component tied to a benchmark plus a supplemental spread component. That the Ninth Circuit held that the LIBOR Act *could* allow fixed rates to serve as a benchmark replacement does not mean this Court *should* allow it here where it undermines PennyMac's express obligation to pay a floating rate based on a benchmark component and a supplemental component. The LIBOR Act does not operate in a bubble; it is necessarily tied to the language in the contracts it seeks to reform.

12. PennyMac's application of Section 4(g) was improper under the LIBOR Act for four reasons: (1) striking the portions of Section 4(g) in accordance with Section 5803(b)(1) of the LIBOR Act renders the remaining fallback provision incoherent to the point that it is neither clear nor practicable in accordance with Section 5801(b)(1); (2) because each fallback provision is conditional on the preceding provision, striking any portion of Section 4(g) causes the waterfall to fail; (3) the entirety of Section 4(g) is based on LIBOR and therefore must be disregarded in accordance with Section 5803(b)(1) of the LIBOR Act; and (4) reading the final

clause to impose a fixed rate in perpetuity is not practicable because it conflicts with Section 4(a)'s requirement that PennyMac pay a floating rate.

13. Section 4(a) requires that dividends during the Floating Rate Period be paid "at a floating rate," and the Preferred Shares are, by name, "Fixed-to-Floating Rate" shares. Section 4(g) defines only Three-Month LIBOR, the benchmark on which that floating rate is built. Reading its final clause to fix the dividend in perpetuity turns the Floating Rate Period into a permanent extension of the Fixed Rate Period. Because Section 4(g) supplies no workable replacement for LIBOR, the LIBOR Act substitutes SOFR, and PennyMac owes a SOFR-based floating rate plus the spread, resetting each quarter: 11.18884% for the Series A Preferred Shares as of March 15, 2024, and 11.34784% for the Series B Preferred Shares as of June 15, 2024.

14. Moreover, even if Section 4(g) allowed PennyMac to substitute a fixed rate for Three-Month LIBOR, and even assuming PennyMac's interpretation of the final clause of Section 4(g) is "clear" or "practicable" and survives § 5803(b)(1), PennyMac is *still* underpaying its preferred stockholders because Section 4(a) requires that during the Floating Rate Period, the dividend rate consist of two components: the benchmark component and the spread component.

15. At most, Section 4(g) supplies the first component of the two-part calculation for determining the floating rate dividend: Three-Month LIBOR *plus* a spread. When PennyMac applied the fallback provision to define Three-Month LIBOR, it ignored its obligation to include the required spread. Even if the initial fixed rate replaces Three-Month LIBOR, as PennyMac contends, the dividend owed is no less than 13.956% for Series A (8.125% plus 5.831%) and 13.99% for Series B (8.00% plus 5.99%). PennyMac replaced the first component and never paid the second.

16. Since the Floating Rate Period began, PennyMac has underpaid every quarterly dividend: under the LIBOR Act and Section 4(a), by more than 25% as of the first Floating Rate Period dividend; and, even if the initial fixed rate replaces Three-Month LIBOR, as PennyMac contends, by more than 40%. It will continue to do so for as long as the Preferred Shares remain outstanding.

17. PennyMac is not only paying less; it has also removed its incentive to redeem the Preferred Shares once the Fixed Rate Period ended. At the Fixed Rate Period rate, the Preferred Shares are inexpensive capital for PMIT, and they trade below $25.00 because their dividend is below what the market requires. PMIT has no reason to pay $25.00 per share to redeem them. Meanwhile, holders, who cannot affirmatively redeem or otherwise force redemption, can exit only by selling at a market discount.

18. Plaintiff asserts four claims[3]:

(a) Count One alleges that PennyMac's conduct was and continues to be "unlawful" under the UCL because it violates the LIBOR Act and its implementing regulation, 12 C.F.R. pt. 253 (the "LIBOR Rule"). The terms of the Articles Supplementary have no clear or practicable benchmark replacement under § 5801.

(b) Count Two alleges that PennyMac's conduct was and continues to be "unfair" under the UCL for two distinct reasons. First, Count Two alleges that it is unfair because investors were deprived of their promise of a fixed-to-floating rate. Second, independent of the LIBOR Act, Count Two alleges that PennyMac's conduct is unfair because PennyMac denied the Preferred Shareholders the

[3] Plaintiff's Count Five under the UCL is asserted to preserve any arguments Plaintiff may have on appeal after a final judgment.

agreed-to spread component. For both reasons, allowing PennyMac, an industry outlier, to undermine its contractual obligation harms the market for preferred stock.

(c) Count Three alleges that PMIT breached the express terms of the contract (Section 4(a) of the Articles Supplementary) for two reasons. First, Section 4(a) requires that PMIT pay a "floating rate." Second, to the extent that the Floating Rate may be based on a permanently fixed rate benchmark component by Section 4(g), PMIT's failure to pay the spread component during the Floating Rate Period breached its obligations under Section 4(a).

(d) Count Four alleges that PMIT breached the implied covenant of good faith and fair dealing by using the discontinuation of LIBOR as an excuse to deprive the holders of a dividend rate based on the combination of a benchmark component and a spread component, despite no language indicating such application.

Defendants' misconduct is actionable under each of these distinct legal claims and Counts Two, Three, and Four are untethered from the LIBOR Act. On those theories, PennyMac's conduct is unfair, breaches the express terms of the Articles Supplementary, and breaches the implied covenant of good faith and fair dealing regardless of any gap-filling provisions required by the LIBOR Act.

19. Finally, Plaintiff seeks injunctive relief and restitution under the UCL, which embodies California's fundamental policy of providing private parties with injunctive relief and restitution as redress for unlawful and unfair business practices committed in California. Defendants' principal places of business are in Westlake Village, California. Business decisions are made there, including the decision to pay a Fixed Rate Period rate during the Floating Rate Period that was announced from Westlake Village, California, on August 25, 2023.

20. California has a material interest in applying the UCL to enjoin Defendants' conduct, require restitution, and prevent continuing and future harm to holders of the Preferred Shares, who are retail investors.

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) of the Class Action Fairness Act ("CAFA") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the proposed Class includes more than one hundred (100) Class members, with at least one member of the proposed Class being a citizen of a different state than at least one Defendant.

22. This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly because they conduct business in and are "at home" in this district, as their principal places of business are in Westlake Village, California.

23. Venue is appropriate in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Defendants' principal places of business are within the County of Los Angeles, State of California, which is within this judicial district; (ii) Defendants are subject to personal jurisdiction in this judicial district; (iii) the injury to Plaintiff occurred within this judicial district; and (iv) many of the acts and transactions giving rise to this action occurred in this judicial district.

## III. PARTIES

24. Plaintiff Roberto Verthelyi ("Plaintiff" or "Verthelyi") is a natural person and a resident of the State of New Jersey. He holds 20 shares of PennyMac's Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares, which he has held since June 27, 2023. Verthelyi also holds 60 shares of PennyMac's Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred

Shares, which he has held since before June 30, 2023. As a result of Defendants' conduct alleged herein, Verthelyi has incurred injuries and will continue to incur additional injuries.

25. Defendant PennyMac Mortgage Investment Trust ("PMIT") is a mortgage real estate investment trust ("REIT") that invests primarily in residential mortgage loans and mortgage-related assets. It is externally managed by PNMAC Capital Management, LLC, a wholly owned subsidiary of PennyMac Financial Services, Inc. (NYSE: PFSI), and is organized and existing under the laws of Maryland, with its principal place of business at 3043 Townsgate Road, Westlake Village, California.

26. Defendant PNMAC Capital Management, LLC is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 3043 Townsgate Road, Westlake Village, California.

27. PMIT does not manage itself. PMIT states that it is "externally managed and advised by PCM pursuant to a management agreement," that "PCM is responsible for administering our business activities and day-to-day operations," and that "PCM provides us with our senior management team, including our officers and support personnel." PMIT, Annual Report (Form 10-K) at 16 (fiscal year ended Dec. 31, 2023). PMIT further states that, "[u]nder our management agreement, PCM makes all or substantially all of our investment, financing and risk management decisions, and has significant discretion as to the implementation of our operating policies and strategies." *Id.* at 37. On information and belief, PCM, through the officers it provides to PMIT, made or participated in the decision announced on August 25, 2023, and the calculation and payment of each dividend on the Preferred Shares since then, in Westlake Village, California.

# IV. FACTUAL BACKGROUND

## A. Dividend Rates Required Under the Contracts Governing the Preferred Shares

28. In 2017, PennyMac issued two series of Preferred Shares, raising over $310 million: (i) the Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares; and (ii) the Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares.

29. Each Series is governed by a corresponding "Articles Supplementary" to the Declaration of Trust of PennyMac Mortgage Investment Trust.

30. The Articles Supplementary for each Series promise holders that, after a period of approximately seven years, floating rate dividends would accrue at a rate consisting of two components: a floating component tied to a benchmark—the "Three-Month LIBOR" as defined by Section 4(g)—and a supplemental spread component.

### 1. The Series A Preferred Shares

31. The Articles Supplementary for the Series A Preferred Shares were adopted on March 2, 2017.

32. PennyMac issued 4,600,000 Series A Preferred Shares, all of which are still outstanding.

33. Series A Preferred Shares rank senior to the common shares and on parity with the Series B Preferred Shares with respect to payments of dividends or amounts upon the liquidation, dissolution, or winding up. Moreover, Series A Preferred Shares were not redeemable before March 15, 2024, except in connection with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

34. Series A Preferred Shares have no stated maturity date and are not subject to any sinking fund or mandatory redemption. On or after March 15, 2024, or within 120 days of the occurrence of a change of control, PMIT may redeem any or all of the Series A Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

35. Section 4 of the Articles Supplementary for the Series A Preferred Shares governs dividend payments.

36. Dividends on the Series A Preferred Shares are payable quarterly in arrears on the 15th day of each March, June, September, and December.

37. Section 4(a) provides the dividend rates for both the “Fixed Rate Period” and the “Floating Rate Period” and the definitions of both periods.

38. The Fixed Rate Period for the Series A Preferred Shares is defined as “from, and including, the date on which Series A Preferred Shares are first issued (the ‘Original Issuance Date’) to, but not including, March 15, 2024.”

39. During the Fixed Rate Period, holders of the Series A Preferred Shares were entitled to receive cumulative dividends on the Series A Preferred Shares at a fixed rate of 8.125% per annum based on the $25.00 per share liquidation preference.

40. The Floating Rate Period is defined as “from, and including, March 15, 2024 and thereafter.”

41. Section 4(a) prescribes the applicable floating rate. During the Floating Rate Period, holders of the Series A Preferred Shares were and are entitled to receive cumulative dividends on the Series A Preferred Shares “at a floating rate equal to Three-Month LIBOR (as defined below) as calculated on each applicable Dividend Determination Date (as defined below) plus a spread of

5.831% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference."

42. Section 4(g) of the Articles Supplementary provides the definition of "Three-Month LIBOR," which serves as the benchmark component of the two-component rate mandated under Section 4(a) during the Floating Rate Period. Section 4(g) starts by explaining that "[t]he term 'Three-Month LIBOR' shall be calculated for each Dividend Period during the Floating Rate Period and shall mean, on any Dividend Determination Date: (i) the rate (expressed as a percentage per year) for deposits in U.S. dollars having an index maturity of three months, in amounts of at least $1,000,000, as such rate appears on 'Reuters Page LIBOR01' at approximately 11:00 a.m. (London time) on the relevant Dividend Determination Date...." The definition continues by providing alternative definitions for the event that the rate is not available on Reuters Page LIBOR01. These conditional definitions for Three-Month LIBOR are commonly called "fallback provisions."

43. The Articles Supplementary for the Series A Preferred Shares contain three fallback provisions. Each fallback provision is conditional on the previous fallback being unavailable. The fallback provisions are as follows:[4]

i. If Reuters Page LIBOR01 is not providing a rate, then PennyMac will request offered quotations for three-month U.S. dollar deposits from four banks in the London interbank market that PennyMac selects. If at least two quotes are provided, then "the Three-Month LIBOR for such Dividend Period will be the arithmetic mean" of the quotes provided.

[4] *See* Art. Supp. Series A, ¶ 4(g); Art. Supp. Series B, ¶ 4(g).

ii. If the London banks do not provide enough quotes, then PennyMac will request quoted rates for three-month U.S. dollar loans from three banks in New York, New York that PennyMac selects. If at least three quotes are provided, then "the Three-Month LIBOR for such Dividend Period will be the arithmetic mean" of the quotes provided.

iii. "If fewer than three New York, New York banks selected by the Company quote rates in the manner described above, the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period."

44. Thus, Section 4(g) merely addresses the definition of the defined term, "Three-Month LIBOR." The defined term "Three-Month LIBOR" constitutes only the benchmark component of the dividend rate.

**2. The Series B Preferred Shares**

45. The Articles Supplementary for the Series B Preferred Shares were adopted on June 27, 2017.

46. PennyMac issued 7,800,000 Series B Preferred Shares, all of which are still outstanding.

47. Series B Preferred Shares rank senior to the common shares and on parity with the Series A Preferred Shares with respect to payments of dividends or amounts upon the liquidation, dissolution, or winding up. Moreover, Series B Preferred Shares were not redeemable before June 15, 2024, except in connection

with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

48. Series B Preferred Shares have no stated maturity date and are not subject to any sinking fund or mandatory redemption. On or after June 15, 2024, or within 120 days of the occurrence of a change of control, PMIT may redeem any or all of the Series B Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

49. Section 4 of the Articles Supplementary for the Series B Preferred Shares governs dividend payments.

50. Dividends on the Series B Preferred Shares are payable quarterly in arrears on the 15th day of each March, June, September, and December.

51. Section 4(a) provides the dividend rates for both the "Fixed Rate Period" and the "Floating Rate Period" and the definitions of both periods.

52. The Fixed Rate Period for the Series B Preferred Shares is defined as "from, and including, the date on which Series B Preferred Shares are first issued (the 'Original Issuance Date') to, but not including, June 15, 2024."

53. During the Fixed Rate Period, holders of the Series B Preferred Shares were entitled to receive cumulative dividends on the Series B Preferred Shares at a fixed rate of 8.00% per annum based on the $25.00 per share liquidation preference.

54. The Floating Rate Period is defined as "from, and including, June 15, 2024 and thereafter."

55. Section 4(a) prescribes the applicable floating rate. During the Floating Rate Period, holders of the Series B Preferred Shares were and are entitled to receive cumulative dividends on the Series B Preferred Shares "at a floating rate equal to Three-Month LIBOR (as defined below) as calculated on

each applicable Dividend Determination Date (as defined below) plus a spread of 5.99% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference."

56. Section 4(g) of the Articles Supplementary for the Series B Preferred Shares provides the same definition of "Three-Month LIBOR" (which serves as the benchmark component of the two-component rate mandated under Section 4(a)), including the same three fallback provisions, as the Articles Supplementary for the Series A Preferred Shares.[5]

57. Thus, Section 4(g) merely addresses the definition of the defined term, "Three-Month LIBOR." The defined term "Three-Month LIBOR" constitutes only the benchmark component of the dividend rate.

## B. The History of the LIBOR Act and LIBOR Rule

### 1. The Cessation of LIBOR and Development of SOFR

58. For decades, it was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in USD. As recently as 2020, the value of financial products referencing USD LIBOR was $223 ***trillion***.[6]

59. LIBOR was a basic rate of interest used in lending between banks on the London interbank market and served as a reference for setting the interest rate on loans and instruments such as preferred stock. However, by 2012, banks were accused by various governmental agencies of manipulating LIBOR rates.

60. In 2014, the Board of Governors of the Federal Reserve System (the "Board") and the Federal Reserve Bank of New York created the *Alternative*

---

[5] *See* Art. Supp. Series A, ¶ 4(g); Art. Supp. Series B, ¶ 4(g).

[6] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3 (Dec. 2, 2022), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20221216a2.pdf.

*Reference Rates Committee* ("ARRC") to help ensure a successful transition from USD LIBOR to a more robust reference rate.

61. As part of its efforts, the ARRC developed the Secured Overnight Financing Rate ("SOFR") as an alternative to LIBOR. SOFR has been published on an overnight basis since 2018 and is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities in the overnight Treasury repurchase agreement market.

62. By late 2017, as a result of the price manipulation allegations, the LIBOR panel banks announced that they would stop publishing LIBOR at the end of 2021 to allow time for the market to move away from LIBOR (the date was later extended for LIBOR denominated in USD to June 30, 2023).

63. In 2018, the ARRC developed a set of guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR. That year, the ARRC was also reconstituted with expanded membership to, among other things, coordinate with the cash and derivatives markets on the risk that LIBOR might not exist beyond 2021. The expanded membership included public and private sector employees from, among others, the United States Department of the Treasury, the United States Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, the United States Securities and Exchange Commission, Bank of America, BlackRock, JPMorgan Chase, MetLife, and the Securities Industry and Financial Markets Association.

64. By 2019, the ARRC published guidance on suggested fallback provisions for use in the event of LIBOR's cessation to reduce market disruption. Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions that replaced LIBOR with SOFR or a SOFR equivalent; minimize ambiguity; reduce litigation and regulatory risk; ensure LIBOR fallback

language resembled language used in other classes and liabilities where feasible; ensure that fallback language was feasible, practicable, and fair; and encourage the use of fallback provisions that did not advantage any market participant to the disadvantage of another. All of the ARRC's suggested benchmark replacements for LIBOR contemplated using either SOFR with certain spread adjustments, or replacements chosen by a relevant governmental body or the International Swaps and Derivatives Association ("ISDA"). For its part, the ISDA has also published guidance encouraging the replacement of LIBOR in floating rate contracts with SOFR.[7]

65. Similar to LIBOR, SOFR publishes one-, three-, six-, and twelve-month forward-looking rates and is considered by experts to be the more accurate and secure interest rate pricing benchmark.

66. Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants. Indeed, the ARRC's findings are specifically cited by the Board of Governors of the Federal Reserve in the Board's final memorandum implementing the LIBOR Act, as well as part of the Supplementary Information published as part of the LIBOR Rule.[8]

67. In March 2021, the United Kingdom Financial Conduct Authority announced that LIBOR would cease publication and set forth a plan for transition. Banks and financial institutions stopped using USD LIBOR for new loans in the United States by January 1, 2022, and all remaining USD LIBOR rate publications were discontinued by June 30, 2023.

---

[7] *See* 12 C.F.R. pt. 253, app. A.

[8] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3, *supra* note 8; Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204, 5205 n.15 (Jan. 26, 2023).

68. Shortly thereafter, the United States Congress began working on legislation "to establish a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate." 12 U.S.C. § 5801(b)(1).

69. Key members of the ARRC such as Mark Van Der Weide (General Counsel at the Board of Governors of the Federal Reserve), Thomas Wipf (Managing Director and Vice Chairman of Morgan Stanley and Chair of the ARRC), and J. Christopher Giancarlo (the former Chair of the U.S. Commodity Futures Trading Commission) were directly involved in the drafting of the legislation and provided testimony at Senate and House hearings.

70. The ARRC members repeatedly warned that, without legislation, the cessation of LIBOR risked "effectively converting what were floating-rate instruments into fixed-rate instruments."

71. On March 15, 2022, Congress enacted the LIBOR Act. 12 U.S.C. § 5801 *et seq*.

72. Pursuant to authority granted to it under the LIBOR Act, the Federal Reserve issued the LIBOR Rule in December 2022, adopting SOFR as the default replacement for LIBOR. *See* 12 C.F.R. § 253.4(b).

**2. The LIBOR Act and LIBOR Rule**

73. The LIBOR Act was passed with the purpose of providing default gap filler language for contracts pegged to LIBOR that "do not provide for the use of a clearly defined or practicable replacement benchmark rate." 12 U.S.C. § 5801(b)(1).

74. To execute that purpose, Congress defines "LIBOR contract" as "any contract ... that by its terms, uses LIBOR as a benchmark." 12 U.S.C. § 5802(16).

75. In accordance with the LIBOR Act, on the first London banking day following June 30, 2023 (the "LIBOR replacement date"), any LIBOR contract that either "(1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person" shall be read in a manner that replaces all references to LIBOR with the default replacement chosen by the Federal Reserve (i.e., SOFR). 12 U.S.C. § 5803(a).

76. Moreover, Section 5803(b) of the LIBOR Act provides that, on the LIBOR replacement date, "any reference in the fallback provisions of a LIBOR contract to—(1) a benchmark replacement that is based in any way on any LIBOR value, except to account for the difference between LIBOR and the benchmark replacement; or (2) a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates; shall be disregarded as if not included in the fallback provisions of such LIBOR contract and shall be deemed null and void and without any force or effect." 12 U.S.C. § 5803(b).

77. The LIBOR Act and LIBOR Rule were adopted to address the exact deficiencies present in PennyMac's outdated, legacy Articles Supplementary, which have no clearly defined, practicable replacement benchmark rate or fallback procedures for replacing LIBOR in the event of its discontinuation.

### C. PennyMac Acts in Contravention of the LIBOR Act and Industry Norms

78. By 2023, banks, REITs, and financial institutions that had previously issued loans or preferred stock pegged to LIBOR began transitioning to SOFR. For example, Bank of America—which had issued similar LIBOR-based variable rate investments governed by legacy fallback provisions similar to those used by PennyMac, *i.e.*, contemplating a fixed rate replacement only if LIBOR was

temporarily unavailable and only after obtaining quotes from banks—announced a replacement of the three-month LIBOR rate with the three-month SOFR rate as adjusted pursuant to the LIBOR Act and the Federal Reserve's LIBOR Rule on comparable floating-rate preferred shares.

79. Holders of PennyMac's Series A and B Preferred Shares were entitled to the same treatment, as evidenced by market reaction to the announcement. Specifically, commencing on March 15, 2024, PennyMac should have paid Series A Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

80. Similarly, commencing on June 15, 2024, PennyMac should have paid Series B Preferred Shareholders a floating rate dividend equal to three-month SOFR as adjusted plus a spread of 5.99% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

81. On August 25, 2023, PennyMac's Preferred Shareholders learned that instead of adopting the three-month SOFR rate, PennyMac unilaterally decided to replace its floating, two-component dividend rate obligation for Series A and Series B Preferred Shares with the existing fixed rate, stating:

> In accordance with the Articles Supplementary for each of the Series ... and disregarding the Polling Provisions contained therein, the applicable dividend rate for dividend periods from and after March 15, 2024, in the case of the Series A Preferred Shares, or June 15, 2024, in the case of the Series B Preferred Shares, shall be calculated at the dividend rate in effect for the immediately preceding dividend period.[9]

[9] PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares*, *supra* note 2.

82. Contrary to PennyMac's contention, the Articles Supplementary do not permit PennyMac to convert the dividend rate during the Floating Rate Period to the initial fixed rate.

83. PennyMac sought to justify its decision by claiming that:

> The LIBOR Rule provides with respect to any reference in the terms of a security requiring a poll or inquiries for quotes or information related to USD LIBOR ("Polling Provisions") contained in so called "fallback provisions" applicable in the event USD LIBOR is not published, such Polling Provisions shall be disregarded and deemed null and void and without any force or effect.[10]

84. In doing so, PennyMac relied upon the legacy LIBOR-based fallback language in Section 4(g) that was used in similar form throughout the industry.

85. PennyMac has publicly pointed to Section 4(g) as its fallback provision. PennyMac claimed that, absent LIBOR, the already-existing fixed rate should continue to be used because that was the last dividend rate paid on the first date that PennyMac would seek to calculate a LIBOR-based floating rate.

86. Despite using a boilerplate fallback provision, PennyMac was one of only a very small minority of institutions to adopt the position that the initial fixed rate, rather than a floating rate based on SOFR or an alternative benchmark, would be used for all future dividends.

87. Moreover, PennyMac's application of the LIBOR Act and LIBOR Rule is erroneous, because the Articles Supplementary for the Series A and Series B Preferred Shares require the payment of a floating rate based on both a benchmark component and a spread component during the Floating Rate Period, and the Articles Supplementary do not contain adequate fallback provisions.

---

[10] *Id.*

88. The fallback provisions in Section 4(g) are insufficient under the LIBOR Act for four reasons: (1) striking references to LIBOR or requirements that PennyMac poll banks results in the remaining language of Section 4(g) becoming incoherent to the point that the fallback provision is neither clear nor practicable; (2) since each fallback is conditional on the prior provision, any attempt to strike the first two fallback clauses causes the entire waterfall to fail, leaving the contract without any fallback provisions; (3) since each fallback provision is conditional on the prior provision, each fallback is still based in some part on LIBOR; and (4) applying the final clause to impose a fixed rate in perpetuity is not practicable because it conflicts with Section 4(a)'s requirement that PennyMac pay a floating rate.

**D. Section 4(g) Does Not Provide for a Clearly Defined or Practicable Replacement Benchmark Rate**

89. Congress enacted the LIBOR Act to establish a uniform process for replacing LIBOR in existing contracts "the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate." 12 U.S.C. § 5801(b)(1). By contrast, only contracts that "provide for the use of a clearly defined and practicable replacement rate" are permitted "to operate according to their terms." 12 U.S.C. § 5801(b)(3).

90. Section 4(g) is not such a contract term. Once the London bank polling provision, the New York bank polling provision, and the instruction to carry forward the prior period's Three-Month LIBOR are disregarded under 12 U.S.C. § 5803(b), all that remains of Section 4(g) reads: "The term 'Three-Month LIBOR' shall be calculated for each Dividend Period during the Floating Rate Period and shall mean, on any Dividend Determination Date: if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period."

91. Section 4(g) exists to define "Three-Month LIBOR," the benchmark component of the Section 4(a) floating rate. Any attempt to read the final clause as applying to the entire two-component dividend is contradictory with the first clause: "'Three-Month LIBOR' shall be calculated for each Dividend Period …."

92. The rewritten provision also lacks a workable antecedent. The condition "if there was no such Dividend Period" originally referred to the immediately preceding Dividend Period for which Three-Month LIBOR had been set. With that language disregarded, "such Dividend Period" can refer only to the "Dividend Period during the Floating Rate Period" identified in Section 4(g)'s opening language. Read like this, the fallback provision can never operate because the Floating Rate Period is defined by date so there is always a Dividend Period during the Floating Rate Period, and therefore the condition where "there was no such Dividend Period" cannot occur.

93. The final clause of the fallback provision was never meant to operate as a permanent replacement for the use of LIBOR, and that is clear from the unclear drafting. After extracting the fallback provision's reliance on LIBOR, there is nothing practicably workable left in the waterfall.

**E. <u>PennyMac Breached Its Promises to Investors by Failing to Pay the Spread Component</u>**

94. PennyMac's announcement also violated the express language of the contract.

95. Section 4(a) requires that the dividend rate during the Floating Rate Period consist of two components: the benchmark component, which is determined based on the language of Section 4(g), and the spread component.

96. Thus, even if PennyMac properly adopted the initial fixed rate as the benchmark component, it was still obligated to add the spread component of 5.831% (Series A) or 5.99% (Series B).

97. For each Dividend Period beginning on or after March 15, 2024, PennyMac should have paid Series A Preferred Shareholders dividends at a rate equal to the initial fixed rate of 8.125% plus the spread component of 5.831% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

98. For each Dividend Period beginning on or after June 15, 2024, PennyMac should have paid Series B Preferred Shareholders dividends at a rate equal to the initial fixed rate of 8.00% plus the spread component of 5.99% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

### F. <u>PennyMac's Decision Shocked the Market and Continues to Harm Holders of the Preferred Shares</u>

99. Following PennyMac's announcement, the prices of both the Series A and Series B Preferred Shares fell precipitously, shedding $40 million in collective market capitalization. Specifically, prior to PennyMac's announcement, Series A Preferred Shares (NYSE: PMT-PA) were trading at or near $24 per share, or a 4% discount to par value ($25). After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $22 per share, a 12% discount to par.

100. Prior to PennyMac's announcement, Series B Preferred Shares (NYSE: PMT-PB) traded at or near $24.00 per share, or a 4% discount to par. After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $20 per share, or a 20% discount.

101. Had PennyMac adopted the three-month SOFR, the Series A Preferred Shareholders would have received 11.18884% on March 15, 2024—not the 8.125% fixed rate that PennyMac announced. And the Series B Preferred Shareholders would be receiving 11.34784% as of June 15, 2024—not the 8.00% that PennyMac announced.

102. Even on PennyMac's own reading of Section 4(g), with the spread component added to the initial fixed rate, the Series A Preferred Shareholders would be receiving 13.956%, and the Series B Preferred Shareholders 13.99%.

103. In addition to the loss in market value, Preferred Shareholders have earned, and will continue to earn, less than the dividends promised on their investment, in an amount to be proven at trial.

104. The Preferred Shares have no maturity date and may be redeemed only at PMIT's option, at $25.00 per share plus accumulated and unpaid dividends. Holders have no right to require redemption. Paid during the Floating Rate Period as Section 4(a) requires—roughly 14% per year—the Preferred Shares would be costly capital for PMIT, giving it reason to redeem them at $25.00 per share once the Fixed Rate Period ended. By paying the Fixed Rate Period rate, without the spread, throughout the Floating Rate Period, PennyMac has instead kept outstanding a security that costs it far less than the Articles Supplementary require. Because their dividend is below what the market requires, the Preferred Shares are worth less than their liquidation preference, trading below $25.00, and PMIT has no reason to pay $25.00 per share to redeem them. The only exit available to holders is to sell below their $25.00 liquidation preference.

**G. The Ninth Circuit Left Open the Validity of the Final Fallback Provision**

105. On August 19, 2026, the Ninth Circuit held, on interlocutory appeal, that a fixed dividend rate can qualify as a "benchmark replacement" under § 5802(3). *Verthelyi v. PennyMac Mortgage Investment Trust*, 187 F.4th 1217, 1225–27 (9th Cir. 2026).[11]

[11] Plaintiff respectfully reserves all rights and arguments regarding his prior allegations for the purposes of any future appellate proceedings.

106. The Ninth Circuit expressly left open whether, among other things, after giving any effect to § 5803(b), the final fallback "is invalid because it references 'a benchmark replacement that is based in any way on any LIBOR value,'" and whether the final fallback references a "'clearly defined or practicable replacement benchmark rate' under § 5801...." *Id.* at 1231 n.4.

## V. CLASS ACTION ALLEGATIONS

107. Plaintiff brings this action as a class action individually and on behalf of all others similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who own or owned shares of PennyMac's Series A Preferred Shares and/or Series B Preferred Shares at any time between August 25, 2023 and the conclusion of this action. Excluded from the Class are (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director, or controlling person of Defendants; (e) any entity in which any person or entity excluded from the Class has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

108. The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable. While the exact number and location of Class members are unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class located nationwide. Indeed, as of February 22, 2024, PennyMac had 4,600,000 outstanding shares of Series A Preferred Shares and 7,800,000 outstanding shares of Series B Preferred Shares.

109. Members of the Class may be identified from records maintained by PennyMac, its transfer agent, or other brokers and nominees and, as necessary, may be notified of the pendency of this action by mail, using a form of notice customarily used in class action lawsuits.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a) whether Defendants' conduct as alleged herein violated the LIBOR Act, 12 U.S.C. § 5801 *et seq.*;

(b) whether Defendants' conduct as alleged herein violated the LIBOR Rule, 12 C.F.R. pt. 253;

(c) whether Defendants' conduct as alleged herein amounts to unlawful acts or practices within the meaning of the UCL, California Business and Professions Code § 17200 *et seq.*;

(d) whether Defendants' conduct as alleged herein amounts to unfair acts or practices within the meaning of the UCL, California Business and Professions Code § 17200 *et seq.*;

(e) whether PMIT breached Section 4(a) of the Articles Supplementary by failing to pay the dividend rate it requires;

(f) whether PMIT breached the implied covenant of good faith and fair dealing by failing to honor the Floating Rate Period dividend rate of the Preferred Shares;

(g) whether Plaintiff and the putative Class members are entitled to equitable relief, including restitution and injunctive relief, as sought herein; and

(h) whether Plaintiff and the putative Class members are entitled to relief at law, including damages, as sought herein.

111. Plaintiff's claims are typical of the claims of other members of the Class, and the other members of the Class suffered economic injury and will continue to suffer economic injury as a result of Defendants' wrongful conduct in violation of state law as alleged in this Complaint.

112. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

113. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the money and/or property lost by the individual Class members as well as the future harm to them may be relatively small, the expense and burden of individual litigation make it impracticable for the Class members individually to redress those wrongs. There will be no difficulty in the management of this action as a class action.

114. Further, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

(a) The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for PennyMac;

(b) The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or that would substantially impair their ability to protect their interests; and

(c) PennyMac has acted or refused to act on grounds generally applicable to the proposed Class, thereby making final injunctive and other

equitable relief appropriate with respect to the members of the proposed Class as a whole.

## VI. CLAIMS FOR RELIEF

### COUNT ONE
**Violation of California's Unfair Competition Law (UCL)**
**Unlawful Conduct**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(Against All Defendants)**

115. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

116. Plaintiff and Defendants are each a "person" as defined by California Business and Professions Code § 17201. California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

117. "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including: (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; or (c) a "fraudulent" business act or practice. The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

118. By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful business practices as prohibited by California's UCL.

119. California Business and Professions Code § 17200 *et seq.* treats violations of other laws, when committed pursuant to a business activity, as independently actionable unlawful practices.

### A. PennyMac Violated the LIBOR Act

120. In accordance with the LIBOR Act, PennyMac was required to disregard "***as if not included***" any fallback provision that is "based ***in any way*** on ***any*** LIBOR value" or required conducting "a poll, survey, or inquiries for quotes." 12 U.S.C. § 5803(b) (emphasis added).

121. When applied to Section 4(g) of each Articles Supplementary, the LIBOR Act excises the requirement to solicit quotes from London banks, the requirement to solicit quotes from New York banks, and the requirement to use the Three-Month LIBOR as calculated for the prior period.

122. What remains of Section 4(g) is its final clause. That clause fails under the LIBOR Act for two independent reasons.[12] First, it must itself be disregarded, because it is "based in any way on any LIBOR value." 12 U.S.C. § 5803(b)(1). Second, even if it were not disregarded, it does not "provide for the use of a clearly defined or practicable replacement benchmark rate." 12 U.S.C. § 5801(b)(1).

123. First, the final clause must itself be disregarded, because it references a benchmark replacement "based in any way on any LIBOR value." 12 U.S.C. § 5803(b)(1). The final clause is not a freestanding provision. It is the second half of a single sentence, which provides that "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend

[12] *See Verthelyi v. PennyMac Mortg. Inv. Tr.*, 187 F.4th 1217, 1231 n.4 (9th Cir. 2026) ("In particular, we do not decide whether, 'after giving any effect to [§ 5803(b)],' 12 U.S.C. § 5803(a), the third fallback provision is invalid because it references 'a benchmark replacement that is based in any way on any LIBOR value.' *Id.* § 5803(b)(1). We also do not decide whether the third fallback provision references 'a clearly defined or practicable replacement benchmark rate' under § 5801....").

Period." The first half carries forward the Three-Month LIBOR value from the prior Dividend Period. The second half, the final clause, applies only "if there was no such Dividend Period," that is, only if there is no prior Dividend Period whose Three-Month LIBOR value can be carried forward. Whether the final clause applies at all therefore depends on whether a prior Three-Month LIBOR value exists. And the rate the final clause carries forward, "the dividend rate in effect for the immediately preceding Dividend Period," is, during the Floating Rate Period, a rate set by reference to Three-Month LIBOR. The final clause cannot be read or applied without reference to a LIBOR value.

124. Second, even if the final clause were not itself disregarded, it does not provide for a clearly defined or practicable replacement benchmark rate. After excising the provisions that § 5803(b) disregards, Section 4(g) would read:

> The term "Three-Month LIBOR" shall be calculated for each Dividend Period during the Floating Rate Period and shall mean, on any Dividend Determination Date: if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.

125. That language is neither clearly defined nor practicable, for three reasons.

126. First, the remaining clause does not supply a value for the term it is meant to define. The opening words of Section 4(g) call for a definition of "Three-Month LIBOR," to be "calculated for each Dividend Period during the Floating Rate Period." Any attempt to read the final clause as applying to the entire two-component dividend is contradictory with the first clause: "'Three-Month LIBOR' shall be calculated for each Dividend Period …."Second, the remaining clause also has no workable antecedent. Its condition—"if there was no such Dividend Period"—originally referred to the immediately preceding Dividend Period for which Three-Month LIBOR had been set. That language has

been disregarded. Read against what remains, "such Dividend Period" can refer only to the "Dividend Period during the Floating Rate Period" named in the opening words.

127. Third, because there is always a "Dividend Period during the Floating Rate Period," the condition "if there was no such Dividend Period" can never be met. Three-Month LIBOR must be calculated for every such Dividend Period. The Floating Rate Period is defined solely by date—on or after March 15, 2024 for the Series A Preferred Shares and on or after June 15, 2024 for the Series B Preferred Shares—and is agnostic as to the applicable rate. A clause that applies only when there is no such Dividend Period can never apply during the Floating Rate Period.

128. For each of these reasons, what remains of Section 4(g) does not "provide for the use of a clearly defined or practicable replacement benchmark rate." 12 U.S.C. § 5801(b)(1).[13] A clause that cannot be applied as written, or that can be applied only by reference to a LIBOR value that no longer exists, does not provide for a clearly defined or practicable replacement.

129. Nor is the final clause practicable given the requirement in Section 4(a) that PennyMac pay a floating rate.

130. Section 4(g) therefore contains no fallback provision that can be performed, and it identifies no "determining person." Sections 5803(a)(1) and 5803(a)(2) of the LIBOR Act apply. Therefore, PennyMac was required to adopt SOFR as the replacement for LIBOR on the first London banking day following June 30, 2023.

131. By refusing to do so, PennyMac violated the LIBOR Act and the LIBOR Rule.

[13] *See* 12 U.S.C. § 5801(b)(1); 12 C.F.R. § 253.1(c).

132. Defendants have violated the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. pt. 253, and thus, pursuant to California Business and Professions Code § 17200 *et seq.*, have engaged in a pattern of actionable "unlawful" business practices within the meaning of California's UCL.

133. As alleged herein, pursuant to the LIBOR Act and LIBOR Rule and their provisions amending existing LIBOR-based contracts, including those governing Defendants' conduct here, commencing on March 15, 2024, holders of PennyMac Series A Preferred Shares were required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on the twenty-five dollars ($25.00) per share liquidation preference. Similarly, pursuant to the LIBOR Rule, commencing on June 15, 2024, holders of PennyMac Series B Preferred Shares were required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.99% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

134. Beginning on or about August 25, 2023, Defendants committed and have been committing unlawful acts, including those described herein, by engaging in a pattern of "unlawful" business practices within the meaning of California Business and Professions Code § 17200 *et seq.*, by failing to adopt the Board-selected benchmark replacement to replace LIBOR in the Series A and Series B Preferred Shares, in violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. pt. 253.

135. When Defendants announced their intention to replace the floating rate dividend in Series A and Series B Preferred Shares in violation of the LIBOR Act and the provisions set forth under the LIBOR Rule, the price of Series A and Series B Preferred Shares dropped precipitously in the secondary market,

translating to a loss of value of $40 million in collective market capitalization and causing Plaintiff's and the putative Class's investments to lose substantial value.

136. Further, as a result of Defendants' decision to replace the floating rate dividend on Series A and Series B Preferred Shares with an already-existing fixed rate dividend in violation of the LIBOR Act and the LIBOR Rule, Preferred Shareholders have received and are expected to receive dividends at an interest rate materially lower than the SOFR three-month rate and will thus lose many millions of dollars in dividend payments on their investments.

137. Therefore, as a direct and proximate result of Defendants' prohibited unlawful business practices that took place in California, as alleged herein, Plaintiff and the putative Class have suffered injury in fact and have lost and will continue to lose substantial value and sums of money in an amount to be proven at trial.

**B. Remedies Provided for Under the UCL**

138. The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. Plaintiff and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

139. Through its unlawful acts and practices, PennyMac has improperly obtained and will continue to obtain money from Plaintiff and the Class. As such, Plaintiff requests that this Court cause PennyMac to restore this money to Plaintiff and all Class members, and to enjoin PennyMac from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Plaintiff and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

140. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees

and expenses, which are available to a prevailing Plaintiff in a class action such as this, whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

141. Plaintiff and the Class lack an adequate remedy at law for the conduct alleged in this Count. First, Plaintiff's remedies at law run only against PMIT. PCM is not a party to the Articles Supplementary, and the contract claims provide no remedy for PCM's participation in the conduct alleged in this Count. Second, this Count rests on the LIBOR Act and the LIBOR Rule. The contract claims do not require Plaintiff to prove a violation of either, and they cannot supply the benchmark replacement that the LIBOR Act and the LIBOR Rule require. Third, the dividends recur each quarter and will be underpaid for as long as the Preferred Shares remain outstanding, and damages for future Dividend Periods cannot be measured now.

**COUNT TWO**
**Violation of California's Unfair Competition Law (UCL)**
**Unfair Conduct**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(Against All Defendants)**

142. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143. Plaintiff and Defendants are each a "person" as defined by California Business and Professions Code § 17201. California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

144. "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including: (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; or (c) a "fraudulent" business act or practice. The definitions in §

17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

145. A business act or practice is "unfair" under the UCL if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, where that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

### A. Defendants' Decision to Apply a Fixed Rate in Perpetuity and Their Failure to Include the Spread Component Was Unfair

146. Defendants' conduct is unfair because investors were deprived of their promise of a fixed-to-floating rate and because allowing PennyMac, an industry outlier, to undermine its contractual obligation to pay a floating rate through misuse of the LIBOR Act, and without a spread, harms the market for preferred stock.

147. Defendants' decision to issue dividends at the initial fixed rate was unscrupulous and substantially injurious to consumers.

148. Defendants promised purchasers of the Series A and Series B Preferred Shares a fixed-to-floating dividend rate that, during the Floating Rate Period, is based on two components: (1) the benchmark component, plus (2) the spread component. That promise is reflected repeatedly throughout the Articles Supplementary for the Preferred Shares.

149. The full name of the Series A Preferred Shares according to the Articles Supplementary is "8.125% Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest."

150. The full name of the Series B Preferred Shares according to the Articles Supplementary is "8.00% Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest."

151. Section 4(a) of the Articles Supplementary for the Series A Preferred Shares promises to pay dividends "from, and including, March 15, 2024 and thereafter (the 'Floating Rate Period'), at a *floating rate*" (emphasis added).

152. Section 4(a) of the Articles Supplementary for the Series B Preferred Shares promises to pay dividends "from, and including, June 15, 2024 and thereafter (the 'Floating Rate Period'), at a *floating rate*" (emphasis added).

153. The Series A Preferred Shares were not redeemable until March 15, 2024, months after their price plummeted in the wake of Defendants' announcement not to honor the floating rate.

154. The Series B Preferred Shares were not redeemable until June 15, 2024.

155. Independent of the LIBOR Act and the floating-rate promise, Defendants were required to pay a spread on top of the benchmark component pursuant to Section 4(a) of the Articles Supplementary. They had that obligation irrespective of what rate they ultimately replaced Three-Month LIBOR with and irrespective of whether the rate they selected complied with the LIBOR Act. This alternative theory does not challenge Defendants' selection or use of a benchmark replacement.

156. Defendants replaced the first component of the floating rate dividend with a fixed rate, pursuant, they claim, to Section 4(g) of the Articles Supplementary, which defines Three-Month LIBOR. They never paid the second component, which is the spread that Section 4(a) requires.

157. The weight of Defendants' decision to pay significantly lower Floating Rate Period dividend rates falls principally on retail investors, who hold the Preferred Shares in significant part, rather than on larger financial institutions.

158. Defendants' decision not to provide the promised floating, two-component dividend was so unscrupulous that professionals within the same

industry described it as "particularly nasty, even exploitative, to investors.... [¶] I don't think they would have had the sheer chutzpah to treat institutional investors that badly."[14]

159. Defendants' decision deprives holders of the spread for every Dividend Period in the Floating Rate Period and transfers to PMIT the value holders were intended to receive after 2024.

160. PMIT's conduct removed the incentive created by the Floating Rate Period terms for PMIT to redeem the shares. If paid as Section 4(a) required, redemption of the Series A Preferred Shares would cost approximately $115 million. Redemption of the Series B Preferred Shares would cost approximately $195 million. At the Fixed Rate Period rate, PMIT has little to no reason to redeem because the dividends paid were too low to warrant expending that much capital. The risk of higher dividend rates during the Floating Rate Period is an incentive for PMIT to redeem the Preferred Shares. By locking the dividends at the rate during the Fixed Rate Period, without applying the spread component, PMIT has minimal incentive to redeem. Meanwhile, holders, who have no right to redeem, are locked in—collecting substantially less than Section 4(a) requires, with no way out except at a value significantly below the $25.00 liquidation preference.

161. As a result of Defendants' decision, purchasers of the Series A and Series B Preferred Shares have received dividend payments during the Floating Rate Period that are more than 40% less than Section 4(a) requires.

162. There is no reason, justification, or motive that outweighs the harm to Plaintiff and the Class members.

---

[14] *See* Randall W. Forsyth, *Investors in This REIT Got a 'Nasty' Surprise. Why It Pays to Read the Fine Print*, Barron's (Sept. 8, 2023), https://www.barrons.com/articles/reit-preferred-share-investors-nasty-surprise-2bd5153b.

**B. PennyMac's Conduct Offends Public Policy**

163. As alleged herein, Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. In addition to violating the LIBOR Act, policies underlying the Act, as well as its own contractual covenants, PennyMac's conduct also threatens the integrity of the preferred stock marketplace. Competitors with similar legacy contracts adopted SOFR in lieu of paying a fixed rate when their instruments transitioned from the fixed-rate period to the floating-rate period. *See supra* ¶ 78.

164. PennyMac's outlier conduct targeted retail investors and has prompted other outliers, creating unforeseen risk to participants in this marketplace.

165. The gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct. Furthermore, neither Plaintiff nor the putative Class could reasonably have avoided being injured by Defendants' conduct as alleged herein, and there were reasonably available alternatives to further Defendants' legitimate business interests other than the unfair and unlawful interference with Plaintiff's and the putative Class's ownership interests in their Preferred Shares as described herein.

**C. Remedies Provided for Under the UCL**

166. The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. Plaintiff and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

167. Through its unfair acts and practices, PennyMac has improperly obtained and will continue to obtain money from Plaintiff and the Class. As such, Plaintiff requests that this Court cause PennyMac to restore this money to Plaintiff and all Class members, and to enjoin PennyMac from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Plaintiff

and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

168. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and expenses, which are available to a prevailing Plaintiff in a class action such as this, whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

169. Plaintiff and the Class lack an adequate remedy at law for the conduct alleged in this Count. First, Plaintiff's remedies at law run only against PMIT. PCM is not a party to the Articles Supplementary, and the contract claims provide no remedy for PCM's participation in the conduct alleged in this Count. Second, this Count's first theory rests on Defendants' unfair effort to refuse to provide investors with the floating rate and spread and to use the LIBOR Act to justify this unfair conduct. The contract claims turn on the terms of the Articles Supplementary and may fail even if the conduct alleged in this Count is unfair. Third, the dividends recur each quarter and will be underpaid for as long as the Preferred Shares remain outstanding, and damages for future Dividend Periods cannot be measured now.

## COUNT THREE
**Breach of Contract (In the Alternative)**
**(Against Defendant PMIT)**

170. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

171. The operative contracts between PMIT and Plaintiff and the Class for the Preferred Shares consist of the Articles Supplementary for each series, together with PMIT's Declaration of Trust, under which the Articles Supplementary were adopted.

172. Plaintiff and Class members have performed all obligations required under the contract, including purchasing and holding the Series A and Series B Preferred Shares.

**A. <u>PMIT Breached Section 4(a) of the Articles Supplementary for the Series A Preferred Shares</u>**

173. Even on PMIT's own reading of Section 4(g), PMIT has breached its obligations to the Series A Preferred Shareholders by paying the initial 8.125% fixed dividend rate during the Floating Rate Period without the spread component of 5.831%.

174. The Articles Supplementary for both the Series A and Series B Preferred Shares use precise language to define the dividend rate during the Fixed Rate Period and the Floating Rate Period.

175. Section 4(a) of the Articles Supplementary for Series A states that, during the Fixed Rate Period, PMIT would pay dividends "at a fixed rate equal to 8.125% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference, or $2.03125 per share" and during the Floating Rate Period "at ***a floating rate equal to*** Three-Month LIBOR (as defined below) as calculated on each applicable Dividend Determination Date (as defined below) ***plus*** a spread of 5.831% per annum..." (emphasis added).

176. PMIT's interpretation of Section 4(g) undermines its obligation to pay a floating rate dividend based on both a benchmark component and a spread component.

177. Moreover, as discussed above, "Three-Month LIBOR" is a defined term within Section 4(g) of the Articles Supplementary. That definition of "Three-Month LIBOR" includes ***both*** the requirement that it be calculated as it appears on Reuters Page LIBOR01 and each of the three fallback provisions discussed above.

178. Each step in Section 4(g), including the final clause, supplies a value for that defined term. Nothing in Section 4(g) addresses, reduces, or eliminates the spread.

179. Section 4(g) requires that "[t]he term 'Three-Month LIBOR' shall be ***calculated*** for each Dividend Period...." (emphasis added).

180. When PennyMac announced its decision to apply a dividend rate of 8.125% during the Floating Rate Period, it stated that the applicable dividend rate "shall be calculated at the dividend rate in effect for the immediately preceding dividend period."

181. Thus, when PennyMac determined that the final fallback provision required using the "dividend rate in effect for the immediately preceding Dividend Period," it was required to apply that dividend rate to Section 4(a) in place of the defined term "Three-Month LIBOR."

182. Even if PennyMac correctly adopted the initial fixed rate under the fallback provisions, the adoption is limited to replacing the term "Three-Month LIBOR," not the "floating rate."

183. Therefore, with PennyMac's use of the fixed rate to replace Three-Month LIBOR, Section 4(a) of the Articles Supplementary requires that the dividend rate during the Floating Rate Period be equal to 8.125% ***plus*** a spread of 5.831%. The correct dividend rate for the Series A Preferred Shares for all Dividend Periods beginning on or after March 15, 2024, is 13.956%.

184. Therefore, holders of the Series A Preferred Shares have received dividends that have been underpaid by over forty (40) percent.

### B. PMIT Breached Section 4(a) of the Articles Supplementary for the Series B Preferred Shares

185. Even on PMIT's own reading of Section 4(g), and for the reasons alleged above as to the Series A Preferred Shares, PMIT has breached its

obligations to the Series B Preferred Shareholders by paying the initial 8.00% fixed dividend rate during the Floating Rate Period.

186. Similarly, Section 4(a) of the Articles Supplementary for the Series B Preferred Shares requires that the dividend rate for the Floating Rate Period be equal to 8.00% ***plus*** a spread of 5.99%. The correct dividend rate for the Series B Preferred Shares for all Dividend Periods beginning on or after June 15, 2024, is 13.99%.

187. Therefore, holders of Series B Preferred Shares have received dividends that have been underpaid by over forty (40) percent.

### C. PMIT's Breaches Are Independent of the LIBOR Act and Continuing

188. These breaches do not depend on the LIBOR Act. Whether the final clause of Section 4(g) is reached because the earlier steps cannot be performed or because those steps are disregarded by operation of law, the result under Section 4(a) is the same.

189. The Articles Supplementary, like every contract, contain an implied covenant of good faith and fair dealing. PMIT's conduct alleged in Count Four also breached the Articles Supplementary through that implied covenant. Plaintiff incorporates the allegations of Count Four as if fully set forth here.

190. As a result of PMIT's breach, Plaintiff and Class members have suffered damages in an amount to be proven at trial.

191. PMIT's breaches are continuing. Each quarterly dividend paid at the initial fixed rate is a further breach.

192. In addition to damages, Plaintiff and the Class are therefore entitled to a declaration of PMIT's obligations under Section 4(a) of the Articles Supplementary and to an order requiring PMIT to specifically perform those

obligations for each future Dividend Period. Damages cannot compensate for Dividend Periods that have not yet occurred.

## COUNT FOUR
## Breach of the Implied Covenant of Good Faith and Fair Dealing (In the Alternative) (Against Defendant PMIT)

193. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194. The operative contracts between PMIT and Plaintiff and the Class for the Preferred Shares consist of the Articles Supplementary for each series, together with PMIT's Declaration of Trust, under which the Articles Supplementary were adopted.

195. Plaintiff and Class members have performed all obligations required under the contract, including purchasing and holding the Series A and Series B Preferred Shares.

196. Holders bargained for a Floating Rate Period dividend equal to a floating rate consisting of a benchmark component plus a spread component, and for the value embedded in those terms. Section 4(a) entitles holders, for each Dividend Period in the Floating Rate Period, to a fixed spread of 5.831% (Series A) or 5.99% (Series B) on top of Three-Month LIBOR. Section 4(g) addresses only Three-Month LIBOR; nothing in it reaches the spread.

197. When LIBOR ceased, PMIT was obligated to perform the Articles Supplementary in good faith.

198. Because Section 4(a) requires PMIT to issue dividends during the Floating Rate Period ***at a floating rate*** based on a benchmark component and a spread component, and because Section 4(g) was not contemplated to apply in the event of LIBOR's permanent cessation, PMIT had an implied duty to adopt an alternative floating benchmark to replace LIBOR and to continue to play .

199. Thus, when PMIT relied on the LIBOR Act as an excuse to issue dividends during the Floating Rate Period at the initial fixed rate and without the inclusion of the spread component, it breached its duty of good faith and fair dealing to the Preferred Shareholders.

200. Nothing in Section 4(g) permits PMIT to eliminate the spread. PMIT nonetheless read and applied the final clause of Section 4(g) as replacing the entire Floating Rate Period dividend, rather than only Three-Month LIBOR, and thereby eliminated the spread.

201. PMIT's conduct removed the incentive created by the Floating Rate Period terms for PMIT to redeem the shares. If paid as Section 4(a) required, redemption of the Series A Preferred Shares would cost approximately $115 million. Redemption of the Series B Preferred Shares would cost approximately $195 million. At the Fixed Rate Period rate, PMIT has little to no reason to redeem because the dividends paid were too low to warrant expending that much capital. The risk of higher dividend rates during the Floating Rate Period is an incentive for PMIT to redeem the Preferred Shares. By locking the dividends at the rate during the Fixed Rate Period, without applying the spread component, PMIT has minimal incentive to redeem. Meanwhile, holders, who have no right to redeem, are locked in—collecting substantially less than Section 4(a) requires, with no way out except at a value significantly below the $25.00 liquidation preference.

202. PMIT's conduct was unreasonable, frustrated the purpose of the contract, and deprived Plaintiff and Class members of the benefit of their bargain—namely, a Floating Rate Period dividend that actually floats and includes the spread component, and the value embedded in those terms.

203. PMIT's breach of the implied covenant is independent of, and pleaded in the alternative to, its breach of Section 4(a) alleged in Count Three.

204. As a direct and proximate result of PMIT's breaches of its duty of good faith and fair dealing, Plaintiff and Class members have suffered damages, including but not limited to lost dividend income and diminution in the value of the Preferred Shares.

205. PMIT's breaches are continuing. Each quarterly dividend paid at the initial fixed rate is a further breach.

206. In addition to damages, Plaintiff and the Class are therefore entitled to a declaration of PMIT's obligations under Section 4(a) of the Articles Supplementary and to an order requiring PMIT to specifically perform those obligations for each future Dividend Period. Damages cannot compensate for Dividend Periods that have not yet occurred.

## COUNT FIVE[15]

**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(Against All Defendants)**

207. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208. Plaintiff and Defendants are each a "person" as defined by California Business and Professions Code § 17201. California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

209. "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including: (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; (c) a "fraudulent" business act or practice; and (d) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the

[15] Plaintiff pleads this Count to preserve all arguments upon appeal from entry of a final judgment.

disjunctive, meaning that each of these "wrongs" operates independently from the others.

210. By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful and/or unfair business practices as prohibited by California's UCL.

**A. "Unlawful" Prong**

211. California Business and Professions Code § 17200 et seq., treats violations of other laws, when committed pursuant to a business activity, as independently actionable unlawful practices.

212. Defendants have violated the LIBOR Act, 12 U.S.C. 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*, and thus, pursuant to California Business and Professions Code § 17200 *et seq.*, have engaged in a pattern of "unlawful" business practices within the meaning of California's UCL.

213. As alleged herein, pursuant to the LIBOR Act and LIBOR Rule and their provisions amending existing LIBOR-based contracts, including those governing Defendants' conduct here, commencing on March 15, 2024, holders of PennyMac Series A Preferred Shares were required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on a twenty-five dollars ($25.00) per share liquidation preference. Similarly, pursuant to the LIBOR Rule, commencing on June 15, 2024, holders of PennyMac Series B Preferred Shares are required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.99% per annum based on a twenty-five dollars ($25.00) per share liquidation preference.

214. Beginning on or about August 25, 2023, Defendants committed and have been committing unlawful and unfair acts, including those described herein, by engaging in a pattern of "unlawful" business practices within the meaning of

California Business and Professions Code § 17200 *et seq.*, by replacing its floating three-month LIBOR dividend rate for Series A and Series B Preferred Shares with a fixed rate, in violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq*.

215. When Defendants announced their intention to replace the floating rate dividend in Series A and Series B Preferred Shares in violation of the LIBOR Act and the provisions set forth under the LIBOR Rule, the price of Series A and Series B Preferred Shares dropped precipitously in the secondary market, translating to a loss of value of $40 million in collective market capitalization and causing Plaintiff's and the putative Class's investments to lose substantial value.

216. Further, as a result of Defendants' decision to replace the floating rate dividend on Series A and Series B Preferred Shares with an already-existing fixed rate dividend in violation of the LIBOR Act and the LIBOR Rule, Preferred Shareholders are expected to receive dividends at an interest rate materially lower than the SOFR three-month rate and will thus lose many millions of dollars in dividend payments on their investments.

217. Therefore, as a direct and proximate result of Defendants' prohibited unfair and unlawful business practices that took place in California, as alleged herein, Plaintiff and the putative Class have suffered injury in fact and have lost and will continue to lose substantial value and sums of money in an amount to be proven at trial.

**B. "Unfair" Prong**

218. Beginning as of approximately August 25, 2023, as alleged herein, Defendants also committed unfair acts as prohibited by California Business and Professions Code § 17200 *et seq.*

219. A business act or practice is "unfair" under the UCL if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers, where that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

220. As alleged herein, Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct. Furthermore, neither Plaintiff nor the putative Class could reasonably have avoided being injured by Defendants' conduct as alleged herein, and there were reasonably available alternatives to further Defendants' legitimate business interests other than the unfair and unlawful interference with Plaintiff's ownership interests in their Preferred Shares as described herein.

**C. Remedies Provided for Under the UCL**

221. The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. Plaintiff and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

222. Through its unfair and unlawful acts and practices, PennyMac has improperly obtained and will continue to obtain money from Plaintiff and the Class. As such, Plaintiff requests that this Court cause PennyMac to restore this money to Plaintiff and all Class members, and to enjoin PennyMac from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Plaintiff and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

223. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees, a reward which is available to a prevailing Plaintiff in a class action such as this,

whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

224. Absent an award for injunctive relief and restitution as alleged and requested herein, Plaintiff and the putative Class would not otherwise have an adequate remedy at law given that Defendants' unfair and unlawful conduct in violating the LIBOR Act and the LIBOR Rule is continuing and will not cease until Defendants are forced to come into compliance with the law.

225. Plaintiff reserves the right to allege further conduct that constitutes other unlawful and/or unfair business acts or practices.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as Class Counsel;

B. Declaring that Defendants must implement the applicable Board-selected benchmark replacement, SOFR, as a replacement for the Three-Month LIBOR rate set forth in the Articles Supplementary for PennyMac Series A and Series B Preferred Shares pursuant to 12 C.F.R. § 253.5 *et seq.*, and that PMIT must pay the applicable spread under Section 4(a) on top of that replacement;

C. Alternatively, declaring that Section 4(a) of each Articles Supplementary requires PMIT to pay, for each Dividend Period during the Floating Rate Period, Three-Month LIBOR as determined under Section 4(g) plus the applicable spread;

D. Ordering PMIT to specifically perform Section 4(a) of each Articles Supplementary for each future Dividend Period;

E. Granting injunctive relief as permitted by law and in equity;

F. Ordering that Defendants pay all amounts equitably owed to Plaintiff and the Class arising out of the actions complained of herein, including restitution, interest, disgorgement of any ill-gotten gains, and any other relief as allowed in equity;

G. Ordering that PMIT pay all damages at law in an amount to be proven at trial to Plaintiff and the Class arising out of the actions complained of herein, together with prejudgment and post-judgment interest, as well as any other relief as allowed at law;

H. Awarding Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

I. Awarding such other and further relief as the Court may deem just and proper.

## VIII. DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury.

DATED: November 20, 2026 **BERMAN TABACCO**

By: */s/ Daniel E. Barenbaum*
Daniel E. Barenbaum

Nicole Lavallee (SBN 165755)
Sean Micah Akchin (SBN 361186)
101 Montgomery Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com
sakchin@bermantabacco.com

Catherine Pratsinakis (admitted *pro hac vice*)
Mariah Heinzerling (admitted *pro hac vice*)
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7013
Email: cpratsinakis@dilworthlaw.com
mheinzerling@dilworthlaw.com

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*